No. 26-2684

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

SECRETARY OF STATE FOR THE COMMONWEALTH OF PENNSYLVANIA,
Defendant-Appellee

PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS, NICHOLAS MASTON, GREGORY PERRY, TODD THATCHER, JOEL DICKSON, TRISHA KENT, LIOR STERNFELD, JOHN THOMPSON, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, COMMON CAUSE, MIKE CROSSEY,
Intervenors Defendants-Appellees

NATIONAL ASS'N FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA STATE CONFERENCE OF THE NAACP, STACEY TAYLOR,
Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

# JOINT APPENDIX
(VOLUME II OF II) (pp. 10-287)

*(See inside cover for continuation of counsel)*

*(continuation of counsel)*


MICHAEL J. FISCHER
KATHLEEN A. MULLEN
AIMEE D. THOMSON
Pennsylvania Office of General Counsel
30 N 3rd Street, 17th Floor, Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
*Counsel for Secretary of the Commonwealth Al Schmidt*

TIMOTHY J. FORD
DILWORTH PAXSON
1650 Market Street, Suite 1200
Philadelphia, PA 19103
(215) 575-7017
tford@dilworthlaw.com
*Counsel for Pennsylvania Alliance for Retired Americans and Mike Crossey*

BRANDEN D. LEWISTON
UZOMA N. NKWONTA
TORI A. SHAW
JACOB D. SHELLY
Elias Law Group
250 Massachusetts Avenue, NW
Suite 400
Washington, D.C. 20001
(202) 968-4674
blewiston@elias.law
*Counsel for Pennsylvania Alliance for Retired Americans and Mike Crossey*

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
JOSHUA R. ZUCKERMAN
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
771-333-0027
Joshua.Zuckerman@usdoj.gov
*Counsel for the United States of America*


*(See next page for continuation of counsel)*

*(continuation of counsel)*

NOAH BOKAT-LINDELL
O'Melveny & Myers
1625 Eye Street, NW
Washington, D.C. 20006
(202) 383-5321
nbokat-lindell@omm.com
*Counsel for NAACP, NAACP Pennsylvania State Conference, and Stacey Taylor*

ROBERT N. WEINER
Lawyers Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600
rweiner@lawyerscommittee.org
*Counsel for NAACP, NAACP Pennsylvania State Conference, and Stacey Taylor*

BENJAMIN D. GEFFEN
SOPHIA LIN LAKIN
THERESA J. LEE
OLIVIA MANIA
ARI J. SAVITZKY
KATE STEIKER-GINZBERG
Public Interest Law Center
1617 John F. Kennedy Boulevard
Suite 1650
Philadelphia, PA 19103
(267) 546-1308
bgeffen@pubintlaw.org
*Counsel for Common Cause, Nicholas Maston, Gregory Perry, Todd Thatcher, Joel Dickson, Trisha Kent, and Lior Sternfeld*

## TABLE OF CONTENTS

### VOLUME I OF II

**DOCUMENT TITLE:** **PAGE**


Memorandum and Order, filed June 27, 2026 (Doc. 146) ........................ 1

Judgment Order, filed June 27, 2026 (Doc. 147) ........................ 6

Notice of Appeal, filed July 6, 2026 (Doc. 148) ........................ 7


### VOLUME II OF II


District Court Docket ........................ 10

Complaint, filed September 25, 2025 (Doc. 1) ........................ 41

Declaration of Anthony P. Ashton, filed October 7, 2025 (Doc. 17-1) ........................ 59

Declaration of Stacey Taylor, filed October 7, 2025 (Doc. 17-2) ........................ 63

Exhibit A – Declaration of Nicholas Maston, filed October 9, 2025 (Doc. 36-2) ........................ 68

Exhibit B – Declaration of Gregory Perry, filed October 9, 2025 (Doc. 36-3) ........................ 83

Exhibit C – Declaration of Todd Thatcher, filed October 9, 2025 (Doc. 36-4) ........................ 87

**DOCUMENT TITLE:** **PAGE**


Exhibit D – Declaration of Joel Dickson, filed October 9, 2025 (Doc. 36-5) .......... 94

Exhibit E – Declaration of Trisha Kent, filed October 9, 2025 (Doc. 36-6) .......... 102

Exhibit F – Declaration of Lior Sternfeld, filed October 9, 2025 (Doc. 36-7) .......... 111

Exhibit G – Declaration of John Thompson, filed October 9, 2025 (Doc. 36-8) .......... 115

Exhibit H – Declaration of Amy Widestrom, filed October 9, 2025 (Doc. 36-9) .......... 118

Exhibit I – Declaration of Suzanne Almeida, filed October 9, 2025 (Doc. 36-10) .......... 122

Brief of Secretary of the Commonwealth Al Schmidt in Support of his Motion to Dismiss, filed December 16, 2025 (Doc. 92) .......... 127

Memorandum of Law of the United States in Opposition to Motions to Dismiss (Docs. 88-3, 90-2, 91-92), filed January 12, 2026 (Doc. 103) .......... 160

Exhibit 1 (Letter from the DOJ to Secretary Schmidt, dated June 23, 2025), filed January 12, 2026 (Doc. 103-1) .......... 193

Exhibit 2 (Letter from Secretary Schmidt to the DOJ, dated July 23, 2025), filed January 12, 2026 (Doc. 103-2) .......... 197

Exhibit 3 (Letter from the DOJ to Secretary Schmidt, dated August 4, 2025), filed January 12, 2026 (Doc. 103-3) .......... 209

**DOCUMENT TITLE:** **PAGE**


Exhibit 4 (Letter from Secretary Schmidt to the DOJ, dated August 18, 2025), filed January 12, 2026 (Doc. 103-4) ............... 213

Exhibit 5 (Letter from the DOJ to Secretary Schmidt, dated August 14, 2025), filed January 12, 2026 (Doc. 103-5) ............... 220

Exhibit 6 (Letter from Secretary Schmidt to the DOJ, dated August 21, 2025), filed January 12, 2026 (Doc. 103-6) ............... 224

Exhibit A – Confidential Memorandum of Understanding (Colorado), filed January 28, 2026 (Doc. 116-1) .......................... 228

Exhibit B – Hearing Re: Motion to Dismiss, *U.S. v. Weber*, No. 2:25-cv-9149 (C.D. Cal.) (Transcript Excerpts) held December 4, 2025, filed January 28, 2026 (Doc. 116-2) ........................................... 238

United States' Memorandum of Law in Support of Motion to Transfer Venue, filed January 29, 2026 (Doc. 121) .................... 272

Brief of Secretary of the Commonwealth Al Schmidt in Response to DOJ's Motion to Transfer Venue (Excerpts), filed February 12, 2026 (Doc. 131) ............................................ 281

# 2:25cv1481, United States Of America V. Commonwealth Of Pennsylvania Et Al

US District Court Docket

United States District Court, Pennsylvania Western

(Pittsburgh)

**This case was retrieved on 09/01/2026**

## Header

**Case Number:** 2:25cv1481
**Date Filed:** 09/25/2025
**Assigned To:** Chief Judge Cathy Bissoon
**Nature of Suit:** Voting (441)
**Cause:** Civil Rights: Other
**Lead Docket:** None
**Other Docket:** Third Circuit, 26-02684
**Jurisdiction:** U.S. Government Plaintiff

**Class Code:** Closed
**Closed:** 06/27/2026
**Statute:** 42:2000
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Voting

## Participants

| Litigants | Attorneys |
|---|---|
| United States of America<br>**Plaintiff** | Alexander D. Keely<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Crt<br>Crt 150 M Street, N.E., 8th Floor<br>Washington, DC 20002<br>USA<br>202-532-5088 Email:Alexander.Keely@usdoj.Gov<br><br>David D. Vandenberg<br>LEAD ATTORNEY;PRO HAC VICE<br>[Terminated: 01/30/2026]<br>DOJ-Crt<br>Crt 150 M Street, Ne<br>Washington, DC 20002<br>USA<br>202-307-2767 Email:David.Vandenberg@usdoj.Gov<br><br>Jonathon Hauenschild<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Civil Rights Division, Voting Section<br>150 M St. Ne Room 8.1134<br>Washington, DC 20002<br>USA<br>202-215-2110 Email:Jonathon.Hauenschild@usdoj.Gov<br><br>Megan Frederick<br>PRO HAC VICE<br>[Terminated: 02/25/2026]<br>DOJ-Crt<br>Crt 150 M Street Ne |

| Litigants | Attorneys |
|---|---|
| | Washington, DC 20002<br>USA<br>202-304-2927 Email:Megan.Frederick@usdoj.Gov |
| Al Schmidt<br>in his official capacity as Secretary of the State of Pennsylvania \|<br>**Defendant** | Aimee D. Thomson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF GENERAL COUNSEL<br>30 N. 3rd St. Suite 200<br>Harrisburg, PA 17101<br>USA<br>223-234-4986 Email:Aimeethomson@pa.Gov<br><br>Michael Fischer<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of General Counsel<br>30 North Third Street Suite 200<br>Harrisburg, PA 17101<br>USA<br>717-831-2847 Email:Mjfischer@pa.Gov<br><br>KATHLEEN A. MULLEN<br>ATTORNEY TO BE NOTICED<br>Pennsylvania Office of Chief Counsel<br>Department Of State 306 North Office Building<br>Harrisburg, PA 17120<br>USA<br>717-783-0736 Email:Kamullen@pa.Gov |
| Commonwealth of Pennsylvania<br>[Terminated: 01/16/2026]<br>**Defendant** | Meghan A. Flowers<br>ATTORNEY TO BE NOTICED<br>PA Office of Attorney General<br>1251 Waterfront Place Mezzanine Level<br>Pittsburgh, PA 15222<br>USA<br>412-627-7889 Email:Mflowers@attorneygeneral.Gov |
| AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA<br>**Intervenor Plaintiff** | Walter S. Zimolong , III<br>ATTORNEY TO BE NOTICED<br>Zimolong LLC<br>353 W. Lancaster Avenue Suite 300<br>Wayne, PA 19087<br>USA<br>215-665-0842 Email:Wally@zimolonglaw.Com |
| Pennsylvania Alliance for Retired Americans<br>**Intervenor Defendant** | Uzoma Nkem Nkwonta<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4517 Email:Unkwonta@elias.Law<br><br>Branden D Lewiston<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Nw Ste 400<br>Washington, DC 20001<br>USA<br>202-998-8667 Email:Blewiston@elias.Law<br><br>David A Rodkey<br>ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
|---|---|
| | Dilworth Paxson LLP<br>Litigation 1650 Market Street Suite 1200<br>Philadelphia, PA 19103<br>USA<br>215-575-7027 Fax: 215-575-7200<br>Email:Drodkey@dilworthlaw.Com |
| | Elisabeth C. Frost<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law |
| | Jacob D Shelly<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4496 Email:Jshelly@elias.Law |
| | Tori Shaw<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>Litigation 250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-987-4663 Email:Tshaw@elias.Law |
| | Timothy James Ford<br>ATTORNEY TO BE NOTICED<br>Dilworth Paxson LLP<br>Dilworth Paxson Llp 1650 Market Street Suite 1200<br>Philadelphia, PA 19103<br>USA<br>215-575-7017 Fax: 215-754-4603<br>Email:Tford@dilworthlaw.Com |
| Mike Crossey<br>**Intervenor Defendant** | Uzoma Nkem Nkwonta<br>LEAD ATTORNEY;PRO HAC VICE<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4517 Email:Unkwonta@elias.Law |
| | Branden D Lewiston<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Nw Ste 400<br>Washington, DC 20001<br>USA<br>202-998-8667 Email:Blewiston@elias.Law |
| | David A Rodkey<br>ATTORNEY TO BE NOTICED<br>Dilworth Paxson LLP<br>Litigation 1650 Market Street Suite 1200 |

| Litigants | Attorneys |
|---|---|
| | Philadelphia, PA 19103<br>USA<br>215-575-7027 Fax: 215-575-7200<br>Email:Drodkey@dilworthlaw.Com<br><br>Elisabeth C. Frost<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law<br><br>Jacob D Shelly<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4496 Email:Jshelly@elias.Law<br><br>Tori Shaw<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>Litigation 250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-987-4663 Email:Tshaw@elias.Law<br><br>Timothy James Ford<br>ATTORNEY TO BE NOTICED<br>Dilworth Paxson LLP<br>Dilworth Paxson Llp 1650 Market Street Suite 1200<br>Philadelphia, PA 19103<br>USA<br>215-575-7017 Fax: 215-754-4603<br>Email:Tford@dilworthlaw.Com |
| National Association for the Advancement of Colored People<br>**Intervenor Defendant** | Edward G. Caspar<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street, Nw Ste 900<br>Washington, DC 20005<br>USA<br>202-662-8390 Email:Ecaspar@lawyerscommittee.Org<br><br>Gillian Cassell-Stiga<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street Northwest Suite 900<br>Washington, DC 20005<br>USA<br>202-662-8352 Email:Gcassell-Stiga@lawyerscommittee.Org<br><br>Leah Frazier<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law |

| Litigants | Attorneys |
|---|---|
| | 1500 K Street Nw Ste Ninth Floor<br>Washington, DC 20005<br>USA<br>202-662-8316 Email:Lfrazier@lawyerscommittee.Org<br><br>Grace Thomas<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K St Nw Suite 900<br>Washington, DC 20005<br>USA<br>202-662-8365 Email:Gthomas@lawyerscommittee.Org<br><br>DAVID SMITH<br>ATTORNEY TO BE NOTICED<br>Dilworth Paxson LLP<br>1650 Market Street Suite 1200<br>Philadelphia, PA 19103<br>USA<br>215-575-7062 Fax: 215-754-4603<br>Email:Dsmith@dilworthlaw.Com |
| NAACP PENNSYLVANIA STATE CONFERENCE<br>**Intervenor Defendant** | Edward G. Caspar<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street, Nw Ste 900<br>Washington, DC 20005<br>USA<br>202-662-8390 Email:Ecaspar@lawyerscommittee.Org<br><br>Gillian Cassell-Stiga<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street Northwest Suite 900<br>Washington, DC 20005<br>USA<br>202-662-8352 Email:Gcassell-Stiga@lawyerscommittee.Org<br><br>Leah Frazier<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street Nw Ste Ninth Floor<br>Washington, DC 20005<br>USA<br>202-662-8316 Email:Lfrazier@lawyerscommittee.Org<br><br>Grace Thomas<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K St Nw Suite 900<br>Washington, DC 20005<br>USA<br>202-662-8365 Email:Gthomas@lawyerscommittee.Org<br><br>DAVID SMITH<br>ATTORNEY TO BE NOTICED<br>Dilworth Paxson LLP |

| Litigants | Attorneys |
|---|---|
| | 1650 Market Street Suite 1200<br>Philadelphia, PA 19103<br>USA<br>215-575-7062 Fax: 215-754-4603<br>Email:Dsmith@dilworthlaw.Com |
| Stacey Taylor<br>**Intervenor Defendant** | Edward G. Caspar<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street, Nw Ste 900<br>Washington, DC 20005<br>USA<br>202-662-8390 Email:Ecaspar@lawyerscommittee.Org<br><br>Gillian Cassell-Stiga<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street Northwest Suite 900<br>Washington, DC 20005<br>USA<br>202-662-8352 Email:Gcassell-Stiga@lawyerscommittee.Org<br><br>Leah Frazier<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street Nw Ste Ninth Floor<br>Washington, DC 20005<br>USA<br>202-662-8316 Email:Lfrazier@lawyerscommittee.Org<br><br>Grace Thomas<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K St Nw Suite 900<br>Washington, DC 20005<br>USA<br>202-662-8365 Email:Gthomas@lawyerscommittee.Org<br><br>DAVID SMITH<br>ATTORNEY TO BE NOTICED<br>Dilworth Paxson LLP<br>1650 Market Street Suite 1200<br>Philadelphia, PA 19103<br>USA<br>215-575-7062 Fax: 215-754-4603<br>Email:Dsmith@dilworthlaw.Com |
| NICHOLAS MASTON<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org<br><br>Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org |
| | Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org |
| | Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org |
| | Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| Gregory Perry<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org |
| | Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org<br><br>Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org<br><br>Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org<br><br>Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org<br><br>Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| TODD THATCHER<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org<br><br>Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org |
| | Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org |
| | Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org |
| | Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| Joel Dickson<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org |
| | Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org |
| | Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org |
| | Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org |
| | Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| TRISHA KENT<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org |
| | Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org<br><br>Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org<br><br>Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org<br><br>Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org<br><br>Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| LIOR STERNFELD<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org<br><br>Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org |
| | Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org |
| | Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org |
| | Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| John Thompson<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org |
| | Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org |
| | Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org |
| | Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org |
| | Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| The League of Women Voters of Pennsylvania<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org |
| | Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org<br><br>Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org<br><br>Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org<br><br>Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org<br><br>Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| Common Cause<br>**Intervenor Defendant** | ARI J. SAVITZKY<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>USA<br>401-529-3982 Email:Asavitzky@aclu.Org<br><br>Sophia Lin Lakin<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE |

| Litigants | Attorneys |
|---|---|
| | NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| | Benjamin David Geffen<br>ATTORNEY TO BE NOTICED<br>Public Interest Law Center<br>1617 John F. Kennedy Blvd. Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1308 Fax: 215-627-3183<br>Email:Bgeffen@pubintlaw.Org |
| | Kate Steiker-Ginzberg<br>ATTORNEY TO BE NOTICED<br>ACLUF of Pennsylvania<br>P.O. Box 60173<br>Philadelphia, PA 19102<br>USA<br>917-444-6803 Email:Ksteiker-Ginzberg@aclupa.Org |
| | Olivia Mania<br>ATTORNEY TO BE NOTICED<br>The Public Interest Law Center<br>1617 John F. Kennedy Blvd., Suite 1650<br>Philadelphia, PA 19103<br>USA<br>267-546-1305 Email:Omania@pubintlaw.Org |
| | Witold J. Walczak<br>ATTORNEY TO BE NOTICED<br>ACLF of PA<br>313 Atwood Street<br>Pittsburgh, PA 15213<br>USA<br>(412) 681-7864 Email:Vwalczak@aclupa.Org |
| RealAmerica.Vote<br>**Amicus** | John L O'Kelly<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>John L. O'Kelly<br>339 Richard Avenue E2<br>Hicksville, NY 11801<br>USA<br>516-450-1720 Fax: 516-681-1437<br>Email:Okellyj56@gmail.Com |
| Bipartisan Former Secretaries of State<br>**Amicus** | John B. Hill<br>ATTORNEY TO BE NOTICED<br>Crew |

## Litigants

## Attorneys

Po Box 14596
Washington, DC 20044
USA
202-408-5565 Email:Jhill@citizensforethics.Org

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 09/25/2025 | COMPLAINT against COMMONWEALTH OF PENNSYLVANIA, AL SCHMIDT ( Filing fee, including Administrative fee, $405, ), filed by UNITED STATES. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Attachment) (Vandenberg, David) (Entered: 09/25/2025) | |
| 2 | 09/25/2025 | MOTION for attorney David D. Vandenberg to Appear Pro Hac Vice, (Filing fee $70 by UNITED STATES. (Vandenberg, David) (Entered: 09/25/2025) | |
| 3 | 09/25/2025 | PRAECIPE to Issue Summons by UNITED STATES (Vandenberg, David) (Entered: 09/25/2025) | |
| 4 | 09/25/2025 | PRAECIPE to Issue Summons by UNITED STATES (Vandenberg, David) (Entered: 09/25/2025) | |
| | 09/25/2025 | Judge Cathy Bissoon added. (sms) (Entered: 09/25/2025) | |
| 5 | 09/25/2025 | ORDER governing procedures for motions filed under Fed. R. Civ. P. 12. See contents of this filing for instructions. Signed by Judge Cathy Bissoon on 9/25/2025. (jmm) (Entered: 09/25/2025) | |
| 6 | 09/25/2025 | ORDER granting 2 Motion for David D. Vandenberg to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 9/25/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 09/25/2025) | |
| | 09/26/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 3 Praecipe to Issue Summons, 4 Praecipe to Issue Summons. ERROR: The summons(es) was/were filed as the main document. CORRECTION: Attorney to refile the document with a Praecipe to Issue/Reissue Summons as the main document and the properly filled out summons(es) as an attachment(s) to the Praecipe, using the Praecipe to Issue Summons/Reissue Summons event. (jd) (Entered: 09/26/2025) | |
| 7 | 09/26/2025 | PRAECIPE to Issue Summons by UNITED STATES OF AMERICA (Attachments: # 1 Summons) (Vandenberg, David) Praecipe removed from public view and refiled as Errata at 9 . Modified text on 9/29/2025. (keh) (Entered: 09/26/2025) | |
| 8 | 09/26/2025 | PRAECIPE to Issue Summons by UNITED STATES OF AMERICA (Attachments: # 1 Summons) (Vandenberg, David) Praecipe removed from public view and refiled as Errata at 10 . Modified text on 9/29/2025. (keh) (Entered: 09/26/2025) | |
| | 09/26/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 8 Praecipe to Issue Summons, 7 Praecipe to Issue Summons. ERROR: Typed name omitted by s/. CORRECTION: Attorney advised of signature requirements. Attorney to resubmit with signature, using Errata event. (jd) (Entered: 09/26/2025) | |
| 9 | 09/26/2025 | Errata re 7 Praecipe to Issue Summons by UNITED STATES OF AMERICA. Reason for Correction: Add signature. (Vandenberg, David) (Entered: 09/26/2025) | |
| 10 | 09/26/2025 | Errata re 8 Praecipe to Issue Summons by UNITED STATES OF AMERICA. Reason for Correction: Add signature. (Vandenberg, David) (Entered: 09/26/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 11 | 09/29/2025 | MOTION to Intervene as Defendants by Pennsylvania Alliance for Retired Americans, Mike Crossey. (Attachments: # 1 Proposed Order, # 2 Exhibit A - Proposed Answer, # 3 Declaration of Mike Crossey, # 4 Certificate of Service) (Ford, Timothy) (Entered: 09/29/2025) | |
| 12 | 09/29/2025 | Disclosure Statement by Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Certificate of Service) (Ford, Timothy) (Entered: 09/29/2025) | |
| 13 | 09/29/2025 | Summons Issued as to COMMONWEALTH OF PENNSYLVANIA, AL SCHMIDT (Attachments: # 1 Summons) (keh) (Entered: 09/29/2025) | |
| | 09/29/2025 | w/ 11 BRIEF in Support re 11 Motion to Intervene, filed by Mike Crossey, Pennsylvania Alliance for Retired Americans. (keh) (Entered: 09/29/2025) | |
| | 09/29/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 11 Motion to Intervene. ERROR: Document should have been filed as two separate documents. CORRECTION: Attorney advised in future that documents of that nature are to be filed as separate documents. Clerk of Court docketed Brief in Support. This message is for informational purposes only. (keh) (Entered: 09/29/2025) | |
| 14 | 09/30/2025 | SUMMONS/Return of Service Returned Executed by UNITED STATES OF AMERICA. AL SCHMIDT served on 9/30/2025, answer due 10/21/2025. (Vandenberg, David) (Entered: 09/30/2025) | |
| 15 | 10/01/2025 | MOTION to Stay for Lapse of Appropriations by UNITED STATES OF AMERICA. (Vandenberg, David) Link added to Proposed Order filed at 16 . Modified text on 10/1/2025. (keh) (Entered: 10/01/2025) | |
| | 10/01/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 15 Motion to Stay. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (keh) (Entered: 10/01/2025) | |
| 16 | 10/01/2025 | Proposed Order re 15 Motion to Stay for Lack of Appropriations by UNITED STATES OF AMERICA. (Vandenberg, David) (Entered: 10/01/2025) | |
| 17 | 10/07/2025 | MOTION to Intervene as Defendants by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NAACP Pennsylvania State Conference, STACEY TAYLOR. (Attachments: # 1 Declaration of Anthony Ashton, # 2 Declaration of Stacey Taylor, # 3 Exhibit A - Proposed Answer, # 4 Certificate of Service, # 5 Proposed Order) (Smith, David) (Entered: 10/07/2025) | |
| 18 | 10/07/2025 | BRIEF in Support re 17 Motion to Intervene, filed by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Certificate of Service) (Smith, David) (Entered: 10/07/2025) | |
| 19 | 10/07/2025 | Disclosure Statement by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Smith, David) (Entered: 10/07/2025) | |
| 20 | 10/07/2025 | Disclosure Statement by NAACP Pennsylvania State Conference. (Smith, David) (Entered: 10/07/2025) | |
| 21 | 10/07/2025 | MOTION for attorney Elisabeth C. Frost to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9131190) by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Affidavit of Elisabeth C. Frost) (Frost, Elisabeth) Link added to 26 | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Proposed Order. Modified text on 10/9/2025. (keh) (Entered: 10/07/2025) | |
| 22 | 10/07/2025 | MOTION for attorney Jacob D. Shelly to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9131296) by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Affidavit of Jacob D. Shelly) (Shelly, Jacob) Link added to 27 Proposed Order. Modified text on 10/9/2025. (keh) (Entered: 10/07/2025) | |
| 23 | 10/07/2025 | MOTION for attorney Branden D. Lewiston to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9131322) by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Affidavit of Branden D. Lewiston) (Lewiston, Branden) Link added to 28 Proposed Order. Modified text on 10/9/2025. (keh) (Entered: 10/07/2025) | |
| 24 | 10/07/2025 | ORDER. Consistent with the Order in 2:25-mc-01098-MRH, granting the government's omnibus Motion to stay civil matters due to the lapse in certain appropriations, this case hereby is STAYED. The Order in 2:25-mc-01098-MRH is incorporated by reference, and counsel are directed to review the same. For the duration of the Stay, the case will be electronically CLOSED. This is a docket control device having no impact on the parties' substantive rights. Any existing CONFERENCE or DEADLINE is CANCELLED, and will be reset by future order once the stay is lifted (and the case is reopened). Accordingly, Plaintiff's 15 Motion is denied as moot. Signed by Judge Cathy Bissoon on 10/7/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/07/2025) | |
| 25 | 10/08/2025 | MOTION for attorney Tori Shaw to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9134184) by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Affidavit of Tori Shaw) (Shaw, Tori) Link added to 29 Proposed Order. Modified text on 10/9/2025. (keh) (Entered: 10/08/2025) | |
| | 10/08/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 21 Motion to Appear Pro Hac Vice, 22 Motion to Appear Pro Hac Vice, 23 Motion to Appear Pro Hac Vice, 25 Motion to Appear Pro Hac Vice. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorneys are advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (keh) (Entered: 10/08/2025) | |
| 26 | 10/09/2025 | Proposed Order re 21 Motion to Appear Pro Hac Vice, of Elisabeth C. Frost by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Frost, Elisabeth) (Entered: 10/09/2025) | |
| 27 | 10/09/2025 | Proposed Order re 22 Motion to Appear Pro Hac Vice of Jacob D. Shelly by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Shelly, Jacob) (Entered: 10/09/2025) | |
| 28 | 10/09/2025 | Proposed Order re 23 Motion to Appear Pro Hac Vice, of Branden D. Lewiston by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Lewiston, Branden) (Entered: 10/09/2025) | |
| 29 | 10/09/2025 | Proposed Order re 25 Motion to Appear Pro Hac Vice of Tori Shaw by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Shaw, Tori) (Entered: 10/09/2025) | |
| 30 | 10/09/2025 | ORDER granting 21 Motion for Elisabeth C. Frost to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/9/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/09/2025) | |
| 31 | 10/09/2025 | ORDER granting 22 Motion for Jacob D. Shelly to Appear Pro Hac | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Vice. Signed by Judge Cathy Bissoon on 10/9/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/09/2025) | |
| 32 | 10/09/2025 | ORDER granting 23 Motion for Branden D. Lewiston to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/9/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/09/2025) | |
| 33 | 10/09/2025 | ORDER granting 25 Motion for Tori Shaw to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/9/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/09/2025) | |
| 34 | 10/09/2025 | MOTION for attorney Gillian Cassell-Stiga to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9136183) by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Declaration, # 2 Proposed Order) (Cassell-Stiga, Gillian) (Entered: 10/09/2025) | |
| 35 | 10/09/2025 | ORDER granting 34 Motion for Gillian Cassell-Stiga to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/9/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/09/2025) | |
| 36 | 10/09/2025 | MOTION to Intervene as Defendants by NICHOLAS MASTON, GREGORY PERRY, TODD THATCHER, JOEL DICKSON, TRISHA KENT, LIOR STERNFELD, JOHN THOMPSON, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, COMMON CAUSE. (Attachments: # 1 Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J - PROPOSED ANSWER) (Walczak, Witold) (Entered: 10/09/2025) | |
| 37 | 10/09/2025 | BRIEF in Support re 36 Motion to Intervene, filed by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6) (Walczak, Witold) (Entered: 10/09/2025) | |
| 38 | 10/10/2025 | MOTION for attorney Grace Thomas to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9138154) by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Declaration, # 2 Proposed Order) (Thomas, Grace) (Entered: 10/10/2025) | |
| 39 | 10/14/2025 | MOTION for attorney Ari Savitzky to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9141086) by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Affidavit, # 2 Proposed Order) (Savitzky, Ari) (Entered: 10/14/2025) | |
| 40 | 10/14/2025 | MOTION for attorney Sophia Lin Lakin to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9141276) by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Affidavit, # 2 Proposed | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Order) (Savitzky, Ari) Link added to Errata filed at 47 . Modified text on 10/17/2025. (keh) (Entered: 10/14/2025) | |
| | 10/15/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 40 Motion to Appear Pro Hac Vice,. ERROR: Signature on document and filer do not match. CORRECTION: Attorney advised of signature requirements. Attorney to resubmit the document using the Errata event. (keh) (Entered: 10/15/2025) | |
| 42 | 10/16/2025 | MOTION for attorney Theresa Lee to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9147342) by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Affidavit, # 2 Proposed Order) (Lee, Theresa) (Entered: 10/16/2025) | |
| 43 | 10/17/2025 | ORDER granting 38 Motion for Grace Thomas to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/17/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/17/2025) | |
| 44 | 10/17/2025 | ORDER granting 39 Motion for Ari Savitzky to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/17/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/17/2025) | |
| 45 | 10/17/2025 | ORDER granting 42 Motion for Theresa Lee to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/17/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/17/2025) | |
| 46 | 10/17/2025 | NOTICE of Appearance by Kate Steiker-Ginzberg on behalf of COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Steiker-Ginzberg, Kate) (Entered: 10/17/2025) | |
| 47 | 10/17/2025 | Errata re 40 Motion to Appear Pro Hac Vice, by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. Reason for Correction: Signature on document and filer did not match. (Attachments: # 1 Affidavit, # 2 Proposed Order) (Lakin, Sophia) (Entered: 10/17/2025) | |
| 48 | 10/21/2025 | MOTION for attorney Edward G. Caspar to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9154519) by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Declaration, # 2 Exhibit A (Certificate of Good Standing), # 3 Proposed Order) (Caspar, Edward) (Entered: 10/21/2025) | |
| 49 | 10/22/2025 | ORDER granting 48 Motion for Edward G. Caspar to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/22/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/22/2025) | |
| 50 | 10/22/2025 | NOTICE of Appearance by Meghan A. Flowers on behalf of COMMONWEALTH OF PENNSYLVANIA. (Flowers, Meghan) (Entered: 10/22/2025) | |
| 51 | 10/22/2025 | ORDER granting 40 Motion for Sophia Lin Lakin to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 10/22/2025. Text- | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 10/22/2025) | |
| 52 | 11/05/2025 | NOTICE of Appearance by Kathleen A. Mullen on behalf of AL SCHMIDT. (Mullen, Kathleen) (Entered: 11/05/2025) | |
| 53 | 11/13/2025 | MOTION for attorney Leah Frazier to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9193262) by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Proposed Order, # 2 Exhibit Certificate of Good Standing MD, # 3 Exhibit Certificate of Good Standing DC) (Frazier, Leah) Link added to 54 Supplement with Affidavit supporting this motion. Modified text on 11/13/2025. (keh) (Entered: 11/13/2025) | |
| | 11/13/2025 | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 53 Motion to Appear Pro Hac Vice. ERROR: Affidavit not attached to Motion to Appear Pro Hac Vice. CORRECTION: See LCvR 83.2(B) PRO HAC VICE ADMISSIONS. A motion for admission pro hac vice must be accompanied by an affidavit from the attorney seeking to be admitted pro hac vice. Attorney seeking admission is advised to sign and submit the Affidavit by using the "Supplement" filing event and link filing to the previously filed motion. (keh) (Entered: 11/13/2025) | |
| 54 | 11/13/2025 | SUPPLEMENT by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR to 53 Motion to Appear Pro Hac Vice,. (Frazier, Leah) (Entered: 11/13/2025) | |
| 55 | 11/13/2025 | SUMMONS/Return of Service Returned Executed by UNITED STATES OF AMERICA. COMMONWEALTH OF PENNSYLVANIA served on 10/3/2025, answer due 10/24/2025. (Vandenberg, David) (Entered: 11/13/2025) | |
| 56 | 11/17/2025 | ORDER. Consistent with the Order entered on 11/14/2025 in 2:25-mc-01098-MRH (Doc. 7, therein), the stay is LIFTED, and the case is REOPENED. Shortly, the Court will enter another order setting the case back on track, including - as appropriate - the setting of new deadline(s) and/or the rescheduling of any continued court event(s). Signed by Judge Cathy Bissoon on 11/17/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 11/17/2025) | |
| 57 | 11/17/2025 | ORDER granting 53 Motion for Leah Frazier to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 11/17/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 11/17/2025) | |
| 58 | 11/19/2025 | NOTICE of Appearance by Michael Fischer on behalf of AL SCHMIDT. (Fischer, Michael) (Entered: 11/19/2025) | |
| 59 | 11/19/2025 | MOTION to Intervene as Plaintiff by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA. (Attachments: # 1 Declaration, # 2 Proposed Order) (Zimolong, Walter) (Entered: 11/19/2025) | |
| 60 | 11/19/2025 | BRIEF in Support re 59 Motion to Intervene as Plaintiff filed by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA. (Attachments: # 1 Declaration, # 2 Exhibit Proposed) (Zimolong, Walter) (Entered: 11/19/2025) | |
| 61 | 11/20/2025 | NOTICE of Joint Status Report and Motion to Modify Briefing Schedules by UNITED STATES OF AMERICA (Vandenberg, David) (Entered: 11/20/2025) | |
| | 11/20/2025 | w/ 61 MOTION to Modify Briefing Schedules by UNITED STATES OF AMERICA. (keh) (Entered: 11/20/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | 11/20/2025 | CLERK'S NOTICE OF CORRECTION re 61 Notice. ERROR: Document should have been filed as two separate documents. CORRECTION FOR FUTURE FILINGS: In the future, documents of this nature are to be filed as separate events. Clerk has docketed the Motion to Modify Briefing Schedules. THIS MESSAGE IS FOR INFORMATIONAL PURPOSES ONLY. (keh) (Entered: 11/20/2025) | |
| | 11/20/2025 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 61 Notice. ERROR: Filer did not attach a Proposed Order as required by LCvR 7. CORRECTION: Filer to submit a proposed order using the Proposed Order event. Filer is to link the Proposed Order to the relevant motion in the event. (keh) (Entered: 11/20/2025) | |
| 62 | 11/21/2025 | Joint MOTION for Status Conference Proposal of Briefing Schedule by UNITED STATES OF AMERICA. (Vandenberg, David) (Entered: 11/21/2025) | |
| 63 | 11/21/2025 | Proposed Order re 62 Motion for Status Conference on Proposed Briefing Schedule by UNITED STATES OF AMERICA. (Vandenberg, David) (Entered: 11/21/2025) | |
| 64 | 11/23/2025 | Amended MOTION to Modify Briefing Schedule Jointly Proposed 62 Motion for Status Conference by UNITED STATES OF AMERICA. (Vandenberg, David) (Entered: 11/23/2025) | |
| 65 | 11/24/2025 | First MOTION for attorney John L. O'Kelly to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9215414) by RealAmerica.Vote. (O'Kelly, John) Link added to 69 Proposed Order. Modified text on 11/26/2025. (keh) (Entered: 11/24/2025) | |
| | 11/25/2025 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 65 First MOTION for attorney John L. O'Kelly to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9215414). ERROR: Filer did not attach a Proposed Order as required by LCvR 7. CORRECTION: Filer to submit a proposed order using the Proposed Order event. Filer is to link the Proposed Order to the relevant motion in the event. (keh) (Entered: 11/25/2025) | |
| 66 | 11/25/2025 | Errata re 63 Proposed Order, 64 Motion to Modify Briefing Schedule Jointly Proposed by UNITED STATES OF AMERICA. Reason for Correction: Date within document.. (Vandenberg, David) (Entered: 11/25/2025) | |
| 67 | 11/25/2025 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM re 1 COMPLAINT, by COMMONWEALTH OF PENNSYLVANIA. (Attachments: # 1 Proposed Order, # 2 Certificate of Conferral) (Flowers, Meghan) (Entered: 11/25/2025) | |
| 68 | 11/25/2025 | BRIEF in Support re 67 Motion to Dismiss for Failure to State a Claim filed by COMMONWEALTH OF PENNSYLVANIA. (Flowers, Meghan) (Entered: 11/25/2025) | |
| 69 | 11/26/2025 | Proposed Order re 65 Motion to Appear Pro Hac Vice John O'Kelly by RealAmerica.Vote. (O'Kelly, John) (Entered: 11/26/2025) | |
| 70 | 11/26/2025 | ORDER granting 65 Motion for John L. O'Kelly to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 11/26/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 11/26/2025) | |
| 71 | 11/26/2025 | MOTION for attorney Uzoma Nkwonta to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-9218751) by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Affidavit, # 2 Proposed Order) (Nkwonta, Uzoma) (Entered: 11/26/2025) | |
| 72 | 11/26/2025 | ORDER granting 71 Motion for Uzoma Nkwonta to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 11/26/2025. Text-only entry; no PDF document will issue. This text-only entry | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 11/26/2025) | |
| 73 | 11/27/2025 | First MOTION to File Amicus Brief by RealAmerica.Vote. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Proposed Order) (O'Kelly, John) (Entered: 11/27/2025) | |
| | 11/27/2025 | w/ 73 BRIEF in Support re 73 Motion to File Amicus Brief filed by RealAmerica.Vote. (keh) (Entered: 12/02/2025) | |
| 74 | 12/01/2025 | BRIEF in Opposition re 59 Motion to Intervene filed by AL SCHMIDT. (Attachments: # 1 Exhibit Letter from Sec. Schmidt to AAG Dhillon (Aug. 21, 2025), # 2 Exhibit AFPI Pet. for Review, PA Commw. Ct. (Oct. 24, 2025), # 3 Exhibit Dept of State Appl. for Summ. Relief, PA Commw. Ct. (Nov 17, 2025), # 4 Proposed Order) (Mullen, Kathleen) (Entered: 12/01/2025) | |
| 75 | 12/01/2025 | BRIEF in Opposition re 59 Motion to Intervene, 11 Motion to Intervene, 36 Motion to Intervene, 17 Motion to Intervene, filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7) (Vandenberg, David) (Entered: 12/01/2025) | |
| 76 | 12/03/2025 | MOTION for Leave to File Reply in Support of Motion to Intervene by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Exhibit 1) (Cassell-Stiga, Gillian) Link added to 79 Proposed Order. Modified text on 12/15/2025. (keh) (Entered: 12/03/2025) | |
| 77 | 12/04/2025 | MOTION for Leave to File Reply Brief by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Exhibit 1: Proposed Reply Brief, # 2 Proposed Order) (Steiker-Ginzberg, Kate) (Entered: 12/04/2025) | |
| 78 | 12/04/2025 | MOTION for Leave to File Reply in Support of Motion to Intervene by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Proposed Order, # 2 Exhibit 1 - Reply Brief in Support of Motion to Intervene) (Nkwonta, Uzoma) (Entered: 12/04/2025) | |
| 79 | 12/05/2025 | Proposed Order re 76 Motion for Leave to File by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Cassell-Stiga, Gillian) (Entered: 12/05/2025) | |
| 80 | 12/08/2025 | NOTICE of Supplemental Authority by Mike Crossey, Pennsylvania Alliance for Retired Americans re 11 Motion to Intervene, (Attachments: # 1 Exhibit 1 - United States v. Oregon) (Nkwonta, Uzoma) (Entered: 12/08/2025) | |
| 81 | 12/08/2025 | MOTION for Leave to File Reply Brief by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA. (Attachments: # 1 Proposed Order, # 2 Exhibit) (Zimolong, Walter) (Entered: 12/08/2025) | |
| 82 | 12/08/2025 | MOTION for Leave to File Reply Brief by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA. (Attachments: # 1 Proposed Order, # 2 Exhibit) (Zimolong, Walter) (Entered: 12/08/2025) | |
| 83 | 12/09/2025 | NOTICE of Supplemental Authority (Second) by Mike Crossey, Pennsylvania Alliance for Retired Americans re 11 Motion to Intervene, (Attachments: # 1 Exhibit 1 - United States v. Benson) (Nkwonta, Uzoma) Document removed from public view and refiled at 84 Errata. Modified text on 12/15/2025. (keh) (Entered: 12/09/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 84 | 12/10/2025 | Errata re 83 Notice of Supplemental Authority (Second) by Mike Crossey, Pennsylvania Alliance for Retired Americans. Reason for Correction: Replacing Document. (Attachments: # 1 Exhibit 1 - United States v. Benson) (Nkwonta, Uzoma) (Entered: 12/10/2025) | |
| 85 | 12/12/2025 | NOTICE Regarding Plaintiff's Change in Position by Mike Crossey, Pennsylvania Alliance for Retired Americans re 11 Motion to Intervene, (Nkwonta, Uzoma) (Entered: 12/12/2025) | |
| 86 | 12/15/2025 | NOTICE Regarding Plaintiff's Change in Position by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR re 17 Motion to Intervene, (Cassell-Stiga, Gillian) Document removed from public view and refiled at 94 Errata. Modified text on 12/17/2025. (keh) (Entered: 12/15/2025) | |
| 87 | 12/15/2025 | NOTICE of Change in Plaintiff's Position by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON (Attachments: # 1 Exhibit A) (Savitzky, Ari) (Entered: 12/15/2025) | |
| 88 | 12/16/2025 | MOTION for Leave to File Proposed Notice of Motion to Dismiss and Memorandum in Support by Mike Crossey, Pennsylvania Alliance for Retired Americans. (Attachments: # 1 Proposed Order - Motion for Leave to File, # 2 Exhibit 1 - Proposed Notice of Motion to Dismiss, # 3 Exhibit 2 - Proposed Memorandum in Support of Motion to Dismiss, # 4 Proposed Order - Motion to Dismiss, # 5 Certificate of Conferral) (Nkwonta, Uzoma) (Entered: 12/16/2025) | |
| | 12/16/2025 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 86 Notice. ERROR: Attorney signature missing from filing. CORRECTION: Attorney directed to comply with all requirements of LCvR 5.2(B). Attorney advised to refile the document with signature, using the Errata event. (keh) (Entered: 12/16/2025) | |
| 89 | 12/16/2025 | NOTICE of No Opposition to Commonwealth's Motion to Dismiss by UNITED STATES OF AMERICA re 67 Motion to Dismiss for Failure to State a Claim, 68 Brief in Support of Motion (Vandenberg, David) (Entered: 12/16/2025) | |
| 90 | 12/16/2025 | MOTION for Leave to File a Motion to Dismiss by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Cassell-Stiga, Gillian) (Entered: 12/16/2025) | |
| 91 | 12/16/2025 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction re 1 Complaint by AL SCHMIDT. (Attachments: # 1 Proposed Order) (Fischer, Michael) Modified text to add link on 12/17/2025. (keh) (Entered: 12/16/2025) | |
| 92 | 12/16/2025 | BRIEF in Support re 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction filed by AL SCHMIDT. (Attachments: # 1 Appendix) (Fischer, Michael) (Entered: 12/16/2025) | |
| 93 | 12/17/2025 | NOTICE of Change in Position of Plaintiff by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA re 60 Brief in Support of Motion, 59 Motion to Intervene (Zimolong, Walter) (Entered: 12/17/2025) | |
| 94 | 12/17/2025 | Errata re 86 Notice by NAACP Pennsylvania State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. Reason for Correction: | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | missing signature. (Cassell-Stiga, Gillian) (Entered: 12/17/2025) | |
| | 12/17/2025 | CLERK'S NOTICE OF CORRECTION re 91 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction . ERROR: Document not linked. CORRECTION FOR FUTURE FILINGS: Filer advised to link filing to related document(s) in future filings. Clerk added link to appropriate document. THIS MESSAGE IS FOR INFORMATIONAL PURPOSES ONLY AND NO FURTHER ACTION IS REQUIRED ON THE FILING AT ISSUE. (keh) (Entered: 12/17/2025) | |
| 95 | 12/17/2025 | NOTICE of Continued Opposition to Intervention by AL SCHMIDT re 93 Notice (Fischer, Michael) (Entered: 12/17/2025) | |
| 96 | 01/05/2026 | NOTICE of Appearance by Benjamin David Geffen on behalf of COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Geffen, Benjamin) (Entered: 01/05/2026) | |
| 97 | 01/05/2026 | NOTICE of Appearance by Olivia Mania on behalf of COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Mania, Olivia) (Entered: 01/05/2026) | |
| 98 | 01/06/2026 | NOTICE of Supplemental Authority (Third) by Mike Crossey, Pennsylvania Alliance for Retired Americans re 11 Motion to Intervene, (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Nkwonta, Uzoma) (Entered: 01/06/2026) | |
| 99 | 01/07/2026 | NOTICE of Supplemental Authority by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON (Savitzky, Ari) (Entered: 01/07/2026) | |
| 100 | 01/07/2026 | NOTICE of Appearance by Aimee D. Thomson on behalf of AL SCHMIDT. (Thomson, Aimee) (Entered: 01/07/2026) | |
| 101 | 01/08/2026 | Unopposed MOTION to File Amicus Brief in support of Secretary of the Commonwealth's Motion to Dismiss by Bipartisan Former State Secretaries of State. (Attachments: # 1 Exhibit Proposed Brief of Amici Curiae) (Hill, John) Link added to 102 Proposed Order. Modified text on 1/8/2026. (keh) (Entered: 01/08/2026) | |
| | 01/08/2026 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 101 Unopposed MOTION to File Amicus Brief in support of Secretary of the Commonwealth's Motion to Dismiss. ERROR: Filer did not attach a Proposed Order as required by LCvR 7. CORRECTION: Filer to submit a proposed order using the Proposed Order event. Filer is to link the Proposed Order to the relevant motion in the event. (keh) (Entered: 01/08/2026) | |
| 102 | 01/08/2026 | Proposed Order re 101 Motion to File Amicus Brief by BIPARTISAN FORMER SECRETARIES OF STATE. (Hill, John) (Entered: 01/08/2026) | |
| 103 | 01/12/2026 | RESPONSE IN OPPOSITION to 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction, 92 Brief in Support of Motion, filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10) (Vandenberg, David) (Entered: 01/12/2026) | |
| 104 | 01/13/2026 | Unopposed MOTION for Leave to File Excess Pages by AL SCHMIDT. (Attachments: # 1 Proposed Order) (Fischer, Michael) (Entered: 01/13/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 105 | 01/16/2026 | ORDER. Defendants' unopposed Motion (Doc. 67 ) to dismiss the COMMONWEALTH OF PENNSYLVANIA (only) as a party is GRANTED. The Motions to intervene by PARA (all movants are referenced, collectively, by organizational-acronym) at Doc. 11 ; the NAACP, at Doc. 17 ; and LWV, at Doc. 36 ; no longer are opposed. See Docs. 85 , 94 & 87 . The Motions are GRANTED, for cause shown in the Motion papers, and the movants are intervenor-Defendants. NAACP's, LWV's and PARA's Motions (Docs. 76 , 77 & 78 ) for leave to file replies are DENIED AS MOOT. PARA's and NAACP's Motions (Docs. 88 ) & 90 ) for leave to file MTDs are GRANTED. The Court will consider their Motion papers as attached. If the intervenor-Defendants collectively referred to as LWV determine that their arguments are not sufficiently addressed in the other MTDs, they may file a motion for leave. Putative plaintiff-intervenor AFPI's Motions (Docs. 81 & 82 ) to file replies in support of intervention are GRANTED, and the attached replies are deemed filed. Filing obligations regarding AFPI otherwise are held in abeyance pending resolution of its request to intervene. The Motions to file amicus briefs (Docs. 73 & 101 ) are GRANTED, and the briefs are deemed filed. PA Secretary Al Schmidt's Motion (Doc. 104 ) to file a reply in support of his MTD (Doc. 91 ) is GRANTED, and he may file a 10-page reply by 1/30/2026. Finally, the Motions (Docs. 61 & 64 ) as to briefing schedule are DENIED AS MOOT. Signed by Chief Judge Cathy Bissoon on 1/16/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 01/16/2026) | |
| 106 | 01/16/2026 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM re 1 COMPLAINT, by MIKE CROSSEY, PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS. (Attachments: # 1 Proposed Order) (keh) (Entered: 01/20/2026) | |
| 107 | 01/16/2026 | BRIEF in Support re 106 Motion to Dismiss for Failure to State a Claim filed by MIKE CROSSEY, PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS. (keh) (Entered: 01/20/2026) | |
| 108 | 01/16/2026 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM re 1 COMPLAINT, MOTION to Dismiss for Lack of Jurisdiction by NAACP PENNSYLVANIA STATE CONFERENCE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (Attachments: # 1 Proposed Order) (keh) (Entered: 01/20/2026) | |
| 109 | 01/16/2026 | BRIEF in Support re 108 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction, filed by NAACP PENNSYLVANIA STATE CONFERENCE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR. (keh) (Entered: 01/20/2026) | |
| 110 | 01/16/2026 | REPLY BRIEF re 59 Motion to Intervene filed by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA. (keh) (Entered: 01/20/2026) | |
| 111 | 01/16/2026 | REPLY BRIEF re 59 Motion to Intervene filed by AMERICA FIRST POLICY INSTITUTE - PENNSYLVANIA. (keh) (Entered: 01/20/2026) | |
| 112 | 01/28/2026 | MOTION for Leave to File Joinder and Motion to Dismiss by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Exhibit Brief in Support of Joinder and Motion to Dismiss) (Savitzky, Ari). Added MOTION for Joinder on 1/28/2026 (keh) Exhibit Brief in Support Removed from public view and refiled at 116 . Modified text on 1/28/2026. (keh) (Entered: 01/28/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 113 | 01/28/2026 | NOTICE of Appearance by Megan Frederick on behalf of UNITED STATES OF AMERICA. (Attachments: # 1 Certificate of Service) (Frederick, Megan) (Entered: 01/28/2026) | |
| 114 | 01/28/2026 | ORDER. The Maston Intervenors (previously referred to as "LWV," although the Court agrees that movants' proposed collective-reference is superior) have filed a Motion (Doc. 112 ) seeking to join the other Defendants' MTDs, and leave to file their own MTD on other grounds. See text-Order at 105 (directing the Maston Intervenors to file a motion for leave, should events unfold as they have). The Motion to join and for leave is GRANTED, and the Court will consider their Motion papers as attached. Given the limited scope of the Maston Intervenors' additional arguments, the government's response period will be slightly truncated, with a deadline of 2/11/2026. Otherwise, and in light of the voluminous briefing already filed, the Court does not anticipate granting leave for additional filings. Signed by Chief Judge Cathy Bissoon on 1/28/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 01/28/2026) | |
| 115 | 01/28/2026 | w/ 112 MOTION to Dismiss by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. Motion deemed filed per Order 114 . (keh) (Entered: 01/28/2026) | |
| 116 | 01/28/2026 | BRIEF in Support re 112 Motion for Leave to File, Motion for Joinder, 115 Motion to Dismiss filed by COMMON CAUSE, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, GREGORY PERRY, LIOR STERNFELD, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (keh) (Entered: 01/28/2026) | |
| | 01/28/2026 | CLERK'S NOTICE OF CORRECTION re 112 MOTION for Leave to File Joinder and Motion to Dismiss MOTION for Joinder. ERROR: Document should have been filed as two separate documents. CORRECTION FOR FUTURE FILINGS: Attorney advised that in the future all documents of that nature are to be filed separately. Clerk docketed Brief in Support at 116 . ERROR: Multiple relief motion filed requesting only a relief. CORRECTION FOR FUTURE FILINGS: Filer to select all relief types sought when filing the Motion event. Clerk added Motion for Joinder. ERROR: Filer did not attach a Proposed Order as required by LCvR 7. CORRECTION FOR FUTURE FILINGS: Motions are to be accompanied with an attached Proposed Order. ERROR: Exhibits were filed as part of the Brief in Support. CORRECTION FOR FUTURE FILINGS: Attorney is advised that in the future, exhibits and proposed orders are to be made attachments to the main document. THIS MESSAGE IS FOR INFORMATIONAL PURPOSES ONLY AND NO FURTHER ACTION IS REQUIRED ON THE FILING AT ISSUE. (keh) (Entered: 01/28/2026) | |
| 118 | 01/29/2026 | MOTION for attorney Megan Frederick to Appear Pro Hac Vice, UNITED STATES (Filing fee $70 by UNITED STATES OF AMERICA. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Supplement, # 4 Proposed Order) (Frederick, Megan) (Entered: 01/29/2026) | |
| 119 | 01/29/2026 | ORDER granting 118 Motion for Megan Frederick to Appear Pro Hac Vice. Signed by Chief Judge Cathy Bissoon on 1/29/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 01/29/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 120 | 01/29/2026 | MOTION to Transfer Case by UNITED STATES OF AMERICA. (Attachments: # 1 Supplement Memo in Support, # 2 Proposed Order) (Frederick, Megan) Brief in Support removed from public view and refiled at 121 . Modified text on 1/30/2026. (keh) (Entered: 01/29/2026) | |
| 121 | 01/29/2026 | BRIEF in Support re 120 Motion to Transfer Case filed by UNITED STATES OF AMERICA. (keh) (Entered: 01/30/2026) | |
| | 01/30/2026 | CLERK'S NOTICE OF CORRECTION re 120 MOTION to Transfer Case . ERROR: Document should have been filed as two separate documents. CORRECTION FOR FUTURE FILINGS: Attorney advised that in the future all documents of that nature are to be filed separately. Clerk docketed Brief in Support at 121 . THIS MESSAGE IS FOR INFORMATIONAL PURPOSES ONLY AND NO FURTHER ACTION IS REQUIRED ON THE FILING AT ISSUE. (keh) (Entered: 01/30/2026) | |
| 122 | 01/30/2026 | REPLY BRIEF re 92 Brief in Support of Motion, 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction filed by AL SCHMIDT. (Thomson, Aimee) (Entered: 01/30/2026) | |
| 123 | 01/30/2026 | Unopposed MOTION to Withdraw as Attorney by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order) (Vandenberg, David) (Entered: 01/30/2026) | |
| | 01/30/2026 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 123 Unopposed MOTION to Withdraw as Attorney . ERRORS: Motion is not signed. Attorney signature does not comply with requirements (missing attorney bar ID number). CORRECTION: Filer advised of signature requirements. Filer to resubmit the document using the Errata event. (keh) (Entered: 01/30/2026) | |
| 124 | 01/30/2026 | Amended MOTION to Withdraw as Attorney by UNITED STATES OF AMERICA. (Vandenberg, David) (Entered: 01/30/2026) | |
| 125 | 01/30/2026 | ORDER granting 124 Amended Motion to Withdraw as Attorney filed by UNITED STATES OF AMERICA. Attorney David Vandenberg is terminated as to this matter. 123 Unopposed Motion to Withdraw as Attorney is terminated as a duplicate. Signed by Chief Judge Cathy Bissoon on 1/30/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 01/30/2026) | |
| 126 | 01/30/2026 | Joint MOTION for Leave to File Reply Briefs in Support of Motions to Dismiss by MIKE CROSSEY, NAACP PENNSYLVANIA STATE CONFERENCE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS, STACEY TAYLOR. (Attachments: # 1 Exhibit 1 - PARA Intervenors' Reply in Support of Motion to Dismiss, # 2 Exhibit 2 - NAACP Intervenors' Reply in Support of Motion to Dismiss) (Nkwonta, Uzoma) Link added to 127 Proposed Order. Modified text on 2/2/2026. (keh) (Entered: 01/30/2026) | |
| | 02/02/2026 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 126 Joint MOTION for Leave to File Reply Briefs in Support of Motions to Dismiss . ERROR: Filer did not attach a Proposed Order as required by LCvR 7. CORRECTION: Filer to submit a proposed order using the Proposed Order event. Filer is to link the Proposed Order to the relevant motion in the event. (keh) (Entered: 02/02/2026) | |
| 127 | 02/02/2026 | Proposed Order re 126 Motion for Leave to File, by MIKE CROSSEY, NAACP PENNSYLVANIA STATE CONFERENCE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA ALLIANCE FOR | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | RETIRED AMERICANS, STACEY TAYLOR. (Nkwonta, Uzoma) (Entered: 02/02/2026) | |
| 128 | 02/02/2026 | ORDER. The Joint Motion (Doc. 126 ) for leave to file reply briefs is GRANTED, and the attached reply briefs are deemed filed. Signed by Chief Judge Cathy Bissoon on 2/2/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 02/02/2026) | |
| 129 | 02/02/2026 | ORDER response/briefing schedule re 120 the government's Motion to Transfer the Case. Response(s) are due by 2/12/2026. Parties with aligned interests are encouraged to file one set of responsive materials, indicating the parties joining. The twenty-five page limit in the undersigned's Ps & Ps should prove sufficient. All parties and their counsel are encouraged, in this and all other matters moving forward, to favor substance over form; and reasonable efforts at streamlining will not be disturbed. Signed by Chief Judge Cathy Bissoon on 2/2/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 02/02/2026) | |
| 130 | 02/06/2026 | NOTICE of Supplemental Authority by AL SCHMIDT re 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction, 92 Brief in Support of Motion (Attachments: # 1 Exhibit 1) (Thomson, Aimee) (Entered: 02/06/2026) | |
| 131 | 02/12/2026 | RESPONSE to Motion re 120 MOTION to Transfer Case filed by AL SCHMIDT. (Thomson, Aimee) (Entered: 02/12/2026) | |
| 132 | 02/12/2026 | JOINDER of COMMON CAUSE, MIKE CROSSEY, JOEL DICKSON, TRISHA KENT, NICHOLAS MASTON, NAACP PENNSYLVANIA STATE CONFERENCE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS, GREGORY PERRY, LIOR STERNFELD, STACEY TAYLOR, TODD THATCHER, THE LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOHN THOMPSON to 131 Response to Motion. (Savitzky, Ari) (Entered: 02/12/2026) | |
| 133 | 02/24/2026 | NOTICE of Appearance by Jonathon Hauenschild on behalf of UNITED STATES OF AMERICA. (Hauenschild, Jonathon) (Entered: 02/24/2026) | |
| 134 | 02/24/2026 | MOTION to Withdraw as Attorney - Attorney Megan Frederick - by UNITED STATES OF AMERICA. (Frederick, Megan) Link added to 135 Proposed Order. Modified text on 2/24/2026. (keh) (Entered: 02/24/2026) | |
| | 02/24/2026 | CLERK'S REQUEST FOR CORRECTIVE ACTION re 134 MOTION to Withdraw as Attorney - Attorney Megan Frederick -. ERROR: Filer did not attach a Proposed Order as required by LCvR 7. CORRECTION: Filer to submit a proposed order using the Proposed Order event. Filer is to link the Proposed Order to the relevant motion in the event. (keh) (Entered: 02/24/2026) | |
| 135 | 02/24/2026 | Proposed Order re 134 Motion to Withdraw as Attorney -Attorney Megan Frederick- by UNITED STATES OF AMERICA. (Frederick, Megan) (Entered: 02/24/2026) | |
| 136 | 02/25/2026 | ORDER granting 134 Motion to Withdraw as Attorney. Attorney Megan Frederick is terminated as to this matter. Signed by Chief Judge Cathy Bissoon on 2/25/2026. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 02/25/2026) | |
| 137 | 03/20/2026 | NOTICE of Appearance by Alexander D. Keely on behalf of UNITED STATES OF AMERICA. (Keely, Alexander) (Entered: 03/20/2026) | |
| 139 | 04/09/2026 | NOTICE of Supplemental Authority by MIKE CROSSEY, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS re 106 Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit A) (Nkwonta, Uzoma) (Entered: 04/09/2026) | |
| 140 | 04/13/2026 | RESPONSE to 139 Notice, filed by UNITED STATES OF AMERICA. (Attachments: # 1 Ex. 1 - CT Transcript Excerpt) (Hauenschild, Jonathon) (Entered: 04/13/2026) | |
| 141 | 04/17/2026 | NOTICE of Supplemental Authority by AL SCHMIDT re 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction, 92 Brief in Support of Motion (Attachments: # 1 Exhibit 1 - United States v. Amore, No. 25-cv-00639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)) (Thomson, Aimee) (Entered: 04/17/2026) | |
| 142 | 04/29/2026 | NOTICE of Supplemental Authority by MIKE CROSSEY, PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS re 106 Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit A - Arizona Order) (Nkwonta, Uzoma) (Entered: 04/29/2026) | |
| 143 | 05/27/2026 | NOTICE of Supplemental Authority by AL SCHMIDT re 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction, 92 Brief in Support of Motion (Attachments: # 1 Exhibit 1 - United States v. Bellows, No. 25-cv-00468, 2026 WL 1430579 (D. Me. May 21, 2026), # 2 Exhibit 2 - United States v. Wisconsin Elections Commn, No. 25-cv-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026)) (Thomson, Aimee) (Entered: 05/27/2026) | |
| 144 | 06/22/2026 | NOTICE of Supplemental Authority by MIKE CROSSEY, PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS re 106 Motion to Dismiss for Failure to State a Claim (Nkwonta, Uzoma) (Entered: 06/22/2026) | |
| 145 | 06/25/2026 | NOTICE of Supplemental Authority by AL SCHMIDT re 91 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction, 92 Brief in Support of Motion (Attachments: # 1 Exhibit 1 - United States v. Benson, No. 26-1225, 2026 WL 1815425 (6th Cir. June 24, 2026)) (Thomson, Aimee) (Entered: 06/25/2026) | |
| 146 | 06/27/2026 | MEMORANDUM & ORDER. The Motions to Dismiss (Docs. 91 , 106 , 108 & 115) are GRANTED. The Motion by AFPI to intervene (Doc. 59 ) is DENIED AS MOOT. The Motion to transfer (Doc. 120 ) is DENIED. Final judgment under Rule 58 will be entered, and the case marked closed. Signed by Chief Judge Cathy Bissoon on 6/27/2026. (dcd) Docket text modified, today, to accurately reflect the date of signature (6/27/2026). (dcd) (Entered: 06/27/2026) | |
| 147 | 06/27/2026 | JUDGMENT ORDER. FINAL JUDGMENT hereby is entered pursuant to Rule 58 of the Federal Rules of Civil Procedure. This case is marked CLOSED. Signed by Chief Judge Cathy Bissoon on 6/27/2026. (dcd) (Entered: 06/27/2026) | |
| 148 | 07/06/2026 | NOTICE OF APPEAL as to 146 Order on Motion to Intervene, Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Transfer Case, 147 Rule 58 Judgment by UNITED STATES OF AMERICA. Motion for IFP N/A. Certificate of Appealability N/A. Court Reporter(s): N/A. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. The Transcript Purchase Order form will NOT be mailed to the parties. The form is available on the Court's internet site. (Hauenschild, Jonathon) (Entered: 07/06/2026) | |
| 149 | 07/07/2026 | USCA Case Number 26-2684 for 148 Notice of Appeal filed by UNITED STATES OF AMERICA. USCA Case Manager Laurie | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (lr) (Entered: 07/07/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH OF PENNSYLVANIA; and AL SCHMIDT, in his official capacity as Secretary of the State of Pennsylvania,<br><br>Defendants. | ) | Case No. |

**COMPLAINT**

As President Trump said earlier this year, "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic." Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025). Indeed, "[t]he right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id*. Under our Constitution, States "must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id*. Without such safeguards, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006). And "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*

To prevent fraudulent votes from being cast, federal law requires that States conduct routine list maintenance procedures of their statewide voter registration databases. Accurate voter

rolls prevent the opportunity for fraud in federal elections. The Civil Rights Division of the Department of Justice is tasked with ensuring that States conduct voter-registration-list maintenance to prevent the inclusion of ineligible voters on any State's voter registration list. This action seeks to remedy Defendants' violations of federal voting laws. Plaintiff United States of America ("United States") brings this action against the Commonwealth of Pennsylvania and Al Schmidt in his official capacity as the Secretary of State for the Commonwealth of Pennsylvania, and alleges as follows:

1. Defendants have failed to comply with the important mandates of the NVRA and HAVA by refusing to provide necessary information to enable the United States to assess its compliance. One purpose of the NVRA is to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). Consistent with these purposes, the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of "the death of a registrant or a change in residence of the registrant." 52 U.S.C. § 20507(a)(4)(A)-(B).

2. Similarly, HAVA requires the appropriate state or local election official to perform list maintenance with respect to the centralized, computerized statewide voter registration list required under HAVA "on a regular basis[.]" 52 U.S.C. § 21083(a)(1)-(2). HAVA also requires that states have "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters[,]" with "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A)-(B).

3. The United States brings this action pursuant to its authority under the NVRA, the HAVA and the CRA to compel the Commonwealth of Pennsylvania and its chief state election official, Secretary of State Al Schmidt, to provide information regarding the State's voter list maintenance procedures and an electronic copy of the statewide voter registration list including all fields, to allow the Attorney General to effectively assess Defendants' compliance with the requirements of the NVRA and HAVA.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); 52 U.S.C. §§ 20510(a) and 21111; and 52 U.S.C. § 20705.

5. Venue is proper in this District pursuant, to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and the Defendants are located in and conduct election administration activities in this District.

**PARTIES**

6. Plaintiff United States, through the Attorney General, has authority to enforce the NVRA, 52 U.S.C. § 20510(a), and Sections 21081 through 83, and 21083a of HAVA, 52 U.S.C. § 21111. Both the NVRA and HAVA authorize the Attorney General to bring a civil action in an appropriate district court for such declaratory and injunctive relief as are necessary to carry out the relevant requirements under the statute. 52 U.S.C. §§ 20510(a) and 21111. Pursuant to the CRA, 52 U.S.C. § 20705, the Attorney General may compel states to produce certain records and papers relating to the administration of federal elections.

7. Defendant Commonwealth of Pennsylvania is a state of the United States of America and, therefore, is subject to the requirements of the NVRA, the HAVA, and the CRA. 52 U.S.C. §§ 20502(4), 20503, 20701, and 21141.

8. Defendant Secretary of State Al Schmidt is sued in his official capacity as the chief state election official responsible for coordinating Pennsylvania's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; https://www.pa.gov/agencies/dos/about. Secretary Schmidt is sued in his official capacity only.

**STATUTORY BACKGROUND**

**A. The Civil Rights Act of 1960**

9. Congress empowered the Attorney General to request records pursuant to Title III of the CRA, codified at 52 U.S.C. § 20701, et seq.

10. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

11. Section 303 of the CRA provides, in pertinent part, "Any record or paper required by Section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

**B. The National Voter Registration Act**

12. The NVRA was enacted "to establish procedures that will increase the number of

eligible citizens who register to vote in Federal elections "while ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1) and (4).

13. Section 8 of the NVRA establishes requirements for the administration of voter registration for elections for federal office in covered states, including Pennsylvania. Section 8(a)(4) requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of "the death of the registrant," or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. §20507(a)(4)(A)-(B).

14. Subsections (b), (c), and (d) set forth procedures for the removal of ineligible voters from official lists of voters as part of a state's "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office[.]" 52 U.S.C. § 20507(b).

15. State voter list maintenance programs must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 [.]" 52 U.S.C. § 20507(b)(1); *see also* S. Rep. No. 103-6 at 31 (Feb. 25, 1993) ("The term 'uniform' is intended to mean that any purge program or activity must be applied to an entire jurisdiction."); accord H.R. Rep. No. 103-9 at 15 (Feb. 2, 1993) (same).

16. Section 8(d) of the NVRA provides that a "[s]tate shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence," unless the registrant:

> A. confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
>
> B. has failed to respond to a [Confirmation Notice] . . . and has not voted or appeared to vote . . . in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for

Federal office that occurs after the date of the notice.

52 U.S.C. § 20507(d)(1).

17. Section 8(d)(2) sets forth specific requirements for the Confirmation Notice to be sent to registrants, and Section 8(d)(3) provides that a "voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with [subsection 8(d)]." 52 U.S.C. § 20507(d)(2)-(3).

18. Section 8 of the NVRA also provides an example of a voter list maintenance program that constitutes a reasonable effort to remove registrants who have become ineligible due to a change of residence. *See* 52 U.S.C. § 20507(c)(1). Under this program, a state uses information from the United States Postal Service National Change of Address ("NCOA") program to identify registrants who may have changed residence. *See* 52 U.S.C. § 20507(c)(1)(A). Where it appears from the NCOA information that a registrant has moved to a new address in the same jurisdiction, the registration record is updated to show the new address, and the registrant is sent a notice of the change by forwardable mail that includes a postage-prepaid, pre-addressed return form by which the registrant may verify or correct the address information. *See* 52 U.S.C. § 20507(c)(1)(B)(i). Where it appears from the NCOA information that a registrant has moved to a new address in a different jurisdiction, the procedure set out in Section 8(d), described above, is used to confirm the address change. *See* 52 U.S.C. § 20507(c)(1)(B)(ii).

19. Section 8(i) of the NVRA provides that:

> "Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

Section 8(i)(2) further specifies:

> "The records maintained pursuant to paragraph (1) include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2).

20. Section 10 of the NVRA requires each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509.

**C. The Help America Vote Act**

21. The purpose of HAVA "can be stated very simply—it is to improve our country's election system." H.R. Rep. 107-329(I) at 31 (2001). "Historically, elections in this country have been administered at the state and local level[,]" but Congress found that "the federal government can play a valuable [role] by assisting state and local government in modernizing their election systems." *Id*. at 31-32.

22. HAVA imposes "minimum requirements" for the conduct of federal elections, which "allow the states to develop their own laws and procedures to fulfill the requirements" to the extent that they are consistent with the standards set by HAVA. *Id*. at 35.

23. HAVA requires all states to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level," that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

24. The computerized list required by HAVA "shall be coordinated with other agency databases within the State." 52 U.S.C. § 21083(a)(1)(A)(iv).

25. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 provides that a state's "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

26. HAVA mandates that a state may not process a voter-registration application without the applicant's driver's license number, where an applicant has a current and valid driver's license, or, for other applicants, the last four digits of the applicant's Social Security number. *See* 52 U.S.C. § 21083(a)(5)(A)(i). For applicants who have neither a driver's license nor a social security number, a state must assign a unique identifying number for voter registration purposes. *See* 52 U.S.C. § 21083(a)(5)(A)(ii). A state must then determine the validity of the information provided by the applicant. *See* 52 U.S.C. § 21083(a)(5)(A)(iii).

27. HAVA applies to all fifty states, including Pennsylvania. *See* 52 U.S.C. § 21141.

28. Section 303 of HAVA incorporates by reference certain provisions of the NVRA. *See* 52 U.S.C. § 21083(a)(4)(A). These provisions, unless explicitly noted otherwise, apply to all states covered under HAVA. *Id.*

29. HAVA vests the Attorney General of the United States with sole authority to "bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under "Sections 21081, 21082, 21083, and 21083a of [HAVA]." 52 U.S.C. § 21111.

30. HAVA contains no private right of action. *See* 52 U.S.C. §§ 20901 to 21145.

**FACTUAL ALLEGATIONS**

31. The United States Election Assistance Commission (EAC) was established by HAVA to serve as "a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections." EAC website, "Help America Vote Act," https://www.eac.gov/about/help_america_vote_act.aspx. The EAC "is an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process." EAC website, "About the EAC," (Sept. 22, 2025)https://www.eac.gov/about.

32. The EAC conducts a biennial Election Administration and Voting Survey ("EAVS"), "an analysis of state-by-state data that covers various topics related to the administration of federal elections[,]" including voter registration and list maintenance. *Id*. The EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), explains that as part of the 2024 EAVS, the states "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance[,]" such as the number of confirmation notices states sent "to verify continued eligibility from registered voters[,]" and the number of voter registration records that state removed from their voter lists. EAC (Sept. 15, 2025), 2024 EAVS Report, https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf, at 7.

33. The Attorney General sent a letter to Secretary Schmidt on June 23, 2025, seeking information regarding Pennsylvania's compliance with HAVA. ("June 23 Letter"). The June 23 Letter requested, among other information and documents, a description of the process by which

registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list and descriptions of the processes that Pennsylvania uses to carry out its list maintenance obligations under Section 303 of HAVA, such as the process by which the state identifies and removes any duplicate voter registrations and deceased registrants.

34. The June 23 Letter also inquired about the requirement under Section 303(a)(5) of HAVA that applicants provide certain information and the state's process for verifying that information.

35. Secretary Schmidt responded in a July 23, 2025, letter to the Department of Justice. The response did not explain whether non-citizens were identified and what steps were taken to remove those voters. The response also admitted that if the Commonwealth could not verify the ID number provided as required by HAVA, the applicant would be registered to vote anyway.

36. A second letter from the Attorney General on August 4, 2025, requested that Pennsylvania provide a list of election officials responsible for implementing Pennsylvania's general program of voter registration list maintenance from November 2022 through receipt of the letter and requested, pursuant to Section 8(i) of the NVRA, the current electronic copy of its computerized statewide voter registration list ("SVRL"), required under Section 303(a) of HAVA. The Department's August 4 letter asked Pennsylvania to produce the requested information and records by encrypted email or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

37. The Department's August 4 letter also requested information about duplicate registrations, other EAVS survey questions, and inquired about the removal procedures for ineligible voters from the voter rolls because they were noncitizens, felons, or adjudicated incompetent.

38. In response, Secretary Schmidt sent a second letter on August 18, 2025, providing explanations to the Attorney General's EAVS requests. In that letter, however, the Secretary stated, "Nothing in the NVRA provides a process by which those who are deemed non-eligible on the basis of being a non-citizen are to be removed from the voter rolls." While acknowledging that it is illegal for a non-citizen to misrepresent that he is a citizen on a voter registration application, the Commonwealth does not appear to have any process in place to make any determination about whether there are non-citizens on the voter rolls.

39. On August 14, 2025, the Attorney General sent a third letter to Secretary Schmidt, requesting production of Pennsylvania's SVRL that contains all fields. The August 14, 2025, letter from the Justice Department requested an electronic copy of Pennsylvania's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number as required by 52 U.S.C. § 20703.

40. Furthermore, the August 14 letter stated, "all data received from you will be kept securely and treated consistently with the Privacy Act."

41. The information that the Justice Department collects pursuant to its request to Pennsylvania will be maintained consistent with Privacy Act protections as explained on the Justice Department's website at https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction. The full list of routine uses for this collection of information can be found in the System of Records Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records", 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005);

and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include the NVRA, HAVA, and the CRA. The records in the SORN are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

42. The August 14 letter also explained that HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974 (5 U.S.C. [§] 552a note)." 52 U.S.C. § 21083(c). The August 14 letter also stated: "In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing."

43. In response, Secretary Schmidt sent a letter on August 21, 2025 and offered public voter records to the United States for review. However, Pennsylvania's public voter records do not include the HAVA required unique identifiers requested by the Attorney General.

44. Pennsylvania is a member of the Electronic Registration Information Center (ERIC), an organization comprised of states whose stated mission "is to assist states in improving the accuracy of America's voter rolls and increasing access to voter registration for all eligible citizens."1 FAQ's, ERIC, (Sept. 22, 2025) https://ericstates.org/faq/; *see id.*, "Which States Are Members of ERIC?" https://ericstates.org/about/. ERIC is funded by its members, who pay a one-time membership fee and annual dues. *Id.* ERIC's website explains that "[a]t least every 60 days, each member submits their voter registration data and licensing and identification data from motor vehicle departments (MVD) to ERIC." *Id.* ERIC's website states: "Members submit dates of birth,

---

driver's license/ID card numbers, and Social Security numbers to ERIC after applying a cryptographic one-way hash to these data points." *Id*.

45. Pennsylvania provides the identical information that the Department has requested to ERIC, a private organization which lacks any enforcement authority, yet refuses to comply with federal law and provide that same information to the Attorney General of the United States.

**CAUSES OF ACTION**

**COUNT I: CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20701, *et seq.***

46. The United States restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

47. The CRA, 52 U.S.C. §§ 20701-20706, provides the United States authority to obtain the records and information requested in its June 23 Letter and its August 14 Letter.

48. The August 14, 2025, letter from the Justice Department requested an electronic copy of Pennsylvania's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number as required by 52 U.S.C. § 20703.

49. In his August 21, 2025, letter Secretary Schmidt refused to provide the records requested by the United States, including the SVRL and the requisite HAVA unique identifiers in violation of the CRA. 52 U.S.C. §§ 20701-20706.

50. Defendants' refusal to provide the information demanded by the Attorney General is a violation of the Civil Rights Act. *See* 52 U.S.C. §§ 20701-20706.

51. Unless and until ordered to do so by this Court, Defendants' refusal to provide these records as requested constitutes a continuing violation of federal law.

//

**COUNT II: NATIONAL VOTER REGISTRATION ACT, 52 U.S.C. § 20507(i)**

52. The United States restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

53. The Attorney General requested an electronic copy of Pennsylvania's statewide voter registration list with all fields, including the HAVA-mandated unique identifiers, in letters from August 4 and August 14, pursuant to the NVRA's disclosure requirement.

54. Defendants have failed to make available and to provide to the United States "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . [,]" in violation of 52 U.S.C. § 20507(i)(1).

55. This information is necessary for the Attorney General to determine if Pennsylvania is conducting "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters," as required by 52 U.S.C. § 20507(a)(4), including evaluating issues raised by the data and by answers provided by the Commonwealth of Pennsylvania to the Election Assistance Commission's 2024 EAVS and reflected in the EAC's June 30, 2025 report.

56. Unless and until ordered to do so by this Court, Defendants' refusal to provide these records as requested constitutes a continuing violation of federal law.

**COUNT III: HELP AMERICA VOTE ACT, 52 U.S.C. § 21083**

57. The United States restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

58. Defendants have failed to take the actions necessary for the State of Pennsylvania to comply with Section 303 of HAVA.

59. Defendants' failure to provide sufficient information in response to requests made by the Justice Department's Civil Rights Division prevent the Attorney General from evaluating Pennsylvania's compliance with HAVA, pursuant to the Attorney General's statutory enforcement authority under 52 U.S.C. § 21111.

60. Defendants' refusal to provide sufficient information prevents the Attorney General from evaluating Pennsylvania's procedures that "ensure[] . . . duplicate names are eliminated from the computerized list." 52 U.S.C. § 21083(a)(2)(B).

61. Defendants' refusal to provide the United States the current electronic copy of Pennsylvania's computerized statewide voter registration list, containing all fields, including each registrant's full name, date of birth, residential address, and either his state driver's license number or the last four digits of the Social Security number prevents the Attorney General from determining Pennsylvania's compliance with the list maintenance requirements of HAVA. *See* 52 U.S.C. § 21083(a)(5)(A).

62. Unless and until ordered to do so by this Court, Defendants' refusal to provide these records as requested constitutes a continuing violation of federal law.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands judgment in its favor and against Defendants as follows:

A. Declare that Defendants' refusal to provide registration records and Pennsylvania's electronic statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number, upon a demand by the Attorney General violates Title III of the CRA. 52 U.S.C. § 20703;

B. Declare that Defendants have failed to make available and provide to the United States "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," in violation of the NVRA. 52 U.S.C. § 20507(i)(1);

C. Declare that the Defendants' refusal to provide the requested records concerning voter registration and list maintenance prevents the Attorney General from enforcing HAVA's list maintenance requirements;

D. Declare that any State law that prohibits Defendants from providing the requested statewide voter registration list is preempted by Federal law.

E. Order Defendants to provide to the United States the current electronic copy of Pennsylvania's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number as required by the CRA, NVRA, and HAVA; and

F. Order such additional relief as the interests of justice may require.

Dated: September 25, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

*/S/ David D. Vandenberg*__________
MICHAEL E. GATES (CA Bar No. 258446)
Deputy Assistant Attorney General
Civil Rights Division

MAUREEN S. RIORDAN (NY Bar No. 205880)
Counsel, Voting Section
Civil Rights Division
TIMOTHY F. MELLETT (DC Bar No. 430968)
BRITTANY E. BENNETT (GA Bar No. 717377)
DAVID D. VANDENBERG
(TX Bar No. 24107948)
Attorneys, Voting Section
Civil Rights Division
950 Pennsylvania Avenue 4CON
Washington, DC 20530
Michael.Gates2@usdoj.gov
Maureen.Riordan2@usdoj.gov
Timothy.F.Mellett@usdoj.gov
Brittany.Bennett@usdoj.gov
David.Vandenberg@usdoj.gov
Tel. (202) 307-2767
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ David D. Vandenberg*
David D. Vandenberg

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>COMMONWEALTH OF PENNSYLVANIA; and AL SCHMIDT, in his official capacity as Secretary of the State of Pennsylvania,<br>*Defendants,* | Case No. 2:25-CV-01481 |

**DECLARATION OF ANTHONY P. ASHTON**

Pursuant to 28 U.S.C. § 1746, I, Anthony P. Ashton, hereby declare as follows:

1. I am a U.S. citizen, over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am Senior Associate General Counsel of the National Association for the Advancement of Colored People ("NAACP"), and I have been in the Office of the General Counsel since October 2020. I am a lifetime member of the NAACP.

3. The NAACP is headquartered in Baltimore, Mayland, and operates across the entire country, including Pennsylvania.

4. The NAACP was founded in 1909 by pioneers of racial justice in the United States. The NAACP is the oldest and largest civil rights organization in the United States. Its mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color.

5. The NAACP is a non-partisan organization that maintains many units, including state and state-regional conferences that cover every state, plus the District of Columbia. The NAACP has over two thousand local branches, college chapters, prison chapters, and youth councils. In total, the NAACP has approximately 200,000 members including approximately 6,700 in Pennsylvania.

6. As Senior Associate General Counsel for the NAACP, I work to address legal concerns of the National NAACP, the various NAACP units, and individual NAACP members. I am familiar with the various challenges that our members face, including challenges related to voting rights, civil rights, and privacy concerns.

7. The NAACP has a long history of its members and constituents facing legal retaliation for their advocacy around civil rights and voting rights. Accordingly, the NAACP has a proud tradition of fighting for and protecting its members, constituents, and the Black community at large from legal retaliation. In a seminal case on the First Amendment, the NAACP successfully defended against the disclosure of its membership lists to the State of Alabama on the basis of the right to free association. *See NAACP v. Alabama*, 357 U.S. 449 (1958). The NAACP maintains this longstanding tradition of protecting members and supporters from the unlawful disclosure of their personal information in response to government overreach and unlawful invasions of privacy.

8. Among our many initiatives, the NAACP works to mobilize voters through robust non-partisan civic engagement and election-related programming. For example, the NAACP, in conjunction with partners across the country, has launched programs focused on turning out voters through direct voter contact, mass communication, targeted digital mobilization, and SMS texting. In the lead-up to the 2024 elections, the NAACP recruited over 100,000 volunteers across the country to execute these programs. The NAACP has also engaged in voter protection efforts, advocating on behalf of voters across the country to ensure that the law is followed and that the right to vote is respected and protected. These efforts include litigation, a voter protection hub and voter guides, and voter protection command centers staffed by dozens of lawyers and law students. Naturally, voter registration is crucial to all these civic engagement efforts. The NAACP currently is taking steps to educate and register voters for elections, including referenda, taking place in November 2025. The NAACP is currently a party in lawsuits to protect voting rights and is seeking judgments that will impact the 2026 elections. As it does in every election cycle, the NAACP anticipates ramping up its election voter protection efforts as the 2026 elections draw near.

9. The NAACP plays a crucial role for its members and constituents as the Black community's most trusted messenger and the country's largest civil rights organization, especially in a public square rife with political noise and distractions.

10. I understand that the Department of Justice has recently sued Pennsylvania to obtain complete, unredacted voter registration data of all voters in the commonwealth, including their driver's license numbers and partial social security numbers. If the Department of Justice is successful in obtaining this information, it will harm the NAACP's mission and ability to successfully execute its programs by risking the sensitive data of its members and constituents. Such efforts amount to government-sanctioned voter intimidation. This will deter our members from engaging in the political process for fear of government mishandling or weaponization of such data, including through improper removal of voters from the rolls.

11. My concerns are exacerbated by the fact that the current administration has targeted people with whom it disagrees, or whose voices it thinks should be silenced, by using any and all information and resources within its possession against such people. This includes using information held by federal agencies against political opponents, such as the recent public disclosure of a New Jersey gubernatorial candidate's military records, which contained various pieces of sensitive and confidential personal details. Similarly, many of our community members are disturbed by efforts by the so-called Department of Government Efficiency ("DOGE") to obtain social security data of all Americans, despite questionable data management policies by that agency and the perception that, without seeking or obtaining consent from millions of the affected Americans, this confidential information may end up in the hands of private actors.

12. Unfortunately, the NAACP, its members, and its constituents have been singled out and targeted many times over the years by government officials and other individuals who disagree with our mission. Our leaders and politically vocal members, for example, have been targeted with unjust espionage and investigation—and sometimes even physical violence—because of their advocacy efforts. Against this backdrop, the prospect of disclosures of mass amounts of sensitive voter data to the Department of Justice is especially chilling for the NAACP and its members.

13. I am concerned that disclosure of voters' private information on Pennsylvania's voter rolls will deter qualified voters in our communities from participating in the franchise. That is particularly so because the Department of Justice's efforts do not reflect good faith efforts to improve the electoral system or voter rolls. Instead, those efforts appear driven by a desire to perpetuate misinformation and disinformation about non-existent voter fraud and to punish people who oppose the President's agenda. The federal government's demand for Pennsylvania's complete voter registration list is likely to sow distrust of the electoral system, which further frustrates our mission to convince community members to trust and make their voices heard at the ballot box. These concerns are especially notable for voters who are most skeptical of the electoral system and worried about improper government scrutiny, including younger voters, voters who are naturalized citizens, first-generation voters, and voters who were formerly incarcerated.

14. In addition to my concerns about the Department of Justice misusing personal voter data, I am also concerned about whether it will properly maintain and protect such data if it obtains such data. The actions that the Department of Justice has taken to compel the production of sensitive personal information of Pennsylvania voters, as well as voters across the country, do not give me confidence that the Department will respect federal or state privacy laws or be a reliable custodian of the personal information of the communities the NAACP works with in Pennsylvania. As explained, many of our members are disturbed by reports of DOGE negligently storing sensitive Social Security information. As a result, I am extremely concerned about the improper disclosure of the personal information of community members that the NAACP works with and

seeks to enfranchise. The risk of such improper disclosure further discourages the community members we serve from registering to vote.

15. The threat that voters' personal information may be provided to the federal government will frustrate the work of NAACP. A major goal of our civic engagement work is to encourage all eligible Pennsylvania voters to be informed and to exercise their rights as American citizens by participating in the electoral process. That work could become significantly more difficult if our members and constituents believe they could be punished, scrutinized, or investigated simply for registering to vote.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of October, 2025

Anthony P. Ashton

Anthony P. Ashton

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>COMMONWEALTH OF PENNSYLVANIA; and AL SCHMIDT, in his official capacity as Secretary of the State of Pennsylvania,<br>*Defendants,* | Case No. 2:25-CV-01481 |

**DECLARATION OF STACEY TAYLOR**

Pursuant to 28 U.S.C. § 1746, I, Stacey Taylor, hereby declare as follows:

1. I have personal knowledge of the matters stated herein and would testify to the same if called as a witness in Court.

2. I am a U.S. citizen, over eighteen years of age and am otherwise competent to testify.

3. I am a registered voter in Berks County. I have been a Pennsylvania voter for 23 years, since 2002. I intend to vote in the upcoming November 4, 2025, election and the 2026 federal elections, including the May Primary Election and November General Election. I have voted in state and federal elections as a Pennsylvania voter between 2022 and 2024.

4. I am the President of the National Association for the Advancement of Colored People Pennsylvania State Conference ("State Conference"). I have held this position since July of 2023. As President, I am responsible for overseeing all of the State Conference's branches, college chapters, and youth councils with the Commonwealth of Pennsylvania. My work includes supporting and assisting in the development of each branch's programs. Previously I served as the President for the Reading Branch for even years prior to this role.

5. The State Conference is a nonpartisan organization operating in the Commonwealth of Pennsylvania and is affiliated with the National Association for the Advancement of Colored People ("NAACP") operating across the United States. The State Conference has been in existence

for 91 years and has over 6,700 members in 107 adult, youth, college, and prison units across the state. Many of these members participated in Pennsylvania state and federal elections in 2022 and 2024, and plan to participate in future elections. As a constituent and subordinate unit of the Association, the State Conference works diligently to carry out the mission of the NAACP which is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Early objectives of the State Conference included providing support to the National Office in its efforts to end injustices and bigotry throughout the nation, as well as securing voting rights for all citizens and putting an end to mob violence and lynching.

6. Among other organizational missions, the State Conference is dedicated to ensuring that all eligible Pennsylvania citizens are given a full and equal opportunity to exercise their fundamental right to vote. In furtherance of these purposes, State Conference engages in broad nonpartisan civic engagement and voter registration efforts, seeking to build confidence in the integrity of the election system and mobilize members and their communities to vote in each election. The State Conference works generally in the areas of voter registration, voter education, get out the vote, and grassroots mobilization around voting rights. Our efforts include voter protection, ensuring that voters are not disenfranchised by violations of law, threats of violences, or partisan gamesmanship. We have been involved in voting rights litigation in the Commonwealth and have sought to prevent efforts to suppress or disenfranchise African American voters.

7. The State Conference works particularly hard to ensure that members and their communities have accurate information about elections and their rights, feel and are safe registering and participating in an election, and have trust in the process of our elections to make their voices heard. Because we provide accurate and reliable information, and understand our members concerns and interests, we are able to maintain and mobilize election engagement and truth in the political process. Our organization is successful at encouraging participation in the political process by individuals who would otherwise avoid it. These are interests central to our mission.

8. Recently, the Department of Justice has sought to obtain complete, unredacted voter registration data of all voters in Pennsylvania. It is seeking this information without offering any evidence of civil neglect or criminal mischief. Instead, baseless claims of widespread noncitizen voting and fraud have been weaponized to undermine the integrity of our state election system. Additionally, the federal government has engaged in efforts to consolidate data across federal and state sources for use in not only purging registered voters from the rolls, but to support civil and criminal investigations. This effort has been undertaken despite the unreliability of the underlying data, the questionable method of merging these differing systems and differently defined categories of information, and without consent of the individuals from whom the sensitive personal

information was obtained. Further, there is evidence that the effort is being conducted in clear violation of state and federal law.

9. I only learned of this nonpublic effort to obtain the private sensitive personal information of voting members due to a lawsuit filed by the Department of Justice on September 25, 2025, after their nonpublic efforts to coerce disclosure were resisted. Until the Department of Justice sued on September 25, 2025, I was not aware that the Commonwealth had shared any voter information, including my voter information, with the federal government.

10. I now understand that the Commonwealth of Pennsylvania may have provided some of this sensitive personal information of members to the Department of Justice, but it is still unclear exactly what was shared. No individuals were notified in advance that their information would be disclosed in this manner. No prior consent was obtained from the voters in question.

11. As a Pennsylvania voter, I understand that my information, including sensitive, personal information, is included in the state's registered voter database and my information may have been shared or may be shared with the Department of Justice. I was not notified in advance by the Secretary of State that information may be shared or will be shared with the Department of Justice or other entities. I have not provided consent to the Secretary of State to share my information, including sensitive personal information, with the Department of Justice or other entities.

12. As a Black voter and civil rights leader, I worry about and fear how my voting history and any personal information I provided in the voter registration process to my local election officials and the Pennsylvania Secretary of State will be shared with and used by the federal government.

13. The State Conference's members include eligible voters of color who are at risk of not being able to vote due to inaccurate records and information stored by federal agencies that may be used to invalidate their voter registration. Members include traditionally marginalized communities, like first-generation voters and voters with criminal histories. Members also include individuals who may have recently changed addresses or have multiple addresses while legally maintaining their registered voter residence, and individuals with jobs that require long hours, young children and a lack of childcare support, and other burdens and obligations that prevent them from conducting an exhaustive survey of, and verifying the accuracy of, all federally held sources of information and records associated with their name. Such a project would be especially difficult for our members to complete at all, let alone in the limited period prior to the upcoming election.

14. The mere threat of disclosure of sensitive personal information, let alone the greater context of misuse and abuse, serves to chill participation of our members and discourage engagement in upcoming elections.

15. This November's election will determine three State Supreme Court seats. Thus, this election is not merely important to determining who will lead our state or local offices for the next few years, but who will define the laws of this state for the next decade.

16. The consolidation of massive amounts of sensitive personal information of members, disclosed for discrete and unrelated purposes in varied but particular contexts, is understandably alarming for members. The data maintenance and security of recent federal effort has been called into question by courts. The mere consolidation of this sensitive information creates a honey pot—a clear bullseye for bad actors who would seek to access and utilize this information to cause our members significant harm. These risks were not contemplated when the information at issue was disclosed by members, who provided consent for the storage and use of this sensitive information only for the purposes then clearly defined.

17. Further, the current administration has already weaponized personal sensitive information against individuals perceived to be political adversaries, dissidents, or non-supporters. For example, I am aware of a recent disclosure of a New Jersey gubernatorial candidate's military records. Similarly, many of our community members are aware of, and disturbed by, efforts by the so-called Department of Government Efficiency ("DOGE") to obtain social security data of all Americans, despite questionable data management policies by that agency.

18. The State Conference members and I do not trust the federal government to handle sensitive information without further sharing personal information and jeopardizing our rights and wellbeing, including the basic right to vote.

19. The disclosure and potential misuse or abuse of sensitive personal information at issue here creates a burden on the right to vote. It also poses a form of intimidation that will discourage participation in the franchise, both from registered voters who voted in elections between 2022 and 2024, registered voters intending to vote in future elections, and individuals who are eligible to vote in future elections but are not yet registered to vote. This intimidation especially targets our members who fear retribution for their political participation or do not wish to invite excessive government scrutiny. It facilitates partisan efforts to target political adversaries, spread misinformation, and sow distrust in our elections. It suggests further efforts to violate state and federal law.

20. If the DOJ obtains the sensitive information of our registered members, STATE CONFERENCE will have to change its messaging to voters of color about how information shared with the government is stored and used. It will also have to divert considerable resources from its ongoing election protection, advocacy, and get out the vote efforts to educate and assist eligible voters with ensuring that their personal information stored by various state and federal agencies is accurate and consistent—lest even a minor discrepancy result in the purge of their voter registration or worse. I anticipate that many people will either opt out of voting or opt out of registering to vote if they know that the Commonwealth shares personal data with the federal

government. This frustrates the work of STATE CONFERENCE to encourage exercise of basic constitutional rights and participation in the electoral process.

21. If this unprecedented consolidation of provenly unreliable data moves forward under the guise of registration roll "maintenance" immediately prior to the upcoming election, many impacted voters of color will likely be impacted. Further, our members have serious and well-grounded concerns, informed by decades of American history, about the unrestricted access and use of their personal information. Members have and will continue to experience fear and intimidation in maintaining their voter registrations and exercising their rights under the current threat of DOJ criminal enforcement arising from as little as a mere data error. These heavy-handed registration "maintenance" and enforcement tactics constitute a significant burden on members right to vote, which we strongly oppose.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6 day of October, 2025

Stacey Taylor President
NAACP PA State Conference

# EXHIBIT A

**DECLARATION OF NICHOLAS MASTON**

I, Nicholas Maston, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 37 years old and am otherwise competent to testify.

3) I am a resident of Swarthmore, Pennsylvania, located in Delaware County. We moved to Swarthmore in July, 2025. Prior to that, my family resided in Media, Pennsylvania, also located in Delaware County.

4) I am a general medicine doctor and geriatrician. I work at a hospital in Philadelphia and at a nursing facility.

5) The right to vote is important to me. I'm an American citizen and I believe in this country and in our democracy. The right to vote isn't a trivial issue to be politicized; it's the way we operate our society. I believe that people on both sides of the aisle agree on that.

6) My family has moved around a lot because my wife and I were both in medical training. We've always been meticulous about changing our documentation in each place we've resided:

a) After medical school, I completed a four-year residency in North Carolina. I changed my driver's license and registered to vote in North Carolina. I also completed a USPS change-of-address form.

b) Next, we moved to Pittsburgh for three years, where I worked at a hospital. I changed my driver's license to Pennsylvania, registered to

vote in Pennsylvania, and again filed the USPS change-of-address form.

c) In 2023, we moved to Chicago for one year of medical training. We did not register to vote in Illinois or change our documents because our intention was to return to Pennsylvania. We *did* file a USPS change of address form to receive our mail in Chicago.

d) In the summer of 2024, we moved to Media, Pennsylvania and were excited to finally settle down. I updated my driver's license address from Pittsburgh to Media and updated my voter registration for Delaware County. Once again, I completed the USPS change-of-address form.

7) I applied for a mail-in ballot in August 2024 and my application was approved by Delaware County on August 28, 2024. A true and correct copy of the Department of State email regarding my mail-ballot application is attached as Exhibit A. After I received and completed the mail-in ballot packet, I returned the completed ballot packet to the ballot drop-box on site at the Delaware County Courthouse in Media, PA in October and received email confirmation that it had been received on October 10, 2024. A true and correct copy of the Department of State email regarding receipt of my mail-ballot is attached as Exhibit B.

8) On November 2, 2024—three days before the Presidential Election—I received an email from Jim Allen, the election director for Delaware County. The email stated that the Board of Elections had received a challenge to my mail-in ballot application. A true and correct copy of the email notice and

challenge is attached as Exhibit C. The document stated that the challenger believed I was "not eligible to vote" on the basis that I had filed a change of address form with USPS when I lived in Chicago.

9) When I received the email, I was shocked and upset. I spent about an hour researching on the internet to see if this was legal. It felt like some person I had never met was trying to disqualify my vote.

10) On November 7, 2024, the Delaware County Board of Elections held a hearing on the 143 challenges that had been filed. I took the morning off work to be able to attend the hearing over Zoom.

11) The process was frustrating and infuriating. It quickly became clear that the challenger didn't have any individualized evidence or know any of the people who she had challenged. The only basis for the challenges was that the voters had completed the USPS change-of-address form, which the Board explained was not the basis for determining eligibility to vote in Delaware County. Moreover, the challenger testified that she hadn't done the data analysis herself, and had received a spreadsheet from a group of "concerned citizens" who she refused to identify.

12) The challenge hearing felt like a waste of time and resources. It felt like someone was injecting uncertainty in the election under the guise of "election integrity."

13) After an extended back and forth with the Board of Elections, the challenger withdrew the challenges. The Board then gave the impacted voters

an opportunity to testify.

a) I testified under oath over Zoom. I told the challenger that I considered it a very serious allegation to suggest that my vote is ineligible to be counted. I invited her to my home—just 1.6 miles away—to verify my eligibility and residence in this county.

b) I testified about the various moves my family had made and explained that we filed the change-of-address form each time. I noted that in addition to the faulty assumptions that were made about the USPS database, the data itself was flawed because it didn't capture the most recent change-of-address form that we filed upon moving back to Pennsylvania in 2024.

c) Finally, I asked the challenger whether there was any financial support provided by a third party to support the cost of the $10-per-ballot challenges, and she refused to identify who was behind the effort.

14) My family went through a long and stressful moving process, and we always tried to do everything correctly in terms of updating our documentation. For that to be interpreted as being ineligible to vote in the community where I live is not only an affront to my right to vote, but also to the sense that I am member of this community as much as anyone else. It was upsetting to think that the challenger and I are neighbors in the same community, and this person thinks that I don't have a right to vote here.

15) Based on this experience, I have significant concerns about the

Department of Justice's request for the full, unredacted Pennsylvania voter file. It is not clear to me why they need this information and what processes they are seeking to improve that aren't addressed elsewhere in our system. I don't see how releasing this private data will ensure a fairer election and am concerned that an attempt to use the data may in fact lead to a less certain outcome.

16) I am particularly concerned about the DOJ's request after the experience of having my ballot application challenged last year. An unidentified group found a way to access a lot of data and completely misused it. The mass challenges actually ended up injecting more uncertainty into the election and making the election *less* fair by suspending a significant number of ballots from qualified voters while election results were decided.

Executed this 6th of October, 2025 in Swarthmore, Pennsylvania.

Nicholas Maston

# EXHIBIT
# A

Gmail **Nick Maston** [redacted]

## Your Ballot Application Has Been Processed

1 message

**PA Dept of State, My Ballot** <myballot@pa.gov> Wed, Aug 28, 2024 at 4:23 PM
To: [redacted]

Dear NICHOLAS FRIES MASTON,

The DELAWARE County Election Office has processed your ballot application on 08/21/2024.

Your application status is: Approved.

If your application was approved, you will receive an email when your ballot is being prepared for mailing. You can always check your ballot status at the following Department of State link: https://www.pavoterservices.pa.gov/Pages/BallotTracking.aspx

If you have questions about your ballot application, please contact DELAWARE County at 610-891-4659.

Thank you

****Please do not reply to this email.****

# EXHIBIT
# B

Gmail **Nick Maston** [redacted]

# Your Ballot Has Been Received

1 message

**PA Dept of State, My Ballot** <myballot@pa.gov> Thu, Oct 10, 2024 at 4:06 PM
To: [redacted]

Dear NICHOLAS FRIES MASTON,

Your ballot has been received by DELAWARE County as of October 10, 2024.

To get more information, you can click here: https://www.pavoterservices.pa.gov/Pages/BallotTracking.aspx.

Thank you!

Para leer esta información en español, vaya a https://www.pavoterservices.pa.gov/Pages/BallotTracking.aspx .
要閱讀此資訊的中文版，請造訪 https://www.pavoterservices.pa.gov/Pages/BallotTracking.aspx。

******Please do not reply to this email.******

# EXHIBIT C

Gmail **Nick Maston** [redacted]

# NOTICE TO VOTER: OBJECTION FILED AGAINST YOUR MAIL BALLOT

**Allen, Jim** <AllenJ@co.delaware.pa.us> Sat, Nov 2, 2024 at 10:33 PM
To: "[redacted]

Voter Registration Number 110449006-23

NICHOLAS FRIES MASTON

[redacted]

MEDIA PA 19063-2039

Dear NICHOLAS FRIES MASTON,

**We have received a challenge to your mail/absentee application or your mail/absentee ballot. A copy of the challenge is attached.**

You are welcome and encouraged to respond to the challenge by:

- submitting a statement in an email to allenj@co.delaware.pa.us

– or –

- giving a statement in person at the hearing on these challenges scheduled for 9 a.m. on Thur., Nov. 7, 2024 in the County Council Room, Delaware County Government Center, 201 W Front St. (Orange Street Entrance), Media PA

– or –

- sending a statement in a letter to:

ATTN JAMES ALLEN

ELECTION DIRECTOR

DELAWARE COUNTY

201 W FRONT ST

MEDIA PA 19063

Statements received by Nov. 6 will be provided to the Board of Elections at or before the hearing.

**Thank you for the opportunity to be of assistance.**

Sincerely,

James P. Allen

Election Director

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organi ations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**Objection-MastonNF.pdf**
106K

**Delaware County**
Bureau of Elections
201 W. Front St.
Media, PA 19063

## Affidavit to Challenge the Application or Ballot Envelope of a Mail/Absentee Voter

I, PATRICIA BLEASDALE as a voter in EDGMONT TOWNSHIP
(Name of Voter Filing Challenge) (Municipality)

at 1295 WAKEFIELD CT, GLEN MILLS, PA 19342,
(House Number, Direction, Street Address of Challenger)

**hereby challenge the mail/absentee application OR mail/absentee ballot of**

NICHOLAS FRIES MASTON,
(Name of Delaware County voter being challenged)

**who is registered to vote at:** [redacted] MEDIA, PA 19063
(Delaware County address of voter being challenged)

**for the following reason(s):** SEE ATTACHED

**Pursuant to the Pennsylvania Election Code [25 P.S. § 3146.8 (f)], this form must be filed in person with a deposit of $10 in cash (US currency) for each challenge affidavit. Further, the $10 deposit shall be subject to forfeiture to the County if the challenge is denied/overruled.**

**I swear (or affirm) that this challenge is, to the best of my knowledge and belief, true, correct and complete.**

Patricia Bleasdale — 10/26/24
Signature of Challenger — Date

bleasie@gmail.com — 484-459-9563
Challenger Email — Challenger Phone

COUNTY OF DELAWARE BOARD OF ELECTIONS
2024 OCT 30 P 3:45

**For office use only**

Voter Registration Number of Challenger ____________________

Amount in cash received ____________________

Employee who received ____________________

Receipt number ____________________

October 21, 2024

Dear DELAWARE County Board of Elections,

I am submitting this challenge to a mail ballot application pursuant to **25 Pa. Stat. § 3146.8(f)**[1]. Based on the following information, I believe that the applicant below is not eligible to vote and therefore I challenge her/his ballot application.

NICHOLAS FRIES MASTON Voter ID: 110449006-23, Address: [redacted]
MEDIA PA 19063

NICHOLAS FRIES MASTON filed a **permanent change of address** with the USPS indicating that she/he was moving to [redacted] CHICAGO IL 60661-1700. Our group mailed a letter to NICHOLAS FRIES MASTON informing her/him that she/he was still registered in Pennsylvania and that if she/he wanted to be removed, she/he would have to submit a removal form to the county election office. The letter was mailed to her/him in IL.

Section 704 of the PA Election Code; Rules for Determining Residence[2] says that a person who intends to remain outside of PA permanently or for an indefinite amount of time is not eligible to vote in PA and is not a qualified elector.

Nonetheless, the Department of State mail ballot file indicates that NICHOLAS FRIES MASTON was approved to receive a mail ballot for the November General Election.

Along with this challenge, I am submitting a deposit of $10.00 cash with the county board. I understand that this deposit will be refunded if this challenge is sustained.

Please don't hesitate to contact me if you have any questions about this challenge.

Thank you,

Patricia Bleasdale
1295 Wakefield CT, Glen Mills, PA 19342
Phone (484) 459-9563
bleasie@gmail.com

COUNTY OF DELAWARE
BOARD OF ELECTIONS
2024 OCT 23 P 3:17



2024 OCT 30 P 3:45
BOARD OF ELECTIONS
COUNTY OF DELAWARE

# EXHIBIT B

**DECLARATION OF GREGORY PERRY**

I, Gregory Perry, hereby declare as follows:

1. I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2. I am 65 years old and am otherwise competent to testify.

3. I was born in Chicago, Illinois and am a United States citizen.

4. I currently reside in London, in the United Kingdom.

5. I am the CEO of the Association for Art History, a not-for-profit learned society in London, which serves both UK and global constituents.

6. Immediately prior to moving to the United Kingdom, I lived in Allentown Pennsylvania, located in Lehigh County, where I served as the Director of the Allentown Art Museum. In 2009, I moved to the United Kingdom to take a position at the National Gallery, London.

7. I have always dearly prized the right to vote, having voted in every election since I was 18 and continuing to vote in federal elections since I moved to the UK. I have cast my votes with appreciation and with pride, valuing and understanding that many Americans over the centuries have given their lives to instill and preserve that right.

8. In September 2024, I applied for an absentee ballot using the Federal Post Card Application. My application was approved a few weeks later, and I received, completed, and returned the ballot. I received confirmation that my ballot was timely received by Lehigh County on October 30, 2024.

9. I was shocked and devastated when I received an email from Lehigh County on Monday, November 4, 2024, notifying me that Pennsylvania State Senator Jarrett Coleman had challenged my right to vote, without any legal or factual basis, just ahead of the November 1 filing deadline. As I later found out, this was part of a mass challenge to overseas voters that Sen. Coleman and others had filed, presumably in an attempt to ensure that his candidate for president would win the electoral votes in the contested state of Pennsylvania.

10. I was incredulous that anyone in the U.S., not least an elected official, would attempt such a brazen, reckless act in order to interfere with an election. I cannot overstate how disturbing, undermining, and personally upsetting this was and still is. My belief in our shared ideal of "government of the people, by the people, and for the people" was upended by an utterly cynical and bad faith actor. The challenger's attempt to discount the votes of so many legitimate Pennsylvania voters was, in a word, un-American. I am offended that one American would do this to another and am demoralized over the prospect that future elections in Pennsylvania and in other states could be delegitimized by similar actions.

11. On November 6, 2024, the day after the Election, I received another email from Lehigh County stating that Sen. Coleman had withdrawn the challenges to the overseas voters' absentee ballots.

12. Given this experience, I am very concerned that less than one year later, a department of the federal government is attempting to obtain personal

information about voters in Pennsylvania and in other states which it has no right to. As with my right to vote, I also value my right to privacy. It is hard to envision any legitimate reason as to why the Department of Justice would need this information. I trust the Commonwealth to collect my personal information and keep it private solely for the purpose of certifying my right to vote in the state. It is legally required to do so. I strongly object to the attempt by the DOJ to obtain my sensitive, personal information, and I do not agree to have it shared with that department. There is no reason why they need this information and, with the untoward actions in Pennsylvania last year, I am suspicious that it may be used in some fashion to interfere with future elections.

13. Prior to a career in museums and the arts, I practiced law in Illinois. When admitted to the bar in that state and when sworn in to practice at the bar in the Northern District of Illinois, I took an oath to uphold the Constitution of the United States. In joining this action with the Commonwealth of Pennsylvania, I am honoring that oath—without free and fair elections our Constitution is made moribund, and we must be vigilant to protect them from interfering elected officials and overreaching government departments.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 9th day of October, 2025, in London, United Kingdom

[signature]

Gregory Perry

\

# EXHIBIT C

## DECLARATION OF TODD THATCHER

I, Todd Thatcher, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 58 years old and am otherwise competent to testify.

3) I am a resident of West Grove, Pennsylvania, located in Chester County.

4) I am a print media specialist and have worked in graphic design for more than 30 years.

5) I believe that voting is the right and duty of every U.S. citizen. I vote in every major election, and have voted for both Democratic and Republican candidates.

6) I have serious concerns about the Department of Justice requesting access to the Pennsylvania voter file containing voters' sensitive information. Last year, I was one of the thousands of Pennsylvania voters whose mail ballot application was challenged in what appears to have been a coordinated effort to throw out votes.

7) My wife and I have lived in Pennsylvania for most of our lives. We moved back to the state in August, 2024, after four years living in California because of my wife's job. When we moved back to Pennsylvania, we re-registered to vote, got Pennsylvania drivers' licenses, and bought a home in West Grove.

8) I applied for a mail-in ballot from Chester County for the 2024 Presidential Election and my application was approved by Chester County Voter Services. I received, completed, and returned my mail-in ballot on time.

9) About a week before the election, I received a letter from Chester County that was dated October 26, 2024. A true and correct copy of the letter is attached as Exhibit A.[1] The notice letter stated that Chester County had received a challenge to my mail-ballot application, on the basis that I had completed a change of address form with the United States Postal Service. My wife received the same letter stating that she had been challenged.

10) When I received the letter, I was shocked, outraged, and agitated. I had never received anything like this before. I immediately gathered relevant documentation and emailed it to Voter Services, showing that I am a qualified, registered Chester County voter.

11) The Chester County Board of Elections held a hearing on November 1, 2024 to hear the challenges filed against 212 mail-ballot voters. The voters had been challenged based on having completed the USPS change of address form.

12) I attended the hearing on behalf of myself and my wife. The challenger's attorney specifically mentioned us when referencing a group of 13 voters who they said were registered in other states.

13) When it was time to hear testimony from the challenged voters, I

[1] The handwriting on the challenge letter is my own notes and questions that I wrote upon receiving the letter.

was initially nervous; public speaking is not my forte. But after hearing testimony from a military spouse who had been challenged, I got fired up and decided to get my story out. I explained how my wife and I had moved back to Pennsylvania after living in California. I also explained that I had been registered in California and completed the USPS form, and that I re-registered in Pennsylvania when we moved back. I completed the USPS form *again* when we moved to Chester County in 2024.

14) At the conclusion of the hearing, the challenger's attorney withdrew the challenge against me and my wife. Then, the Chester County Board of Elections voted unanimously to dismiss all the challenges filed against the voters, based on a finding that the challenger did not present credible evidence and had failed to meet her burden of proof as required by law.

15) I am still irritated about the experience of being challenged. I don't think it's right that a person can make mass challenges against hundreds of people's right to vote based on such flimsy evidence. I still have strong feelings toward the challenger who brought this; it feels like it should be illegal to have your right to vote called into question in this way. The process felt like a form of intimidation and like they were trying to scare people away from voting.

16) I am very concerned about the Department of Justice seeking access to the full voter file with everyone's sensitive, personal information. I've seen reports about how DOGE mishandled people's sensitive data. This is an issue of voter privacy, but I am concerned that they will use the data for other

purposes as well.

17) I am concerned that what happened to me last year could happen again to me or to other voters in the future.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8 of October, 2025 in West Grove, Pennsylvania.

Todd Thatcher

# EXHIBIT

# A

Per CA. 10-30-24.
Our registration in CA should have been cancelled by PA when we registered to vote in PA?

# THE COUNTY OF CHESTER

**BOARD OF ELECTIONS:**
Josh Maxwell, Chair
Marian D. Moskowitz, Vice Chair
Eric M. Roe, Commissioner

**CHESTER COUNTY VOTER SERVICES**
Government Services Center
601 Westtown Road, Suite 150
P.O. Box 2747
West Chester, PA 19380-0990
(610) 344-6410 FAX: (610) 344-5682

Karen Barsoum
Director

8:30 - 4:30
M - F

October 26, 2024

858
565 CA
5800

TODD G THATCHER
[redacted]

Voter Registration Number: 011772418-15

Dear TODD G THATCHER

We have received a challenge to your mail/absentee ballot application. The challenge alleges that you filed a permanent change of address with the United States Postal Service.

If you have any evidence that you are a qualified elector of Chester County or if you wish to respond to this challenge by:

- calling our office at 610-344-6410
- submitting an email to ccelectionofficials@chesco.org
- appear at the hearing for this and other challenges currently scheduled for Friday November 1 at 12 p.m. at 313 W. Market Street, 6th Floor, Meeting Room #6276, West Chester PA.

**Please reference your voter registration number in any correspondence: [Voter Registration Number]**

If you have not yet returned your completed mail-in or absentee ballot, you are still permitted to do so. However, please be advised that all challenged ballots will be segregated until the outcome of the hearing and any appeals.

You also may go to your Polling Place and vote by casting a Provisional Ballot on Election Day (Tuesday, November 5, 2024). The elections staff at your polling place will assist you. As a reminder, the polls are open from 7AM to 8PM on Election Day. To find your polling place, visit www.chesco.org/elections.

If the claim in the challenge is that you are registered in more than one jurisdiction, please note the following:

- If you never registered in that other jurisdiction, please note that in your response.
- If both registrations are yours but one of these registrations is outdated, contact that jurisdiction to ask about steps to cancel that outdated registration.
- Although a US citizen may be registered in more than one jurisdiction, attempting to vote more than once in the same election is a criminal offense.

If you have questions about this matter, please call our offices at 610-344-6410.

Sincerely,

• Name of Person representing the people? at the hearing

*Karen Barsoum*

Karen Barsoum, Director
Voter Services

Unfounded Challenge
* Was this Challenged by Sworn Affidavit?

# EXHIBIT D

**DECLARATION OF JOEL DICKSON**

I, Joel Dickson, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 58 years old and am otherwise competent to testify.

3) I am a resident of West Chester, Pennsylvania, located in Chester County.

4) I work in the financial services industry and am a leading expert on the impact taxes have on investors' savings and portfolio choices. I previously worked as a staff economist at the Federal Reserve Board and hold a Ph.D. in economics from Stanford University.

5) I believe that the right to vote is a paramount part of our civic duty. I am registered as "No Affiliation," and when I do exercise my right to vote, I base my decision on the issues that are important to me, rather than voting for the candidate from a particular political party.

6) In October 2024, I applied for a mail-in ballot from Chester County for the General Election. My application was approved by Chester County. I received, completed and returned my mail-in ballot packet shortly thereafter, and the Department of State tracker indicated that Chester County Voter Services received my mail-in ballot on October 23, 2024.

7) About a week before the Presidential Election, I received a letter dated October 26, 2024 from Chester County Voter Services informing me that

my mail ballot application had been challenged. A true and correct copy of the notice letter is attached as Exhibit A. The letter stated that the reason for the challenge to my mail-ballot application was that I had filed a permanent Change-of-Address form with the U.S. Postal Service (USPS).

8) After I received the letter, I was frustrated that my vote in the upcoming election might not be counted. I was also determined to fight this challenge, because I knew I had done everything to be a properly registered voter in Chester County, Pennsylvania.

9) I immediately called Chester County Voter Services. I also sent an email to the Chester County election official explaining my voting history. I am a duly registered Pennsylvania voter, and I wanted to ensure that my ballot would be counted in the Presidential Election.

10) I moved to Chester County for my job in 1996 and registered to vote in Pennsylvania. In May 2022, I relocated to Collin County, Texas for my company. At that time, I filed a permanent Change-of-Address form with the USPS and registered to vote in Texas.

11) In 2024, I moved back to Pennsylvania for my job and re-established residency in Chester County. I purchased a home in June 2024 and obtained a Pennsylvania driver's license in August, 2024. During that process, I also re-registered to vote in Pennsylvania. In August, 2024, upon leaving Collin County, TX, I *once again* filed a Change-of-Address form with USPS, changing my permanent address to Chester County, Pennsylvania.

12) Upon receiving the letter notifying me of the challenge to my registration, I was immediately surprised by how easy it seemed to be to challenge a registration with no knowledge of my situation or evidence of wrongdoing on my behalf. All of a sudden, it felt that I had to prove my registration was valid or my registration would be deemed invalid — kind of a version of guilty until proven innocent. Yet, I knew that I had followed all the requirements for registration in Chester County, PA and that the County had approved my mail-ballot application based on its own processes. Within a few days, I learned from an article in the Philadelphia Inquirer that this was part of a broader effort to challenge a large number of mail ballot voters in Chester County.

13) The Chester County Board of Elections held a hearing on November 1, 2024 to hear the challenges filed against 212 mail-ballot voters, like myself, who had all been challenged by the same individual.

14) Although I could not attend the hearing in person, I later reviewed the video of the challenge hearing. I was among the 13 voters who were specifically mentioned by name by the challenger's attorney because of my previous out-of-state voter registration.

15) The Chester County solicitor presented my emailed statement, explaining that I had moved back to Pennsylvania in 2024 and properly registered to vote in the state. The challenger withdrew the challenge to my mail ballot application at the hearing.

16) At the conclusion of the hearing, the Chester County Board of Elections voted unanimously to dismiss all the challenges filed against the remaining voters, based on a finding that the challenger did not present credible evidence and had failed to meet her burden of proof as required by law.

17) At the time, I believed the challenge was unwarranted and frivolous, yet I needed to respond or risk losing my right to vote in the 2024 Presidential Election. I do not know what might have happened had I not emailed a statement detailing the steps I took to register to vote in PA. I should have never needed to do that, as my registration and mail-ballot application were already approved by Chester County. This is not a partisan issue, it is a *voting rights* issue. Someone attempted to invalidate my vote in the last Presidential Election based on an invalid reason using erroneous interpretations of my personal data, and based on information (the USPS change-of-address form) that is not used by the County to determine eligibility to vote.

18) I believed at the time that these challenges were a malicious attempt to disenfranchise legitimate Chester County voters like myself in the Presidential Election. I continue to be angry at how easy it was to attempt to disenfranchise me by misusing information about my state of legal residence based off of an outdated internet search, after I had provided all of the required and proper information (under penalty of perjury) to the Commonwealth of Pennsylvania and Chester County for the approval of my voter registration.

19) My experience suggests that almost any challenge to a person's

right to vote could be brought by people making incorrect, incomplete or even nefarious interpretations about the personal data of a registered voter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8 of October, 2025 in West Chester, Pennsylvania.

Joel Dickson

# EXHIBIT A

# THE COUNTY OF CHESTER

**BOARD OF ELECTIONS:**
Josh Maxwell, Chair
Marian D. Moskowitz, Vice Chair
Eric M. Roe, Commissioner

**CHESTER COUNTY VOTER SERVICES**
Government Services Center
601 Westtown Road, Suite 150
P.O. Box 2747
West Chester, PA 19380-0990
(610) 344-6410 FAX: (610) 344-5682

Karen Barsoum
Director

October 26, 2024

JOEL MALCOLM DICKSON
[redacted]

Voter Registration Number: 110342717-15

Dear JOEL MALCOLM DICKSON

We have received a challenge to your mail/absentee ballot application. The challenge alleges that you filed a permanent change of address with the United States Postal Service.

If you have any evidence that you are a qualified elector of Chester County or if you wish to respond to this challenge by:

- calling our office at 610-344-6410
- submitting an email to ccelectionofficials@chesco.org
- appear at the hearing for this and other challenges currently scheduled for Friday November 1 at 12 p.m. at 313 W. Market Street, 6th Floor, Meeting Room #6276, West Chester PA.

**Please reference your voter registration number in any correspondence: [Voter Registration Number]**

If you have not yet returned your completed mail-in or absentee ballot, you are still permitted to do so. However, please be advised that all challenged ballots will be segregated until the outcome of the hearing and any appeals.

You also may go to your Polling Place and vote by casting a Provisional Ballot on Election Day (Tuesday, November 5, 2024). The elections staff at your polling place will assist you. As a reminder, the polls are open from 7AM to 8PM on Election Day. To find your polling place, visit www.chesco.org/elections.

If the claim in the challenge is that you are registered in more than one jurisdiction, please note the following:

- If you never registered in that other jurisdiction, please note that in your response.
- If both registrations are yours but one of these registrations is outdated, contact that jurisdiction to ask about steps to cancel that outdated registration.
- Although a US citizen may be registered in more than one jurisdiction, attempting to vote more than once in the same election is a criminal offense.

If you have questions about this matter, please call our offices at 610-344-6410.

Sincerely,

*Karen Barsoum*

Karen Barsoum, Director
Voter Services

# EXHIBIT E

**DECLARATION OF TRISHA KENT**

I, Trisha Kent, hereby declare as follows:

1. I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2. I am 43 years old and am otherwise competent to testify.

3. I currently reside in Richmond Hill, Ontario, Canada.

4. My last residence in the United States was in Beaver County, Pennsylvania.

5. I was born and raised in Beaver County. I attended K-12 school in the county, and my parents continue to reside in the same house where I grew up.

6. In 2005, I married a Canadian and moved abroad to be with him. I have continued to vote by absentee ballot since moving to Canada, as I am entitled to do under federal law.

7. Voting is very important to me. I'm an American citizen, and voting is the only way you can make your voice heard. I always say that if you don't vote, you give up your right to complain.

8. Ahead of the November 2024 Presidential election, I completed the Federal Post Card Application (FPCA) to request my absentee ballot. I provided all the qualifying information to show that I have a right to vote in Beaver County, Pennsylvania.

9. I take voting very seriously and always make sure to complete the

process early to ensure that my ballot arrives on time. I received the ballot in September, filled it out, and sent it back via registered mail with a tracking number. I received an email from the Pennsylvania Department of State that my ballot was received by Beaver County on September 30, 2024.

10. The day before the election, November 4, 2024, I received an email from the Beaver County Election Bureau informing me that it had received 125 challenges to applications for Federal Absentee Ballots, and that my ballot was among those challenged. The Board also informed me that it would hold a hearing at 3pm on November 7, 2024, and that I could submit written comments or attend the hearing. A true and correct copy of the challenge notice that I received is attached as Exhibit A.

11. When I received this notice, I was furious. I wanted to know who had brought these challenges and how this had happened. Upon reflection, I believe that these challenges were politically motivated and that the challenger was trying to cry voter fraud before anything even happened.

12. I sent an email response to the Beaver County Election Bureau stating that I was born and raised in Pennsylvania, and that I believed this effort to be voter suppression. A true and correct copy of my email response is attached as Exhibit B.

13. I attended the Beaver County Board of Elections hearing on November 7, 2024 via Zoom. In the end, the Board voted to reject the challenges because the challenger did not carry his burden of proof.

14. The experience of having my absentee ballot challenged was very scary. I didn't realize that so much of my information is available, and I don't think a random person who I've never heard of should be able to challenge me like that. I have a right to vote, I exercised that right, and I followed the proper procedures for a federal voter.

15. I have concerns about the federal government's request for voters' sensitive data. It's the state's responsibility to manage my sensitive information and this is an example of the federal government overstepping its bounds.

16. I am scared that more of these mass challenges will happen in the future. I fear that democracy is on the line, and I worry that they're ultimately going to take away my right to vote entirely.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 7th day of October, 2025, in Richmond Hill, Ontario, Canada

______________________

Trisha Kent

# EXHIBIT A

Outlook

## Ballot Application Challenged

**From** Elections <elections@beavercountypa.gov>
**Date** Mon 2024 11 04 5:43 PM
**To** Elections <elections@beavercountypa.gov>

Dear Overseas Voter:

On Friday November 1, 2024, the Beaver County Bureau of Elections received 125 challenges to various applications for Federal Absentee Ballots under 25 PS § 3146.8(f). Your ballot request was among those challenged. As such, the Beaver County Board of Elections will be holding a review hearing on Thursday, November 7, 2024 at 3 PM Eastern Standard Time in Courtroom 4 of the Beaver County Courthouse. Although your attendance/participation is not mandatory; as one of the challenged voters, you have the right to attend the hearing; and if necessary, to provide supplemental evidence if the challenger meets his burden of proof related to your specific application.

All challenged voters are able to attend virtually, and if you would like to submit written comments to be added to the record you are able to do so. Please be aware of the following:

1) If you would plan to participate via video conference upon the introduction of specific evidence related to your challenge, please reply to this email indicating such by no later than 5 PM Eastern Standard Time on Wednesday, November 6, 2024.

2) If you would want to submit written comments regarding the challenge of your application to vote via absentee ballot, please do so in a reply to this email by no later than 11 AM Eastern Standard Time on Thursday, November 7, 2024.

Best Regards,

Beaver County Election Bureau

# EXHIBIT
# B

Outlook

## Re: Ballot Application Challenged

**From** Trisha Kent [redacted]
**Date** Tue 2024 11 05 7:47 AM
**To** Elections <elections@beavercountypa.gov>

Good morning,

I do want to attend this hearing virtually. Please provide me with the necessary information. I would also like to know who is challenging my vote and why.

I would also like to submit that I am an American citizen born and raised in Pennsylvania. I have voted in every election since I turned 18, most of them by absentee ballot. I will not let this person/people take away my right to vote. I can provide proof of my social security number, American passport, tax return, etc. although I do not believe that I need to. At the time that I requested my absentee ballot, I provided all of the necessary information to receive it. That should be all that I had to do instead of having to attend this hearing to save my vote. What is happening here is voter suppression.

Thank you,
Trisha Kent (she/her/hers)

---

**From:** Elections <elections@beavercountypa.gov>
**Sent:** November 4, 2024 5:43 PM
**To:** Elections <elections@beavercountypa.gov>
**Subject:** Ballot Application Challenged

Dear Overseas Voter:

On Friday November 1, 2024, the Beaver County Bureau of Elections received 125 challenges to various applications for Federal Absentee Ballots under 25 PS § 3146.8(f). Your ballot request was among those challenged. As such, the Beaver County Board of Elections will be holding a review hearing on Thursday, November 7, 2024 at 3 PM Eastern Standard Time in Courtroom 4 of the Beaver County Courthouse. Although your attendance/participation is not mandatory; as one of the challenged voters, you have the right to attend the hearing; and if necessary, to provide supplemental evidence if the challenger meets his burden of proof related to your specific application.

All challenged voters are able to attend virtually, and if you would like to submit written comments to be added to the record you are able to do so. Please be aware of the following:

1) If you would plan to participate via video conference upon the introduction of specific evidence related to your challenge, please reply to this email indicating such by no later than 5

PM Eastern Standard Time on Wednesday, November 6, 2024.

2) If you would want to submit written comments regarding the challenge of your application to vote via absentee ballot, please do so in a reply to this email by no later than 11 AM Eastern Standard Time on Thursday, November 7, 2024.

Best Regards,

Beaver County Election Bureau

# EXHIBIT F

## DECLARATION OF LIOR STERNFELD

I, Lior Sternfeld, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 45 years old and am otherwise competent to testify.

3) I reside in State College, Pennsylvania with my wife and children.

4) I am a Professor of History and Jewish Studies at Penn State University.

5) I am originally from Israel. I came to the United States in 2009 to pursue a Ph.D. at the University of Texas in Austin. In 2015, I began a tenure-track position at Penn State University, which allowed me to begin the green card process. My wife and I received our green card status in 2018.

6) When we realized that living in the United States was not a temporary decision, and especially after our children were born in this country, we became very invested and involved in life here—in American society and in our American community. From that moment on, I knew that my ability to fully become part of this community was by becoming a United States citizen.

7) Five years after receiving my green card, I applied for naturalization. The process was straightforward and in November, 2023, my wife and I became United States citizens.

8) Voting is the most crucial decision that a citizen can make. It is an opportunity to shape the government, to voice my opinion, and to express my

opposition. It is the way that I can be part of the civic conversation and is a citizen's most patriotic duty.

9) The first year I was able to vote as a naturalized U.S. citizen was in 2024. I had waited for so long to be able to vote and to participate in this process. The experience of voting for the first time was truly uplifting and exciting, especially in a state like Pennsylvania where the closeness of elections demonstrates how consequential our votes are.

10) However, I am concerned that the current administration will explore every opportunity to suppress votes. They have even publicly floated the idea of de-naturalizing citizens. I want to exercise my rights as a citizen, but I am worried that some in power do not share my beliefs in the rule of law and the rights of citizens.

11) When I learned that the Department of Justice had requested the voter records from Pennsylvania, including with sensitive data, I became concerned about how they might try to manipulate these lists. I believe that recently naturalized citizens are perhaps more vulnerable than other groups of voters to certain types of false allegations about illegal voting.

12) I care about the privacy of my personal data and about the integrity of the voting system. I believe that we should make the electoral process more welcoming to every eligible voter and not try to intimidate voters or expunge voters from lists. The Constitution says that states should run their own elections, and I believe that the states should be able to maintain their voter

rolls without interference from the federal government.

13) Having lived in and studied the Middle East for decades, with a scholarly focus on Iran, I know how fragile political systems are. These systems are never as resilient as people think, and it takes very few steps to fall from a democracy—however flawed—into a dictatorship. Messing with elections is perhaps the easiest step to take in the process of sliding down the ladder from democracy to dictatorship.

14) Naturalized citizens are people who have chosen to live here. They typically have more faith in the American system than many American-born citizens. We vote to preserve this belief in the American democracy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 of October, 2025 in Centre County, Pennsylvania.

Lior Sternfeld

# EXHIBIT G

**DECLARATION OF JOHN THOMPSON**

I, John Thompson, hereby declare as follows:

1) I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2) I am 63 years old and am otherwise competent to testify.

3) I am a resident of Philadelphia, Pennsylvania.

4) I currently work as an organizer with the Abolitionist Law Center, where I help manage campaigns around ending solitary confinement in prison and advocating for the release of aging and geriatric people who are imprisoned.

5) I spent more than 37 years in Pennsylvania state prisons. I was convicted at the age of 17 and sentenced to life-without-parole, or "death by incarceration." I was released from prison in 2017.

6) While incarcerated, I worked at the prison's legal clinic for many years and co-founded a grassroots organization that advocates for social and political issues.

7) I registered to vote as soon as I came home from prison. Voting is very important to me. It's every citizen's civic duty and gives you a voice in the political process. If you don't vote, you can't complain and you can't be a part of the solution.

8) Voting in 2017 was an important first-time experience. I had never been able to vote before because I was incarcerated from before the time I turned 18 years old.

9) A lot of people in Pennsylvania return from prison and don't know they have regained the right to vote. In my current role, we work with partner organizations to educate formerly incarcerated people with felony convictions about their right to vote.

10) This issue is very important to me. I've voted in almost every single election since coming home from prison. There are some people with felony convictions in the United States who are not allowed to vote. When you strip that from us, you strip away our civil liberties. We've been in prison, we've paid our time, and now we're back in society as productive, tax-paying citizens. The right to vote is an important part of being a citizen, and people with felony convictions should not be excluded.

11) I have concerns about the privacy of my data. I don't know what the federal government wants to do with my personal information, and the federal government has not shown a compelling reason that they need all that information about me and other Pennsylvania voters.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 of October, 2025 in Philadelphia, Pennsylvania.

John Thompson

John Thompson

# EXHIBIT H

**DECLARATION OF AMY WIDESTROM**

I, Amy Widestrom, hereby declare as follows:

1. I have personal knowledge of the matters in this declaration, and this is what I would testify to if called as a witness in Court.
2. I am over eighteen years of age and am otherwise competent to testify.
3. I am a resident of and registered voter in Montgomery County, Pennsylvania.
4. I am the Executive Director of the League of Women Voters of Pennsylvania ("the League" or "LWVPA"). I have held this position since January 2024.
5. The League is a nonpartisan statewide non-profit organization that was formed in 1920 (incorporated in 1923). The League and its members are dedicated to helping the people of Pennsylvania exercise their right to vote, as protected by the law. The League encourages informed and active participation in government, works to increase understanding of major public policy issues, and seeks to influence public policy through education and advocacy. The League is a predominantly volunteer organization and has 32 member chapters around the Commonwealth.
6. LWVPA has nearly 2,500 individual members who are registered voters and regularly vote in state and federal elections. The League has active members in nearly every county in Pennsylvania.
7. The League's mission is to empower voters and defend democracy, which includes voter registration, education, and get-out-the-vote drives. During

every election cycle, the League conducts voter-registration drives, staffs nonpartisan voter-registration tables at naturalization ceremonies, educates incarcerated and formerly incarcerated individuals about their voting rights, and works with local high schools and universities to register young voters. It also maintains an online database called VOTE411, a nonpartisan and free digital voter resource with information available in both English and Spanish, including registration information, voter guides, mail-in ballot information, candidate information, polling rules and locations.

8. LWVPA has members who are naturalized citizens, who have recently moved within or to Pennsylvania, or who have other traits that put them at risk of baseless challenges to their eligibility to vote by mail or to vote at all. These members, and indeed all LWVPA members, have reason to fear violations of their privacy if the United States gets the sensitive data it seeks through this litigation.

9. LWVPA's membership rolls include elected officials and victims of stalking and harassment who have a heightened need for privacy, especially as to their home addresses.

10. During the 2024 general election cycle in Pennsylvania, members of LWVPA faced challenges to their eligibility to vote based on inaccurate or obsolete data about their places of residence.

11. During that same election cycle, LWVPA had to divert staff resources to helping voters respond to such challenges to their eligibility.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of October, 2025 in Montgomery County, Pennsylvania.

Amy Widestrom

# EXHIBIT I

**DECLARATION OF SUZANNE ALMEIDA**

I, Suzanne Almeida, hereby declare as follows:

1. I have personal knowledge of the matters in this declaration and this is what I would testify to if called as a witness in Court.

2. I am of majority age and am otherwise competent to testify.

3. I am a resident and registered voter in Philadelphia, Pennsylvania.

4. I am Common Cause's Vice President, States. I have worked for Common Cause since July 2018.

5. Common Cause is a nonprofit, nonpartisan membership organization incorporated under the laws of the District of Columbia and registered to do business in Pennsylvania. Pursuant to its bylaws, Common Cause is organized and operated as a membership organization and seeks to intervene in this action in a representative capacity on behalf of its members.

6. Common Cause is a grassroots organization dedicated to empowering all people in Pennsylvania to make their voices heard in the political process. Common Cause's members live across Pennsylvania and include registered Pennsylvania voters. Through its members in Pennsylvania, Common Cause works to create open, honest, and accountable government that serves the public interest—including by protecting voting rights.

7. Pursuant to its bylaws, Common Cause has defined who qualifies as a member. Under its definition, a "member" of Common Cause is any individual who, within the past two years, (a) made a financial contribution to the

organization; or (b) has taken meaningful action in support of Common Cause's advocacy work. Such meaningful action includes, but is not limited to, signing petitions directed to government officials; participating in letter-writing or phone-banking campaigns; attending town halls, workshops, or rallies organized by Common Cause; or otherwise engaging in activities designed to advance the organization's mission.

8. In Pennsylvania, Common Cause has three full-time staff members and approximately 24,000 members.

9. Many of Common Cause's Pennsylvania members are registered voters whose personal information is maintained in the statewide voter registration database held by the Pennsylvania Department of State ("DOS"). If DOS discloses the unredacted voter registration file to DOJ, these members' sensitive personal information—including voter signatures, driver's license numbers, and portions of social security numbers—would be unlawfully released, causing an invasion of privacy, chilling participation in the electoral process, and undermining confidence in the integrity of Pennsylvania's elections.

10. Common Cause represents the interests of its members in this litigation. Common Cause moves to intervene on behalf of its Pennsylvania members, who would have standing to sue individually because they face direct and imminent injury if their personal data is disclosed. Litigating this matter on behalf of its members is germane to Common Cause's mission of protecting

voting rights and election integrity, and the relief requested—dismissal or denial of the claims of the United States—does not require participation of individual members.

11. Common Cause's voting-related work in Pennsylvania includes educating our members and the general public about voter registration; voting by mail and absentee ballots; and voting in person by ordinary and provisional ballots. We have consistently worked to assure voters that Pennsylvania's voter registration system is safe and secure.

12. Common Cause is also a leader of a nonpartisan election protection effort at every major election to protect, advance, and defend the right to vote. As part of this work, we help to organize and administer a hotline that thousands of Pennsylvanians call during every major election cycle. Topics of calls the hotline handles include questions about voter registration and problems with voting by mail. We connect callers with volunteers who help to resolve problems in order to ensure that all voters have an equal opportunity to vote and have that vote count. We will continue this work during next month's general election in Pennsylvania and during the primary and general elections in Pennsylvania in 2026 and beyond.

13. If the federal government succeeds through this lawsuit in obtaining sensitive, private information about Pennsylvania voters, Common Cause will have to redirect staff time and other resources to educating member and the general public about new threats they may face, including baseless challenges

to their eligibility to vote by mail or in person, potential purging of their names from voter rolls, and identity theft risks resulting from improper dissemination of their personal data. We will struggle to balance the need to inform people of these genuine threats while not scaring them away from registering to vote and casting ballots.

14. Common Cause has many members in Pennsylvania who faces risks if the United States obtains the confidential information it seeks through this litigation. Our members have reported concerns to our staff in Pennsylvania about risks including federal usurpation of election administration, manipulation of elections, and disenfranchisement of mail voters.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 9th day of October, 2025, in Philadelphia County, Pennsylvania

Suzanne Almeida

______________________________

Suzanne Almeida

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH OF PENNSYLVANIA; and AL SCHMIDT, in his official capacity as Secretary of the Commonwealth of Pennsylvania,<br><br>Defendants. | No. 2:25-cv-1481<br>Chief Judge Cathy Bissoon |

**BRIEF OF SECRETARY OF THE COMMONWEALTH AL SCHMIDT IN SUPPORT OF HIS MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ........ iii

Introduction ........ 1

Background ........ 2

I. DOJ's requests to Secretary Schmidt about Pennsylvania list maintenance. ........ 2

II. Public statements by DOJ and DHS about their intended use of voter data. ........ 5

Argument ........ 7

I. DOJ has failed to state a claim under the National Voter Registration Act (NVRA). ........ 8

A. NVRA Section 8(i) does not require disclosure of voters' SSN4 or DLN. ........ 8

B. DOJ does not need voters' SSN4 or DLN to accomplish its stated purposes. ........ 10

C. The NVRA does not require electronic disclosure. ........ 14

II. DOJ has failed to state a claim under the Help America Vote Act (HAVA) ........ 14

A. DOJ lacks statutory authority under HAVA. ........ 15

B. DOJ does not need voters' SSN4 or DLN to ensure compliance with HAVA's voter registration requirements. ........ 16

C. DOJ does not need voters' SSN4 or DLN to ensure elimination of duplicates. ........ 18

III. DOJ has failed to state a claim under Title III of the Civil Rights Act of 1960. ........ 19

A. This Court lacks jurisdiction to adjudicate DOJ's Title III claim. ........ 20

B. DOJ has not provided a legally sufficient "basis and purpose." ........ 20

C. Title III does not require electronic disclosure. ........ 22

IV. Pennsylvania privacy protections operate harmoniously with the NVRA, HAVA, and Title III. ........ 22

V. DOJ's demand would violate the Privacy Act, E-Government Act, and Driver's Privacy Protection Act. ........ 23

Conclusion ........ 25

## TABLE OF AUTHORITIES

**Cases**

*Allegheny Reprod. Health Ctr. v. Pa. DHS*, 309 A.3d 808 (Pa. 2024) .......... 22

*Am. C.R. Union v. Phila. City Comm'ners*, 872 F.3d 175 (3d Cir. 2017) .......... 8, 10, 14

*Applewhite v. Com.*, 2014 WL 184988 (Pa. Commw. Ct. Jan. 17, 2014) .......... 18

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) .......... 23

*Ashcroft v. Iqbal*, 556 US 662 (2009) .......... 15

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) .......... 10, 11, 12

*Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168 (3d Cir. 1978) .......... 23

*Blunt v. Lower Merion School Dist.*, 2009 WL 1259100 (E.D. Pa. May 7, 2009) .......... 10

*Commonwealth v. Nixon*, 761 A.2d 1151 (Pa. 2000) .......... 22

*EPIC v. Pres. Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) .......... 25

*Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) .......... 17

*Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324 (11th Cir. 2024) .......... 14, 22

*Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993) .......... 9

*In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125 (3d Cir. 2016) .......... 2

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) .......... 21

*Int'l Broth. of Elec. Workers Local Union No. 5 v. U.S. Dep't. Of Housing and Urban Development*, 852 F.2d 87 (3rd Cir. 1988) .......... 9

*Judicial Watch v. Grimes*, No. 3:17-cv-94 (E.D. Ky. 2018) .......... 13

*Judicial Watch, Inc. v. Illinois State Bd. of Elections*, 2025 WL 2712209 (N.D. Ill. Sept. 23, 2025) .......... 11

*Judicial Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399 (M.D. Pa. 2021 .......... 12

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) .......... 21

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .......... 21

*League of Women Voters v. DHS*, No. 25-cv-3501 (D.D.C.) .......... 7

*Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99 (3d Cir. 2015) .......... 20

*McLinko v. Pennsylvania*, 2025 WL 2952837 (Pa. Comm. Ct. Oct. 20, 2025) .......... 18

*PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598 (Pa. Comm. Ct. 2025) .......... 17

*Pa. State Educ. Ass'n (PSEA) v. Com. Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142 (Pa. 2016) .......... 22, 23

*Project Vote v. Long*, 752 F. Supp. 2d 697 (E.D. Va. 2010) .......... 9

*Pub. Int. Legal Found. v. Benson*, 136 F.4th 613 (6th Cir. 2025) .......... 11, 12

*Pub. Int. Legal Found. v. Sec'y Com. of Pa.*, 136 F.4th 456 (3d Cir. 2025) .......... 8

*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) .......... 9, 21

*Rossman v. Pa. Dep't of State*, 2025 WL 3514275 (Pa. Comm. Ct. Dec. 8, 2025) .......... 18

*Sheet Metal Workers' Int'l Ass'n, Local Union No. 19 v. U.S. Dep't. of Veterans Affairs*, 135 F.3d 891 (3rd Cir. 1998) .......... 9

*State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) .......... 19, 21

*Tavarez v. Klingensmith*, 372 F.3d 188 (3d Cir. 2004) .......... 21

*Tribune-Review Pub. Co. v. Bodack*, 961 A.2d 110 (Pa. 2008) .......... 22

*U.S. v. Indiana*, No. 1:06-cv-1000 (S.D. Ind. 2006) .......... 13

*U.S. v. Maine*, No. 06-86 (D. Me. 2006) .......... 13

*U.S. v. Missouri*, No. 2:05-cv-4391 (W.D. Mo. 2005) .......... 13

*U.S. v. New Jersey*, No. 06-4889 (D.N.J. 2006) .......... 13

*U.S. v. Philadelphia*, No. 2:06-cv-4592 (E.D. Pa. 2007) .......... 13

*U.S. v. Pulaski County*, No. 4-04-cv-389 (E.D. Ark. 2004) .......... 13

*Washington Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264 (W.D. Wa. 2006) .......... 17

**Statutes**

Pa. Const. art. I, § 1 .......... 22

U.S. Const. art. I, § 4, cl. 1 .......... 1, 7, 23

**Other Authorities**

18 U.S.C. § 2721 .......... 25

18 U.S.C. § 2725 .......... 25

25 P.S. § 3050 .......... 18

25 P.S. § 3146.2b .......... 18

25 P.S. § 3150.12b .......... 18

25 Pa.C.S. § 1323 .......... 25

25 Pa.C.S. § 1327 .......... 22

25 Pa.C.S. § 1328 .......... 17, 19

25 Pa.C.S. § 1505 .......... 12

25 Pa.C.S. Part IV .......... 3

5 U.S.C. § 552a .......... 24

5 U.S.C. § 552a note .......... 24

52 U.S.C. § 20507 .......... passim

52 U.S.C. § 20701 .......... 20

52 U.S.C. § 20703 .......... 20, 22

52 U.S.C. § 20705 .......... 20

52 U.S.C. § 21083 .......... passim

52 U.S.C. § 21111 .......... 3, 14, 15

E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 .......... 25

Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 .......... 23, 24

**Rules**

4 Pa. Code ch. 18 .......... 3

**Treatises**

70 Fed. Reg. 43904 (July 29, 2005) .......... 24

82 Fed. Reg. 24147 (May 25, 2017) .......... 24

*Central Civil Rights Division Index File and Associated Records, CRT-001*, 68 Fed. Reg. 47610 (2003) .......... 24

DHS, *Privacy Act of 1974; System of Records*, 90 Fed. Reg. 48948 (Oct. 31, 2025) .......... 5

DHS, *Private Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025) .......... 7

DOJ, *Cases Raising Claims Under The National Voter Registration Act* (Mar. 6, 2025) .......... 13

DOJ, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025) .......... 4

ERIC, *Technology and Security Overview* (Sept. 29, 2025) .......... 5

ERIC, *What is ERIC?* .......... 4

Executive Order 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) .......... 5

GAO, *Immigration Status Verification For Benefits - Actions Needed to Improve Effectiveness and Oversight* (Mar. 2017) .......... 5

H.R. Rep. No. 86-956 (1959) .......... 20, 21

Jim Saksa, *Trump Administration Sharing Voter Data Across Agencies, DHS Confirms*, Democracy Docket (Sept. 11, 2025) .......... 6

Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025) .......... 6

Matt Cohen, *The DOJ Accelerates Its Hunt For Voter Fraud—With DOGE's Help*, Democracy Docket (May 23, 2025) .......... 6

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR (May 22, 2025) .......... 6

OMB Guidance, M-03-22 (Sep. 26, 2003) .......... 25

OMB, Circular No. A-108 (Dec. 2016) .......... 24

Pa. Dep't of State, *Administration of Voter Registration in Pennsylvania, 2024 Annual Report to the Pennsylvania General Assembly* (June 30, 2025) .......... 2, 19

Pa. Dep't of State, *Directive Concerning HAVA — Matching Drivers' Licenses or Social Security Numbers for Voter Registration Applications* (2018)................................... 17

Pa. Dep't of State, *PA Full Voter Export*........................................................................... 3

Pennsylvania Voter Registration Application & Mail-In Ballot Request.................................... 16

Post by @AAGDhillon, https://x.com/AAGDhillon/status/1997003629442519114 (Dec. 5, 2025) ........................................................................................................... 6

Presidential Statement on Signing the Civil Rights Act of 1960 (May 6, 1960).......................... 21

U.S. Br. as Amicus Curiae, Project Vote v. Long, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283 ............................................................................ 9

U.S. Br. as Amicus Curiae, Pub. Int. Legal Found. v. Sec'y Com. of Pa., 136 F.4th 456 (3d Cir. 2025) (Nos. 23-1590, 23-1591), 2023 WL 7486717 ................................. 9

U.S. Br. as Amicus Curiae, Pub. Int. Legal Found., Inc. v. Bellows, 92 F.4th 36 (1st Cir. 20254) (No. 23-1361), 2023 WL 4882397 ................................................................ 9

U.S. Election Assist. Comm'n, *Studies and Reports* (Aug. 11, 2025)........................................... 3

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Aug. 27, 2025) ........................................................................................................................... 7

## INTRODUCTION

The U.S. Constitution empowers Pennsylvania to prescribe the "Times, Places and Manner" of holding federal elections, subject to the power of Congress to make or alter such regulations. U.S. Const. art. I, § 4, cl. 1. Congress exercised this power through the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA), requiring Pennsylvania to maintain and administer a computerized statewide voter registration list and to conduct regular list maintenance to ensure accurate voter rolls. The Pennsylvania Department of State, under the leadership of Secretary Schmidt, works diligently with the Commonwealth's 67 counties to help them ensure that all electoral processes are fully compliant with federal and Pennsylvania laws.

The Department of Justice now seeks to usurp the authority Congress granted Pennsylvania. It demands complete and unfettered electronic access to Pennsylvania's voter registration list—ostensibly to ensure that Pennsylvania is conducting a general program of list maintenance, but without any allegation that Pennsylvania's list maintenance practices are deficient. Although Secretary Schmidt has offered Pennsylvania's public voter file, which includes many data fields, DOJ insists that it must receive the driver's license number or partial Social Security number ("DLN" and "SSN4" respectively) for Pennsylvania's more than 8.9 million voters.

Neither the NVRA, nor HAVA, nor Title III of the Civil Rights Act of 1960 authorizes DOJ to obtain this highly sensitive personal information about every Pennsylvania voter. The NVRA's public disclosure provision does not extend to SSNs and DLNs. Nor is this data necessary to establish that Pennsylvania has a general program to remove deceased and moved registrants or duplicate records, or complies with HAVA's voter registration requirements. DOJ has brought its Title III claim to the wrong court, and its claim is not supported by the text or purpose of the statute. Finally, Pennsylvania voters enjoy robust informational privacy protections under the Pennsylvania Constitution that do not conflict with these federal election laws.

## BACKGROUND

### I. DOJ's requests to Secretary Schmidt about Pennsylvania list maintenance.

On June 23, 2025, DOJ wrote to Secretary Schmidt asking for 14 categories of information about how Pennsylvania complies with the list maintenance requirements of HAVA. Ex. 1.[1] On July 23, Secretary Schmidt explained in response that while local election officials are responsible for maintaining their voter lists, the Department works diligently with the Commonwealth's 67 counties to help them ensure that all electoral processes are fully compliant with federal and Pennsylvania laws, including HAVA. Ex. 2. He provided detailed responses to each question and referred DOJ to the most recent report issued by the Department on the Administration of Voter Registration in Pennsylvania, which comprehensively addresses voter list maintenance programs in the Commonwealth.[2] The letter also explained that HAVA leaves verification of SSN4 and DLNs to the States, 52 U.S.C. § 21083(a)(5)(A)(iii), and Pennsylvania law does not allow denying a voter registration application solely for failure to match an ID number, Ex. 2, at 8–9.

DOJ did not respond to the Department's letter. Instead, on August 4, 2025, DOJ wrote to Secretary Schmidt with questions about how Pennsylvania complies with the list maintenance requirements of the NVRA. Ex. 3. Relying upon Section 8(i) of the NVRA, 52 U.S.C. § 20507(i), DOJ requested the "current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list," with "all fields contained with the list." *Id.* at 1. DOJ also posed

[1] At the motion to dismiss stage, the Court may consider "documents integral to or explicitly relied upon in the complaint." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016) (cleaned up).

[2] Pa. Dep't of State, *Administration of Voter Registration in Pennsylvania, 2024 Annual Report to the Pennsylvania General Assembly* (June 30, 2025) (hereinafter "DOS 2024 VR Report"), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.

additional questions about the Department's responses to the most recent biennial U.S. Election Assistance Commission's Election Administration and Voting Survey.[3] *Id.* at 2.

Before Secretary Schmidt could respond, DOJ wrote again on August 14, 2025, to clarify that "the Justice Department's request to provide an electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Ex. 4, at 1. For the first time, DOJ asserted that it sought these records under HAVA Section 401 (52 U.S.C. § 21111) and Title III of the Civil Rights Act of 1960. *Id.* at 1–2. DOJ stated that the "purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2.

On August 18, 2025, Secretary Schmidt responded to DOJ's August 4 letter. Ex. 5. He explained that most of DOJ's questions about the Election Administration and Voting Survey misunderstood the data or misrepresented the Department's response. *Id.* at 2–5.

On August 21, 2025, Secretary Schmidt responded to DOJ's request for statewide voter registration data. Ex. 6. He offered to provide DOJ with Pennsylvania's Full Voter Export, which is available through the Department's website.[4] *Id.* at 1. It includes all voters in the Commonwealth (with certain limited exceptions for crime victims and other confidential voters) and contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or

---

[3] U.S. Election Assist. Comm'n, *Studies and Reports* (Aug. 11, 2025) (most recent report published June 30, 2025), https://www.eac.gov/research-and-data/studies-and-reports.

[4] In accordance with the Pennsylvania voter registration law, 25 Pa.C.S. Part IV, and the Statewide Uniform Registry of Electors (SURE) Regulations, 4 Pa. Code ch. 183, all requesters must agree to the same terms and conditions: payment of $20 and affirmation that the records will only be used for non-commercial purposes related to elections, political activities and law enforcement, and will not be published on the internet. *See* Pa. Dep't of State, *PA Full Voter Export*, https://www.pavoterservices.pa.gov/pages/PurchasePAFullVoterExport.aspx.

inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes, voter history, and date the voter's record was last changed. But Secretary Schmidt declined to provide voters' SSN4 or DLN because DOJ lacked legal authority for such a broad collection of highly sensitive, private information. *Id.* at 2.

DOJ did not respond to the Department's August letters. Instead, it filed this complaint on September 25, 2025, seeking an order that Secretary Schmidt provide DOJ with the "current electronic copy of Pennsylvania's computerized statewide voter registration list, with all fields," including each voter's SSN4 or DLN. Compl. at 16. The only fields requested by DOJ that Secretary Schmidt has declined to provide are voters' SSN4 and DLNs. Compl. ¶ 43. DOJ has also sued 17 other states for their statewide voter registration lists.[5]

As the complaint acknowledges, Compl. ¶ 44–45, the Department is a member of the Electronic Registration Information Center (ERIC), which helps states improve the accuracy of America's voter rolls by identifying inaccurate or out-of-date voter registration records, duplicate registrations, deceased voters, and possible cases of illegal voting.[6] Importantly, the Department does not provide ERIC with voters' SSN4s and DLNs in plain text in an .xls, .csv, or delimited-text file format, as DOJ has demanded. *Cf.* Ex. 3; Compl. ¶¶ 44–45. Instead, the Department applies a cryptographic one-way hash to these data *before* sending them to ERIC, which transforms SSN4s and DLNs into "what appears to be a string of random characters" that is not meant to be

[5] DOJ, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://www.justice.gov/opa/pr/justice-department-sues-four-additional-states-and-one-locality-failure-comply-federal.

[6] ERIC is a nonprofit, nonpartisan membership organization funded and governed by its members states. *See* ERIC, *What is ERIC?* https://ericstates.org/about/ (last visited Dec. 11, 2025).

decrypted.[7] This allows the Department to transmit information necessary for voter list maintenance without disclosing voters' sensitive personal information.

## II. Public statements by DOJ and DHS about their intended use of voter data.

On March 25, 2025, the President issued an Executive Order on elections.[8] That order requires the Department of Homeland Security and the Administrator of the Department of Government Efficiency to review each state's voter file and list maintenance records for non-citizens, Sec. 2(b)(iii), and requires the U.S. Attorney General to use information maintained by DHS (including DLN records) to prosecute non-citizens who vote, Sec. 2(e).

In response to the Executive Order, DHS overhauled its Systematic Alien Verification for Entitlements program (SAVE)—a database originally created to assist with verifying the immigration status of applicants for federal, state, or local benefits.[9] According to DHS, SAVE now provides voter verification; permits bulk searching; permits searching by full or partial SSN and (soon) DLNs; "searches multiple government databases or systems to provide a SAVE response," including the Social Security Administration databases; and includes U.S. citizens by birth.[10]

DHS asserts that all records and information in SAVE may be disclosed to DOJ "when it is relevant or necessary" to "litigation or proceedings before any court, adjudicative, or administrative body" and the United States is a party or has an interest in the litigation. 90 Fed. Reg. at

---

[7] ERIC, *Technology and Security Overview*, at 2 (Sept. 29, 2025), https://eric-states.org/wp-content/uploads/documents/ERIC-Tech-Security-Brief.pdf.

[8] Executive Order 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025), https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections.

[9] GAO, *Immigration Status Verification For Benefits - Actions Needed to Improve Effectiveness and Oversight*, at 1 (Mar. 2017), https://www.gao.gov/assets/gao-17-204.pdf.

[10] DHS, *Privacy Act of 1974; System of Records*, 90 Fed. Reg. 48948 (Oct. 31, 2025), https://www.govinfo.gov/content/pkg/FR-2025-10-31/pdf/2025-19735.pdf.

48954. DHS will also allow agencies with "a legal authority to monitor and audit … voter registration records" to "view relevant case data such as biographic data, enumerators, case submission date/time, and SAVE response information." *Id.* at 48951. Given DOJ's claim that it "is tasked with ensuring that States conduct voter-registration-list maintenance to prevent the inclusion of ineligible voters on any State's voter registration list," Compl. at 2, it is likely that DHS intends to allow DOJ access.

Public statements by government officials make clear that these agencies are, in fact, working together to sort through state voter files to find potential non-citizens. A DOGE staffer this summer confirmed that DOJ asked DOGE to find noncitizen voters in every state, and that DOGE was doing so by comparing Social Security data with state voter data.[11] In September 2025, a DHS spokesperson confirmed that DOJ was sharing voter registration data with DHS.[12] And earlier this month, DOJ's Assistant Attorney General for Civil Rights announced that "we've checked 47.5 million voting records" and found "several thousand non-citizens who are enrolled to vote in Federal elections,"[13] while DHS's U.S. Citizenship and Immigration Services confirmed to NPR a few days later that "more than 47 million voters have been run through SAVE."[14]

[11] Matt Cohen, *The DOJ Accelerates Its Hunt For Voter Fraud—With DOGE's Help*, Democracy Docket (May 23, 2025), https://www.democracydocket.com/news-alerts/the-doj-accelerates-its-hunt-for-voter-fraud-with-doges-help (link to podcast statements); Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR (May 22, 2025), https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizen-voting.

[12] Jim Saksa, *Trump Administration Sharing Voter Data Across Agencies, DHS Confirms*, Democracy Docket (Sept. 11, 2025), https://www.democracydocket.com/news-alerts/trump-administration-sharing-voter-data-across-agencies-dhs-confirms/.

[13] Post by @AAGDhillon, https://x.com/AAGDhillon/status/1997003629442519114 (Dec. 5, 2025).

[14] Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

Public reporting belies the success of these efforts, *id.*, and DHS' own documents indicate SAVE cannot produce consistently accurate results because the records upon which it relies do not always contain updated information regarding naturalization status.[15] The legality and accuracy of SAVE is under challenge. *See League of Women Voters v. DHS*, No. 25-cv-3501 (D.D.C.).

**ARGUMENT**

DOJ claims to need DLNs and SSN4s of all 8.9 million registered Pennsylvania voters to determine whether Pennsylvania is complying with (a) the NVRA's requirement to remove registrants who have moved or died, and (b) HAVA's requirements to remove duplicate registrants and require identifying numbers at the time of registration. Compl. ¶¶ 55, 60–61. As explained below, obtaining registrants' DLNs and SSN4s is not necessary to achieve those proffered goals. DOJ is using its claims of NVRA and HAVA "oversight" as a pretext to scour the personal data of every registered voter in Pennsylvania and to run that data through the SAVE database—despite the fact that evidence of non-citizen voter registration is exceedingly rare. It is Pennsylvania—not DOJ—that is constitutionally empowered to administer and maintain its voter rolls, subject only to the power of Congress. U.S. Const. art. I, § 4, cl. 1. And it is Pennsylvania—not DOJ—that Congress has authorized to maintain a computerized statewide voter registration list and conduct list maintenance. 52 U.S.C. §§ 20507, 21083.

[15] USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Aug. 27, 2025), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet (stating that SAVE may return inaccurate results for individuals with acquired citizenship); DHS, *Private Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025), https://www.dhs.gov/sites/default/files/2025-10/privacy-pia-dhsuscis006d-save-october2025%20%28002%29.pdf (stating that SAVE may produce inaccurate results due to misspellings, transposed numbers, and incomplete information, and queries using SSN do not trigger the manual review designed to mitigate these errors).

**I. DOJ has failed to state a claim under the National Voter Registration Act (NVRA).**

The NVRA both "protects registered voters from improper removal from the rolls" and places "limited requirements on states to remove ineligible voters from the rolls." *Am. C.R. Union v. Phila. City Comm'ners*, 872 F.3d 175, 179 (3d Cir. 2017); *accord Pub. Int. Legal Found. v. Sec'y Com. of Pa.*, 136 F.4th 456, 466 (3d Cir. 2025). Among other obligations, NVRA Section 8(a) instructs states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change in residence. 52 U.S.C. § 20507(a)(4).

DOJ demands Pennsylvania voter records under Section 8(i) of the NVRA, which requires Pennsylvania to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1); *see* Compl. ¶¶ 53–54. DOJ claims voters' SSN4 and DLNs are necessary to determine if Pennsylvania is conducting a "general program" of list maintenance as required by the NVRA and to evaluate issues "raised by the data and by answers provided by the Commonwealth of Pennsylvania to the Election Assistance Commission's 2024 EAVS." Compl. ¶ 55. But the NVRA does not require disclosure of sensitive personal information, which in any event would not serve DOJ's stated purposes. Nor does the NVRA require electronic disclosure.

**A. NVRA Section 8(i) does not require disclosure of voters' SSN4 or DLN.**

Secretary Schmidt offered DOJ the Full Voter Export, which contains all fields from the statewide voter registration list except voters' SSN4s and DLNs. Not satisfied, DOJ demands this highly sensitive personal data by attempting to rely on the NVRA's disclosure provision. Compl. ¶ 54. But, to the extent that provision applies at all, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information," such as SSNs and

DLNs. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases); *Project Vote v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding that the NVRA does not require disclosure of SSNs, because disclosure would "potentially undermine[] the voter registration goals of the NVRA"), *aff'd* 682 F.3d 331, 339 (4th Cir. 2012).

DOJ has previously agreed—taking the position across multiple administrations—that states may redact certain information before disclosing records under Section 8(i). U.S. Br. as Amicus Curiae, Pub. Int. Legal Found. v. Sec'y Com. of Pa., 136 F.4th 456 (3d Cir. 2025) (Nos. 23-1590, 23-1591), 2023 WL 7486717, at *28–*29 ("[T]he NVRA does not prohibit the *redaction* of highly sensitive information within those records, or information whose disclosure would violate other federal laws."); U.S. Br. as Amicus Curiae, Pub. Int. Legal Found., Inc. v. Bellows, 92 F.4th 36 (1st Cir. 20254) (No. 23-1361), 2023 WL 4882397, at *27–*30 (same); U.S. Br. as Amicus Curiae, Project Vote v. Long, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *25–*26 (same).

Courts have also declined to require disclosure of SSNs and similarly sensitive data in other, non-NVRA contexts. *See, e.g.*, *Int'l Broth. of Elec. Workers Local Union No. 5 v. U.S. Dep't. Of Housing and Urban Development*, 852 F.2d 87, 89 (3rd Cir. 1988) (holding that SSNs were exempt from disclosure under FOIA, because their release "would constitute a clearly unwarranted invasion of privacy"), *holding cited with approval and expanded by Sheet Metal Workers' Int'l Ass'n, Local Union No. 19 v. U.S. Dep't. of Veterans Affairs*, 135 F.3d 891, 989–99 (3rd Cir. 1998); *Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that a Virginia state law requiring voter registration applicants to provide their SSNs and requiring officials to disclose those numbers in public records created an "intolerable burden on [the right to vote] as protected

by the First and Fourteenth Amendments"); *Blunt v. Lower Merion School Dist.*, 2009 WL 1259100, at *3 (E.D. Pa. May 7, 2009) (requiring redaction of SSNs in discovery responses).

If NVRA Section 8(i) does not prohibit *redaction* of sensitive, personally identifiable data such as SSNs and DLNs, then it cannot compel production of such data either. DOJ's reliance on Section 8(i) must fail.

**B. DOJ does not need voters' SSN4 or DLN to accomplish its stated purposes.**

As explained in the Secretary's July 23 and August 18, 2025 letters, *supra* at 2–3, and as detailed in the Department's Annual Report, *see supra* note 2, the Department does a robust job of ensuring that all of Pennsylvania's 67 counties comply with their list maintenance responsibilities under the NVRA. DOJ provided no response to these letters, nor does it allege that the Commonwealth is *not* conducting a general program of list maintenance. Instead, DOJ now claims that it needs the SSN4 or DLN of more than 8.9 million registered voters to evaluate Pennsylvania's compliance with Section 8(a)(4) and responses to the 2024 Election Administration and Voting Survey. Compl. ¶¶ 53–55. But this is incorrect, and DOJ provides no reason to hold otherwise.

As an initial matter, the NVRA only *requires* states to remove registrants who are no longer eligible due to death or change in residence. 52 U.S.C. § 20507(a)(4); *see also Am. C.R. Union*, 872 F.3d at 182 ("By its terms, the mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away."); *Bellitto v. Snipes*, 935 F.3d 1192, 1195 (11th Cir. 2019) ("[T]he statute could not be clearer: the states and their subsidiaries are required to conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible on account of death or change of residence, and only on those two accounts."). The NVRA also *permits*—but does not require—states to remove registrants at their request, or due to criminal conviction or mental incapacity, if those categories are disqualifying under state law. 52 U.S.C. § 20507(a)(3); *Bellitto*, 935 F.3d at 1203 ("Although the statute also allows and encourages

the states to conduct additional programs of list maintenance—and indeed the states have administrative and other incentives to do so—the statute requires nothing more of the state.”).

In mandating removals for death or change in residence, the NVRA's focus is on process, not results. It requires states to “conduct a general program that makes a *reasonable effort*” to remove these ineligible registrants. 52 U.S.C. § 20507(a)(4) (emphasis added). To constitute a reasonable effort, the removal program must make “a rational and sensible attempt to remove dead [or non-resident] registrants; a state need not, however, go to ‘extravagant or excessive’ lengths in creating and maintaining such a program.” *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *petition for cert. pending.* Indeed, “[t]he state is not required to exhaust all available methods for identifying deceased [or non-resident] voters; it need only use reasonably reliable information to identify and remove such voters.” *Bellitto*, 935 F.3d at 1205.

For change in residence, the NVRA provides a “safe harbor” for states: complying with Section 8(c)(1), which provides that a state “may meet the requirement of Section 8(a)(4)” by using “change-of-address information supplied by the Postal Service” to update the addresses of registrants who have moved within the same registrar's jurisdiction and to confirm that other registrants have moved outside the registrar's jurisdiction using the notice procedure established in Section 8(d)(2). 52 U.S.C. § 20507(c)(1); *see also, e.g.*, *Bellitto*, 935 F.3d at 1205 (“As a safe harbor, the NCOA process, at a minimum, constitutes a reasonable effort at identifying voters who have changed their addresses.”); *Judicial Watch, Inc. v. Illinois State Bd. of Elections*, 2025 WL 2712209 at *11 (N.D. Ill. Sept. 23, 2025). The NVRA does not similarly provide a safe harbor for removals based on deaths, but courts have recognized that states made a “reasonable effort” where removal programs were based on state and federal death records. *See, e.g.*, *Benson*, 136 F.4th at 628; *Bellitto*, 935 F.3d at 1205.

Thus, to determine whether a state is violating Section 8(a)(4), the proper inquiry is on the reasonableness of the process itself, rather than the result. "Section 8(a)(4) does not require a perfect removal effort[.]" *Judicial Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 407 (M.D. Pa. 2021). This is because Congress was striking a balance between making registration more accessible and maintaining accurate voter rolls, and "a maximum effort at purging voter lists could minimize the number of ineligible voters, but those same efforts might also remove eligible voters." *Bellitto*, 935 F.3d at 1198.

A snapshot of Pennsylvania's voter registration file—with or without registrants' DLNs and SSN4s—will not tell DOJ what processes election officials follow, what data sources they use, or how regularly they remove registrants who have become ineligible due to death or change in residence. The mere existence at a given time of specific individuals on the voter rolls who have died or have changed residence is not determinative of whether a state's process is reasonable. *See Benson*, 136 F.4th at 628 (assuming *arguendo* that 27,000 deceased voters were on Michigan's voter rolls and finding that, at 0.3% of the registration rolls, "that vanishingly small percentage is in-and-of-itself indicative that Michigan has taken rational, sensible steps to maintain accurate voter rolls"). Obviously, people die and move every day; removals are a process, and there will always be some number of dead or non-resident registrants on any state's voting rolls, no matter how diligent the state is. *See* 25 Pa.C.S. § 1505(a) ("The Department of Health shall, within 60 days of receiving notice of the death of an individual 18 years of age or older, send the name and address of residence of that individual to a commission … [which] shall promptly update information contained in its registration records."); 52 U.S.C. § 20507(d) (prohibiting states from removing registrants due to a change in residence unless the registrant (a) has confirmed the change

in writing or (b) failed to respond to a sent notice and failed to vote or appear to vote for a two-year period beginning when the notice).[16]

Furthermore, DOJ's enforcement history demonstrates that it does not need SSN4s or DLNs to bring successful lawsuits alleging that states' removal programs were not reasonable. DOJ lists on its website at least six such lawsuits from the mid-2000s.[17] None of the complaints or settlements indicate that DOJ had access at any point to registrants' SSN4s or DLNs. More recently, in 2017, DOJ requested information from Kentucky about its compliance with the list maintenance provisions of the NVRA and HAVA, as well as data that was missing from its most recent report to the U.S. Election Assistance Commission.[18] Unlike the present demand from DOJ, however, the 2017 letter did not request any personally identifying information at all, let alone such sensitive information as SSN4s or DLNs. DOJ subsequently intervened in a NVRA Section 8(a)(4) lawsuit against Kentucky and entered into a remedial consent judgment. Again, neither the complaint nor consent judgment make any reference to personally identifying information.[19]

[16] Because removals are a process, the number of ineligible registrants will also fluctuate from week to week and month to month. Thus, a static, point-in-time snapshot of the voter file (with or without SSN4s and DLNs) would also not tell DOJ anything about what the voter file will look like at a later point of time, and the voter file would be just as likely to have fewer ineligible registrants than more.

[17] DOJ, *Cases Raising Claims Under The National Voter Registration Act* (Mar. 6, 2025), https://www.justice.gov/crt/cases-raising-claims-under-national-voter-registration-act. The relevant cases are: *U.S. v. Pulaski County*, No. 4-04-cv-389 (E.D. Ark. 2004); *U.S. v. Missouri*, No. 2:05-cv-4391 (W.D. Mo. 2005); *U.S. v. Indiana*, No. 1:06-cv-1000 (S.D. Ind. 2006); *U.S. v. Maine*, No. 06-86 (D. Me. 2006); *U.S. v. New Jersey*, No. 06-4889 (D.N.J. 2006); *U.S. v. Philadelphia*, No. 2:06-cv-4592 (E.D. Pa. 2007).

[18] *Judicial Watch v. Grimes*, No. 3:17-cv-94, Dkt. 35 Ex. A (E.D. Ky. June 21, 2018), https://www.justice.gov/crt/case-document/file/1148356/dl?inline

[19] *Id.*; *id.* Dkt. 39 (E.D. Ky. July 3, 2018), https://www.justice.gov/crt/case-document/file/1083361/dl?inline.

Finally, DOJ has not demonstrated how voters' SSN4s and DLNs are necessary to evaluate "issues raised by the data and by answers provided" by the Secretary to the EAC's 2024 Election Administration and Voting Survey. Compl. ¶ 55. DOJ already asked the Secretary questions about Pennsylvania's responses, which the Secretary answered. *Supra* at 2–3. DOJ concedes that Secretary Schmidt provided "explanations to the Attorney General's EAVS requests," Compl. ¶ 38, and nowhere alleges that these responses were incomplete or unsatisfactory.

**C. The NVRA does not require electronic disclosure.**

Even if the NVRA did require disclosure of voters' SSN4s and DLNs, the statute does not require electronic disclosure as demanded by DOJ. *Contra* Compl. at 16. Instead, Section 8(i) "requires states to make covered records available in two ways: (1) for 'public inspection,' and (2) 'where available, photocopying at a reasonable cost.'" *See Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324, 1332–35 (11th Cir. 2024) (quoting 52 U.S.C. § 20507(i)(1)). Electronic production "is an entirely different method of disclosure" that Congress has not chosen to require, *id.*, and so not one the Court can order Pennsylvania to provide.

**II. DOJ has failed to state a claim under the Help America Vote Act (HAVA)**

Congress enacted HAVA to, among other things, "help improve ... the way registration lists are maintained." *Am. C.R. Union*, 872 F.3d at 180–81. HAVA "builds on the NVRA" by requiring each state to maintain "a computerized database for voter registrations" and "perform list maintenance" of the computerized database. But "states may not remove individuals from the voter rolls unless they do so in accordance with" the NVRA. *Id.* at 181.

DOJ claims that it needs voters' SSN4 and DLN to: (a) evaluate Pennsylvania's compliance with HAVA, pursuant to the Attorney General's statutory enforcement authority under 52 U.S.C. § 21111; (b) evaluate Pennsylvania's procedures to ensure that duplicate names are eliminated from the voter rolls as required by 52 U.S.C. § 21083(a)(2)(B); and (c) determine

Pennsylvania's compliance with HAVA's list maintenance requirements in 52 U.S.C. § 21083(a)(5)(A). Compl. ¶¶ 59–61. These arguments are not legally or factually credible.

**A. DOJ lacks statutory authority under HAVA.**

HAVA does not contain a public records disclosure provision, and so it cannot grant DOJ a right to Pennsylvania to registered voters' records. DOJ instead attempts to muddy the waters, baldly alleging that "Defendants have failed to take the actions necessary for the State of Pennsylvania to comply with Section 303 of HAVA," Compl. ¶ 58, while simultaneously claiming that it does not have the necessary information to evaluate Pennsylvania's compliance with HAVA. Compl. ¶ 59. As a matter of logic, DOJ cannot have evaluated Pennsylvania's compliance with HAVA if it does not have the necessary information to evaluate Pennsylvania's compliance with HAVA. These "naked assertion[s]" do not "contain sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 US 662, 678 (2009) (cleaned up).

Moreover, even if the allegations were ordinarily sufficient, they cannot support the notion here that DOJ is entitled to the relief it seeks—a declaration that the Secretary's refusal to provide records prevents the Attorney General from enforcing HAVA's list maintenance requirements, Compl. Prayer for Relief C., because the Secretary is under no obligation to provide records pursuant to HAVA nor to voluntarily assist the Attorney General in suing him.

DOJ appears to misunderstand 52 U.S.C. § 21111. That section grants the Attorney General authority to "bring a civil action … for such declaratory and injunctive relief … as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" in specific sections of HAVA. In other words, this section in a subchapter titled "Enforcement" grants the Attorney General authority to *enforce* certain provisions of HAVA, including Section 303. That is hardly the same as an independent grant of authority to create a whole

new obligation on states to disclose records, or indeed to do anything at all that Congress did not choose to require.

### B. DOJ does not need voters' SSN4 or DLN to ensure compliance with HAVA's voter registration requirements.

DOJ does not specify which requirements of 52 U.S.C. § 21083(a)(5)(A) Pennsylvania is allegedly violating. Compl. ¶ 61. That section generally requires that a state not accept or process a voter registration application unless the applicant provides a DLN or SSN4. *Id.* § 21083(a)(5)(A)(i). If the applicant does not have one of those two numbers, the state must assign them an identification number for voter registration purposes. *Id.* § 21083(a)(5)(A)(ii). Crucially, however, Congress authorized Pennsylvania to "determine whether the information provided by an individual," i.e., their SSN4, DLN, or a lack thereof, "is sufficient to meet [these requirements], *in accordance with State law*." *Id.* § 21083(a)(5)(A)(iii) (emphasis added).

As a practical matter, DOJ knows that Pennsylvania requires DLNs and SSN4s; otherwise, it would not be suing the Secretary for them. The Commonwealth's voter registration application confirms that Pennsylvania collects that information.[20] But obtaining voters' SSN4s and DLNs would tell DOJ nothing about whether Pennsylvania requires those numbers from all applicants who possess them. To check whether there are any registrants who do not have an SSN4 or DLN listed in the voter file, but who do in fact have such a number and should have listed it on their registration, DOJ would also need to have access to the Commonwealth's driver's license database and the Social Security database, as well as a way to verify that any given registrant without an

[20] *See* Pennsylvania Voter Registration Application & Mail-In Ballot Request, https://www.pa.gov/content/dam/copapwp-pagov/en/vote/resources/documents-and-forms/Voter_Registration_Application_English.pdf

SSN4 or DLN listed in the voter file is the same person as an individual in the driver's license or Social Security databases.

Obtaining voters' SSN4s and DLNs would also tell DOJ nothing about whether or how Pennsylvania law determines whether the information provided is sufficient to meet the requirements of HAVA, "in accordance with State law." 52 U.S.C. § 21083(a)(5)(A)(iii). The "in accordance with State law" clause—which DOJ has entirely left out of its restatement of the law, Compl. ¶ 26—means that *Pennsylvania* may choose whether to query the SSN4 or DLN provided by a registrant against the relevant database, and if they do, what to do if the query returns a non-match. *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1174 n.21 (11th Cir. 2008) ("HAVA also does not require that states authenticate these numbers by matching them against existing databases. It is explicit that states are to make determinations of validity in accordance with state law. States are therefore free to accept the numbers provided on [the] application form . . . as self-authenticating."); *Washington Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264, 1268–69 (W.D. Wa. 2006) (holding that HAVA does not require a match at the time of registration, and that holding otherwise would directly conflict with other provisions of HAVA).

Pennsylvania law does not require a match at the time of registration. 25 Pa.C.S. § 1328 (governing the approval or rejection of voter registration applications, with no reference to mismatched or unverified identification numbers); *see also* Pa. Dep't of State, *Directive Concerning HAVA — Matching Drivers' Licenses or Social Security Numbers for Voter Registration Applications* (2018) (advising that county election officials may not reject voter registration applications based solely on a mismatch); *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 604 (Pa. Comm. Ct. 2025) (citing with approval the Deputy General Counsel's determination that HAVA does not require a match in order to register to vote); *McLinko v. Pennsylvania*, 2025 WL 2952837,

at *5–6 (Pa. Comm. Ct. Oct. 20, 2025) (noting that, under Pennsylvania law, "voter registration commissions are not required to match the DLNs or SSNs provided by applicants with established databases to accept a voter registration application"); *Rossman v. Pa. Dep't of State*, 2025 WL 3514275, at *6 (Pa. Comm. Ct. Dec. 8, 2025) ("[S]tate law does not authorize an out-of-hand rejection based merely upon a mismatch in the driver's license or SSN databases, without investigation.").[21]

In short, possessing voters' SSN4s and DLNs will not tell DOJ whether Pennsylvania requires those numbers from registrants who have them and otherwise assigns numbers to those who do not. As with the NVRA, DOJ can accomplish its goals without sensitive personally identifying information. And because neither HAVA nor Pennsylvania law require a match at the time of registration, there is no other potential violation of HAVA's voter registration requirements, let alone one that would require registrants' SSN4s and DLNs to establish.

### C. DOJ does not need voters' SSN4 or DLN to ensure elimination of duplicates.

HAVA does require that list maintenance be conducted "on a regular basis" to remove duplicate names. 52 U.S.C. § 21083(a)(2). But a static, point-in-time voter roll would tell DOJ nothing about how regularly removals are conducted. Depending on when DOJ were to receive the voter file, the same HAVA-compliant program would different numbers of potential duplicates. For example, because the removal process takes time, one would expect a higher number of

[21] Importantly, if an individual registers by mail (including online registration) and they do not provide a DLN or SSN4, or the number they provide cannot be verified at the time of registration, HAVA provides that the individual must not be permitted to vote for the first time unless they provide proof of identity with their voter registration application, with their mail ballot, or at the polling place, unless they meet a limited exception. 52 U.S.C. § 21083(b). Pennsylvania law also requires identification at the polling place when voting for the first time, and with each application for an absentee or mail-in ballot. *See* 25 P.S. § 3050(a), as modified by *Applewhite v. Com.*, 2014 WL 184988, at *27 (Pa. Commw. Ct. Jan. 17, 2014); 25 P.S. §§ 3146.2b(c), 3150.12b(a).

duplicates in the weeks immediately before a voter registration deadline, when voter registration activity typically spikes. *See* 25 Pa.C.S. § 1328(d) (a registrant's new county must send a cancellation notice to her old county, but the old county must investigate and verify the address change before cancelling the record). Likewise, one would expect the number of duplicate registrations to be higher immediately before the Department receives a duplicate report from ERIC and sends information to the relevant counties to process under the NVRA.[22]

Even if the number of duplicate registrations at a fixed point in time were relevant to determining HAVA compliance, it is not necessary for DOJ to possess registrants' SSN4s and DLNs. The Secretary has offered DOJ a voter file with a wealth of registrant information, including voter ID number, full name, date of birth, residential address, sex, political party, date registered, voter history, and date the registrant's record was last changed. *Supra* at 3–4. Were DOJ genuinely concerned about removing duplicate registrations, it could use the information in the voter file to identify likely duplicates, and then ask the Commonwealth to use SSN4s, DLNs, or signatures to confirm.

**III. DOJ has failed to state a claim under Title III of the Civil Rights Act of 1960.**

Congress enacted Title III of the Civil Rights Act of 1960 "to secure a more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). To enable the Attorney General to meaningfully investigate complaints of voter discrimination, Title III requires election officials to retain "for a period of twenty-two months from the date of any general, special, or primary [federal] election … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such

[22] *See generally* DOS 2024 VR Report, *supra* note 2, at 17–18, 72–74, 87–89.

election." 52 U.S.C. § 20701; *see* H.R. Rep. No. 86-956, at 7 (1959). The Attorney General may then inspect those records upon a "demand in writing" that "contain[s] a statement of the basis and the purpose therefore." 52 U.S.C. § 20703.

Although DOJ demands voters' SSN4 and DLN under Title III, Compl. ¶¶ 47–50, it has brought its complaint to the wrong court, failed to provide a legally sufficient basis *and* purpose, and demanded electronic disclosure where the statute does not so require.

**A. This Court lacks jurisdiction to adjudicate DOJ's Title III claim.**

When the Attorney General seeks to enforce a valid demand for records or papers under 52 U.S.C. § 20703, the Civil Rights Act grants jurisdiction only to the federal district court "for the district in which a demand is made" or "in which a record or paper so demanded is located." 52 U.S.C. § 20705. Even though DOJ bears the burden of proof that jurisdiction exists, *see Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015), DOJ has not alleged facts to show that either criteria is satisfied here. Nor could it, as Secretary Schmidt sits in Harrisburg, which is in the Middle District. *See* Compl. ¶¶ 33–43 (discussing demand made upon Secretary Schmidt). As a result, this Court lacks jurisdiction to adjudicate DOJ's Title III claim.

**B. DOJ has not provided a legally sufficient "basis and purpose."**

DOJ is only entitled to inspect records "upon demand in writing" that contains "a statement of the basis *and* the purpose therefor." 52 U.S.C. § 20703 (emphasis added). It has not done so.

In its August 14 letter that first invoked Title III, DOJ stated that the "purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 4, at 2. But as explained above, *supra* at 10–13, 16–19, production of voters' SSN4 and DLN is not necessary to ascertain Pennsylvania's compliance with these requirements.

Nor would it be consistent with the purpose of Title III, which Congress enacted to "provide a more effective protection of the right of all qualified citizens to vote without discrimination

on account of race." H.R. Rep. No. 86-956 at 7; *accord Rogers*, 187 F. Supp. at 853. Title III built on the Civil Rights Act of 1957, which authorized "the Attorney General to institute proceedings for preventive relief from the discriminatory denial of the right to vote." H.R. Rep. No. 86-956 at 7. But experience had shown that without "access to voting records during the course of an investigation" into complaints of race discrimination, the Attorney General "is rendered relatively ineffective." *Id.* In his signing statement, President Eisenhower recognized that "retention of voting records … will be of invaluable aid in the successful enforcement of existing voting rights statutes." Presidential Statement on Signing the Civil Rights Act of 1960 (May 6, 1960).[23]

Moreover, Congress chose to require DOJ to provide *both* a basis and a purpose. Black-letter law requires giving effect to every word of a statute and avoiding surplusage. *Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (collecting caselaw). Consistent with the civil rights purpose of Title III, contemporaneous caselaw confirms that the "basis" is a statement showing reason to believe there have been civil rights violations and the "purpose" explains how the requested records would help determine if there has been such a violation. *E.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962).

Here, DOJ has offered an insufficient purpose—hypothetical noncompliance with list maintenance obligations Congress authorized States to conduct (which falls far afield from investigating voter discrimination)—and has failed altogether to provide a basis.

Finally, nothing in Title III prohibits the redaction of sensitive voter information. *Cf. Bellows*, 92 F.4th at 56 (1st Cir. 2024) (finding that "the appropriate redaction of uniquely or highly

[23] https://www.presidency.ucsb.edu/documents/statement-the-president-upon-signing-the-civil-rights-act-1960.

sensitive personal information in the Voter File" was permissible where the NVRA did not prohibit such redactions). And if sensitive information can be redacted, it cannot be compelled.

### C. Title III does not require electronic disclosure.

Even if Title III did require the Secretary to produce voters' SSN4s and DLNs, the statute does not require electronic disclosure. *Contra* Compl. at 16. Instead, the demanded records must "be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." 52 U.S.C. § 20703. As with the NVRA (which permits "public inspection" and "photocopying"), Congress did not choose to require electronic production. *Cf. Greater Birmingham Ministries*, 105 F.4th at 1332–45.

## IV. Pennsylvania privacy protections operate harmoniously with the NVRA, HAVA, and Title III.

Article I, Section 1 of the Pennsylvania Constitution protects voters' "inherent and indefeasible" right to informational privacy, which is the "right of the individual to control access to, or the dissemination of, personal information about himself or herself." Pa. Const. art. I, § 1; *Pa. State Educ. Ass'n (PSEA) v. Com. Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142, 150 (Pa. 2016). This protection recognizes that the disclosure of some types of information, such as SSN4 and DLN, "by their very nature[] would operate to the prejudice or impairment of a person's privacy, reputation, or personal security, and thus intrinsically possess a palpable weight." *See Tribune-Review Pub. Co. v. Bodack*, 961 A.2d 110, 115–16 (Pa. 2008). Only a context-specific "compelling state interest will override one's privacy rights" and justify disclosure. *Allegheny Reprod. Health Ctr. v. Pa. DHS*, 309 A.3d 808, 903–04 (Pa. 2024); *accord Commonwealth v. Nixon*, 761 A.2d 1151, 1156 (Pa. 2000).

While HAVA and state law require Pennsylvania voters to provide their SSN4 or DLN when registering to vote, *see* 52 U.S.C. § 21083(a)(5)(A); 25 Pa.C.S. § 1327(a)(2), their exercise

of the franchise does not require them to forfeit their constitutionally protected privacy interest in that information, *see, e.g.*, *PSEA*, 148 A.3d at 363 (noting that public school employees "should not be required to forfeit their privacy merely as a precondition to, or by virtue of, their decision to be employed as public school employees").

The Elections Clause gives States the power to regulate the time, place, or manner of federal congressional elections (including registration), subject to congressional power to "make or alter such [r]egulations." U.S. Const., art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013). State law is preempted only if it is "inconsistent" with a federal election law. *ITCA*, 570 U.S. at 15. But no inconsistency exists between Pennsylvania's constitutional privacy protections and the NVRA, HAVA, and Title III. DOJ identifies no provision of any of these statutes that demands disclosure of voters' SSN4 and DLN (because none do). Nor has DOJ demonstrated that it needs voters' SSN4 and DLN to exercise its statutory oversight functions under HAVA. And because DOJ has therefore failed to provide a "compelling state interest," it cannot override voters' constitutional private interests in their SSN4 and DLN.

## V. DOJ's demand would violate the Privacy Act, E-Government Act, and Driver's Privacy Protection Act.

An affirmative defense may be raised in a Rule 12(b)(6) motion "if the predicate establishing the defense is apparent from the face of the complaint." *Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978). Three fatal defects are apparent here.

1. Congress enacted the Privacy Act to "provide certain safeguards for an individual against an invasion of personal privacy" by, among other things, regulating the collection of personal information by Federal Agencies. Pub. L. No. 93-579, § 2(a)(5), (b), 88 Stat. 1896 (1974). Before an agency establishes or revises a "system of records" (i.e., a group of "records" about an individual collected or maintained by that agency), it must first publish a notice in the Federal

Register. 5 U.S.C. § 552a(a)(3), (a)(4), (a)(5), (e)(4). The notice must include the categories of individuals on whom records are maintained. *Id.* § 552a(e)(4). For a "significant change," the agency must provide "adequate advance notice" to certain congressional committees and the Office of Management and Budget to permit evaluation of the effect on privacy rights. *Id.* § 552a(r); *see* OMB, Circular No. A-108, at 5–6 (Dec. 2016) (significant change is substantive in nature).

DOJ concedes that the Privacy Act applies to its demand and represents it will store the data in a system of records called the Central Civil Rights Division Index File and Associated Records, CRT-001. Compl. ¶ 41; *see* 68 Fed. Reg. 47610 (2003).[24] But that system of records does not encompass the personal information of 8.9 million registered Pennsylvania voters (and millions of voters in other states), who are not "[s]ubjects of investigations, victims, [or] potential witnesses," nor "other persons or organizations referred to CRT in potential or actual cases and matters of concern to CRT." *Cf.* 68 Fed. Reg. at 47611 (listing categories of individuals covered by the system). Nor has DOJ provided notice to the relevant congressional committees or OMB. It is therefore apparent on the face of the Complaint that DOJ's request violates the Privacy Act.

DOJ's claim that HAVA exempts SSN4s from section 7 of the Privacy Act, Compl. ¶ 42, is irrelevant. Section 7 makes it unlawful for a government agency "to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." 5 U.S.C. § 552a note; Pub. L. No. 93-579, § 7, 88 Stat at 1909. The HAVA exemption, therefore, permits denial of voter registration because of a person's refusal to disclose her SSN; it does not exempt SSN4s from the Privacy Act's protections.

[24] Revisions to the system of records are not relevant here. *See* 70 Fed. Reg. 43904 (July 29, 2005) (adding new routine use for disclosing information related to closing certain criminal matters); 82 Fed. Reg. 24147 (May 25, 2017) (adding routine use related to data breach).

2. DOJ has also not complied with the E-Government Act, which requires an agency to conduct a "privacy impact assessment" *before* "initiating a new collection of information." Pub. L. No. 107-347, § 208, 116 Stat. 2899 (2002); *see EPIC v. Pres. Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 309 (D.D.C. 2017); OMB Guidance, M-03-22 (Sep. 26, 2003). Collecting the SSN4s and DLNs of 8.9 million registered Pennsylvania voters (and millions of voters in other states) is undoubtedly a new collection of information, but the Complaint does not allege that DOJ completed a PIA in advance. This apparent failure also warrants dismissal.

3. Finally, the Driver's Privacy Protection Act (DPPA) generally prohibits the disclosure of DLNs and SSN4s obtained by the Pennsylvania Department of Transportation in connection with a motor vehicle record. 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). These protections extend to the Department, which is permitted under DPPA to receive personal information from PennDOT to carry out the Department's voter registration functions. *Id.* § 2721(b)(1), (c); 25 Pa.C.S. § 1323(c). But DOJ's request does not fall within a permissible use because it has not identified how it needs voters' SSN4 and DLN to "carry[] out its functions." *Contra* Compl. ¶ 42.

## CONCLUSION

For the reasons set forth above, the Court should dismiss this action.

December 16, 2025

Respectfully submitted,

Carolyn A. DeLaurentis (PA 307018)
Chief Counsel
Kathleen A. Mullen (PA 84604)
Executive Deputy Chief Counsel
Pennsylvania Department of State
306 North Office Bldg.
401 North Street
Harrisburg, PA 17120-0500

Jennifer Selber (PA 80644)
General Counsel

*<u>/s/ Michael J. Fischer</u>*
Michael J. Fischer (PA 322311)
Executive Deputy General Counsel
Aimee D. Thomson (PA 326328)
Deputy General Counsel
Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Secretary of the Commonwealth Al Schmidt*

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AL SCHMIDT, in his official capacity as Secretary of the Commonwealth of Pennsylvania,<br><br>Defendant. | Case No. 2:25-cv-01481-CB |

**MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO MOTIONS TO DISMISS (DOCS. 88-3, 90-2, 91-92)**

**TABLE OF CONTENTS**

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

III. THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA. ........ 7

A. The Federal Rules of Civil Procedure, including the motion to dismiss standard, are inapplicable to orders to compel under Section 305 of the CRA. ........ 8

B. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights. ........ 9

C. Pennsylvania's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections. ........ 12

D. Movants cannot challenge the Attorney General's basis and purpose to investigate Pennsylvania's HAVA and NVRA compliance. ........ 13

E. The United States is entitled to unredacted electronic copies of Pennsylvania's federal election records, including its SVRL. ........ 16

F. The United States has subject-matter jurisdiction to bring suit in the Federal District Court for the Western District of Pennsylvania to compel production of the SVRL. ........ 17

IV. THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS ........ 18

A. The United States is complying with the Privacy Act. ........ 19

B. The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims ..... 21

C. The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data. ..... 22

V. THE UNITED STATES HAS VALID CLAIMS UNDER HAVA AND THE NVRA ..... 23

VI. CONCLUSION ..... 26

**TABLE OF AUTHORITIES**

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) .............................. 8, 9, 10, 12

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................................ 3

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) .................................................................. 12

*Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008)................................................................ 24

*Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345 (Fed. Cir. 2005).. 19

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962).................................................. 11, 16

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ........................................................... 8, 11, 16

*Ebert v. Poston*, 266 U.S. 548 (1925) ............................................................................................ 11

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ............................................................................................................................ 22

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ................................................................................................................................ 22

*Ex Parte Siebold*, 100 U.S. 371 (1879)............................................................................................ 3

*Florida State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............................ 15

*Foster v. Love*, 522 U.S. 67 (1997).................................................................................................. 3

*France Packing Co. v. Dailey,* 166 F.2d 751 (3d Cir. 1948)...................................................... 11

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)................................................................... passim

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)............................................................ 3

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................................................... 19

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960). 8, 9, 24, 25

*United States v. Bisceglia*, 420 U.S. 141 (1975)............................................................................. 8

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952) ........ 12

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ........ 11

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........ 8

*United States v. Powell*, 379 U.S. 48 (1964) ........ 8

**Statutes**

5 U.S.C. § 552a ........ 21

52 U.S.C. § 20507 ........ 4, 25

52 U.S.C. § 20510 ........ 4

52 U.S.C. § 20701 ........ passim

52 U.S.C. § 20703 ........ passim

52 U.S.C. § 20705 ........ 1, 4, 14, 18

52 U.S.C. § 20706 ........ 2

52 U.S.C. § 21083 ........ 4, 6, 15

52 U.S.C. § 21111 ........ 4, 15, 24

CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960) ........ 10

The E-Government Act of 2002, Pub. L. No. 107–347, § 208 ........ 21, 22

The Privacy Act of 1974, Pub. L. No. 93–579, 88 Stat. 1896 (1974) ........ 21

**Other Authorities**

64 Fed. Reg. 73585-02 (Dec. 30, 1999) ........ 20

66 Fed. Reg. 8425-02 (Jan. 31, 2001) ........ 20

74 Fed. Reg. 57194 (Nov. 4, 2009) ........ 20

82 Fed. Reg. 24151 (May 25, 2017) ........ 20

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 .......... 3

**Legislative Materials**

106 Cong. Rec. 7767 .......... 11

148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002) .......... 24

H.R. Rep. 107-329, pt. 1 (2001) .......... 11

Plaintiff United States of America respectfully submits this Response in Opposition to the Motion to Dismiss by Secretary of State Al Schmidt. (Doc. 91-92).

## I. INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Pennsylvania's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States engaged in repeated correspondence with Defendant, requesting their cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Defendant provided some information relevant to HAVA and NVRA compliance but failed to produce Pennsylvania's statewide Voter Registration List ("SVRL") as mandated by federal law and necessary to evaluate their compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including the SVRL. Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the defendant relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1] The United States will focus most of its response on its CRA claim

[1] Caselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the

to compel production of federal election records it requires to complete its investigation of Defendant's list maintenance practices under HAVA and the NVRA.[2]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose (52 U.S.C. § 20703); (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration;[3] (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying;" (52 U.S.C. § 20703) and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. The record before the Court demonstrates that the United States has established each of these requirements. In contrast, Defendant has wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for

---

issue. The United States is unaware of any courts disagreeing with the Fifth Circuit's approach to the CRA.

[2] The United States will briefly address its HAVA and NVRA claims, which likewise authorize the Attorney General to obtain federal election records. The record production requirements of those statutes are subject to litigation procedures inapplicable to Title III of the CRA.

[3] Section 306 provides:

> As used in this chapter, the term ''officer of election'' means any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico.

52 U.S.C. § 20706.

his motion to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States is entitled to an order compelling production of Pennsylvania's SVRL and other responsive federal election records, and the motion to dismiss should be denied.

## II. BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections

> Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States.

*Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing breadth of Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish

"[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to its authority to enforce these federal election statutes, on June 23, 2025, the United States sent a letter to Secretary Schmidt, seeking information regarding Pennsylvania's compliance with HAVA ("June 23 Letter"). Ex. 1. The June 23 Letter requested a description of how non-citizen voters are identified and removed from the SVRL. Further, the June 23 Letter inquired into how Pennsylvania carries out its list maintenance obligations under Section 303 of HAVA, particularly how the Commonwealth identifies and removes duplicate and deceased voter registrants. The June 23 Letter also inquired about the requirement under Section 303(a)(5) of HAVA that applicants provide certain information and the Commonwealth's process for verifying that information.

Secretary Schmidt responded in a July 23, 2025, letter to the Department of Justice. ("July 23 Letter"). Ex. 2. The response stated that all registrants are merely required to assert, in response to a yes or no question, that they are a citizen of the United States. The July 23 Letter further stated that if an individual answered no, that applicant would be required to be rejected. The July 23 Letter further stated that state and federal law did not require documentary proof of citizenship.

A second letter from the Attorney General on August 4, 2025, requested that Pennsylvania provide a list of election officials responsible for implementing Pennsylvania's general program of voter registration list maintenance and requested, pursuant to Section 8(i) of the NVRA, the electronic copy of its computerized SVRL, required under Section 303(a) of HAVA ("August 4 Letter"). Ex. 3. The August 4 Letter asked Pennsylvania to produce the requested information and records by encrypted email or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS). The August 4 Letter also requested information about duplicate registrations, other EAVS survey questions, and the removal procedures for ineligible voters from the voter rolls because they were noncitizens, felons, or adjudicated incompetent. The August 4 Letter cited the NVRA's various voter roll maintenance requirements while making these requests.

In response, on August 18, 2025, Secretary Schmidt sent a second letter providing explanations to the Attorney General's EAVS requests ("August 18 Letter"). Ex. 4. In that letter, however, the Secretary stated, "Nothing in the NVRA provides a process by which those who are deemed non-eligible on the basis of being a non-citizen are to be removed from the voter rolls." While acknowledging that it is illegal for a non-citizen to misrepresent that he is a citizen on a voter registration application, the Commonwealth did not describe any verification procedures beyond a mere review of the self-attestation question.

On August 14, 2025, the Attorney General sent a third letter to Secretary Schmidt, requesting production of Pennsylvania's SVRL that contains all fields ("August 14 Letter"). Ex. 5. The August 14 Letter requested an electronic copy of Pennsylvania's computerized voter registration list for the commonwealth, with all fields, including each registrant's full name, date of birth, residential address, and driver's license number, or last four digits of his or her Social Security number as required by 52 U.S.C. § 20703.

Furthermore, the August 14 Letter stated, "[A]ll data received from you will be kept securely and treated consistently with the Privacy Act." The letter explained that information the Justice Department collects pursuant to its request to Pennsylvania will be maintained consistent with Privacy Act protections as explained on the Justice Department's website. Ex. 5 at 3.

The August 14 Letter also explained that HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974 (5 U.S.C. [§] 552a note)." 52 U.S.C. § 21083(c). The August 14 letter further stated: "In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's [Privacy] Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing." *Id.* at 2-3.

In response, Secretary Schmidt sent a letter on August 21, 2025, and offered public voter records to the United States for review. ("August 21 Letter"). Ex. 6. However, Pennsylvania's public voter records do not include the HAVA-required unique identifiers requested by the Attorney General.

On September 25, 2025, the United States filed the instant action seeking to compel production of the federal election records that it demanded, including Pennsylvania's SVRL with

the HAVA identifying numbers. *See* Compl., Doc. 1. The Complaint included three counts requiring production under the CRA, NVRA, and HAVA, respectively. *Id.* at 15-16. As discussed below, the United States believes it is unnecessary for the Court to address its claims under the NVRA and HAVA, which mandate production through the normal litigation process. Rather, the United States' CRA claim is dispositive of all the relief that it seeks through Title III's "severely limited inquiry" in a "summary proceeding." *Lynd*, 306 F.2d at 226.

## III. THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA.

Defendant misapprehends the nature of a CRA claim by erroneously suggesting the Court should apply the motion to dismiss standard to it. He incorrectly maintains that Title III of the CRA applies to investigation of a narrow category of federal election laws involving discrimination. He asks the Court to ignore case law under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. In place of producing all election records requisite to voting in federal elections, Defendant invites the Court to narrow the mandate to encompass only publicly available records.[4] For the reasons discussed below, Defendant's motion should be denied and the United States' demand for production of Pennsylvania's federal election records, including its SVRL, should be granted.[5]

---

[4] A "publicly available" record would never need to be "produced." The Attorney General would simply be able to access it in the same manner as any other member of the public. If that were the rule, CRA's provisions mandating production and privacy protections would essentially be rendered meaningless.

[5] In *United States of America v. Stephanie Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 06, 2026)—a suit raising a CRA claim the same as those raised in the present litigation—the Court (Dooley, J.) has issued an Order to Show Cause why the State of Connecticut "should not be ordered to provide the SVRL to the Attorney General, as well as the 'other documents demanded by the Attorney General to ascertain Defendant's compliance with federal law,' to wit, the NVRA and HAVA." *United States v. Thomas*, ECF 10 (D. Conn. Jan. 8, 2026). *See* Ex. 7.

**A. The Federal Rules of Civil Procedure, including the motion to dismiss standard, are inapplicable to orders to compel under Section 305 of the CRA.**

Defendant contends that the Court should apply the motion to dismiss standard to the United States' CRA claim, seeking an order to compel production of federal election records. *See* Mot., Doc. 92 at 19-22. He is mistaken. Defendant repeats what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what Defendant argues, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[6] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA

[6] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vest investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

and the NVRA, if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's request for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225.[7] It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81.

**B. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306

---

[7] The United States will file an Order to Show Cause later this week.

F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election …." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Defendant argues that the Court must go outside the text of the statute to the sparse legislative history and find that Title III is limited to those records necessary to "provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race."[8] Mot., Doc. 92 at 20-21.

No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706. Moreover, in a decision cited by Defendant, Mot., Doc. 92 at 19, 21, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (sufficient purpose to examine federal

[8] Defendant cites to *State of Ala. ex rel. Gallion v. Rogers*, 187 F.Supp. 848, 853 (M.D. Ala. 1960), which states that the statute protects the right to vote, not that it protects the right to vote *without discrimination on account of race*, as Defendant alleges. (emphasis added).

election records is "to see if any Federal laws were violated"). The United States clearly has satisfied that requirement by informing the officers of election that "the purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA."[9] Ex. 5 at 2. Requiring more than that by engrafting a requirement of racial discrimination that does not exist in the statute would violate the clear congressional mandate. Where, like here, the language of an enactment is clear, "Construction may not be substituted for legislation." *France Packing Co. v. Dailey,* 166 F.2d 751, 755 (3d Cir. 1948) (quoting *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929)). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms

[9] Congress has explained why list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote. For example, passage of HAVA was intended to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found." H.R. Rep. 107-329, pt. 1, at 36 (2001).

inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020). The Court should decline Defendant's invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

**C. Pennsylvania's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, the federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude electronic records or records created by the officer of election. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election…' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be

circumvented. In a similar vein, "there is no question for judicial determination as to how far back the records go. This, too, is fixed by the statute." *Id.* "[T]he Attorney General's right of inspection and copying extend as far back as the earliest date of any such record or paper which bears on the eligibility of any currently listed voter to vote" in a federal election. *Id.* at 227. To put it even more succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Pennsylvania's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230.

Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[10]

### D. Movants cannot challenge the Attorney General's basis and purpose to investigate Pennsylvania's HAVA and NVRA compliance.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those

---

[10] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Jan. 6, 2026). For the Court's convenience, the three documents are provided as Exhibits 8-10.

federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the August 14 Letter, the Attorney General made a written demand under Section 303 of the CRA for Pennsylvania's federal election records. Ex. 5 at 2. The letter cited Section 303 of the CRA as the basis for the request, stating that "[p]ursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Pennsylvania's complete and current [SVRL]. The purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*

Nevertheless, Defendant argues that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records because the Commonwealth relies on registrants' self-attestations as to the authenticity of the driver's license number or last four of their social security number they provide. Mot., Doc. 92 at 16-17. In fact, county election officials are enjoined from rejecting a voter-registration application if they identify a mismatch. *Id*. at 17. Defendant concludes that were the Attorney General to receive Pennsylvania's SVLR, no violations could be found due to the Commonwealth's method of verifying voter registrations. *Id*. at 18. That is incorrect.

It is a requirement of federal law that voter registration applicants provide their driver's license number, and if they do not have that, then they need to provide the last four of their social security number:

> an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes—
> (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or
> (II) in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.

52 U.S.C. § 21083(a)(5)(A)(i).

Defendants cite the Eleventh Circuit in *Florida State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1174 (11th Cir. 2008), to support their position that the federal government is not entitled to look at the driver's license and SSN4 information, but that is not what the court found: "The fact that HAVA section 303(a) requires states to obtain the applicant's identification numbers before accepting a registration application and also to 'determine whether the information provided ... is sufficient to meet [that] requirement[ ]' indicates that Congress deemed the identification numbers material to determining eligibility to register and to vote." *Browning*, 522 F.3d at 1174.Regardless of the method Defendant has elected to verify voter registrations in section 303(a)(5)(A)(iii), the United States has a statutory duty to investigate and review Pennsylvania's unredacted SVRL for compliance with the requirements of list maintenance under Section 303 of HAVA. *See* 52 U.S.C. § 21111.

Federal courts have rejected contentions that parallel those made by Defendant. Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"). The United States plainly satisfied that requirement by stating, "[t]he

purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 5 at 2.

Contrary to what Defendant argues, he is prohibited from using "any procedural device or maneuver," including their motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…." *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228. Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. Defendant's motion to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fails under the plain language of the statute, as applied by federal courts. Therefore, the motion should be denied.

**E. The United States is entitled to unredacted electronic copies of Pennsylvania's federal election records, including its SVRL.**

Section 303 provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether

or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers… relating to any… act requisite to voting'…." *Id.*

Nevertheless, Defendant asks the Court to legislate limitations conspicuously absent from Title III. First, Defendant argues that no electronic records need to be produced to the United States. Instead, Defendant contends, "[t]he statute only mandates that covered records be made available for inspection, reproduction, and copying at the principal office of such custodian…." Mot., Doc. 92 at 20, 22 (citing 52 U.S.C. § 20703). Federal courts have concluded that Section 303 requires reproduction and copying, and 52 U.S.C. § 20704 provides privacy protections for documents produced to the Attorney General. For example, in *Lynd*, the court rejected a "mechanical objection" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* Pennsylvania's SVRL is required by HAVA to be in electronic form. It is axiomatic that providing the United States with an electronic copy of its SVRL will be much less burdensome than physically copying every individual registration record.

**F. The United States has subject-matter jurisdiction to bring suit in the Federal District Court for the Western District of Pennsylvania to compel production of the SVRL.**

The United States brought suit in the Federal District Court for the Western District of Pennsylvania to compel production of the SVRL. Compl., Doc. 1 at 1. Jurisdiction is proper in "The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located…." 52 U.S.C. § 20705.

Federal courts have concluded that Section 303 requires reproduction and copying. *Lynd*, 306 F.2d at 231. Pennsylvania's SVRL is required by HAVA to be in electronic form. *See* 52 U.S.C. § 21083(a)(1)(A). The SVRL is available in electronic form throughout the commonwealth.

Over sixty years ago, the court in *Lynd* recognized that the technological innovation of the photocopying of documents obviated the defendants' demands for antiquated methods of reproduction of information. 306 F.2d at 231. So, in like measure, the custody, inspection, reproduction, and copying of Pennsylvania's SVLR in the twenty-first century in electronic form only eliminates the requirement for DOJ attorneys to physically appear in Harrisburg to review the SVRL. Since this requirement is no longer viable, initiation of suit in any federal district of Pennsylvania is proper, as access to Pennsylvania's SVLR is available through any secure DOJ internet link anywhere in the Commonwealth. Since the United States made a demand for inspection, reproduction, and copying of Pennsylvania's SVRL in the Western District Court, and the electronic SVRL is available in any federal judicial district in Pennsylvania, jurisdiction in the Western District is proper.

## IV. THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS

Defendant argues that privacy laws require dismissal of the United States' efforts to compel production of Pennsylvania's federal election records. *See* Mot., Doc. 74-1 at 29-32. He is mistaken. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA. The requirement for a Privacy Impact Assessment under the E-Government Act does not apply to the investigation of Pennsylvania's list maintenance practices being conducted by the United States under HAVA and the NVRA. Similarly, the Driver's Privacy

Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

### A. The United States is complying with the Privacy Act.

Defendant Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. But Defendant goes even further, contending that "DOJ's request violates the Privacy Act." Mot., Doc. 92 at 24. There is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information.[11] Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the Department is collecting is maintained according to the Privacy Act protections explained in the Civil Rights Division's Privacy Policy, which it has published online.[12] The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148-24,151.[13]

---

[11] Indeed, governmental compliance with relevant laws is, absent a showing to the contrary, presumed. *See, e.g.*, *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345, 1350 (Fed. Cir. 2005) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

[12] *See* U.S. Dep't of Just., Civ. Rts. Div., Privacy Policy ("Privacy Policy"), *available at* https://civilrights.justice.gov/privacy-policy (last visited Jan. 6, 2026).

[13] Additional SORNs issued by the Civil Rights Division to supplement the Department-wide privacy practices are titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); and 70 Fed. Reg. 43904-01

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960. *See* Privacy Policy, *supra* n.16. The United States made its requests pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent Defendant is concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.[14]

Moreover, the Privacy Act does not bar the disclosure of Pennsylvania's SVRL to the United States, as Defendant contends. Mot., Doc. 92 at 23-24. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of

(July 29, 2005). Defendant fails to recognize any of the Department-wide SORNs that permit the Department's collection of its SVRL, as was done previously in the Georgia and Texas examples discussed *supra* note 10.

[14] *See* JUSTICE/DOJ-014, Department of Justice Employee Directory Systems, last published in full at 74 Fed. Reg. 57194 (Nov. 4, 2009), and modified at 82 Fed. Reg. 24151, 24153 (May 25, 2017); JUSTICE/DOJ-002, Department of Justice Computer Systems Activity and Access Records, last published in full at 64 Fed. Reg. 73585-02 (Dec. 30, 1999), and modified at 66 Fed. Reg. 8425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24147-01 (May 25, 2017).

federal agency record systems. There is no basis for Defendant to fail to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

### B. The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.

Defendant next argues that the demand for production of Pennsylvania's SVRL and other federal election records violates the E-Government Act. According to Defendant, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating a new collection of information. *See* Mot., Doc. 92 at 25. Again, neither the E-Government Act nor interpretative caselaw support Defendant's assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Defendant to provide a voter registration list he already maintains pursuant to federal law to analyze Pennsylvania's federally required list maintenance.[15]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd

---

[15] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act

result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act (UOCAVA). Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208 (a).

Even if the Court found the E-Government Act applied here—and it should not—Defendant has misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See id. EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In that case, the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In doing so, the *EPIC II* court explained that the Act "is intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is, therefore, not the type of plaintiff Congress had in mind." *Id*. at 378 (emphasis in original).

**C. The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.**

Defendant Movants' contention that dismissal is warranted because they allege that the United States has "failed to sufficiently allege its compliance with the Driver's Privacy Protection

---

Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Jan. 6, 2026).

Act ('DPPA')," likewise fails. Mot., Doc. 92 at 25. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are, therefore, consistent with the DPPA and fall squarely within the statute's exceptions.

## V. THE UNITED STATES HAS VALID CLAIMS UNDER HAVA AND THE NVRA.

Defendant argues that the Court should dismiss the HAVA and NVRA claims brought by the United States to obtain federal election records, including Pennsylvania's SVRL, necessary to investigate and assess Pennsylvania's compliance with those statutes. *See* Mot., Doc. 92 at 25. As explained in the United States' introduction and its discussion of its CRA action, the claim under the CRA is dispositive of the relief being sought. The summary nature of an action to compel federal election records under Section 305 of the CRA, and the sweeping scope of that provision, obviate the need for additional relief under HAVA and the NVRA. If the Court agrees, the United States stipulates that it is appropriate to dismiss without prejudice its records requests under HAVA and the NVRA, which would be mooted by a CRA order of production. Nevertheless, the United States will briefly address its other two records claims.

Turning first to HAVA, Defendant points out that the text of the Act "does not contain a public record disclosure provision." Mot., Doc. 92 at 15. That is true, and it explains why the United States is entitled to the federal election records it has demanded through its HAVA claim. The only enforcement provision in HAVA authorizing a cause of action in federal court is found at Section 401, which provides that enforcement of the Act is vested solely in the Attorney General. *See* 52 U.S.C. § 21111. Senator Dodd of Connecticut, a HAVA conferee and sponsor, recognized that the Act did not have a private right of action. *See* 148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002). As a result, the Supreme Court has held that private parties may not enforce Section 303, including requests for records under that provision. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per curiam) ("Respondents, however, are not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 in an action brought by a private litigant to justify the issuance of a TRO."). Congress unsurprisingly did not include a public disclosure requirement, such as the one included in Section 8(i) of the NVRA, because unlike the NVRA, private parties cannot enforce HAVA.

However, that does not leave the United States without recourse to seek list maintenance records under HAVA. Rather, it may do so through the ordinary discovery process necessary to prosecute its Section 303 claim. Here, the CRA cases are instructive. Under the CRA, election officials are required to preserve and produce federal election records "to facilitate the investigation … before suit is filed." *Citizens Councils*, 187 F. Supp. at 847. By comparison, the demand for records that the United States has made under HAVA falls into the conventional realm of discovery: "The chief purpose of [Federal] Rule [of Civil Procedure] 34 … is to give a party litigant the right to have records produced after suit has been filed." *Id.* That is all the United States is doing in this case. It seeks records necessary to establish a claim under HAVA, following its

investigation into whether Defendants are violating the list maintenance requirements in Section 303(a)(4) of the Act. Again, the expedited and comprehensive nature of relief under the CRA renders the HAVA claim unnecessary if the Court enters an order compelling production of the federal election records.

Defendant's motion to dismiss the NVRA claim also must be denied. The plain text of Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). That includes the voter registration list, used to ensure the accuracy of the official list of eligible voters, and is the some of the best evidence of a state's voter list maintenance efforts. The United States has properly alleged in its Complaint that based upon the information currently available to it—that is, without the benefit of the federal election records that Defendant seeks to deny—Defendant is impeding efforts to ensure that Pennsylvania's list maintenance efforts comply with federal law.

It is unnecessary to address in any detail the recitation of authorities Defendant offers alleging that Defendants can deny the United States access to everything but the publicly available federal election records. *See* Mot., Doc. 92 at 9-10, 21. All the decisions that Defendant summarizes, as well as the citation to an amicus brief filed by the United States in a different case, involved efforts by *private organizations* to obtain that data and accordingly are readily distinguishable from this action. Here, the United States is seeking certain federal election data in the SVRL in its efforts to enforce the NVRA in Pennsylvania. In contrast to records produced to a private entity or individual, records produced to the United States will be subject to federal privacy protections in place at the Department of Justice. *See supra*, Part IV. Consequently, the United States has adequately pled claims for federal election records under HAVA and the NVRA.

## VI. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion to compel production of federal election records under Section 305 of the CRA, and to deny the Motion to Dismiss (Doc. 92).

Dated: January 12, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/David D. Vandenberg

DAVID D. VANDENBERG
Trial Attorney, Voting Section
U.S. Department of Justice
4 Constitution Square
150 M Street, NE, Room 8.143
Washington, D.C. 20002
Telephone: (202) 307-2767
David.Vandenberg@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ David D. Vandenberg*
David D. Vandenberg

# Exhibit 1

EXHIBIT 1

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW - 4CON*
*Washington, DC 20530*

June 23, 2025

Via U.S. Mail and E-Mail
The Honorable Al Schmidt
Secretary of the Commonwealth
401 North Street, Room 302
Harrisburg, PA 17120
al.schmidt@pa.gov
st-press@pa.gov

Dear Secretary Schmidt:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the Commonwealth's HAVA compliance:

(1) Describe how the Commonwealth processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2) Describe the process by which Pennsylvania assigns a unique identifier to each legally registered voter in Pennsylvania, as required by HAVA Section 303(a)(1)(A).

(3) Describe how the statewide voter registration list is coordinated with the databases of other agencies in the Commonwealth, as required by HAVA Section 303(a)(1)(A). Provide the name of each database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4) Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the Commonwealth determines what constitutes a duplicate voter registration record.

(5) Describe the process by which voters who have been convicted of a felony and are incarcerated are (a) identified and, (b) if applicable under Commonwealth law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6) Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7) Describe all technological security measures taken by the Commonwealth to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8) Describe the process by which voters who have moved outside the Commonwealth and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9) Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10) HAVA requires the Commonwealth to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the Commonwealth's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11) Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12) Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the Commonwealth's chief election official and the Commonwealth's motor vehicle authority.

(13) Provide a copy of the current agreement between the official responsible for the Commonwealth's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14) Under HAVA Section 303(b), describe the Commonwealth's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the Commonwealth.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by email to voting.section@usdoj.gov or by FedEx or UPS to:

U.S. Department of Justice, Civil Rights Division
Voting Section
4 Constitution Square
150 M Street NE, 8th Floor
Washington, DC 20002

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc: Jessica Mathis, Director, Bureau of Election Services and Notaries
401 North Street, Room 210, Harrisburg, PA 17120
jesmathis@pa.gov

# Exhibit 2

EXHIBIT 2

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF STATE

July 23, 2025

***Via Electronic Mail***

Maureen Riordan
Acting Chief, Voting Section
U.S. Department of Justice, Civil Rights Division
4 Constitution Square
150 M Street NE, 8th Floor
Washington, DC 20002
Voting.section@usdoj.gov

Dear Ms. Riordan:

I write in response to your letter dated June 23, 2025, posing various questions regarding the Help America Vote Act of 2002 ("HAVA").[1] As Pennsylvania's chief election official, I take seriously the obligations under that law to ensure that all eligible voters have access to the ballot here in the Commonwealth, and the responsibilities it imposes on our county election officials to faithfully maintain our voter rolls. Although it is our local election officials who are responsible for maintaining their voter lists, the Pennsylvania Department of State ("Department") works diligently with these 67 counties to help them ensure that all electoral processes are fully compliant with federal and Pennsylvania laws, including HAVA.

Please allow me to respond to your questions in turn.

***1) Describe how the Commonwealth processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.***

As a starting point, please note that it is the voter registration commission in each county that is accorded sole authority under Pennsylvania law to adjudicate voter registration applications.[2] Specifically, Pennsylvania voter registration applications are received and processed by the 67 county voter registration commissions pursuant to the Pennsylvania voter registration law.[3] The

[1] 52 U.S.C. § 20901 *et seq.*
[2] 25 Pa.C.S. § 1203.
[3] 25 Pa.C.S. §§ 1101–1906.

Secretary of the Commonwealth
Room 302 North Office Building | 401 North Street | Harrisburg, PA 17120-0500 | 717.787.6458 | F 717.787.1734 www.dos.pa.gov

same registration qualifications and processing system apply to elections for local, state, and federal office.

As required by federal law, all voter lists are maintained in a computerized system. The Department manages Pennsylvania's Statewide Uniform Registry of Electors ("SURE" or "SURE System"), which is used not only to maintain our rolls but to process applications to register to vote. Whether the voter application is received on paper or by another computerized system, the information submitted by the applicant is typed or transferred into the SURE System for review and decision by county election authorities.

If an application is complete and the applicant is qualified, the county official approves the registration and adds the applicant to SURE as an active voter.[4] If the application is incomplete, the applicant is notified, and provided an opportunity to supplement the application until the county has undertaken "reasonable efforts" to determine the necessary missing information.[5] If the information on the application indicates that the voter resides in a different Pennsylvania county, the application is forwarded to that county.[6] If the application is not approved, a rejection notice is sent advising the applicant of the right to appeal pursuant to the voter registration law and Election Code.[7] The counties mail a voter registration card to all approved applicants.[8]

More information on voting registration and application methods can be found by referencing the most recent report issued by the Department on the Administration of Voter Registration in Pennsylvania.[9]

2) ***Describe the process by which Pennsylvania assigns a unique identifier to each legally registered voter in Pennsylvania, as required by HAVA Section 303(a)(l)(A).***

Upon a county's approval of a voter registration application, the approved registrant is added to SURE, which assigns a voter ID number to each registrant.[10] The ID number includes a county-specific suffix to indicate which county the person is registered in, which is changed if a registrant moves and re-registers in a new county within Pennsylvania.

3) ***Describe how the statewide voter registration list is coordinated with the databases of other agencies in the Commonwealth, as required by HAVA Section 303(a)(l)(A). Provide the name of each database used for coordination, and describe the procedures used for the***

---

[4] 25 Pa.C.S. § 1328(b).
[5] 25 Pa.C.S. § 1328(b)(2)(i).
[6] 25 Pa.C.S. § 1328(b)(1).
[7] 25 P.S. § 3073, 25 Pa.C.S. § 1328(b).
[8] 25 P.S. § 1328(c).
[9] Pa. Dep't of State, Administration of Voter Registration in Pennsylvania, 2024 Annual Report to the Pennsylvania General Assembly (June 30, 2025), available at https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.
[10] 25 Pa.C.S. § 1328(c)(1).

***coordination as well as how often the databases are coordinated with the statewide voter registration list.***

The SURE system is coordinated with other state agency databases, including:

- The Pennsylvania Department of Transportation ("PennDOT") driver license database, for receiving and updating voter registrations, as well as to confirm and query the DLN/SSN4 provided by applicants; and
- The Pennsylvania Department of Health registry of deaths, for purposes of canceling deceased voters.

***4) Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the Commonwealth determines what constitutes a duplicate voter registration record.***

Pennsylvania's voter registration forms request that the applicant indicate whether it is a new registration, or a change of name, address, or party; if the applicant correctly marks this part of the application it assists in reducing duplicate entries.

Regardless of the applicant's designation, when processing a registration, SURE performs an automated check for possible duplicates, using information such as the applicant's first and last names, and birthdate. County personnel can also compare the SSN4 or Driver's License number included with the form in a manual duplicate query procedure. The specific procedure to be used is set forth in the regulations on the Establishment, Implementation and Administration of the Statewide Uniform Registry of Electors ("SURE Regulations").[11]

The investigations carried out by the county voter registration commission may result in sending correspondence which triggers inactive status or cancellation as a duplicate.[12] Additional information on duplicate voters can be found in response to Question 8 below.

***5) Describe the process by which voters who have been convicted of a felony and are incarcerated are (a) identified and, (b) if applicable under Commonwealth law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).***

Under Pennsylvania law, felons are not permitted to vote only during the period of their incarceration; the specific mechanism for this is disqualification for an absentee or mail-in ballot (and the person's inability to vote in person at the local polling place).[13] Upon release from

---

[11] 4 Pa. Code § 183.6(a). The SURE Regulations are found at 4 Pa. Code ch. 183.
[12] 4 Pa. Code § 183.6(a)(6), (7), (d).
[13] 25 P.S. §§ 2602(w), (z.6), 3146.1, 3150.11. While the Election Code's disqualification is to "persons confined in a penal institution," the Pennsylvania Attorney General has interpreted that to mean only those who are imprisoned as a result of a felony conviction (as opposed to pretrial detainees or those confined only for misdemeanor offenses). Op. Pa. Att'y Gen. No. 1974-47.

confinement (including on parole or probation), such individuals are once again permitted to vote.

The text of the voter registration law[14] purports to disqualify from registration anyone who has been incarcerated for a felony within the past five years, but that five-year exclusion was declared unconstitutional and is not in force.[15] Under controlling case law, incarcerated felons are entitled to be registered to vote, but may not actually cast a ballot until their release.[16]

Accordingly, because Pennsylvania law does not provide a basis to cancel a person's voter registration as a result of a felony conviction, there is no need for any systematic cancellation process for that purpose. Counties instead can place these records in a hold status during the period of incarceration to prevent unlawful voting.

6) ***Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).***

County registration commissions have the sole authority to cancel registrations of deceased electors. To do so, they use a report provided by the Pennsylvania Department of Health, obituaries and other sources as permitted by the Pennsylvania voter registration law.[17]

The Pennsylvania Department of Health reports all deaths of adults over age 18 to the county voter registration commission to facilitate prompt cancellation of deceased voters' registrations (the "DOH Report").[18] The Department receives the DOH Report twice per month. It then transmits the DOH Report file to county voter registration commissions through the SURE System. County commissions are required to query the Department of Health's DOH Report at least monthly.[19] If records on the report match a deceased elector in their jurisdiction, the commission shall cancel the voter record.[20]

---

[14] 25 Pa.C.S. § 1301.

[15] *Mixon v. Commw.*, 759 A.2d 442, 451 (Pa. Cmwlth. Ct. 2000) *aff'd* 783 A.2d 763, 763 (Pa. 2001). *See also Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 185 (3d Cir. 2017) ("The unambiguous text of the HAVA simply does not require election officials to purge voter rolls of incarcerated felons.").

[16] The exception to this general rule is that those convicted for committing election-related crimes are disenfranchised for a period of four years following conviction, with the person's voter registration to be canceled. 25 P.S. § 3552. In this instance, the voter registration cancellation would be specifically triggered as the trial court would indicate that in its order and communicate directly with county voter registration authorities. *See, e.g., Commw. v. Thurman*, No. CP-51-CR-553-2018 (Phila. Cnty. Ct. Com. Pl. May 9, 2018) (order imposing sentencing following guilty plea for election offenses includes the annotation "Defendant not eligible to VOTE until MAY 9, 2022").

[17] 25 Pa.C.S. §§ 1505, 1901(a)(2).

[18] 25 Pa.C.S. § 1505(a).

[19] 4 Pa. Code § 183.6(d)(1)(iii).

[20] 25 Pa.C.S. §§ 1505(a), 1901(a)(2).

The county voter registration commissions are also permitted to use published newspaper obituaries or probate records to cancel a deceased elector's registration.[21]

7) ***Describe all technological security measures taken by the Commonwealth to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).***

Although voting systems are maintained by the county boards of election, the Department maintains some election-related infrastructure, including the SURE System. The Department supervises and controls credentials to the SURE System.

The Department provides access only through individualized credentials, whether to county or Department personnel. Moreover, counties access the SURE system using computers provided by the Department, and they are maintained in the same manner that any Commonwealth user machine is maintained. Users undergo IT Security Training and comply with identity and access management policies required by the Commonwealth. Additional instruction to counties regarding password protection is included in the Department's guidance.[22]

Like all Commonwealth information systems, access is controlled with state-of-the-art security techniques, which are subject to ongoing improvements for enhanced security. In addition, the devices that county election officials use to access the SURE system are configured in a completely locked down mode and prevent access to programs not essential for the SURE system, including access to Internet.

8) ***Describe the process by which voters who have moved outside the Commonwealth and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).***

Again, Pennsylvania's 67 county registration commissions are responsible for voter list maintenance. The Department works with the counties to assist each county in fulfilling its responsibilities under Pennsylvania and federal law, specifically Section 8 of the NVRA and Section 303(a)(4)(A) of HAVA.

Removal and cancellation of voter registration are governed by the voter registration law and SURE Regulations.[23] As contemplated by the NVRA, the Department, through its membership in the Electronic Registration Information Center ("ERIC"), receives data through the United States Postal Service's National Change of Address program, and forwards it to the county voter

---

[21] 25 Pa.C.S. § 1505(b).

[22] *See, e.g.*, Pa. Dep't of State, Guidance on Electronic Voting System Preparation and Security at 4–5 (Oct. 13, 2020), available at https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/directives-and-guidance/2020-PADOS-Guidance-Electronic-Voting-System-Security.pdf. Although presented in the context of security for electronic voting systems, the principles apply equally to access to SURE.

[23] 25 Pa.C.S. § 1901 and 4 Pa. Code ch. 183.

registration commissions. In accordance with the SURE Regulations,[24] if a county voter registration commission receives information that a voter has moved out of the county (including to another Pennsylvania county, or out-of-state), the commission sends to the registrant, at the address of registration (the "old" address), a Notice of Change of Address ("NCOA") via forwardable mail with a postage prepaid preaddressed return form by which the registrant may verify or correct the address information.

The Department assists the counties in conducting several list maintenance programs to ensure accuracy of the voter registration rolls (including removal of those who have moved to another state):

a) Five-Year Notices. Counties send these notices to voters who have not voted or had other contact for a period of five years. These voters are marked as inactive and set for cancellation if there is no further contact and affirmation of continued residence before the date of the second federal general election.

b) National Change of Address Notice. Counties send these notices to voters for whom the U.S. Postal Service reported a move. If the voters do not reply to either confirm or deny the move, an Address Verification Notice is sent; lack of response to the AVN will trigger inactive status and cancellation following the second federal general election.

c) ERIC Duplicate Notices (out of state). Counties evaluate potential matches, send a notice, and mark the voter as inactive where ERIC data identifies that the same person may be registered in multiple jurisdictions.

d) ERIC In-State Moves. Where ERIC data suggests a person has moved without updating voter registration, the county sends a notice to verify continued residence. This notice triggers inactive status (and potential cancellation if no affirmation of residence is received before the second federal general election).

e) ERIC Out-of-State Moves. Counties use ERIC data where a Pennsylvania registered voter appears to have a more recent voter registration from another member state. In this situation, the county sends a notice to verify continued residence. This notice triggers inactive status (and potential cancellation if no affirmation of residence is received before the second federal general election).

f) Address Verification Notices. When another type mailing to a voter is returned by the post office as undeliverable, the counties send an Address Verification Notice.

These programs are described in greater detail in the Department's annual report on voter registration.[25]

As noted above, as part of the Department's membership in ERIC, it receives and distributes data on potential duplicate voter records to county officials. Because ERIC is a consortium of

[24] 4 Pa. Code § 183.6(d)(5).

[25] Pa. Dep't of State, Administration of Voter Registration in Pennsylvania, 2024 Annual Report to the Pennsylvania General Assembly (June 30, 2025), available at https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.

member states, and because there is no national voter registration database, ERIC is in a unique position to compare, without access to personally identifiable information, the verified data provided by member states to locate records of voters who may be potentially registered in more than one state. It also provides a report on voters who may be registered in more than one Pennsylvania county. These pairs of voter records are identified for further review by county officials, who determine whether the same person is potentially registered in more than one jurisdiction. If the county identifies the registrant as potentially duplicated in another jurisdiction, a notice is sent to the voter's address on record. Further information about this program can be found in the annual report on voter registration.[26]

In 2024, Pennsylvania counties sent out over 502,067 notices to voters in connection with list maintenance activities pursuant to the NVRA and Pennsylvania law. With respect to the NCOA process specifically, Pennsylvania counties mailed 130,119 NCOA notices in 2024. The Department provides counties with NCOA information in June of each year. Counties then begin a two-step mailing process. First, counties send an initial mailing based on data of individuals who have moved as reflected in NCOA data. Those notices are sent via forwardable mail to the address of registration and offer the voter the opportunity to confirm their address or update it. Based on the response, county election officials then update their records accordingly. Following this process, county election officials send a second notice to voters who either: did not respond to the first notice or whose initial notice was returned as undeliverable. This notice, referred to as an Address Verification Notice or AVN, would not typically be sent until approximately 30 days after the initial notice. With the mailing of the AVN, the record is marked Inactive, triggering the waiting period required by Sections 8(b), (c) & (d) of the NVRA before the voter record can be removed from the registration rolls. Information on the number of voter cancellations by Pennsylvania counties can be found in the tables found on pages 23–27 and 87–92 of the 2024 annual report on voter registration.[27]

9) ***Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.***

All registrants must affirmatively answer "yes" to the question "Are you a citizen of the United States."[28] An individual who states that they are not a U.S. citizen is not qualified to vote and their application would be required to be rejected by the county voter registration commission.[29]

---

[26] Pa. Dep't of State, Administration of Voter Registration in Pennsylvania, 2024 Annual Report to the Pennsylvania General Assembly (June 30, 2025), available at https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.

[27] Pa. Dep't of State, Administration of Voter Registration in Pennsylvania, 2024 Annual Report to the Pennsylvania General Assembly (June 30, 2025), available at https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.

[28] 52 U.S.C. § 20508(b)(2)(A), 4 Pa. Code § 183.1.

[29] 25 Pa.C.S. §§ 1301, 1328.

False statements misrepresenting an applicant's citizenship on a voter registration form are crimes punishable under both state[30] and federal laws.[31]

Neither Pennsylvania nor federal law requires a voting registration applicant to provide documentary proof of citizenship. To the extent any county registration commission or the Department becomes aware that an individual who is not a U.S. citizen has registered or attempted to vote, where appropriate, the county may cancel such registration and refer the matter to law enforcement for handling.

***10) HAVA requires the Commonwealth to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the Commonwealth's online voter registration application, and, if applicable, the voter registration application used for same-day registration.***

Please refer to the following:

- Voter Registration Mail Application (the same form is accepted for in-person registration): https://www.pavoterservices.pa.gov/documents/voterapplication_english.pdf
- Link to Online Voter Registration: https://www.pavoterservices.pa.gov/pages/VoterRegistrationApplication.aspx
- Pennsylvania does not have same-day voter registration.

***11) Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.***

As noted on the voter registration applications, the applicant is required to provide a Pennsylvania driver's license number (or non-driver ID card number) and/or the last four digits of their Social Security number, or to check a box that the person has not been assigned either type of number consistent with Section 303(a)(5)(A) of HAVA.

County voter registration commission staff enter the data from applications (or receive them electronically) and query them against the PennDOT database which will return a match or non-match. In the case of an applicant providing a driver's license number, the query is based on the applicant's last name (first two characters only), date of birth, and the driver's license number.

---

[30] 25 Pa.C.S. §§ 1703 (providing for a fine up to $10,000 and five years in prison for improper registration), 1714 (incorporating criminal penalty provisions of the Crimes Code at 18 Pa.C.S. §§ 4902, 4903, and 4904) relating to perjury, false swearing, and unsworn falsification to authorities).

[31] 18 U.S.C. §§ 1015(f) (imposing fines and up to five years in prison for misrepresenting one's citizenship on a voter registration application), 3559 and 3571 (setting fines at $250,000 for class D felonies).

For applicants providing an SSN4, the query uses the first, middle and last names, birthdate, and the last four digits of the Social Security number.

County voter registration authorities adjudicate the sufficiency of the ID number provided "in accordance with State law."[32] There are four qualifications to register to vote under Pennsylvania law: age, citizenship, residence, and incarceration status.[33] The voter registration law further offers four grounds to reject a voter registration application: an incomplete application, non-qualification, non-entitlement to a transfer or address change, and non-entitlement to a name change.[34] "Failure to match ID number" is not among the bases offered in Pennsylvania law to reject a voter registration application. If the "information cannot be verified,"[35] SURE prompts the county voter registration commission to review the application for typographical errors and/or contact the voter to clarify and fix the discrepancy, but the county ultimately would approve the voter registration application—provided that there are no other irregularities in the application, or independent grounds to reject the application.[36] With respect to mail-ballot voters, the Election Code requires that any such voter whose submission of ID numbers (DLN or SSN) did not match against a government database must provide proof of identification within six days of the election, or their ballot will not be counted.[37] All in-person voters must present photo or non-photo ID the first time they appear to vote in an election district.[38]

---

[32] 52 U.S.C. § 21083(a)(5)(A)(iii).
[33] 25 Pa.C.S. § 1301(a), *accord* Pa. Const. art. VII, § 1. As noted above, controlling case law holds that even inmates incarcerated for a felony may be registered to vote. *Mixon v. Commw.*, 759 A.2d 442, 451 (Pa. Cmwlth. Ct. 2000) *aff'd* 783 A.2d 763, 763 (Pa. 2001).
[34] 25 Pa.C.S. § 1328(b)(2).
[35] We understand the reference in this question to "verification" to mean a positive match between the information provided in the voter registration application, including the ID number, and the corresponding entry in a PennDOT or Social Security database.
[36] 25 Pa.C.S. § 1328.
[37] 25 P.S. § 3146.8(h).
[38] 25 P.S. § 3050. Under an injunction, in-person voter ID is governed by the pre-2012 version of 25 P.S. § 3050. The *Applewhite* decision in 2014 enjoined enforcement of the changes wrought by Act 18 of 2012 as to in-person voting only, while leaving in place its changes to the identification requirements for absentee voting. *Applewhite v. Commw.*, No. 330 M.D. 2012, 2014 WL 184988, at *27 (Pa. Cmwlth. Jan. 17, 2014).

The language of that statute provides

> (a) At every primary and election each elector who appears to vote in that election district for the first time and who desires to vote shall first present to an election officer one of the following forms of photo identification . . . .
>
> * * *
>
> (a.1) Where the elector does not have a photo identification as provided for in subsection (a), the elector shall present for examination one of the following forms of identification that shows the name and address of the elector . . . .

***12) Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the Commonwealth's chief election official and the Commonwealth's motor vehicle authority.***

A copy of this agreement between the Department and the Pennsylvania Department of Transportation is attached.

***13) Provide a copy of the current agreement between the official responsible for the Commonwealth's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).***

A copy of this agreement between the Commissioner of Social Security and the Pennsylvania Department of Transportation is attached.

***14) Under HAVA Section 303(b), describe the Commonwealth's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the Commonwealth.***

HAVA Section 303 imposes the requirement that a voter present photo identification, or a utility bill, bank statement, government check, paycheck, or other government document showing name and address to an official at the polling place (if voting in person) or submit a copy of such a document if voting by mail.[39] This is required of all voters who register to vote by mail, but have not previously voted in an election for federal office.[40] HAVA further provides a carve-out for several classes of voters, including (A) registrants who provided an ID document with their mail voter registrant application, (B) registrants who provided a driver's license or Social Security number which matched the PennDOT or SSA database, or (C) overseas citizen and military voters, among others.[41]

The Pennsylvania Election Code contains strict requirements that go beyond HAVA's requirements for first-time voters who register by mail. In-person voters must provide photo or non-photo identification not only at their first time voting in a federal election but also the first time voting in a new election district (i.e., a new local voting precinct—essentially, every time the person moves and re-registers at a new residence).

Pennsylvania further mandates that absentee and mail-in voters provide proof of identification for every election; otherwise their ballots will not be counted.[42] Proof of identification can be

---

25 P.S. § 3050(a), (a.1) (pre-2012 version).
[39] 52 U.S.C. § 21083(b)(2).
[40] 52 U.S.C. § 21083(b)(1).
[41] 52 U.S.C. § 21083(b)(3).
[42] 25 P.S. §§ 3146.2(e.2), 3146.2b(d), 3146.5(b)(1), 3146.8(h)(2), 3150.12b(c), 3150.15 (requiring proof of identification for absentee and mail-in voters).

provided through, *inter alia*, a match of a voter's SSN4 or DLN.[43] Absentee or mail-in voters who fail to provide matching numbers must provide other proof of identification to their county board of elections within six days following an election or their ballot will not count for that election.[44]

* * *

We hope the information provided here is helpful. The Department and Pennsylvania's 67 counties engage in great efforts to ensure that Pennsylvania's voter rolls are accurate and that all requirements of Pennsylvania and federal law are faithfully followed. Please let us know if you have any further questions.

Sincerely,

Al Schmidt
Secretary of the Commonwealth

Enclosures

[43] 25 P.S. § 2602(z.5)(3), *cf.* 52 U.S.C. § 21083(b)(3)(B).
[44] 25 P.S. § 3146.8(h).

# Exhibit 3

**U.S. Department of Justice**
Civil Rights Division

EXHIBIT 3

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

August 4, 2025

Via Mail and Email

The Honorable Al Schmidt
Secretary of the Commonwealth
401 North Street, Rm 302
Harrisburg, PA 17120
Email: al.schmidt@pa.gov | ra-voterreg@pa.gov

Dear Secretary Schmidt:

We write to you as the chief election official for the Commonwealth of Pennsylvania to request information regarding the Commonwealth's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 et seq.

Please provide a list of the election officials who are responsible for implementing Pennsylvania's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Commonwealth officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close

of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the EAVS data for Question A3d, Pennsylvania identified 378,187 voters (4.49 percent) with duplicate registrations, nearly three times below the nationwide average of 12.7 percent. Moreover, we understand the Public Interest Legal Foundation recently identified an additional 19,489 registrants holding matched voter registration files in second states as of Summer 2025, 3,170 instances of same-address duplications, 70 intra-county duplicates, and 321 placeholder/fictitious dates of birth. Please explain why duplicate registrations are such a low percentage of the total registration applications received.
2. Similarly, in the EAVS data for Question A12h, 47 of 66 counties in Pennsylvania recorded either 0 or 1 transactions to remove duplicate registrants. Please confirm how frequently county personnel perform manual duplicate queries and how frequently SURE performs automated searches.
3. In the EAVS data for Question A3g, Pennsylvania listed 40,209 transactions as "other," without further explanation. Please explain those registrations listed as "other."
4. In the EAVS data for Question A4h, Pennsylvania listed 1 transaction arising from an Armed Forces Recruitment Office, which is significantly below similarly sized states. Please explain why such few transactions can be sourced to Armed Forces Recruitment Offices and what actions Pennsylvania is taking to ensure Offices fulfill their voter registration responsibility.
5. In the EAVS data for Question A11, concerning the reason for sending confirmation notices, the largest category by far is A11n, "Other." Please explain the nature of these confirmation notices and why they do not fit in available categories.
6. In the EAVS data, Pennsylvania has failed to respond to Question A13a regarding merged voter records. Please provide the requested data or an explanation for why that information is not available.

Please provide a description of the steps that Pennsylvania has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures that Pennsylvania used to remove those ineligible voters from the registration list for categories two and three below. For all categories below, please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present:

1. Non-citizen
2. Adjudicated incompetent
3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc: Jessica Mathis, Director
Bureau of Election Services and Notaries
401 North Street, Room 210
Harrisburg, PA 17120
jesmathis@pa.gov

# Exhibit 4

EXHIBIT 4

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF STATE**

August 18, 2025

***Via Electronic Mail***

Michael E. Gates
Deputy Assistant Attorney General
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530
Voting.section@usdoj.gov

Dear Mr. Gates:

I write in response to your letter dated August 4, 2025, requesting information regarding the Commonwealth's procedures for complying with list maintenance provisions of the National Voter Registration Act ("NVRA").[1] My office is committed to ensuring that our voting lists are properly maintained according to state and federal law, and our efforts to do so are detailed in my July 23, 2025, response to the letter from the Department of Justice letter dated June 23, 2025 ("July Response"), which contained a comprehensive review of Pennsylvania's list maintenance procedures and links to the Department's Annual Report on the Administration of Voter Registration ("Annual Report"). A copy of the July Response is enclosed for your reference as you review our discussion of data provided in the Election Administration and Voting Survey (EAVS). While it is our local county election officials who are responsible for maintaining their voter lists, the Pennsylvania Department of State ("Department") works diligently with all 67 county election offices to help them ensure that all electoral processes are fully compliant with federal and Pennsylvania laws.[2]

Your letter requests a list of election officials responsible for implementing Pennsylvania's program for voter registration list maintenance from November 2022 to the present, including local elections officials. Pennsylvania voter registration law vests the Commonwealth's 67 county voter registration commissions with principal responsibility for implementing voter

---

[1] 52 U.S.C. §§ 20501–20511.

[2] In light of the subsequent letter dated August 14, 2025, from Assistant Attorney General Harmeet Dhillon, we will respond separately to your request for specific information about Pennsylvania's registered voters.

SECRETARY OF THE COMMONWEALTH
Room 302 North Office Building I 401 North Street I Harrisburg, PA 17120-0500 I 717.787.6458 I F 717.787.1734 www.dos.pa.gov

registration list maintenance.[3] The county election offices are staffed by individuals hired by county leadership, not the Department of State. The roles and functions of each office staff member are dictated by county leadership, which may vary in accordance with municipal law. Accordingly, we are not in a position to provide you with the names of each individual who performed each specific function.

You have also requested the steps taken to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. Know that the Department and its 67 counties engage in all reasonable efforts to fulfill our list maintenance responsibilities. Please refer to the July Response and Annual Report for information on those steps, and their effectiveness.

Specific responses to your questions relating to the Election Administration and Voting Survey 2024 Comprehensive Report (EAVS Report) are as follows:

1. **In the EAVS data for Question A3d, Pennsylvania identified 378,187 voters (4.49 percent) with duplicate registrations, nearly three times below the nationwide average of 12.7 percent. Moreover, we understand the Public Interest Legal Foundation recently identified an additional 19,489 registrants holding matched voter registration files in second states as of Summer 2025, 3,170 instances of same-address duplications, 70 intra-county duplicates, and 321 placeholder/fictitious dates of birth. Please explain why duplicate registrations are such a low percentage of the total registration applications received.**

Question 1 includes figures that are contradicted by the EAVS Report, and your framing misrepresents the data reported in EAVS Survey question A3d. The EAVS Report shows that the 378,187 duplicate registration applications reported represent ***9.4%*** of the total number of registration applications reported, not ***4.49%***, as your letter states.[4] Moreover, the EAVS Report itself qualifies the national average figure, noting that "[t]he percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation," meaning that states with less reported data were consequentially not included in the calculation.[5] Further, many of the states reporting data suggested that their numbers may be incomplete or underinclusive.[6] That 12.7% "nationwide average" number is presumably derived from adding all duplicates and dividing by all transactions.[7] Given that this does not weight states differently based on their population, it may not serve as a reliable interstate comparison. Indeed, comparing the number of duplicate

---

[3] 25 Pa.C.S. § 1203. Of course, the NVRA specifically contemplates that local governments may have a role in the electoral process. 52 U.S.C.§§ 20501; 20507(j).

[4] *See* EAVS Report, pg. 176, *accessible at* https://www.eac.gov/sites/default/files/2025-06/2024_EAVS_Report_508c.pdf.

[5] *Id.* at 177 (Table 3 General Notes).

[6] *See, e.g., id.*, at 177 n.2 (at least one Arizona county did not track duplicate applications caught and rejected).

[7] *Id.* at 177 (Table 3 General Notes) (noting the nationwide total is "casewise").

registrations nationwide to the total of all applications nationwide, the nationwide average of duplicates is closer to 6%.

Critically, however, the data reported in Table 3 does not represent "voters….with duplicate registrations," as it is phrased in your letter. Rather, Question A3d asks for "Registration transactions submitted by persons already registered to vote at the same address, under the same name and personal information (e.g., date of birth, social security number, driver's license), and with the same political party (where applicable)."[8] It is a measure of applications submitted, not a measure of duplicate voters on the rolls. All states have an incentive to prevent duplicate applications from being submitted in the first place, as they unnecessarily pose additional burdens for elections staff to process (and then properly deny them). Indeed, Pennsylvania agrees with the observation of our colleagues from Oklahoma that "[t]he introduction of online voter registration has greatly reduced the occurrence of duplicate, rejected, and invalid voter registrations."[9] Permitting voters to check their registration status *before* they submit their application cuts down on duplicate submissions.

To understand the work that Pennsylvania does to remove duplicate voters who may be on our rolls, as opposed to those who apply and are denied as duplicate, please refer to the Department's Annual Report.[10]

2. **Similarly, in the EAVS data for Question A12h, 47 of 66 counties in Pennsylvania recorded either 0 or 1 transactions to remove duplicate registrants. Please confirm how frequently county personnel perform manual duplicate queries and how frequently SURE performs automated searches.**

Again, the removal of potential duplicate registrations (addressed in A12h) is different from the denial of duplicate applications (addressed in A3d). In addition, Pennsylvania has 67 counties, not 66.

The Department's response to A12h is consistent with our efforts to prevent duplicate registrations by having counties appropriately screen registration applications, as opposed to removing duplicate registrations during list maintenance activities. Moreover, since 2020, the Department has participated in the Electronic Registration Information Center's (ERIC) duplicate program, which allows for a systemic duplicate review. The Department's efforts to remove duplicate registrations in collaboration with ERIC—including efforts made prior to the reporting period at issue in the 2024 EAVS Report—mean that there will be fewer duplicate

[8] EAVS Survey at 7, *accessible at* https://www.eac.gov/sites/default/files/2024-04/2024_EAVS_FINAL_508c.pdf.
[9] EAVS Report, fn. 4, *supra*, at 178 n.11.
[10] You also reference potential duplicates identified by a nongovernmental entity. The Department will be reaching out to review the data purportedly identified by that entity. Critically, the lack of personally identifiable information (PII) in the dataset used by this entity, and the fact that the referenced letter does not specify whether these records are active or inactive, make it difficult to evaluate their claims at this time. The Department is confident that any duplicate registrations will be identified through regular list maintenance processes.

removals in this and subsequent EAVS reports. Indeed, as we noted in our Annual Report, "[t]he number of potential duplicate voter registrations has decreased by more than 80% since Pennsylvania started using this ERIC data in 2020, demonstrating the effectiveness of this program over time."[11]

Finally, as noted previously, the county voter registration commissions have significant autonomy and are not subject to the direct control of the Department.

3. **In the EAVS data for Question A3g, Pennsylvania listed 40,209 transactions as "other," without further explanation. Please explain those registrations listed as "other."**

This question misrepresents DOS' response to A3g. To the contrary, the EAVS Dataset available on the Election Assistance Commission's website[12] shows that the Department noted that the 40,209 transactions enumerated in A3g represented pending applications. This was one of the "most cited" descriptions for the "Other" category.[13]

4. **In the EAVS data for Question A4h, Pennsylvania listed 1 transaction arising from an Armed Forces Recruitment Office, which is significantly below similarly sized states. Please explain why such few transactions can be sourced to Armed Forces Recruitment Offices and what actions Pennsylvania is taking to ensure Offices fulfill their voter registration responsibility.**

Many states reported 0 or no applications received via recruitment offices presumably because Department of Defense Instruction 1000.04 directs recruitment centers to report voting assistance metrics to the Federal Voter Assistance Program (FVAP) and not individual states.[14] And while recruitment centers are NVRA agencies, the Department is nevertheless without authority to require reporting of metrics by recruitment centers.

5. **In the EAVS data for Question A11, concerning the reason for sending confirmation notices, the largest category by far is A11n, "Other." Please explain the nature of these confirmation notices and why they do not fit in available categories.**

As elaborated in the EAVS Dataset, the figure reported in A11n corresponds to "the number of confirmation notices sent due to correspondence sent by an election office being returned as undeliverable or due to failure of the voter to respond to an initial confirmation notice sent for the reason identified in a11l (initial NCOA notice)." This number may be larger than any other

---

[11] Annual Report at 18, *accessible at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.

[12] https://www.eac.gov/sites/default/files/2025-06/2024_EAVS_for_Public_Release_V1_xlsx.xlsx

[13] EAVS Report, fn. 4, *supra* at 132.

[14] DoDI 1000.04, Federal Voting Assistance Program (FVAP), November 12, 2019

individual mailing because it is sent following nonresponse to a variety of prior list maintenance correspondence types.

6. **In the EAVS data, Pennsylvania has failed to respond to Question A13a regarding merged voter records. Please provide the requested data or an explanation for why that information is not available.**

The Department did, in fact, respond to Question A13a. Specifically, the Department noted that the data was not available and further explained in the comments to A13a that "the Pennsylvania Department of State is unable to provide a figure for A13a due to an inability to accurately differentiate between merged records and transferred records."

You also posed questions regarding removal procedures for certain categories of voters. Nothing in the NVRA provides a process by which those who are deemed non-eligible on the basis of being a non-citizen are to be removed from the voter rolls. As set forth in the July Response, false statements misrepresenting an applicant's citizenship on a voter registration form are crimes punishable under both state[15] and federal laws.[16] To the extent any county registration commission or the Department becomes aware that an individual who is not a U.S. citizen has registered or attempted to vote, where appropriate, the county may cancel such registration and refer the matter to law enforcement for handling.

Finally, with respect to removal of voters by reason of criminal conviction or mental capacity, the NVRA does not govern; rather, it defers to state law.[17] Under Pennsylvania law, there is no basis or procedure to challenge, revoke or cancel a person's voter registration on the basis of an adjudication of mental incompetency. As for those voters with felony convictions, there is no removal process contemplated by Pennsylvania law, as explained in the July Response.

* * *

As Pennsylvania's chief election official, I take seriously my legal obligation to ensure that all eligible voters have access to the ballot here in the Commonwealth and the responsibilities that both federal and state law impose on the Department and on our county election officials to faithfully maintain our voter rolls. Likewise, I applaud efforts at transparency in our voting processes, such as the EAVS Survey data reporting. Pennsylvania goes further than is required, detailing our voter registration and list maintenance processes in our Annual Report. The Department and Pennsylvania's 67 counties engage in reasonable efforts to ensure that our voter

---

[15] 25 Pa.C.S. §§ 1703 (providing for a fine up to $10,000 and five years in prison for improper registration), 1714 (incorporating criminal penalty provisions of the Crimes Code at 18 Pa.C.S. §§ 4902, 4903, and 4904) relating to perjury, false swearing, and unsworn falsification to authorities).

[16] 18 U.S.C. §§ 1015(f) (imposing fines and up to five years in prison for misrepresenting one's citizenship on a voter registration application), 3559 and 3571 (setting fines at $250,000 for class D felonies).

[17] 52 U.S.C. § 20507(a)(3)(B).

rolls are accurate and that all requirements of Pennsylvania and federal law are faithfully followed. Please let us know if you have any further questions.

Sincerely,

Al Schmidt
Secretary of the Commonwealth

Enclosure (without appendices)

# Exhibit 5

**U.S. Department of Justice**

Civil Rights Division

EXHIBIT 5

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

August 14, 2025

Via Mail and Email

The Honorable Al Schmidt
Secretary of the Commonwealth
401 North Street, Rm 302
Harrisburg, PA 17120
al.schmidt@pa.gov; ra-voterreg@pa.gov

Re: **Complete Pennsylvania's Voter Registration List with All Fields**

Secretary Schmidt:

We understand that the time the Justice Department has provided your state to respond to the request for a statewide voter registration list ("VRL") and other information has not reached its deadline.

Given responses from other states thus far, we want to clarify that the Justice Department's request to provide an electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Pennsylvania's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative..." 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Pennsylvania's complete and current VRL. The purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Pennsylvania must ensure that it contains *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the

[2] In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department by the date set for your delivery by our original letter, or by August 21, 2025, whichever is later.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Jessica Mathis
Director, Bureau of Election Services and Notaries
401 North Street, Room 210
Harrisburg, PA 17120
jesmathis@pa.gov

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

# Exhibit 6

EXHIBIT 6

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF STATE

August 21, 2025

***Via Electronic Mail***
Harmeet K. Dhillon
Assistant Attorney General
Michael E. Gates
Deputy Assistant Attorney General
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530
voting.section@usdoj.gov

Dear AAG Dhillon and DAAG Gates:

I write in response to your letters dated August 4, 2025, and August 14, 2025, requesting an electronic copy of the Commonwealth of Pennsylvania's statewide voter registration list. Your letter dated August 14 specifically asked for detailed personal and confidential information, including driver's license numbers and social security numbers, for all Pennsylvania voters. This request, and reported efforts to collect broad data on millions of Americans, represent a concerning attempt to expand the federal government's role in our country's electoral process. Please know that the Department of State takes seriously its obligation to safeguard the integrity and accuracy of Pennsylvania's voter rolls, as well as the security of Pennsylvanians' personal information. Because your letters do not provide any legal justification for the Department to disregard this sacred obligation, we are unable to share such confidential information with you. We can, however, provide Pennsylvania's Full Voter Export, subject to the conditions below.

Pursuant to Pennsylvania law, our Full Voter Export is available through the Pennsylvania Department of State's website. This list includes all voters in the Commonwealth (with certain limited exceptions for crime victims and other confidential voters) and contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes, voter history, and date the voter's record was last changed.

In accordance with the Pennsylvania voter registration law[1] and the Statewide Uniform Registry of Electors (SURE) Regulations,[2] all requesters must agree to the terms and conditions for use of public information lists. Further information may be found on our website. Please let us know if you would like to receive this data subject to these terms and conditions.

[1] 25 Pa.C.S. Part IV.
[2] 4 Pa. Code ch. 183.

Your August 14 letter specifically asked for *all* fields in the Commonwealth's computerized statewide voter registration list, including each voter's Pennsylvania driver's license number or last four digits of their social security number. We are aware of no precedent for such a broad request for such sensitive information. While we are happy to provide the Full Voter Export, consistent with the process outlined above, we cannot provide these fields, which contain sensitive, personally identifiable information for Pennsylvania's 8.8 million voters.

As Pennsylvania's chief election official, I take seriously my obligation to ensure that our county election officials faithfully maintain our voter rolls. The Department works with Pennsylvania's 67 counties in making every reasonable effort to ensure that all electoral processes are fully compliant with federal and Pennsylvania laws, including the National Voter Registration Act and the Help America Vote Act. Likewise, I take seriously my responsibility to safeguard the private information that Pennsylvanians entrust to the care of our county election officials. Our laws do not permit the Department to release driver's license or social security numbers. These protections are consistent with other federal and state statutes that protect social security and driver's license numbers. The Department's statutory obligations are reinforced by the Pennsylvania Constitution, which requires the Department to maintain the privacy of our 8.8 million registered voters.

None of the legal bases provided in your letter justify or authorize providing these fields and disregarding the strong protections on voter privacy enshrined in our Commonwealth's laws.

*First*, the NVRA does not require the disclosure of voters' sensitive personal information. Your letter provides no explanation as to why the social security and driver's license numbers of every registered voter in Pennsylvania are necessary to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA. As explained in the Department's letters dated July 23, 2025, and August 18, 2025, and as detailed in our publicly available Annual Report on the Administration of Voter Registration in Pennsylvania, the Department does a robust job of ensuring that all of Pennsylvania's 67 counties comply with their list maintenance responsibilities pursuant to the NVRA. You have provided no basis for concluding otherwise.

*Second*, no provision of HAVA provides authority for such a request. Although the Attorney General has authority under HAVA to bring certain enforcement actions, you have identified no basis for why the social security and driver's license numbers of all Pennsylvania's registered voters is necessary to ascertain Pennsylvania's compliance with the list maintenance requirements of HAVA.

*Finally*, the Civil Rights Act of 1960 does not provide legal authority for such a broad request. You have identified no basis or purpose for why the social security and driver's license numbers of all Pennsylvania's registered voters is necessary to enforce any relevant legal requirements, nor have you shown how such a request would satisfy the requirements of the Civil Rights Act.

* * *

Consistent with Pennsylvania and federal law, the Department and Pennsylvania's 67 counties go far beyond the reasonable efforts required by the NVRA to ensure that Pennsylvania's voter rolls are accurate. The Department is also entrusted to protect and safeguard the personal information of our 8.8 million voters, and I take that obligation extremely seriously.
Please let us know if you have any further questions, or would like to proceed with obtaining the Full Voter Export, as permitted under Pennsylvania law.

Sincerely,

Al Schmidt
Secretary of the Commonwealth

# EXHIBIT A

**U.S. Department of Justice**

Civil Rights Division

---

# CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

## I. PARTIES & POINTS OF CONTACT.

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

VRL/Data Provider
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

## II. AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department"). The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

the last four digits of the registrant's social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.
- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).
- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*
- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.
- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

**III. PURPOSE.**

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters. Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states. The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law. In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact of the issues to assist your state with curing.

Case 1:25-cv-20639-DLS Document 15-11 Filed 01/28/26 Page 4 of 11

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV. TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you. Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V. TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI. METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS"). A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk. JEFS implements strict access controls to ensure that each user can only access their own files. All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

**VII. LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.**

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII. NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX. CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

**X. LOSS OR BREACH OF DATA.**

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

**XI. DESTRUCTION OF DATA.**

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);
2. Archive and store electronic data containing confidential information offline in a secure location; and

3. All other data will be erased or maintained in a secured area.

## XII. OTHER PROVISIONS.

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU. To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq*., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU. To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name:
Signature: ________________________________________ Date of Execution:_________________

Authorized Signatory Name Printed:________________________________

Title: ________________________________

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice

Signature: ________________________________________ Date of Execution:_________________

Authorized Signatory Name Printed:________________________________

Title: ________________________________

# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. SHIRLEY WEBER, ET AL, Defendants. | CASE NO: 2:25-cv-09149-DOC-ADSx<br>CIVIL<br>Los Angeles, California<br>Thursday, December 4, 2025<br>( 7:38 a.m. to 9:09 a.m.)<br>(12:01 p.m. to 12:58 p.m.)<br>( 2:00 p.m. to 2:31 p.m.)<br>( 2:31 p.m. to 2:33 p.m.) |

HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Karlen Dubon

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | ERIC V. NEFF, ESQ.<br>U.S. Department of Justice<br>150 M St. NE, Suite 8-139<br>Washington, DC 20002<br>202-532-3628 |
| For Intervenors: | GRAYCE S.P. ZELPHIN, ESQ.<br>American Civil Liberties<br>Union of Northern California<br>39 Drumm Street<br>San Francisco, CA 94111<br>530-515-8978 |
| | CHRISTOPHER D. DODGE, ESQ.<br>Elias Law Group<br>250 Massachusetts Ave. NW<br>Suite 400<br>Washington, DC 20001<br>202-987-4928 |
| For Robert Page: | SUZANNE E. SHOAI, ESQ.<br>Orange County Counsel<br>P.O. Box 1379<br>Santa Ana, CA 92702<br>714-834-3300 |
| For Defendants: | MALCOLM A. BRUDIGAM, ESQ.<br>Office of the Attorney General<br>1300 I Street<br>Suite 125<br>Sacramento, CA 95814<br>916-210-7873 |
| | ROBERT W. SETRAKIAN, ESQ.<br>California Department of Justice<br>300 S. Spring Street<br>Suite 1702<br>Los Angeles, CA 90013<br>213-269-6668 |

**Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.**

**(Call to Order)**

**THE COURT:** -- Shirley Weber.

**(Pause)**

**THE COURT:** And, counsel, as you're seated, let me take one more matter. Just remain seated for a moment.

**(Pause)**

**THE COURT:** All right. Thank you then. I think that resolves the rest of the morning calendar. So first of all, good morning.

**MR. NEFF:** Good morning, Your Honor.

**THE COURT:** This is the matter of United States v. Shirley Weber. It's case number 25-09149. And, counsel, you can just remain seated. You can pretend it's state court if you want to, but make your appearances.

**MR. NEFF:** Eric Neff on behalf of the United States. Good morning, Your Honor.

**THE COURT:** Thank you.

**MR. BRUDIGAM:** Deputy Attorney General Malcolm Brudigam on behalf of defendants Secretary of State Shirley Weber and the State of California.

**THE COURT:** Okay, thank you very much.

**MR. SETRAKIAN:** Deputy Attorney General Will Setrakian on behalf of defendants State of California and California Secretary of State Shirley Weber.

**THE COURT:** Thank you very much. I appreciate it.

**MR. DODGE:** Chris Dodge on behalf of Intervenors NAACP and Siren.

**MS. ZELPHIN:** Grace Zelphin on behalf of Intervenors League of Women Voters of California.

**THE COURT:** Is anybody here representing what I call the County case?

**MS. SHOAI:** Good morning, Your Honor.

**THE COURT:** Come on up. What we're doing here may be of interest to you. So we want your appearance.

**MS. SHOAI:** Thank you, Your Honor. Deputy County Counsel --

**THE COURT:** No, no, wait, wait till we get a good recording of you.

**MS. SHOAI:** Good morning, Your Honor. Deputy County Counsel Suzanne Schoai on behalf of --

**THE COURT:** I see. Why don't you have a seat? Do you have any other colleague with you today?

**MS. SHOAI:** No, Your Honor.

**THE COURT:** All right. So first, I'd like to address plaintiff's motion for order to produce records pursuant to 52 U.S.C. 20701 that was filed on Monday, set for hearing today. I appreciate the speed, but not at the expense of due process. And although I've encouraged us to move forward as quickly as possible concerning the substantive issues, this is

not the due process because there needs to be at least 28 days' notice before a date for hearing under CD California Rule 6-1.

The plaintiff is seeking to reach the ultimate question in this case regarding the production of records and thousands of voters' lives will be impacted by this case. And the Court will not be setting the matter on any legal -- I don't want to say gamesmanship, but therefore, the motion for order to produce records pursuant to 52 U.S.C. 20701 is denied.

Now, you can once again follow the process and procedure in terms of due process. We'll have time potentially, but this doesn't supply the due process needed.

Second, I'd like to hear arguments if there are any on two motions regarding amicus briefs. First, there was a motion for leave to file an amicus brief brought by 16 states. Those states are Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

The second request was to file an amicus brief and it was filed by the former secretaries of state and the proposed amicus briefs are allegedly from a bipartisan group of state secretaries for the states of Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

Does any party have a statement to make regarding these amici briefs and any wisdom on your part that if I allow

these amici briefs, whether I should then extend for some period of time the opportunity for additional briefs from interested parties, because these are the parties that have directly contacted the Court, but there may be other parties that piecemeal choose to come in, and then I'm deciding that on an almost ex-parte basis, case by case as they come to me, unless you're flying out here for every single hearing for every requested amici brief.

So I was thinking if I was going to allow these, that I should throw this open for 7 days or 14 days for the amici briefs to come in during the period of argument and try to sort through whatever the Court's opinion would be and give you that courtesy and simply extend it. But I'm looking for your wisdom on that because you can anticipate if I'm getting these amici requests now, I promise you, as soon as you leave the courtroom, there's going to be another request. And I don't want to do that ex parte without your wisdom on both parties' parts.

So let's start with the first group. This motion for leave to file an amici brief by 16 states, and one of my concerns was whether this would become a bipartisan effort, for instance, of Democrats and Republicans using the Court in a sense, in a political sense, not necessarily a substantive sense. But I noticed there are what I consider some swing states, New Mexico certainly was during the last election,

those records to make sure we are doing our duty as the federal government to make sure that these federal elections remain free and fair.

And counsel simply has to rely on both misrepresentations of the law and our position, stating our -- for example, that our whole case relies on Lynd. No. This action relies on the Civil Rights Act of 1960 and its very clear text, which is the one thing they don't want to talk about because it's very clear.

Privacy concerns are first not a proper concern for this motion to dismiss but even if they were, they're unfounded. Privacy -- the United States is going to comply with all federal laws. That includes the Federal Privacy Act. The DOJ Civil Rights Division itself has a stated policy available on a website as to how we will comply with the Federal Privacy Act and have before.

**THE COURT:** Explain that to me.

**MR. NEFF:** Yes, sure.

So we publish a series of regulations. They're called the SORNs that show how we tend to the data and make sure everything is properly protected under, not just Federal Privacy Act, but other obvious concerns when you're dealing with large databases.

**THE COURT:** Is that part of my record?

**MR. NEFF:** Yes.

**THE COURT:** And what would I look at that? What exhibit?

**MR. NEFF:** At our -- in our response to our motion to dismiss and the supporting data for that, the attachments for that.

However, I would state, that to any extent, especially the state privacy-type acts would contradict the Civil Rights Act, that the Civil Rights Act would rule.

The United States does this on a regular basis. We have multiple states that don't even see this as a dispute, that simply just -- in fact, on their own do this on a regular basis, share the information with the federal government so that we can run crosschecks to make sure that people are properly on voter rolls.

**THE COURT:** What states are those that have shared either their DMV registrations or the social security numbers of voters?

**MR. NEFF:** Offhand, right now, off of memory I believe the states are Kansas, Indiana -- there are four.

**THE COURT:** That's okay.

**MR. NEFF:** I'll also state the biggest one is -- so we also have an MOU that we produce at the state request. Some states request it, some don't. Some say, yes, you're entitled to this data, here you go. And we have a whole data-sharing setup ready. It's essentially the Box program, plus some

federal proprietary encryption technology to make sure that this is as secure as it needs to be. And we -- so Texas just told us today they're going to enter in the MOU and share us the data in the next few days. We believe many more states are going to follow just in the next few days but so we have four states that have already sent us the data. No questions asked. Probably another dozen or so states in the next week or so that are just going to sign the MOU and share with us. This really shouldn't be controversial. It's clearly stated as part of our duty under HAVA and the Civil Rights Act is clear that this is the mechanism in which we do it.

**THE COURT:** Do you think that those states with attorney generals complying with your request would be interested in filing an amicus just as other states who may be opposed to your request are filing amicus? In other words, what I want to do is make certain if we have states coming late to the table but in compliance that we're looking at the reasoning by all of the atty generals in the respective states.

And what I was worried about before, frankly, is if I had red and blue states lining up when I started to look at the amicus, I was particularly interested in the states bringing that to me.

Now, I don't know how you define what I call -- well those states that have voted for different -- in different elections in different ways. Arizona, New Mexico, Michigan,

Minnesota, seem to be what I call those states that traditionally doesn't go Democrat or Republican.

And then I looked down at the state secretaries for the states and if you notice, there are three states out of there on the amicus. Connecticut is in for the first time. They are not part of the amicus for the 16 states that we initially named but these are the state secretaries for the states of and Connecticut is an addition, Nebraska is an addition, Pennsylvania -- which has certainly been a swing state.

So I was a little worried and that's why I sought your wisdom about whether you all were going to stipulate to me accepting this because I didn't know the weight if I was just dealing with a party disagreement. And I'm not saying that these swing states necessarily carry greater or less weight but I want to be alert that if this is a partisan effort. And certainly the country is divided so ...

**MR. NEFF:** I would be --

**THE COURT:** ... so I've got a stipulation that I'm accepting all of these amicus briefs. I just want to pay you the courtesy if other states are coming onboard, like Texas, et cetera, that we give them a chance for those attorney generals to get this to us but by the same token, I'm going to be writing over the next couple weeks.

Is two weeks enough time for you?

Case 1:25-cv-00539-MSM-PAS Document 156 Filed 01/12/26 Page 12 of 34



**MR. NEFF:** We can inform the states that --

**THE COURT:** Okay.

**MR. NEFF:** -- a judge has invited them to file amicus but --

**THE COURT:** Will you do so? In other words, for both parties. Get it out to all the states that you can and I'll docket this, et cetera. And there may even be disagreements between different courts examining this matter and different circuits.

**MR. NEFF:** I think the bigger picture is that the states that are complying are likely not going to see this as something that they need to delve issue.

**THE COURT:** But I just want to pay you the courtesy in terms of due process. Okay.

**MR. NEFF:** Yes. And I would say that's because this really shouldn't be a political issue. One side can make it a political issue if they want to just simply in a single position declare it that but it doesn't change the fact that the Civil Rights Act of 1960, the text is quite clear and that no one is in favor of faulty voter rolls.

**THE COURT:** We've also had for both parties we've had a series of state rights issues in the federal court for years. And different states have taken a perspective on what the states' rights issues are. Some are much more state-right oriented, others aren't. That's why I was interested in the

division. But since you've all stipulated, I'm accepting this amicus at the present time. I just want to make sure you've got the courtesy on both sides of any other parties coming onboard so if we need an extra week we can take it, okay?

Okay. Won't you continue. I'm sorry.

**MR. NEFF:** Thank you, Your Honor.

The -- would emphasize that this data is necessary for the United States to conduct its HAVA operation -- its HAVA enforcement compliance and that is why that data is specifically cited in the statute. It simply couldn't be clearer that it needs to be the last four digits of a social security number or the driver's license; otherwise, we are not able to make a verified finding as to the various voter roll registrations that might have problems. In fact, we sometimes even have to follow up after that data is run. It's rare but there's a reason that was put in the statute because it's something like we can verify it from what I've talked to our database analysts something like 99.999 percent of the time. That's enough for us to be able to know if it's an actual person that lives in that location and is who the voter registration role says it is.

**(Pause)**

Again, with the caveat that we do not need to ever -- that we do not need to get to this. This is essentially an OSC where we only need to state our purpose and then we are

entitled to the records. Also under a prompt order, according to caselaw, a prompt order that this is essentially an OSC hearing.

The facts of California itself are particularly worrisome. Maybe the most worrisome state in the union.

The state is required to provide various data to the Election Assistance Commission which is a nonpartisan commission. The state -- the agency created by HAVA in order to try and keep this as neutral as possible and California doesn't provide the complete data. Their data doesn't have Los Angeles County in it. It's one-fourth the state's population. That on its own should cause concern countrywide that they've not submitted that data. It would be irresponsible of the United States to not come in at this point and say we need to see your data to ensure fair and free elections.

All of the harms that opposing counsel have pointed to are based on speculation, logical leaps and there is no concrete evidence they can point to.

That being said, with the overarching point that this is before the Court right now as essentially an order for an order to show cause, dressed up as a complaint, and that you have a dismissal that is essentially fighting that order to show cause, dressed up as a motion to dismiss, I believe the Court should act within what would be its lawful authority to issue a prompt order that California needs to turn those

records over to us that we are entitled to.

**THE COURT:** How do you deal with the state provisions concerning the DMV? In other words, the state is arguing to the Court that that has a -- for want of a better word -- a special category that is not subject to the Voting Rights Act of 1960 or HAVA, and that they have a privacy interest in a sense as well. What does the Court do with that?

**MR. NEFF:** Any state privacy interest would be trumped by federal law. It would be trumped by both the Federal Privacy Act, which we're complying with. It would be trumped by HAVA, which is a -- I repeat -- a federal minimum standards law for state compliance that specifically mentions driver's license number or last four digits of social.

The state is required to produce and provide this data under the statute. If they have some issue with the driver's license; hypothetically, if a state just said we have some real concerns about our driver's license, they comply with the statute if they provide the last four of the social security number.

Does the Court have other questions or concerns?

**THE COURT:** Just one moment. Let me look at a note that I made.

**(Pause)**

The state represents that they have offered -- and I think both in the Orange County case with the registrar -- and

it's represented today in the statewide case -- the names and addresses. Has that offer in fact been made?

**MR. NEFF:** Has that offer --

**THE COURT:** Yes. To you.

**MR. NEFF:** Oh --

**THE COURT:** Not to you but to the government, the DOJ.

**MR. NEFF:** California has taken the unique in the nation position that they are -- that they -- we are permitted to come and inspect it in their offices, that data; which, (a), is not sufficient; (b), we argue is not an appropriate way of providing it in today's day and age where it's actually more secure to share this data electronically through our shared file-sharing --

**THE COURT:** Kind of slow-walking you. Kind of slow walking.

**MR. NEFF:** I think --

**THE COURT:** For want of a better term.

**MR. NEFF:** That is the United States' interpretation of it but --

**THE COURT:** How about the voter participation and the registration methods? Have those been offered to you? In other words, that's been argued to me but behind the scenes I don't have that record right now. Has that been offered to you?

**MR. NEFF:** It is in the back-and-forth is in the letters attached as exhibits in the filings, Your Honor; however, the United States' position is that the responses have been woefully inadequate.

**THE COURT:** Okay. So we've never gotten down to really how that information would be exchanged. It's flowing back and forth in terms of representations but as a practical matter there's a big difference between a representation and conveying the information to you.

**MR. NEFF:** Well actually in our letters we did lay out to opposing counsel our file-sharing program, how it works, that it is secure and we invite them to -- assuming they have a change of heart, to use it.

**THE COURT:** About the registration status and the contact information, has that been offered to you?

**MR. NEFF:** That, I'm not sure about. I'm not sure what the scope of their offer is.

**THE COURT:** Okay.

**MR. NEFF:** I just know that it does not include the -- for sure, does not include the driver's license number or the last four of the social as required by the HAVA statute. And in other states as well, that has always been the crux of the dispute.

**THE COURT:** In their opening arguments they'd argued that in the Benson case out of the Sixth Circuit, Bellows out

of the First and Long case out of the Fourth, that there's an inconsistent and uniformed position taken by the government. How do you respond to that?

**MR. NEFF:** That the -- there is no inconsistency in position.

**THE COURT:** Explain that to me.

**MR. NEFF:** What there is is difference in posture of those cases. It is a true statement to say that the United States, as an agency, has yet to go to states to enforce the minimum standards of the HAVA statute. One can argue whether that was a wise or unwise decision but here we are 23 years later and the federal government has yet to do it. It is still, for certain, good law. The United States believes it is a law that should be enforced and complied with. Therefore, because of that history where this hasn't been done before, all of those cases relate to private parties trying to in some way get in.

The DOJ's position is that private parties do not have a right of action under HAVA and therefore they should not be allowed to go to states and say, I would like your driver's license or social security number. However, there are states around the country, including ones that are fighting us, that interestingly, have been willing to turn over that data to a private organization without the same protections as the United States. That's been cited in our briefing, the ERIC

Organization.

So what I would say is all those cases are inapplicable. It often requires selectively quoting them to make it sound like in some way the United States government is not entitled to it. No, the United States government is uniquely mentioned in both the CRA and HAVA. And therefore just because this is the first time the United States is coming in and doing it, doesn't mean that it's not clearly what the statute states.

**THE COURT:** For both parties, you mentioned that California is one of the main outliers, for want of a better word, from the DOJ and the executive branch's position. Is it the position of the executive branch that there need not be any stated purpose that there's an absolute right to obtain this information per statute?

**MR. NEFF:** Statute requires we state a purpose. A purpose.

**THE COURT:** And what is the purpose here?

**MR. NEFF:** The purpose is for, as stated in our letters to them, for voter roll maintenance enforcement and compliance.

**THE COURT:** And we stated in Orange County with a limited county case involving Page. There, there were -- and I keep 13 or 17 but 17, I believe, allegations. The most notorious became the dog that voted twice.

Is that, out of 1.2 million voters, what's the basis, for instance, of that kind of request because of course we're always going to have error, including people who legitimately die. So what's the threshold that this stated purpose has? How should I interpret that?

**MR. NEFF:** Under the CRA there is no threshold.

**THE COURT:** Okay. Now, do you need to -- and thank you. Do you need to make any calls? You're all by yourself, you're doing -- there's nobody to consult with but do you need to make any calls? Are you satisfied with your argument?

**MR. NEFF:** I appreciate the offer, Your Honor, but no, we're satisfied.

**THE COURT:** Okay. There'll be a second round.

**MR. NEFF:** Yes.

**THE COURT:** So counsel, however you'd like to proceed then. One of you has another obligation, I don't care which order. You can take the intervenors first or the parties.

**(Pause)**

**MR. BRUDIGAM:** So there was a lot going on there, Your Honor, and so I'm going to try to be thorough in making sure I cover all of those points.

So I think the first thing I want to talk about is this notion that the complaint is just an order to show cause. And essentially what the federal government wants to do is take the Court and sideline them in this dispute and say that the

Court has no room for any judicial review here. And that's just not supported by the text of the statute.

There's nothing in the Civil Rights Act that creates a special statutory procedure. The words "order to show cause" are not in the statute at all and I'll just read you the text right here.

It says that:

> "The appropriate district court shall have jurisdiction by appropriate process to compel the production of such record or paper."

That's what it says, "By appropriate process." And so that's up to the Court to decide what the appropriate process is here.

And I'd also just point Your Honor to the fact that the Federal Rules of Civil Procedure contemplate what rules apply when you have a government investigative demand. I mean Federal Rule of Civil Procedure 81(a)(5) specifically says:

> "The Federal Rules of Civil Procedure apply to proceedings governing demands for records by the U.S. government."

And so this idea that some other procedure applies, it's not supported by the text, it's not supported by the Federal Rules of Civil Procedure. The only thing that supports this purported procedure are these early 1960s' cases and like we've said, the federal government, they pin their hopes on

Case 1:25-cv-02639-MSN-PAS Document 16-2 Filed 01/28/26 Page 21 of 34 PageID



this one Kennedy v. Lynd, Fifth Circuit case from 1962. That's the one they're referring to which says that the Court shouldn't have any role here.

But that case is obviously nonbinding on Your Honor and it's really been overruled. I would point you to the United States v. Powell case.

**THE COURT:** I'm sorry, what -- just a moment.

**MR. BRUDIGAM:** Sure.

**THE COURT:** All right. Please continue. I've got my note.

**MR. BRUDIGAM:** So the Supreme Court in United States v. Powell found that the Federal Rules of Civil Procedure, they apply to a proceeding like this. And in that case it involved an IRS document request statute which used the very same language that we have here which is that the Court shall, by appropriate process, compel relief under that statute. So even if Your Honor found Kennedy v. Lynd persuasive, it's obviously unbinding, that's been overruled. So just to be clear, the Federal Rules of Civil Procedure govern this action.

**THE COURT:** Well, you've cited on both parties' parts, different enactments by council, statutory provisions. I think we can all agree that we want qualified voters to vote without any chilling effect.

**MR. BRUDIGAM:** I agree.

**THE COURT:** Is there -- well I think we can all

stipulate to that.

**MR. BRUDIGAM:** We can.

**THE COURT:** And I'll use the word "qualified voters".

Is there a chilling effect in the request by the government and if so, what is that chilling effect? How would there allegedly be persons who may believe that the government has no business in the sense of getting more information.

**MR. BRUDIGAM:** Sure I mean I think --

**THE COURT:** And behind this the concern of this court eventually, besides the statutory following the law, is going to be the impact of what we write and do. And this case will probably be the first case that comes out that other circuits look at. So with that noble goal in mind of having voter participation, is there a chilling effect or not?

**MR. BRUDIGAM:** I think there's absolutely a chilling effect here because --

**THE COURT:** And I need you to define that for me.

**MR. BRUDIGAM:** Sure.

**THE COURT:** And it may not be relevant to the opinion but behind all of this, we need voters who are qualified to be able to vote.

**MR. BRUDIGAM:** Right.

**THE COURT:** Now the ease of that could be differences between different administrations and whether you have different methodologies. And I know there's a huge controversy

about mail-in ballots and voter registration and drive-in, et cetera, but when we're finally done with this, we want qualified voters to vote. And if there's a chilling effect, or this privacy right that we've somewhat skipped over, I want to hear how you define that.

**MR. BRUDIGAM:** Sure. Your Honor, I think this action should make the stomach of every American turn, knowing that this executive branch is going in, state by state, collecting and vacuuming up everybody's voter registration information. It is on a scale that we have never seen before. Okay.

And what this is going to do --

**THE COURT:** It is their disparity argument. In other words, remember when I started this conversation early on, and I discussed the amicus briefs, I was particularly interested if I was getting just red and blue states. That's why I was looking to see if there were these swing states.

**MR. BRUDIGAM:** I mean I point Your Honor to --

**THE COURT:** Or is this a argument also that a particular group of states are being examined versus other states? Because here, the government has represented while California from their perception might be an outlier, they've also made inquiries of the let's say more, from their standpoint, compliant states like Kansas and -- I forget which one -- just a moment -- Indiana, and that Texas was coming onboard.

**MR. BRUDIGAM:** Yeah. Well, what I would say is I mean those aren't states that are complying, they're voluntarily giving that information to the federal government.

**THE COURT:** But regardless, the government has made an inquiry so if there's an argument that the government is reaching out and being selective, if the state is voluntarily complying that doesn't seem to me to be singling out progressive states. And if you think that, then I need to hear that and hear your reasoning behind that.

**MR. BRUDIGAM:** I'm not saying they're singling out states.

**THE COURT:** Okay. Then we can pass that.

**MR. BRUDIGAM:** They're going after every state and California is by no means --

**THE COURT:** So I'm not going to have a disparity argument.

**MR. BRUDIGAM:** Right, right. I just mean in terms of the position the secretary has taken, I mean the reason they had to sue 14 different states is because nobody wants to turn this data over. The representations that Counsel just gave today, that's the first that I've heard of any state turning over that information. So we are by no means an outlier in taking this position.

**THE COURT:** Wait just a moment. For the government or DOJ, how do we validate Kansas and Indiana? What validation

do I have about that?

**MR. NEFF:** I was actually looking that up right now, Your Honor, because --

**THE COURT:** Well go ahead and look it up. You've got lots of time.

**MR. NEFF:** And I --

**THE COURT:** By the way, I'm not holding you to it. I know it's in good faith but I'd like to hear what states that we have validation for turning this document over. And there may be numerous states.

**MR. NEFF:** It's a good-faith representation here. I am kind of a point --

**THE COURT:** Okay. Well now take away the good faith. I accept that. Okay, I'm asking for proof now.

**MR. NEFF:** Okay. Wyoming, Kansas, Indiana and Arkansas all complied voluntarily.

**THE COURT:** Okay. Just a moment.

**MR. NEFF:** Texas --

**THE COURT:** Kansas, Indiana, Wyoming and Arkansas ...

**MR. NEFF:** ... have already complied ...

**THE COURT:** ... voluntarily.

**MR. NEFF:** ... voluntarily.

**THE COURT:** Okay. Texas?

**MR. NEFF:** Texas, Virginia, Utah, Tennessee, South Dakota --

**THE COURT:** Just a moment.

**MR. NEFF:** Oh it's gonna go long, yeah. South Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama, all fall into the list of they have expressed with us a willingness to comply based on the represented MOU that we have sent them. And so we expect full --

**THE COURT:** Now apparently Nebraska can't make up its mind because of the proposed amici briefed to the Court, they have the former state secretaries of state for Colorado, Connecticut, Minnesota and guess what? Nebraska.

**MR. NEFF:** Well those are former. And furthermore, just because some states are representing certain things in court, there are still discussions going on now that this MOU we have is fully blessed. There are the -- I don't think it's safe at this point to go beyond those states but --

**THE COURT:** Then that's fine.

**MR. NEFF:** -- that's a fair representation of the state of discussions as of today.

**THE COURT:** And Counsel, back to you.

**MR. BRUDIGAM:** Sure. And yeah, so all I heard there was we've heard a willingness. It doesn't sound like those states have actually turned over any data, just to be clear.

So I want to talk a little bit about --

**THE COURT:** No, I think he said that four states have actually. Kansas --

**MR. BRUDIGAM:** Four states have actually turned over but the broader list --

**THE COURT:** -- Indiana, Wyoming and Arkansas.

**MR. BRUDIGAM:** Right.

**THE COURT:** The others were a purported willingness.

**MR. BRUDIGAM:** Right.

So Your Honor, the federal government is really leaning hard into the text of these statutes and they say that we don't want to talk about the text but that's just absolutely not true. And I want to just start with the Civil Rights Act of 1960.

There is a very clear statutory limitation in that provision and it's in Section 20703. And it says that the attorney general's demand shall contain a statement of the basis and the purpose therefore. DOJ has not satisfied this requirement and so their demand is invalid plainly under the statutory text.

**THE COURT:** So the plain representation by the government is too broad; and that is, they want to stop voter fraud.

**MR. BRUDIGAM:** Well, so they've mentioned a couple of things. It keeps changing so I want to unpack this a little bit.

So they said that the purpose is free and fair elections, clean voter rolls. Then he said up here that it's

for enforcing HAVA. So these are multiple different bases. And also it's different than the -- or than the purpose that was originally articulated in the letters to the secretary.

The original request said that it was -- they were seeking it for NVRA voter list -- list maintenance compliance. So the reason and rationale keeps shifting and changing. And that's a problem, not just because it's suspicious, it's a problem because, again, the text says, "The demand shall contain a statement of the basis and the purpose therefore. The text use of the article." 'The,' twice, in front of the basis and the purpose indicates that there is only one basis and one purpose.

And the federal government has explicitly rejected this plain text reading. They said it up here that they just need to give you any old basis and then the demand is good.

**THE COURT:** That's my question also to both of you; and that is, does the executive branch need to state a purpose? Your argument is that they do.

**MR. BRUDIGAM:** They do.

**THE COURT:** Counsel for DOJ puts that in broad terms.

**MR. BRUDIGAM:** Right. Well but again, it's not just a purpose, it's -- or not just the purpose, it's also the basis.

**THE COURT:** Okay.

**MR. BRUDIGAM:** And they have not alleged any basis

anywhere in their action.

Now, I also want to talk about -- and just -- you know this -- I'm sorry. I want to talk a little bit more about HAVA, which is the law that apparently now that's the main method of enforcement we're now learning today, that that's what they want to enforce and they specifically reference the requirement under HAVA that states collect social security numbers and driver's license numbers. Well let's look to the text of HAVA. What does it say?

"The state shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph in accordance with state law."

And that is -- when it says "this subparagraph," it's referring directly to the requirement that states collect that information when processing voter registration applications. So there is nothing for the federal government to enforce here. This is solely the state's domain.

And as I said in my original motion, another provision of HAVA explicitly delegates discretion of implementation of HAVA to the states. So again, we're not afraid of the text in this case, we think it strongly supports our position. And so I also want to talk about what this data could be used for.

So we've heard a lot of different reasons. I just

explained why it's not relevant for HAVA. I want to also talk about why it's not relevant for List Maintenance under the NVRA.

So the legal standard under the NVRA requires states to conduct a general program that makes a reasonable effort. So the Sixth Circuit held this year in that Benson case that this just means a serious attempt, a rational, sensible approach. It need not be perfect or optimal. And so under this standard, getting line-by-line voter information of their social security numbers and driver's license numbers, that's entirely unrelated to whether a general program exists or whether the state is making a reasonable effort. And so, again, at every turn, the supposed reason why they need this information, it just doesn't add up.

And then finally, I want to talk about they claimed, as they did in their brief, that California has, quote, "the most worrisome voter registration data in the nation." That's just absolutely wrong, okay? That's an assertion in a brief without any support.

And they also incorrectly say that in submitting data to the Election Administration Commission in response to the EACs survey, this is an election administration survey, they said the LA County didn't submit any data. That's not true. That's simply not true. You can go to the survey and look at the data that LA submitted and you can look at our explanation

to DOJ in our letters in advance (inaudible) litigation explaining the questions they had about that survey. So to the extent that they want to rely on EACs as some after-the-fact rationalization for this demand, it just doesn't make sense. It doesn't add up.

So those are the main --

**THE COURT:** Were there inconsistent or consistent offers if you're aware of the Page case, as well as this case. In other words, when this started in Orange County, originally counsel was here, there's a representation about the registrar there making the same or similar representations about what they were willing to share with DOJ but I've never compared the two. And I don't know what the state's position is because DOJ's argument might be, we're getting inconsistent data. In other words, even when we're sharing, with the different entities promising that they'll share some amount of this data, the different counties are supplying this in different ways.

**MR. BRUDIGAM:** Sure. So I won't speak too much about that case but I would say that case is different and there isn't a problem of inconsistent data sharing because in the state case, they're saying, give us the whole list. We want every voter.

In Orange County, they said, we want a list of just the individuals that have been removed from your list because of non-citizenship, people who renounced or for whatever

reason.

**THE COURT:** So this is much broader from your perspective in terms of protection, privacy, HAVA.

**MR. BRUDIGAM:** Yeah. It's not an issue of can they be reconciled.

So I do want to just back up again and just zoom out on the big picture here in this case.

You know, as we talked about -- my colleague talked about, in his motion, that the states really have the primary role in administering elections and the voter registration process. The Constitution makes that quite clear in the elections clause. And it makes sense to prioritize the state in this process because they're the ones that are closer to the voters, more accountable to the voters. And so this is an arrangement that it depends on the principle of subsidiarity where a decision should be made at the local level. And here, we don't -- there's no place for the federal government to come in and start demanding these records under that constitutional framework.

And not only are the states the default entity running elections but it's only Congress that can make or alter those rules. Here, we have the executive branch in court trying to get this information. The Constitution says nothing about the executive branch having any role in federal elections.

And I would just say that this is not a unique position by this administration. The president has been meddling in state election law since he came into office. And I would point Your Honor to a case in the District of Massachusetts, California v. Trump, where the executive was doing something sort of similar where they were going in under the guise of federal law and trying the change the way states administer and conduct elections and that was pursuant to an executive order the president issued. And so here, we're having another situation where the federal government is coming in under the guise of inapplicable federal laws and trying to interfere with the state's role in elections. And so I'd just say against that backdrop, it's important to keep that in mind; but even if, you know, considering all that, if you'd just go back to the text of these statutes, the federal government is not entitled to this information under those laws.

And so at this point I want to turn it over to my colleague, Will Setrakian, to just provide some rebuttal on the federal privacy laws issue.

**THE COURT:** Thank you. And once again, would you state your name because we're on CourtSmart.

**MR. SETRAKIAN:** Good afternoon, Your Honor. Will Setrakian for defendants, The State of California and California Secretary of State Shirley Weber. Just four quick points on the federal privacy statute.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AL SCHMIDT, in his official capacity as the Secretary of State for the Commonwealth of Pennsylvania,<br><br>Defendant. | No. 2:25-cv-01481-CB<br><br>**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE** |

The United States of America respectfully submits this memorandum of law in support of its motion to transfer venue to the Middle District of Pennsylvania, where the principal office of Secretary Schmidt is located. Defendant and Defendant-Intervenors have reserved their right to take a position on this Motion based on what the United States files here.

## I. BACKGROUND

The United States brought this case to facilitate its investigation of Pennsylvania's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). On June 23, 2025, the United States requested that Secretary of State Al Schmidt ("Secretary Schmidt") provide information about the Commonwealth's registration and list maintenance procedures under HAVA. *See* ECF 103-1. On August 4, 2025, the United States requested that Secretary Schmidt explain several irregularities in data that the Commonwealth reported to the Election Assistance Commission that are inconsistent with reasonable list maintenance practices under the NVRA. *See* ECF 103-3. The United States further asked for the current electronic copy of the Commonwealth's statewide voter registration list

("SVRL"), including each registrant's driver's license number or last four of their social security number as required by Section 303(a) of HAVA. *Id.* at 1. On August 14, 2025, the United States made a written demand to Secretary Schmidt for those same records pursuant to Section 303 of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20703, indicating the records would be secured in full compliance with federal privacy laws. *See* ECF 103-5. The letter was sent to Secretary Schmidt's office in Harrisburg. *See id.* Secretary Schmidt declined to produce voter records that included the identification numbers required by HAVA. *See* ECF 103-6.

Title III of the CRA broadly authorizes the Attorney General to compel production of "all records and papers" that "come into … possession" of the defendant relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701. Section 303 of the CRA provides that an officer of election upon whom a written demand is made shall make the federal election records "available for inspection, reproduction, and copying at the principal office of such custodian…" 52 U.S.C. § 20703. If that demand is rejected, Section 305 of the CRA authorizes the Attorney General to bring an action in the federal district court "in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located…" 52 U.S.C. § 20705. On September 25, 2025, the United States filed the action in this District. *See* ECF 1. On December 16, 2025, Secretary Schmidt responded to the Complaint by moving to dismiss it. *See* ECF 92. Defendant has objected that a filing in this district is improper. On January 12, 2026, the United States filed its Opposition to the motion. ECF 103.

## II. LEGAL STANDARDS

Venue transfers between federal courts are governed by two statutes. *See* 28 U.S.C. §§ 1404(a), 1406(a). Section 1404 states in pertinent part that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district

court or division where it might have been brought." 28 U.S.C. § 1404(a). Section 1406 provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought …" 28 U.S.C. § 1406(a).

The Third Circuit has explained the distinction between the statutes concerns "discretion, jurisdiction, and choice of law." *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007). "Section 1404(a) transfers are discretionary determinations made for the convenience of the parties and presuppose that the court has jurisdiction and the case has been brought in the correct forum." *Id.* As the Supreme Court has explained, "[T]he history and purposes of section 1404(a) indicate that it should be regarded as a federal judicial housekeeping measure, dealing with the placement of litigation in the federal courts and generally intended, on the basis of convenience and fairness, simply to authorize a change of courtrooms." *Van Dusen v. Barrack*, 376 U.S. 612, 636–37 (1964). Conversely, "Section 1406(a) comes into play where plaintiffs file suit in an improper forum." *Lafferty*, 495 F.3d at 77; *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995) (same). The determination of which transfer statute applies only affects the standard of review on appeal. *Id.* If an action has been brought in the wrong forum and Section 1406(a) applies, the district court must consider "the possibility of transferring the case," consistent with the criteria for determining whether to exercise discretion in doing so. *Id.*

Both transfer statutes require weighing the same factors. *See Story v. Republic Bank*, 13 F. Supp.3d 483, 492 (W.D. Pa. 2014) (describing Section 1406 factors); *Queszada v. Darden Rests., Inc.*, 139 F. Supp.2d 666, 667 (W.D. Pa. 2001) (same factors for Section 1404). Private interests include: (1) the plaintiff's choice of forum; (2) where the claim arose; (3) the convenience of the parties; (4) the convenience of the witnesses; and (5) the location of the books and records.

*Archinaco/Bracken LLC v. Dawson*, No. 13-917, 2013 WL 5410060, at *7 (W.D. Pa. Sept. 25, 2013) (citing *Jumara*, 55 F.3d at 879-80). Public interests include considerations such as the enforceability of the judgment and practical considerations to reduce costs, expedite proceedings, and mitigate court congestion. *Id.* Regardless of which transfer statute applies, these factors and the interest of justice weigh in favor of transferring this action to the Middle District of Pennsylvania.

## III. ARGUMENT

Defendant objects to the United States' position that venue is proper in any district court in the commonwealth or state where the records are in electronic form.[1] While the United States disagrees with Defendant's arguments, a court in the Middle District of Georgia found in a similar lawsuit that an action there would be more appropriate in the Northern District of Georgia, where the SVRL is maintained.[2]

In that case, the United States filed a CRA suit to compel federal election records in the Middle District of Georgia, where the Secretary of State maintains an elections office in Macon and its electronic SVRL can be accessed. *See Raffensperger*, slip op. at 3-4. The court responded by issuing an order to show cause how it had subject matter jurisdiction over the action under Section 305 of the CRA. *Id.* at 4. That provision limits jurisdiction over actions to compel records

---

[1] In his supporting memorandum, Secretary Schmidt argues that the Court does not have jurisdiction over this litigation. ECF 92 at 20. Specifically, Secretary Schmidt contends that jurisdiction is lacking because the CRA written demand was not made in this District, and because he avers that the federal election records are located where he "sits in Harrisburg, which is in the Middle District." *Id.* The United States responded by pointing out that "[t]he SVRL is available in electronic form throughout the [C]ommonwealth." ECF 103 at 18. As a result, the United States believes that the "record or paper so demanded is located" in any district in the Commonwealth, including in this District. 52 U.S.C. § 20705.

[2] A recent decision from Georgia has construed venue under Section 305 more narrowly. *See* Ex. 1, Order Dismissing Case, *United States v. Raffensperger*, No. 5:25-cv-00548-CAR (M.D. Ga. Jan. 23, 2026).

to either "the district in which a demand is made" or where "a record or paper so demanded is located." 52 U.S.C. § 20705. Interpreting Section 305 as conferring a specific grant of jurisdiction, the court held neither location was in that district. *Id.* at 4-5. The court first observed that the Attorney General's written demand was mailed to the Secretary of State's office in the Northern District of Georgia. *Id.* at 7. The court determined that "the Secretary's administration of the statewide voter registration database," all orders for copies of it, and all processing for those requests "would be performed by the Elections Division at its principal office located in the Northern District of Georgia." *Id.* at 8. Therefore, the court concluded that Georgia's SVRL was in the Northern District for purposes of Section 305 and dismissed the case without prejudice. *Id.*

Although the United States disagrees with that decision, it recognizes the need to not have unnecessary delay in the litigation. There is no disagreement that venue here would be proper in the Middle District of Pennsylvania because the records are located specifically in the Middle District and that the request for records was made there.

Changed conditions can provide just cause for a plaintiff to request a transfer under one of the two statutes. *See Ferens v. John Deere Co.*, 494 U.S. 516, 529-31 (1990). Section 1406 does not limit movants to a particular party and merely provides that a court may "transfer such case to any district or division in which it could have been brought…" 28 U.S.C. § 1406(a). Section 1404 likewise uses neutral text, allowing transfer regardless of the movant if it is "[f]or the convenience of parties and witnesses, in the interests of justice…" 28 U.S.C. § 1404(a). Where that standard is met, a plaintiff's motion to transfer should be granted. *See Walsh v. Chez*, No. 05-286, 2006 WL 2583623 (W.D. Pa. Sept. 6, 2006). The only impact of a plaintiff seeking transfer is that "the 'paramount consideration' given to the plaintiff's original choice of venue… becomes a neutral factor." *Palazzo v. Ciurlino*, No. 05-5093, 2006 WL 2177542, at *1 (D.N.J. July 28, 2006) (quoting

*Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)). Thus, only the remaining factors are to be considered where the transfer movant is a plaintiff. *See Dawson*, 2013 WL 5410060, at *7.

**A. Jurisdiction is proper in the Middle District under Section 305 of the CRA.**

The next factor, which focuses on where the claim arose, is met here. *Jumara*, 55 F.3d at 879. Section 305 provides that an action to compel production of federal election records is proper in the district where the written demand is made or where the records are located. 52 U.S.C. § 20705. Here, both are met in the Middle District. The United States sent its written demand to Secretary Schmidt at his office in Harrisburg. *See* ECF 103-5. Secretary Schmidt acknowledges that the Commonwealth's SVRL is maintained at the same location. *See* ECF 92 at 20. This factor weighs in favor of transfer.

**B. The Middle District should not adversely impact parties or witnesses.**

The next two factors--requiring consideration of the impact of transfer on the parties and any witnesses--likewise are satisfied. *Jumara*, 55 F.3d at 879. The case law interpreting the CRA makes clear that "there is no place" for traditional discovery, including depositions, and a trial in an action to compel federal election records under Section 305. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). As a result, transfer will impose no hardship on witnesses because there are unlikely to be any. Secretary Schmidt and his elections staff are all located at the Secretary's office in Harrisburg, in the Middle District. Therefore, this factor also supports transfer.

**C. The federal election records sought are in the Middle District.**

The last private factor, the location of the books and records, is satisfied. *Jumara*, 55 F.3d at 879. As described above, Secretary Schmidt represents that the Commonwealth's electronic SVRL is maintained at his office in Harrisburg. *See* ECF 92 at 20. Consequently, transfer is

appropriate.

### D. The public interest supports transfer to the Middle District.

The remaining considerations evaluate whether transfer is in the public interest because it will result in an enforceable judgment and would facilitate judicial economy. *Jumara*, 55 F.3d at 879-80. The United States believes that unnecessary delay would undermine the CRA's mandate for an expedited "summary proceeding." *Lynd*, 306 F.2d at 226. It is completely avoidable by transferring the entire action in its present posture, including fully briefed motions, to the Middle District. Consequently, transfer pursuant to 28 U.S.C. § 1406(a) is in the public interest and would be in the interest of justice.

## IV. CONCLUSION

For all the foregoing reasons, the United States respectfully submits that its motion to transfer should be granted, and this action should be transferred to the Middle District of Pennsylvania.

Dated: January 29, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

*/s/ Megan Frederick*
TIMOTHY F. MELLETT (DC Bar No. 430968)
MEGAN FREDERICK (VA Bar No. 79682)
Attorneys, Voting Section
Civil Rights Division
950 Pennsylvania Avenue 4CON
Washington, DC 20530
Timothy.F.Mellett@usdoj.gov
Megan.Frederick@usdoj.gov
Tel. (202) 307-2767

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2026 a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Megan Frederick*
Megan Frederick
Trial Attorney, Voting Section
Civil Rights Division

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AL SCHMIDT, in his official capacity as Secretary of the Commonwealth of Pennsylvania,<br><br>Defendant. | No. 2:25-cv-1481<br>Chief Judge Cathy Bissoon |

**BRIEF OF SECRETARY OF THE COMMONWEALTH AL SCHMIDT IN RESPONSE TO DOJ'S MOTION TO TRANSFER VENUE**

## INTRODUCTION

More than four months after the DOJ filed this action—and more than a month and a half since Secretary Schmidt first pointed out the Court's lack of subject matter jurisdiction over Count I of the Complaint—DOJ moves to transfer venue to the Middle District of Pennsylvania. In the interim, three sets of intervenors have joined the case and four motions to dismiss have been fully briefed. DOJ's claimed change in circumstances is not the discovery of a new fact relevant to jurisdiction or the convenience of the parties, but rather a district court decision in Georgia that dismissed a parallel case for want of jurisdiction over the same claim. It also appears that DOJ has changed its position on the relevant statute, now claiming that 52 U.S.C. § 20705 concerns venue, not subject matter jurisdiction.

Secretary Schmidt agrees that the Middle District of Pennsylvania is the only forum that could have subject matter jurisdiction over DOJ's Count I. But because this Court lacks jurisdiction over that claim, this Court cannot use the venue transfer statutes identified by DOJ in its motion (28 U.S.C. §§ 1404, 1406). Instead, the appropriate vehicle is 28 U.S.C. § 1631, which DOJ fails to mention: if the Court "finds that there is a want of jurisdiction," it has discretion to transfer the case to the Middle District if doing so "is in the interest of justice."

This Court cannot resolve DOJ's transfer motion without first determining the scope of its jurisdiction. But the Court has before it four fully briefed motions to dismiss, two of which address its jurisdiction to review Count I. And DOJ's sole reason for seeking to change venue is fear of an adverse jurisdictional ruling on Count I; it is undisputed that this Court has jurisdiction over Counts II and III. Secretary Schmidt respectfully suggests, therefore, that the Court defer ruling on the motion to transfer venue until it resolves the pending motions to dismiss. Should the Court find a "want of jurisdiction" over Count I, it can then choose to transfer that claim (and any other that remain) to the Middle District of Pennsylvania if it finds doing so "is in the interest of justice."

## ARGUMENT[1]

1. DOJ has brought three claims against Secretary Schmidt: violation of Title III of the Civil Rights Act of 1960 (Count I), violation of the National Voter Registration Act (Count II), and violation of the Help America Vote Act (Count III). Secretary Schmidt has moved to dismiss all three counts on numerous grounds (Doc. 91), including that this Court lacks subject matter jurisdiction under 52 U.S.C. § 20705 to hear Count I. The three intervenor-defendants have also filed motions to dismiss (Docs. 106, 108, 112), one of which also argues that this Court lacks subject matter jurisdiction over Count I (Doc. 108). DOJ has opposed (Doc. 103). No party disputes that this Court has jurisdiction to resolve Counts II and III.

DOJ now asks the Court to transfer this case to the Middle District of Pennsylvania. The sole reason for the transfer is fear of an adverse jurisdictional ruling on Count I, in light of a decision by the Middle District of Georgia that dismissed DOJ's parallel Title III claim for lack of subject matter jurisdiction. DOJ Transfer Br. at 4-5 (Doc. 121) (discussing *United States v. Raffensperger*, No. 25-cv-00548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026)).

DOJ moves to transfer under the federal venue statutes, 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a). Section 1404(a) applies when the original venue is proper and permits the court to transfer a case "[f]or the convenience of parties and witnesses, in the interest of justice." Section 1406(a) applies when the original venue is improper and permits the court to either dismiss the case or transfer "if it be in the interest of justice." *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995).[2]

---

[1] DOJ's motion to transfer makes repeated reference to the summary proceedings it believes are "mandate[d]" by Title III of the Civil Rights Act of 1960. *E.g.*, DOJ Transfer Br. at 7 (Doc. 121). As Secretary Schmidt has argued, however, nothing in the text of Title III, its context, or the caselaw interpreting it supports DOJ's assertion. Schmidt Reply Br. at 6-9 (Doc. 122).

[2] Because 52 U.S.C. § 20705 does not concern venue, the general venue statute, 28 U.S.C. *(continued…)*

To order a transfer of venue under § 1404 or § 1406, however, this Court must have jurisdiction over the subject matter of the action. *See, e.g.*, *CIBC World Markets, Inc. v. Deutsche Bank Sec., Inc.*, 309 F. Supp. 2d 637, 643 (D.N.J. 2004) ("A court must itself have subject matter jurisdiction over an action before it may transfer that action under § 1404(a).") (citing 17-111 James Wm. Moore et al., *Moore's Federal Practice* § 111.14 (3d ed. 1997)); *In re Stewart*, 473 B.R. 612, 626 (Bankr. W.D. Pa. 2012) ("Generally, courts that do not maintain subject-matter jurisdiction over an action do not have the authority to transfer that action pursuant to 28 U.S.C. § 1406.") (citing *Atlantic Ship Rigging Co. v. McLellan*, 288 F.2d 589, 591 (3d Cir. 1961) (per curiam)); *see also* 15 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3844 (4th ed. Sept. 2025 update) ("If subject matter jurisdiction is lacking, Section 1404(a) provides no power to do anything with the case."); *id.* 14D Wright & Miller § 3827 ("A district judge may not order transfer under Section 1406(a) unless the court has jurisdiction of the subject matter of the action[.]").

When a court lacks subject matter jurisdiction, the correct vehicle for transfer is 28 U.S.C. § 1631. This statute confers on the Court "authority to make a single decision upon concluding that it lacks jurisdiction—whether to dismiss the case or, 'in the interest of justice,' to transfer it to a court … that has jurisdiction." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988) (quoting 28 U.S.C. § 1631). A district court has discretion to transfer "all or only part of an action." *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 110 (3d Cir. 2009). It also has "'broad discretion' not to transfer," so long as it makes "some finding under

---

§ 1391, controls. Venue is proper in a judicial district "in which any defendant resides" or "in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(1), (b)(2). Secretary Schmidt, in his official capacity, has his principal and only office in Harrisburg, as does the Department of State Bureau of Elections. Schmidt Reply Br. at 2-3 (Doc. 122). But although venue is proper in the Middle District, Secretary Schmidt has not objected to venue before this Court.

§ 1631." *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 132 (3d Cir. 2020) (quoting *Jumara*, 55 F.3d at 883). The only limitation is that the Court cannot both dismiss and transfer a claim—it must do one or the other. *See Tootle v. Sec'y of Navy*, 446 F.3d 167, 172-73 (D.C. Cir. 2006) (district court that ordered the case dismissed could not also order the case transferred).

A court should determine which provision applies before acting. How a court applies the correct provision (for example, applying § 1404 when the court has subject matter jurisdiction and venue is proper) is reviewed for abuse of discretion, but applying the incorrect provision is an error of law. *Jumara*, 55 F.3d at 878.

As a result, whether this Court has subject matter jurisdiction over Count I is material to how the Court resolves DOJ's motion to transfer venue. A court cannot transfer under § 1404 or § 1406 without first assuring itself of subject matter jurisdiction. And § 1631 contemplates that a court must first "find[] that there is a want of jurisdiction" before it considers transfer. *See also Christianson*, 486 U.S. at 818 (§ 1631 grants a court authority "to make a single decision *upon concluding* that it lacks jurisdiction" (emphasis added)).

Here, the parties have addressed the question of this Court's subject matter jurisdiction over Count I in the fully briefed motions to dismiss, which also address the merits of Counts II and III. DOJ's sole reason to transfer the case is fear of an adverse ruling on jurisdiction over Count I. DOJ Transfer Br. at 5. Should the Court find that it lacks jurisdiction over Count I, however, § 1631 requires that the Court consider transferring that claim to the Middle District in lieu of dismissal. But should the Court find that it does have jurisdiction over Count I, then the interests of justice would not justify transfer. *See Jumara*, 55 F.3d at 879-80 (discussing factors). It would

waste judicial resources to move a case, already fully briefed on dispositive motions, to a new court that would have to familiarize itself with the many legal and factual issues.

Secretary Schmidt respectfully suggests, therefore, that the Court defer ruling on the motion to transfer venue until it has resolved the motions to dismiss.

2. In its transfer motion, DOJ characterizes 52 U.S.C. § 20705 as a venue provision. DOJ Transfer Br. at 4 & n.2. This is a change in position: DOJ argued just last month that § 20705 confers subject matter jurisdiction without mentioning venue. DOJ Resp. Br. at 17-18 (Doc. 103). DOJ makes this change without acknowledgement or explanation.

The distinction between subject matter jurisdiction and venue is not immaterial. The former defines a court's "power to adjudicate" and cannot be waived by the parties; the latter concerns "the place where judicial authority may be exercised" for the "convenience" of the parties and may be waived by the defendant. *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167-68 (1939); *accord Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006); *see also* 14D Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3801 (4th ed. Sept. 2025 update) (discussing the differences between venue and jurisdiction).

A rule is jurisdictional if Congress states so "clearly." *Gonzalez v. Thaler*, 565 U.S. 134, 141-42 (2012) (quoting *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 515 (2006)). A jurisdictional statute tends to "speak to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted). A venue provision, by contrast, speaks "to the authority of the parties to seek relief in the courts." *Brentwood at Hobart v. N.L.R.B.*, 675 F.3d 999, 1003 (6th Cir. 2012); *see also Henderson v. United States*, 517 U.S. 654, 666 (1996) (a "generous-to-plaintiffs provision will be recognized instantly as one describing venue choices, not subject-matter jurisdiction").

In Title III of the Civil Rights Act of 1960, Congress spoke clearly of the power of the court: "The *United States district court* for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, *shall have jurisdiction* by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Consistent with the plain language of § 20705, the Middle District of Georgia held that it lacked "subject matter jurisdiction over this action." *Raffensperger*, 2026 WL 184233, at *4. DOJ offers no reason why this Court should reach a different conclusion.

**CONCLUSION**

For the reasons stated above, Secretary Schmidt respectfully suggests that the Court defer ruling on the motion to transfer venue until it adjudicates the pending motions to dismiss.

February 12, 2026

Respectfully submitted,

Carolyn A. DeLaurentis (PA 307018)
Chief Counsel
Kathleen A. Mullen (PA 84604)
Executive Deputy Chief Counsel
Pennsylvania Department of State
306 North Office Bldg.
401 North Street
Harrisburg, PA 17120-0500

Jennifer Selber (PA 80644)
General Counsel
Michael J. Fischer (PA 322311)
Executive Deputy General Counsel

*/s/Aimee D. Thomson*
Aimee D. Thomson (PA 326328)
Deputy General Counsel
Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov

*Counsel for Secretary of the Commonwealth Al Schmidt*

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2026, and pursuant to Local Rule 30.1(b), four paper copies of this JOINT APPENDIX (Volumes I and II), identical to the joint appendix filed electronically, were sent to the Clerk of the Court by Federal Express.

s/ Joshua R. Zuckerman
JOSHUA R. ZUCKERMAN
Attorney