No. 26-2684

# United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

SECRETARY OF STATE FOR THE COMMONWEALTH OF PENNSYLVANIA,
*Defendant-Appellee*,

&

PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS, ET AL.,
*Intervenors-Defendants-Appellees*,

&

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,
*Intervenors-Appellees*.

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:25-cv-1481 (Bissoon, C.J.)

## BRIEF OF *AMICUS CURIAE* RESTORING INTEGRITY AND TRUST IN ELECTIONS, INC. IN SUPPORT OF APPELLANT

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com

*Counsel for Amicus Curiae*

September 15, 2026

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, Amicus discloses that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock. Further, no publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated: September 15, 2026

*/s/ Gilbert C. Dickey*
Gilbert C. Dickey
*Counsel for Amicus*

# TABLE OF CONTENTS

Corporate Disclosure Statement ..... ii

Table of Authorities ..... iv

Interest of Amicus Curiae ..... 1

Introduction and Summary of the Argument ..... 2

Argument ..... 4

I. The district court violated pleading standards by inferring nefarious intent by government officials. ..... 4

II. The government invoked federal election laws designed to protect election integrity. ..... 11

Conclusion ..... 15

Combined Certifications ..... 16

Certificate of Service ..... 17

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 8

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .......... 4, 14

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .......... 9, 14

*Eu v. S.F. Cnty. Democratic Central Comm.*,
489 U.S. 214 (1989) .......... 11

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2004) .......... 9

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) .......... 12

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... 4, 5, 13

*Martin v. United States*,
605 U.S. 395 (2025) .......... 14

*Mayer v. Belichick*,
605 F.3d 223 (3d Cir. 2010) .......... 6, 7

*Munro v. Socialist Workers Party*,
479 U.S. 189 (1986) .......... 8

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) .......... 12, 13

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 4, 13

*Reynolds v. Sims*,
377 U.S. 533 (1964) ........ 13

*Tex. Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ........ 9

*United States v. Armstrong*,
517 U.S. 456 (1996) ........ 6

*United States v. Benson*,
__ F.4th __, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) ........ 3, 5, 15

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ........ 2, 14, 15

*United States v. Mississippi*,
380 U.S. 128 (1965) ........ 12

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ........ 6, 7

*United States v. Oregon*,
No. 26-1231 (9th Cir.) ........ 6

*Wayte v. United States*,
470 U.S. 598 (1985) ........ 6

**Constitutional Provisions**

U.S. Const. amend. XV, §1 ........ 12

U.S. Const. art. II, §3 ........ 5

**Statutes**

18 U.S.C. §1015 ........ 6

18 U.S.C. §611 ........ 6

28 U.S.C. §516 ........ 5

28 U.S.C. §547 ........ 5

52 U.S.C. §20501 ........ 2, 11, 12, 14

52 U.S.C. §20507 .......... 12

52 U.S.C. §20701 .......... 2, 6

52 U.S.C. §20703 .......... 2, 4, 5

52 U.S.C. §20705 .......... 5

52 U.S.C. §21083 .......... 2, 12

Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 .......... 13

**Other Authorities**

Comm. on Federal Election Reform, Building Confidence in U.S. Elections (Sept. 2005) .......... 8

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) .......... 14

*Five Charged in Pennsylvania, New Jersey, and Wisconsin with Illegally Voting, Fraudulent Registration in 2022 or 2024 Election*, Dep't of J. (Sept. 4, 2026) .......... 10

*Pedro Cortes, Pa. Secretary of State, Steps Down*, Philly.com (Oct. 11, 2017) .......... 10

*Schmidt: Could Be 'Tens of Thousands' of Non-Citizens Who Registered to Vote in Pennsylvania*, CBS Phila. (Dec. 16, 2017) .......... 10

*Statement by Governor Mikie Sherrill*, NJ.gov (July 21, 2026) .......... 9

*Update and Statement from Governor Sherrill on MVC Issue*, NJ.gov (Aug. 19, 2026) .......... 9

*Voter System Glitch Let Thousands of Noncitizens Register in Pennsylvania*, Philly.com (July 27, 2018) .......... 9, 10

## INTEREST OF AMICUS CURIAE

Restoring Integrity and Trust in Elections, Inc. (RITE) is a 501(c)(4) non-profit organization whose mission is to protect the rule of law in elections throughout the United States. RITE supports laws and policies that promote secure elections and enhance voter confidence in the electoral process. It also files briefs in state and federal courts across the country on important issues regarding the qualifications for voting, the administration of elections, and the tabulation of ballots.

This case raises important issues of election integrity. Federal courts across the country are rejecting modest requests by federal officials for access to state voter rolls. RITE regularly files amicus briefs in significant election-related litigations, including in a Sixth Circuit Court of Appeals case explaining why the government is entitled to those records. RITE's expertise and national perspective on voting rights, election law, and election administration will assist the Court in reaching a decision consistent with the rule of law.

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae and their counsel, made any monetary contribution toward the preparation or submission of this brief. Counsel for Amicus conferred with the parties to this case, and no party opposes the filing of this brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Accurate voter rolls are essential to the security of elections and public confidence in their results. Congress recognized as much in the National Voter Registration Act and the Help America Vote Act, which charge States with "ensur[ing] that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. §21083(a)(4). That obligation includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," *id.*, which means ensuring that only "eligible citizens" are registered to vote, *id.* §20501(b)(1), (2). Together, these laws help "protect the integrity of the electoral process." *Id.* §20501(b)(3).

To enforce these and other voting laws, the U.S. Attorney General requested access to Pennsylvania's voter-registration records. The Civil Rights Act gives him that authority. 52 U.S.C. §§20701, 20703. But the state defendants refuse to comply. The request is simply one for disclosure—a modest ask to facilitate the government's investigation of potential registration problems. The Sixth Circuit recently ruled against the government in a similar case out of Michigan. *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026). Judge Nalbandian dissented, explaining why the government's interpretation of the Civil Rights Act is correct, and why the majority erred by second-guessing the government's "basis and purpose" for the demand. *Id.* at 484-88 (Nalbandian, J., dissenting). Judges Griffin and Thapar elaborated on the majority's errors in their dissents from denial of rehearing en banc. *See United States v. Benson*, __

F.4th __, 2026 WL 2364306 (6th Cir. Aug. 14, 2026). As these cases present similar legal and factual issues, this Court should not hesitate to split with the Sixth Circuit. Judges Nalbandian, Griffin, and Thapar got it right. The majority got it wrong.

But reversing the district court here is much simpler, since the court brushed aside basic pleading standards. In resolving a motion to dismiss, courts must take the complaint's allegations as true and construe reasonable inferences in the plaintiff's favor. The district court thought otherwise. It began by second-guessing the government's unreviewable reasons for its demand. It then shrugged off the mandatory presumption of regularity that courts owe government officials. It looked beyond the complaint at news reports and think-pieces questioning the government's motives. And it used those sources to construct inferences *against* the government, concluding that the Attorney General has no legitimate interest in obtaining Pennsylvania's voter rolls. Each error warrants reversal.

In any event, the district court's inferences aren't even reasonable: noncitizen registration is a serious problem. Just ask New Jersey, which had to remove over 5,000 noncitizens from its voter rolls last month, many of whom voted in previous elections. Or ask Pennsylvania, which overlooked an error in its registration system for decades that resulted in thousands of noncitizens registering to vote. Opponents' response is an attempt to shut down the debate: "You're not allowed to look because it's definitely not happening."

The NVRA, HAVA, and the Civil Rights Act work together to ensure that American elections are safe, secure, and open to eligible voters. Enforcement of those laws is essential not only for election security, but also for building "[c]onfidence in the integrity of our electoral processes." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The government has strong interests in preventing and investigating both fraud and mistakes like those Pennsylvania has suffered in recent memory. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). The Civil Rights Act facilitates those efforts, and the district court erred in concluding otherwise. This Court should reverse.

## ARGUMENT

### I. The district court violated pleading standards by inferring nefarious intent by government officials.

When demanding records, the Attorney General must provide "a statement of the basis and the purpose therefor." 52 U.S.C. §20703. "[T]he right of the Attorney General to inspect and copy such records is not dependent upon an existing demonstrable right in the United States or the Attorney General to successfully maintain an injunction suit … against any present or preceding election officer." *Kennedy v. Lynd*, 306 F.2d 222, 227 (5th Cir. 1962). Yet in an inquiry entrusted to executive discretion, *see* Blue Br. 23-27, the district court looked beyond the pleadings, using

external statements to second-guess the government's motives and draw inferences against it, JA3-4.[1] At least five errors infect that ruling.

*First*, the Attorney General's "basis" and "purpose" are not judicially reviewable. 52 U.S.C. §20703. Some executive investigatory demands are constrained by some level of judicial review. Criminal warrants, civil investigative demands, and an IRS summons fit that bill. But the record demand in the Civil Rights Act is different. Congress "didn't give district courts sweeping jurisdiction. Instead, it gave them only a sliver of jurisdiction 'to compel the production of such record or paper' as the Attorney General demands." *Benson*, 2026 WL 2364306, at *15 (Thapar, J., dissenting from the denial of rehearing en banc) (quoting 52 U.S.C. §20705). "Questions of relevancy or good cause or other like considerations which must be evaluated in the injunction suit are completely foreign to the summary proceeding under [the Civil Rights Act]." *Kennedy*, 306 F.2d at 228. The "cabined language" of the statute "doesn't permit … nitpicking" the executive's reasons for demanding the records. *Benson*, 2026 WL 2364306, at *15.

*Second*, even if the Attorney General's reasons are reviewable, they're entitled to a presumption of regularity. The Attorney General and his subordinates are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §3; *see* 28 U.S.C. §§516, 547. They have "'broad discretion'" to enforce federal criminal laws,

[1] "JA" refers to the Joint Appendix filed in this Court. "Doc." refers to district court documents not contained in the Joint Appendix.

*Wayte v. United States*, 470 U.S. 598, 607 (1985) (citation omitted), which includes laws criminalizing the registration and voting of aliens, 18 U.S.C. §§611, 1015(f), as well as the record-retention requirements at issue here, 52 U.S.C. §20701. "As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (cleaned up).

The district court backhanded that presumption in a footnote. JA5 n.3. It did not explain why. It did not support its rejection of that established principle with any record findings, let alone "clear evidence" rebutting the presumption. *Armstrong*, 517 U.S. at 464. And the court's only support—a district court case currently on appeal—likewise cited no authority or record findings for its summary dismissal of the presumption of regularity. *See United States v. Oregon*, 828 F. Supp. 3d 1092, 1107 (D. Or. 2026), *on appeal*, No. 26-1231 (9th Cir.) (argued May 19, 2026).

*Third*, even if the government weren't entitled to deference, the district court erred by looking beyond the pleadings to doubt the government's stated reasons. "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). But the district court claimed that the government's stated purpose was at odds with the "quiet parts" it was hiding, which the court discerned from "numerous sources" attached to the defendants' motions to

dismiss. JA3 (citing Doc. 92 at 5-7; Doc. 116 at 6-13). Those sources include posts from X.com, as well as articles from ProPublica, NPR, Democracy Docket, and the New York Times criticizing the administration and attempts to enforce federal election security requirements. *See* Doc. 92 at 5-7; Doc. 116 at 6-13. None of those sources were "attached to the complaint," nor are they "matters of public record" or "undisputedly authentic." *Mayer*, 605 F.3d at 230. Even if they were, the government's claims are not "based upon these documents" as, for example, claims for a contract dispute are based on the contract. *Id.* The district court tossed aside the motion-to-dismiss rules, using outside sources to second-guess the government's legitimate reasons in requesting the Commonwealth's voter rolls.

*Fourth*, even if the district court could look at external statements, the United States is entitled to reasonable inferences at the pleading stage. In deciding a motion to dismiss, courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Id.* at 229. Again, the district court ducked these rules. The court questioned "the true purpose" of the government's requests, claiming that the government's "assertions that the data is requested for NVRA or HAVA compliance are pretextual." JA4 (cleaned up) (quoting *Oregon*, 828 F. Supp. 3d at 1106). None of those doubts are appropriate at the pleading stage, at which the court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007). Even if there were "reason to believe that the data is in fact being aggregated in part for the purposes of immigration enforcement," JA4 (cleaned up)—and even if that were evident from sources the district court could consider—it wouldn't defeat the "reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Fifth*, even if the government weren't entitled to favorable inferences, the district court's contrary inferences are wrong. The federal government has many valid reasons to demand voting records, including the investigation of illegal registration and voting. The district court doubted the government's motives in part because it believed that "concerns regarding widespread voting by non-citizens simply are not borne out by reality." JA4. As an initial matter, shutting down an *investigation* for lack of evidence is backwards. It's particularly problematic in the election context, because requiring evidence of fraud "would necessitate that a State's political system sustain some level of damage" before those responsible "could take corrective action." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Comm. on Federal Election Reform, Building Confidence in U.S. Elections 10 (Sept. 2005). Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." *Id.* Courts have thus recognized that voter fraud is both real and notoriously "difficult to detect and prosecute." *Tex. Democratic Party v. Abbott*,

961 F.3d 389, 396 (5th Cir. 2020); *accord Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004).

In this Circuit alone, Pennsylvania and New Jersey have experienced significant problems maintaining their voter rolls. Just last month, New Jersey removed 5,100 noncitizens from its voter rolls. *Update and Statement from Governor Sherrill on MVC Issue*, NJ.gov (Aug. 19, 2026), perma.cc/87CK-7NT3. Earlier this summer, New Jersey officials discovered that "a serious software error in New Jersey's Motor Vehicle System led to the registration of roughly 6,600 people who indicated that they were not U.S. citizens between June 2023 and June 2024." *Statement by Governor Mikie Sherrill*, NJ.gov (July 21, 2026), perma.cc/AD6Y-H8FS. "[A]pproximately 340" of those noncitizens voted in New Jersey's elections. *Update and Statement*, *supra*. Although voter fraud is often difficult to detect, these recent events confirm that "the risk of voter fraud [is] real" and can "affect the outcome of a close election." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op.).

Pennsylvania has experienced its own share of registration errors. In 2017, the State Department reported that approximately "8,700 noncitizens who weren't eligible to register to vote in Pennsylvania since the mid-1990s inadvertently registered because of an oversight in PennDot's motor-voter system." *Voter System Glitch Let Thousands of Noncitizens Register in Pennsylvania*, Philly.com (July 27, 2018), perma.cc/2CEE-NXSZ. The issue persisted for "several decades" before "[t]he state was alerted to the problem

in 2017." *Id.* Following the fiasco, then–Secretary of State Pedro Cortes "abruptly resigned." *Pedro Cortes, Pa. Secretary of State, Steps Down*, Philly.com (Oct. 11, 2017), perma.cc/HES7-WUCD. Defendant Al Schmidt is familiar with these issues. Before he was Secretary of the Commonwealth, Schmidt was a Philadelphia election Commissioner. In that capacity, he told a Pennsylvania Senate committee in 2017 that "there may be tens of thousands of non-US citizens who have registered to vote in Pennsylvania." *Schmidt: Could Be 'Tens of Thousands' of Non-Citizens Who Registered to Vote in Pennsylvania*, CBS Phila. (Dec. 16, 2017), perma.cc/AK39-NG8V.

Even more recently, the Justice Department charged three aliens residing in Pennsylvania for illegally voting or fraudulent registration in the 2024 election. *See Five Charged in Pennsylvania, New Jersey, and Wisconsin with Illegally Voting, Fraudulent Registration in 2022 or 2024 Election*, Dep't of J. (Sept. 4, 2026), perma.cc/62Z3-VPJN. Federal grand juries returned indictments earlier this month. *Id.*

* * *

The federal government need not turn a blind eye to reality. It can, and should, ensure that States have systems in place to guard against these registration problems. The least the government is entitled to are records to assist it in investigating the nature and extent of these problems. And the least the district court could give the government is a proper application of the governing law: favorable inferences, the presumption of regularity, and a fair look at its complaint. Instead, the district court consulted outside

materials to draw inferences against the government and assume the worst possible motives. This Court should reverse.

## II. The government invoked federal election laws designed to protect election integrity.

The district court's blinkered view of election laws ignores that Congress enacts those laws to protect the integrity of elections. The NVRA, HAVA, and the Civil Rights Act work together—not against one another—to ensure that qualified citizens can exercise their right to vote in federal elections. Each law furthers the government's "compelling interest" in the "integrity of [the] election process." *Eu v. S.F. Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989).

Start with the NVRA, which is chiefly concerned with ensuring that *citizens* are registered to vote. Congress grounded the NVRA in a finding that "the right of citizens of the United States to vote is a fundamental right." 52 U.S.C. §20501(a)(1). Its four purposes reflect that finding. It enacted the NVRA in part to "increase the number of *eligible citizens* who register to vote in elections for Federal office" and to "enhanc[e] the participation of *eligible citizens* as voters in elections for Federal office." *Id.* §20501(b)(1), (2) (emphases added). The third and fourth purpose confirm that Congress sought to "protect the integrity of the electoral process" from noncitizen registration and voting and "to ensure that accurate and current voter registration rolls are maintained." *Id.* §20501(b)(3), (4). "[R]emoving ineligible persons from the States' voter registration

rolls" is thus one of the NVRA's "two main objectives." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (citing 52 U.S.C. §20501(b)).

The Help America Vote Act pursues similar aims. It requires States to adopt computerized statewide voter-registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. §21083(a)(2)(A). States must "ensure that voter registration records in the State are accurate and are updated regularly," an obligation that includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* §21083(a)(4). And HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. *Id.* §21083(a)(2)(A)(ii)(I)-(II). Together, the NVRA and HAVA "mak[e] this removal mandatory." *Husted*, 584 U.S. at 767 (citing 52 U.S.C. §§20507(d)(3), 21083(a)(4)(A)).

The Civil Rights Act was likewise aimed at protecting the right of qualified citizens to vote in elections. The Act was passed "under the authority of the Fifteenth Amendment," *United States v. Mississippi*, 380 U.S. 128, 138 (1965), which protects "[t]he right of citizens of the United States to vote," U.S. Const. amend. XV, §1. At the time, opposition to that right came chiefly from "discriminatory laws like poll taxes, literacy tests, property qualifications, and 'good morals' requirements." *See Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024). Even where the laws were facially neutral, election officials applied "'arbitrary registration

procedures'" such as "reject[ing] would-be registrants for insignificant, hyper-technical errors in filling out application forms." *Id.* "Voter registration thus was the principal means to suppress Black voter participation." *Id.* The "two civil rights acts" passed in 1957 and 1960 were designed "to rein in some of these practices." *Id.*

In particular, the 1960 Act gave the Attorney General an important tool. It first required every election official in every State to preserve all federal election records that come into his possession. *See* Civil Rights Act of 1960, Pub. L. No. 86-449, §301, 74 Stat. 86, 88. It then gave the Attorney General power to demand those records, and to compel production in court if officials ignored his demand. *Id.* §§303, 305. This power is "sweeping," and the "statutory classification" is broad. *Kennedy*, 306 F.2d at 226. Later, Congress enacted the NVRA and HAVA against the backdrop of the Civil Rights Act, and it didn't modify the Attorney General's enforcement or investigatory authority. The Attorney General's powers under the Civil Rights Act thus buttress enforcement of the NVRA and HAVA.

Protecting against registration and voting by noncitizens furthers Congress's purposes in all three laws. Diluting votes can "just as effectively" deny citizens' voting rights as "wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Moreover, "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. Although "public confidence in the integrity of the electoral process" is "closely related" to "preventing voter fraud," it "has independent significance, because it

encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197. "[T]he fact of inflated voter rolls" is a problem in the United States, and it "provide[s] a neutral and nondiscriminatory reason" justifying election laws like the NVRA and HAVA. *Id.* at 196-97. So, too, does it justify enforcement of those laws. *See* Exec. Order No. 14248, §2(e), 90 Fed. Reg. 14005, 14007 (Mar. 25, 2025).

The district court ignored these many legitimate interests. It wrote that the NVRA merely "recognized deficiencies in accessing the right of suffrage," that HAVA sought only "to assuage contention in the face of a close election," and that the Civil Rights Act addressed "race discrimination in the south." JA4. But Congress rarely "pursue[s] any single purpose at all costs." *Martin v. United States*, 605 U.S. 395, 408 (2025) (cleaned up). Indeed, the NVRA alone lists four purposes, each of which supports the government's efforts to ensure that only "citizens" are registering and voting in elections. 52 U.S.C. §20501(b).

Worse, the district court claimed that "concerns regarding widespread voting by non-citizens" are "unlike" its preferred purposes. JA4. The Sixth Circuit took a similarly cynical view, claiming that the United States "invoke[d]" the Civil Rights Act "for an inverse purpose—to ensure that some people have not voted." *Benson*, 179 F.4th at 474. But there's nothing "inverse" about ensuring that "some people"—in this case, foreign nationals statutorily ineligible to vote—are not voting in American elections. *Contra id.* The "prevention of fraud" is a "strong and entirely legitimate state interest." *Brnovich*, 594 U.S. at 672. And whether by fraud or mistake, ballots cast by unqualified voters

"dilute the right of citizens to cast ballots that carry appropriate weight" and "undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Id.*

The "text and history" of the Civil Rights Act "show that Congress sought to give the federal government broad power to inspect election records" in service of "protecting the integrity of our elections." *Benson*, 2026 WL 2364306, at *16 (Thapar, J., dissenting from the denial of rehearing en banc). The district court erred by thwarting Congress's design.

## CONCLUSION

The Court should reverse the district court's judgment.

Respectfully submitted,

*/s/ Gilbert C. Dickey*

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

September 15, 2026

*Counsel for Amicus Curiae*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I certify the following:

1. I am a member in good standing of the Bar of this Court.
2. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,532 words, excluding the parts exempted by Fed. R. App. P. 32(f).
3. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in 14-point Garamond.
4. The text of the electronic brief is identical to the text in the paper copies.
5. The electronic file containing the brief was scanned for viruses using the most recent version of VirusTotal, and no virus was detected.

Dated: September 15, 2026

*/s/ Gilbert C. Dickey*
Gilbert C. Dickey
*Counsel for Amicus*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2026, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.

Dated: September 15, 2026

*/s/ Gilbert C. Dickey*
Gilbert C. Dickey
*Counsel for Amicus*