**No. 26-2684**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiffs - Appellees*,

v.

AL SCHMIDT, in his official capacity as Secretary of State for the Commonwealth of Pennsylvania,
*Defendant - Appellant*,

PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS, MIKE CROSSEY, NICHOLAS MASTON, GREGORY PERRY, TODD THATCHER, JOEL DICKSON, TRISHA KENT, LIOR STERNFELD, JOHN THOMPSON, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, COMMON CAUSE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA STATE CONFERENCE OF THE NAACP, and STACEY TAYLOR,
*Intervenor-Defendants - Appellees*.

---

On Appeal from the United States District Court for the Western District of Pennsylvania (No. 2:25-cv-01481-CB) Hon. Cathy Bissoon

---

**BRIEF FOR NICHOLAS MASTON, GREGORY PERRY, TODD THATCHER, JOEL DICKSON, TRISHA KENT, LIOR STERNFELD, JOHN THOMPSON, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, AND COMMON CAUSE AS APPELLEES**

---

[*Counsel listed on inside cover*]

Witold J. Walczak (PA 62976)
Kate I. Steiker-Ginzberg (PA 332236)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Tel: (215) 592-1513
vwalczak@aclupa.org
ksteiker-ginzberg@aclupa.org

Mary M. McKenzie (PA 47434)
Benjamin Geffen (PA 310134)
Olivia Mania (PA 336161)
Martin J. Black (PA 54319)
PUBLIC INTEREST LAW CENTER
1617 JFK Blvd., Suite 1650
Philadelphia, PA 19103
Tel: (267) 546-1313
mmckenzie@pubintlaw.org
bgeffen@pubintlaw.org
omania@pubintlaw.org

Ari J. Savitzky (NY 5060181)
Theresa J. Lee (NY 5022769)
Sophia Lin Lakin (NY 5182076)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

*Counsel for Intervenor-Defendants - Appellees Nicholas Maston, Gregory Perry, Todd Thatcher, Joel Dickson, Trisha Kent, Lior Sternfeld, John Thompson, League of Women Voters of Pennsylvania, and Common Cause*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, corporate Intervenors-Defendants-Appellees League of Women Voters of Pennsylvania and Common Cause disclose that they have no parent corporations and there are no publicly held companies that own 10% or more of their stock.

Dated: November 20, 2026 *_/s/ Ari J. Savitzky_*
Ari J. Savitzky

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 2

STATEMENT OF THE CASE ........ 4

I. Statutory Background: Title III of the Civil Rights Act of 1960 ........ 4

II. Factual Background ........ 7

A. DOJ seeks Pennsylvanians' sensitive voter data ........ 7

B. The Administration's attempt to build an unauthorized national voter database. ........ 9

C. Pennsylvania voters, including Intervenor-Defendants, have previously been targeted by misuse of voter data ........ 12

III. Procedural Background ........ 13

SUMMARY OF THE ARGUMENT ........ 16

STANDARD OF REVIEW ........ 17

ARGUMENT ........ 18

I. THE SVRL IS OUTSIDE THE SCOPE OF TITLE III ........ 18

A. The text of Title III provides no support for the Government's expansive interpretation. ........ 19

B. The structure of the CRA and related voting statutes demonstrate that the CRA's investigatory grant is limited. ........ 23

C. The historical context demonstrates that the Government's position is untenable. ........ 26

II. DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS. .................................... 31

A. The Federal Rules of Civil Procedure apply.................... 31

B. DOJ failed to provide "a statement of the basis and the purpose" for its demand. ................................................ 37

III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT............................................. 55

CONCLUSION ........................................................................... 63

COMBINED CERTIFICATIONS ............................................... 65

# TABLE OF AUTHORITIES

## Cases

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962) .......... 6

*American Civil Liberties Union v. Clapper*,
785 F.3d 787 (2d Cir. 2015) .......... 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 18

*Bryan v. United States*,
524 U.S. 184 (1998) .......... 26

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999) .......... 62

*Burton v. Schamp*,
25 F.4th 198 (3d Cir. 2022) .......... 60

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 30

*Children's Health Defense, Inc. v. Rutgers, the State University of New Jersey*,
93 F.4th 66 (3d Cir. 2024) .......... 18

*Corner Post, Inc. v. Board of Governors of the Federal Reserves System*,
603 U.S. 799 (2024) .......... 40

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .......... 56

*Donaldson v. United States*,
400 U.S. 517 (1971) .......... 35

*Duncan v. Walker*,
533 U.S. 167 (2001) .......... 42

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) .......... 57

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 21

*Host International, Inc. v. MarketPlace, PHL, LLC*,
32 F.4th 242 (3d Cir. 2022) .......... 18

*In re Application of United States for an Order Directing a Provider of Electronic Communication Service to Disclose Records to Goverment*,
620 F.3d 304 (3d Cir. 2010) .......... 29

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .......... 6, 37, 61

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Product Liability Litigation*,
706 F.3d 217 (3d Cir. 2013) .......... 44

*In re U.S. Office of Personnel Management Data Security Breach Litigation*,
928 F.3d 42 (D.C. Cir. 2019) .......... 58

*Ingerman v. Delaware River Port Authority*,
630 F. Supp. 2d 426 (D.N.J. 2009) .......... 57

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) .......... 48

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... passim

*Leo Sheep Co. v. United States*,
440 U.S. 668 (1979) .......... 27

*Nasrallah v. Barr*,
590 U.S. 573 (2020) .......... 23

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .......... 39, 56

*Pennsylvania State Conference of NAACP Branches v. Secretary of the Commonwealth of Pennsylvania*,
97 F.4th 120 (3d Cir. 2024) .......... 27

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .......... 59, 61

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) .......... 46, 51, 52

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 59, 61

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) .......... 59

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) .......... 62

*Sierra Club v. Marsh*,
907 F.2d 210 (1st Cir. 1990) .......... 25

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 39

*Stollenwerk v. Miller*,
No. 04-cv-5510, 2006 WL 463393 (E.D. Pa. Feb. 24, 2006) .......... 57

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 18

*U.S. Food and Drug Administration v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 24

*United States v. Adams*,
837 F. Supp. 3d 881 (E.D. Ky. 2026) .......... 14, 19, 32

*United States v. Aguilar*,
No. 25-cv-748, 2026 WL 2364502
(D. Nev. Aug. 14, 2026) .......... 14, 19, 40

*United States v. Albence*,
No. 25-cv-1453, 2026 WL 3407115
(D. Del. Nov. 10, 2026) .......... 14

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) .......... 14, 40

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) .......... passim

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .......... passim

*United States v. Benson*,
187 F.4th 462 (6th Cir. 2026) .......... 25

*United States v. Board of Elections of the State of New York*,
No. 25-cv-1338, __ F. Supp. 3d. __, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) .......... 15, 19, 32

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515
(D.N.J. July 29, 2026) .......... 14, 19, 32

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964) .......... 6

*United States v. DeMarinis*,
No. 25-cv-3934, 2026 WL 1780586
(D. Md. June 18, 2026) .......... 15, 19, 32

*United States v. Edwards*,
996 F.2d 1213 (4th Cir. 1993) .......... 25

*United States v. Evans*,
No. 25-cv-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026) .......... 14, 19, 21, 23

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) .......... 14, 19, 21, 32

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) .......... 14, 38, 39, 40

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374
(D. Colo. Aug. 3, 2026) .......... passim

*United States v. Hanzas*,
No. 25-cv-903, 2026 WL 2754349
(D. Vt. Sep. 17, 2026) .......... 14, 19, 40

*United States v. Henderson*,
No. 26-cv-166, 2026 WL 3181405
(D. Utah Oct. 23, 2026) .......... 14

*United States v. Hobbs*,
No. 25-cv-6078, 2026 WL 2833713
(W.D. Wash. Sept. 22, 2026) .......... 14, 19

*United States v. Koski*,
No. 26-cv-42, 2026 WL 2032532
(E.D. Va. July 14, 2026) .......... 15, 19, 22, 26

*United States v. Matthews*,
No. 25-cv-3398, __ F. Supp. 3d. __, 2026 WL 2212877
(C.D. Ill. July 31, 2026) .......... passim

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964) ........ 4

*United States v. Moalin*,
973 F.3d 977 (9th Cir. 2020) ........ 30

*United States v. Oliver*,
No. 25-cv-1193, 2026 WL 2031479
(D.N.M. July 14, 2026) ........ 14, 32, 45, 54

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026). ........ passim

*United States v. Powell*,
379 U.S. 48 (1964) ........ 33, 34

*United States v. Raffensperger*,
No. 26-cv-485, 2026 WL 3002013
(N.D. Ga. Sept. 30, 2026) ........ 14, 19

*United States v. Scanlan*,
838 F. Supp. 3d 150 (D.N.H. 2026) ........ passim

*United States v. Simon*,
No. 25-cv-3761, 2026 WL 2389778
(D. Minn. Aug. 17, 2026) ........ 14, 19

*United States v. Thomas*,
No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026) ........ 14, 19

*United States v. Union Pacific Railroad Co.*,
91 U.S. 72 (1875) ........ 27

*United States v. Warner*,
840 F. Supp. 3d 446 (S.D.W. Va. 2026) ........ passim

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........ passim

*United States v. Wisconsin Elections Commission*,
833 F. Supp. 3d 949 (W.D. Wis. 2026) .................................... 14, 19, 26

*Whitman v. American Trucking Association*,
531 U.S. 457 (2001) ........................................................................ 31

**Statutes**

5 U.S.C. § 552 .................................................................................. 58

5 U.S.C. § 552a ........................................................................... 58, 62

13 U.S.C. § 214 ................................................................................. 22

18 U.S.C. § 1703 ............................................................................... 22

18 U.S.C. § 2721 ............................................................................... 59

18 U.S.C. § 2722 ............................................................................... 59

18 U.S.C. § 654 ................................................................................. 22

26 U.S.C. § 7604 ............................................................................... 33

44 U.S.C. § 3501 ............................................................................... 59

50 U.S.C. § 217 ................................................................................. 22

52 U.S.C. § 20507 ....................................................................... passim

52 U.S.C. § 20701 ....................................................................... passim

52 U.S.C. § 20702 ...................................................... 19, 24, 25, 26

52 U.S.C. § 20703 ....................................................................... passim

52 U.S.C. § 20705 ............................................................... 6, 33, 34

52 U.S.C. § 21083 ...................................................................... 25, 52

52 U.S.C. § 21085 ............................................................................. 52

25 Pa. Cons. Stat. § 1404 .......... 61

65 Pa. Stat. § 67.708 .......... 62

73 Pa. Stat. § 2301, *et seq.* .......... 62

74 Pa. Stat. § 201 .......... 62

**Regulations**

4 Pa. Code § 183.14 .......... 61

**Other Authorities**

106 Cong. Rec. H5326 (daily ed. March 11, 1960) .......... 5, 38

106 Cong. Rec. S6959 (daily ed. March 30, 1960) .......... 35

*Authority to Obtain and Share Statewide Voter Roll Data*,
50 Op. O.L.C. _ (May 12, 2026) (slip op.) .......... 10, 54, 55

Barry Friedman & Danielle Keats Citron,
*Indiscriminate Data Surveillance*,
110 Va. L. Rev. 1351 (2024) .......... 61

Brett Sholtis,
*'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024) .......... 13

Chester County,
Election Board Hearing (Nov. 1, 2024) .......... 13

Department of Homeland Security,
Office of Strategy, Policy, & Plans .......... 13

Executive Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) .......... 10

H.R. Rep. No. 86-956 (1959) .......... 27, 28

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*,
Brennan Center for Justice ........ 7, 9

Orin S. Kerr,
*A Rule of Lenity for National Security Surveillance Law*,
100 Va. L. Rev. 1513 (2014) ........ 31

The Federalist No. 60
(Alexander Hamilton) ........ 4

U.S. Commission on Civil Rights,
*Report of the U.S. Commission on Civil Rights 1959* (1959) ........ 28

U.S. Election Assistance Commission,
*Election Administration and Voting Survey 2024*
*Comprehensive Report* (2025) ........ 47, 51

William Baude & James Y. Stern,
*The Positive Law Model of the Fourth Amendment*,
129 Harv. L. Rev. 1821 (2016) ........ 61

**Rules**

Fed. R. Civ. P. 1 ........ 34

Fed. R. Civ. P. 12(b)(6) ........ 18

Fed. R. Civ. P. 81 ........ 34, 35

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ........ 4, 30

U.S. Const. art. II, § 1, cl. 2 ........ 30

## INTRODUCTION

The United States, through the Civil Rights Division of its Department of Justice (DOJ), is attempting to seize millions of citizens' sensitive voter data over the objection of their own state governments. A unanimous array of twenty-nine different federal courts has held those efforts unlawful because the Civil Rights Act of 1960 (CRA) does not authorize the Administration to seize private, sensitive voter data or conduct baseless fishing expeditions into state voter rolls. This Court should join the resounding chorus.

Beginning last fall, DOJ began demanding that states turn over complete and unredacted copies of their statewide voter registration lists (SVRLs), which contain the sensitive information of every voter in the state, such as driver's license numbers and partial Social Security numbers. DOJ claims that Title III of the CRA, 52 U.S.C. § 20701 *et seq.*, a 1960s voting rights statute passed to remedy Black voter disenfranchisement in the Jim Crow South, entitles the federal government to seize the personal identifying information of millions of Pennsylvania voters today. It does not. This Court can affirm the district court's rejection of the CRA claim on multiple grounds.

*First*, Pennsylvania's SVRL does not fall within the "records and papers" contemplated by the text, structure, or history of the CRA. 52 U.S.C. § 20701. The CRA covers only records that have "come into [the] possession" of state election officials, like the voter registration applications submitted by Black voters that motivated the statute's passage. *Id.* It does not cover records *created by* Pennsylvania. Nor did this Eisenhower-era law anachronistically empower the government to trawl massive databases of personal information in a quest for evidence of misconduct by individual voters.

*Second*, DOJ failed to provide the written "statement of the basis and the purpose" for its demand that Title III expressly requires. *Id.* § 20703. DOJ never provided any factual "basis" whatsoever in its CRA demand letter and did not provide "the purpose" underlying the request, as required by statute.

*Third*, the relief DOJ seeks—forced disclosure of millions of Pennsylvanians' sensitive, protected data—would impermissibly burden voting and privacy rights, threatening to chill political participation and activity. Disclosure of the unredacted SVRL would be unlawful even if the CRA otherwise authorized it.

In short, there is no statutory basis for the Government's request to obtain access to state voter files. The Framers vested states, not the federal executive, with responsibility for managing most aspects of federal elections to protect our democracy from "tyrants." The Federalist No. 60 (Alexander Hamilton); *see* U.S. Const. art. I, § 4, cl. 1. This Administration's unprecedented attempt to upset the constitutional design and intrude into the machinery of our elections must be rejected. This Court should affirm.

## STATEMENT OF THE CASE

### I. Statutory Background: Title III of the Civil Rights Act of 1960

Congress enacted Title III to stop officials in the Jim Crow South from denying Black citizens the ability to register to vote. *See, e.g.*, H.R. Rep. No. 86-956, at 7 (1959), *reprinted in* 1960 U.S.C.C.A.N. 1939, 1944. The CRA followed the Civil Rights Act of 1957, Congress's first attempt in nearly a century to enforce the Reconstruction Amendments' voting guarantees. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). With Title III, Congress sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in

violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that elections officials retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . ." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General . . . be made available for inspection, reproduction, and copying." *Id.* § 20703.

While Congress wanted DOJ to investigate constitutional violations, some, including Florida Congressman William Cramer, were concerned Title III powers would be used for "fishing expedition[s]." 106 Cong. Rec. H5326 (daily ed. Mar. 11, 1960). To address these concerns, Congress adopted Representative Cramer's amendment to Title III, which added a requirement that a records demand include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also* 106 Cong. Rec. H5326. Congress anticipated judicial review over such statements of basis and purpose, specifying that "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title, . . . shall have jurisdiction by *appropriate*

*process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

DOJ initially used Title III as intended, to investigate jurisdictions that had denied voter registration to Black Americans. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 586-89 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (investigation of registration records showed discriminatory practices led to less than 10 percent Black registration rate); *see also United States v. Cartwright*, 230 F. Supp. 873, 875 (M.D. Ala. 1964) (investigation revealed registrars engaged in racially discriminatory practices resulting in 7.5 percent Black registration). In conducting those investigations, DOJ followed the law by setting forth in writing "the basis and the purpose" for its demands—that is, the factual basis for why it suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III was short lived. In 1965, Congress passed the Voting Rights Act, which established new, broad voter

protections and led to the enfranchisement of millions of Black citizens. Judicial assessment of Title III thus has largely been silent since 1965.

## II. Factual Background

### A. DOJ seeks Pennsylvanians' sensitive voter data.

Sixty years later, beginning in May 2025, the United States, through its DOJ, began sending letters to election officials in nearly every state, making escalating demands for production of statewide voter registration databases.[1] On June 23, 2025, DOJ wrote to Defendant Secretary Al Schmidt requesting information about voter registration and maintenance of voter rolls in Pennsylvania. JA194-196. In particular, DOJ expressed an interest in certain categories of voters, including: voters who might have "duplicate" records in the system for some reason (for example, because they changed addresses and registered to vote at their new address); "voters who have been convicted of a felony;" voters "who have moved outside the Commonwealth" and registered in their new state (even if those voters subsequently moved

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Nov. 10, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

back to Pennsylvania); voters who are supposedly "ineligible to vote due to non-citizenship;" and voters who "registered to vote by mail." *Id.* Secretary Schmidt provided detailed responses to the June 23 requests in a heavily footnoted, 11-page letter. JA198-208.

The United States responded by demanding that Secretary Schmidt provide "[t]he current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list" with "all fields contained within the list." JA210. This August 4 letter again asked about voters with supposed "duplicate registrations," as well as supposed "[n]on-citizen" voters and voters with a "[f]elony conviction." JA211. The August 4 letter purported to demand this information "[p]ursuant to Section 20507(i) of the [National Voter Registration Act (NVRA)]." JA210.

Ten days later, the United States again demanded sensitive Pennsylvania voter data, specifying that "the [SVRL] . . . must . . . contain[] *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number [SSN4s]." JA222. This August 14 letter for the first time invoked the CRA as one

source of purported authority for the demand and stated, with respect to the invocation of Title III, "[t]he purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and [the Help America Vote Act (HAVA)]." JA222.

In subsequent letters, Secretary Schmidt answered the questions posed by the United States and offered to provide the United States a copy of the SVRL, but declined to include in it certain confidential, sensitive data, including voters' driver's license numbers and SSN4s. JA214-219 (Aug. 18 Letter); JA225-227 (Aug. 21 Letter).

The United States responded by filing this lawsuit—one of more than thirty nearly identical lawsuits that DOJ has initiated against states and election officials—seeking to compel the production of this sensitive Pennsylvania voter data.[2]

### B. The Administration's attempt to build an unauthorized national voter database.

In the course of nationwide litigation, the Government has made clear that it intends to create a national voter database, a matter of great concern to the citizens and government of Pennsylvania. Earlier this

---

[2] *See* Martinez-Ochoa, *supra* n.1.

year, the President issued an executive order, in part directing the Department of Homeland Security (DHS), in coordination with the Social Security Administration (SSA), to compile lists of citizens eligible to vote in each state, *see* Exec. Order No. 14,399 § 2(a), 91 Fed. Reg. 17,125 (Mar. 31, 2026). The DOJ conceded in an Office of Legal Counsel (OLC) opinion that the Government is attempting to construct such a database. *See Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. _ (May 12, 2026) (slip op. at 1) (OLC Memo), https://www.justice.gov/olc/media/1440346/dl.

Congress has passed no statute authorizing this massive expansion of the federal role in the election process, let alone addressing the privacy concerns such a database would create. And the manner in which the Government is going about the project has created justified concern regarding the protection of confidential state voter information.

Details relating to the effort have leaked out from Government court filings in related cases. In a January 2026 filing, the Government conceded that it was seeking to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques and that it had been working with outside "election integrity" advocates seeking to deny

election results in those efforts. As detailed in the filing, which was made on behalf of SSA:

> SSA determined in its recent review that in March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrs. to the Rec. at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596 (D. Md. Jan. 16, 2026), Dkt. No. 197 (*AFSCME* Notice). The filing also indicated that, around the same period, federal government actors also shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6.

As part of its efforts to gather SVRLs from all the states, DOJ has asked states to execute a memorandum of understanding (MOU) in connection with its requests for states' voter data. *See* JA229-237. The MOU purports to vest DOJ with substantial new authority to compel states to remove people from the voter rolls, depriving them of the franchise. JA230; JA233. Specifically, under the MOU's terms, federal

officials may take custody of the voter rolls, identify supposed "ineligible voters," and compel states to "remov[e]" these voters "within forty-five (45) days." JA233. These removals are purportedly required by the MOU despite the protections of the NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within 90 days of an election. 52 U.S.C. § 20507. The MOU would thereby turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters.

In short, the Government's own statements and admissions indicate that the United States' aim in seeking sensitive voter data on millions of Americans is to turn states' own voter rolls into a tool for unlawfully challenging voters and interfering with the democratic process in the states.

### C. Pennsylvania voters, including Intervenor-Defendants, have previously been targeted by misuse of voter data.

Eligible Pennsylvania voters, including five Intervenor-Defendants, have been directly impacted by the misuse of voter data before. In advance of the 2024 General Election, Intervenor-Defendants Maston, Perry, Thatcher, Dickson, and Kent were personally subjected

to mass-challenges lodged by individuals affiliated with PA Fair Elections, JA70-72, JA85, JA89, JA96-97, JA104, an entity run by Heather Honey,[3] who, following that election, joined the Administration as the Deputy Assistant Secretary for Election Integrity at DHS.[4] The challenges were based on self-evidently flawed attempts to analyze and match data from the Pennsylvania voter database with external sources. These Intervenor-Defendants have already been victims of untested manipulation of voter data by some of the same individuals who are now behind the federal efforts to get Pennsylvania's unredacted voter files.

## III. Procedural Background

DOJ has now filed more than thirty lawsuits seeking to obtain SVRLs pursuant to Title III. Every other court that has passed upon the

---

[3] *See* Brett Sholtis, *'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024), https://perma.cc/8FNC-5KH9. The challenger in Chester County, who baselessly challenged Intervenors Thatcher and Dickson's ballots, testified under oath to PA Fair Elections' involvement. Chester Cnty., Election Bd. Hr'g at 50:30-51:34; 58:00-58:47; 1:54:58-1:55:19 (Nov. 1, 2024) https://chestercopa.portal.civicclerk.com/event/852/media.

[4] Dep't of Homeland Security, Office of Strategy, Policy, & Plans, https://www.dhs.gov/sites/default/files/2025-08/25_0818_plcy_office-strategy-policy-and-plans-org-chart.pdf (last visited Nov. 20, 2026) [https://perma.cc/3DDB-N8LK].

validity of these actions, across twenty-seven cases in addition to this one, has held that DOJ's demand is unenforceable.[5]

[5] *See* JA1-6; *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Adams*, 837 F. Supp. 3d 881 (E.D. Ky. 2026); *United States v. Warner*, 840 F. Supp. 3d 446 (S.D.W. Va. 2026); *United States v. Scanlan*, 838 F. Supp. 3d 150 (D.N.H. 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026); *United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026); *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Albence*, No. 25-cv-1453, 2026 WL 3407115 (D. Del. Nov. 10, 2026); *United States v. Henderson*, No. 26-cv-166, 2026 WL 3181405 (D. Utah Oct. 23, 2026); *United States v. Raffensperger*, No. 26-cv-485, 2026 WL 3002013 (N.D. Ga. Sept. 30, 2026); *United States v. Hobbs*, No. 25-cv-6078, 2026 WL 2833713 (W.D. Wash. Sept. 22, 2026); *United States v. Hanzas*, No. 25-cv-903, 2026 WL 2754349 (D. Vt. Sep. 17, 2026); *United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-748, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. 25-cv-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, __ F. Supp. 3d. __, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Thomas*, No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Oliver*, No. 25-cv-1193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Koski*, No. 26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Bd. of Elections of the State of N.Y.*, __ F. Supp. 3d. __, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. DeMarinis*, No. 25-cv-3934, 2026 WL 1780586 (D. Md. June 18, 2026).

The district court here joined this chorus. JA1-6. Following full briefing on Rule 12 motions, the district court held that the government's lawsuit, "seeking unfettered access to the Commonwealth voters' highly sensitive personal identifiers, will be dismissed." JA1. The district court adopted the analyses of the Sixth Circuit Court of Appeals in finding that unredacted voter files are not "records," as the term is defined under Title III of the Civil Rights Act and that the government's demand does not contain "a statement of the basis and purpose therefor." JA3. Chief Judge Bissoon observed that "[p]ublic statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." JA3. The district court dismissed the NVRA and HAVA claims with prejudice. JA4. It dismissed the Civil Rights Act claim without prejudice because "the government suffer[ed] the additional indignity of *having sued in the wrong place*" and the court therefore lacked subject matter jurisdiction. JA4-5 (emphasis in the original).

This timely appeal followed. JA7-8.

## SUMMARY OF THE ARGUMENT

The CRA claim here is legally deficient many times over, and there are multiple independent bases on which to affirm.

*First*, Title III does not reach the records DOJ seeks. Title III covers only documents that "come into [the] possession" of election officials. 52 U.S.C. § 20701. The SVRL is a record the Secretary's office *created*, not one obtained from some external source, and thus did not "come into his possession" as a matter of plain text. This reading interprets Title III harmoniously with its structure and historical context, and with the NVRA and HAVA, which requires states to create and maintain their own SVRLs.

*Second*, the United States has neither pleaded nor provided a valid "statement of the basis and the purpose" for its demand for Pennsylvania's unredacted SVRL, as Title III requires. *Id.* § 20703. The August 14 letter in which DOJ invoked the CRA and demanded the SVRL pursuant to it contained no factual basis for its demand. DOJ's attempt to backfill a factual basis for its demand for the first time on appeal, by citing the August 4 letter's reference to Pennsylvania's responses to the 2024 Election Assistance Commission Election Administration and

Voting Survey (EAVS), is both waived and in any event meritless. And DOJ also failed to plead or provide a valid "purpose," an independent ground to affirm. The generalized purpose DOJ pointed to (namely, ascertaining Pennsylvania's compliance with the NVRA and HAVA) does not match the records demanded; a single point-in-time SVRL provides no insight into Pennsylvania's list maintenance process or procedures. And even if this supposed purpose were otherwise valid, it is invalidated here because judicially noticeable materials demonstrate that it is not "the purpose" as required by statute.

*Finally*, the relief sought—disclosure of the SVRL without redactions to protect the privacy of millions of Pennsylvania voters—cannot be granted without trammeling constitutional and privacy rights and thus cannot be granted at all. That is another basis for affirmance.

## STANDARD OF REVIEW

The Court "may affirm on any basis supported by the record, even if it departs from the District Court's rationale." *Children's Health Def., Inc. v. Rutgers, the State Univ. of N.J.*, 93 F.4th 66, 83 (3d Cir. 2024) (citation omitted). Dismissal is proper if, accepting all well-pleaded factual allegations as true, the complaint does not plausibly "state a claim

upon which relief can be granted." Fed. R. Civ. P. 12(b)(6);[6] *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In analyzing a motion to dismiss, a court is "not compelled to accept unsupported conclusions and unwarranted inferences," and "need not accept as true a legal conclusion couched as a factual allegation." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022) (internal quotation marks and citations omitted). "[C]ourts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

### I. THE SVRL IS OUTSIDE THE SCOPE OF TITLE III

This Court should affirm because, as the district court held, the Government seeks records that are simply not covered by Title III. JA3.[7]

[6] The Maston Intervenors agree with the United States that the district court's dismissal was under Rule 12(b)(6). *See* U.S. Br. at 15.

[7] Myriad courts have held that unredacted SVRLs are not covered under Title III. *Benson*, 179 F.4th at 48081; *Raffensperger*, 2026 WL 3002013, at *7; *Hobbs*, 2026 WL 2833713, at *6; *Hanzas*, 2026 WL 2754349, at *5; *Simon*, 2026 WL 2389778, at *11; *Aguilar*, 2026 WL 2364502, at *5; *Evans*, 2026 WL 2267774, at *5; *Griswold*, 2026 WL 2235374, at *4-5; *Matthews*, 2026 WL 2212877, at *3-4; *Caldwell*, 2026 WL 2186515, at *6-

The text, structure, and historical context of the CRA all refute the Government's expansive interpretation of the statute. The SVRL is a state-created database, not a record that has "come into [Secretary Schmidt's] possession" within the meaning of 52 U.S.C. § 20701. To read the statute otherwise would create insuperable conflicts with other provisions of the CRA, *see id.* § 20702, and with other federal law. And the historical context of the CRA, which the Government entirely overlooks, demonstrates that Congress had no intention of authorizing federal fishing expeditions in state election waters. The district court was correct to reject the Government's construction of Title III, and this Court should do the same.

### A. The text of Title III provides no support for the Government's expansive interpretation.

Title III requires an elections official such as Secretary Schmidt to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into his

8; *Adams*, 837 F. Supp. 3d 881, 887; *Thomas*, 2026 WL 2070437, at *7; *Koski*, 2026 WL 2032532, at *6; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *Scanlan*, 2026 WL 1864054, at *6; *DeMarinis*, 2026 WL 1780586, at *5; *Wis. Elections Comm'n*, 833 F. Supp. 3d at 955; *Bellows*, 834 F. Supp. 3d at 123; *Fontes*, 832 F. Supp. 3d at 951.

possession relating to any . . . act requisite to voting in such election . . ." 52 U.S.C. § 20701. The statute then obligates officials to turn over "[a]ny record or paper required by section 20701 . . . to be retained and preserved," *id.* § 20703. The district court correctly concluded that the SVRL is not a record that came into the possession of the Secretary but rather is a state-created database outside the ambit of the CRA.

The phrase "come into . . . possession" in § 20701 refers to records that elections officials *obtain* or *receive*, rather than those they *create*. *See United States v. Benson*, 179 F.4th 470, 480 (6th Cir. 2026). The statute reaches materials provided by voters to elections officials, not those that elections officials create. The plain language of the statute cabins the production obligation to records and papers "relating to any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701. The listed items all "'refer[] to something that the voter submits or does . . .' and thus refers to 'records that election officials receive, rather than create.'" *United States v. Fontes*, 832 F. Supp. 3d 944, 950 (D. Ariz. 2026) (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 769 (W.D. Mich. 2026)).

The district court's construction comports with the plain meaning of the statutory text at the time of its passage. *See Benson*, 179 F.4th at 478-79 (6th Cir. 2026) ("Around the time that Congress enacted Title III, [the phrase 'come into . . . possession,'] meant to 'acquire,' 'obtain,' or 'receive,'" rather than something a state "created . . . themselves"). Other courts have reached the same conclusion with respect to statutes using similar language. *See, e.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" in interpreting terms of the Comprehensive Forfeiture Act) (internal quotation marks and citations omitted)); *United States v. Evans*, No. 25-cv-4403, 2026 WL 2267774, at *6 (D.D.C. Aug. 6, 2026); *United States v. Matthews*, __ F. Supp. 3d. __, 2026 WL 2212877, at *3 (C.D. Ill. July 31, 2026); *United States v. Koski*, No. 26-cv-42, 2026 WL 2032532, at *5 (E.D. Va. July 14, 2026).[8]

---

[8] Indeed, Congress regularly uses the phrase "comes into his possession" to refer to something that the subject obtains or acquires, rather than creates. *See, e.g.*, 13 U.S.C. § 214 (prohibiting census staff from disclosing "any information . . . which comes into his possession"); 18 U.S.C. § 654 (prohibiting embezzlement by federal official of money or property that "comes into his possession"); *id.* § 1703(a) (prohibiting postal employee from delaying or destroying mail materials that "come into his possession"); 50 U.S.C. § 217 (requiring a military member to report

The Government ignores this plain meaning, overreading § 20701 as authorizing federal inquisition into just about any record pertaining to an election. *See* U.S. Br., Dkt. No. 37 at 21-22. That would violate normal rules of usage. "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. Or as another court explained: "As a matter of common usage, one might say, for example, that the Mona Lisa 'came into the possession' of the Louvre around 1797; one would not say that the painting 'came into the possession' of Leonardo da Vinci when he completed it around 1517." *Evans*, 2026 WL 2267774, at *6.

In summary, the Government's interpretation of § 20701 strays far from the plain meaning of the text. Had Congress intended to permit inspection of *all* election materials—those received by elections officials and those created by them—it could easily have said so. Congress said no such thing, and it is axiomatic that "it is not the proper role of the courts

---

whenever abandoned property "comes into his possession"); *see also United States v. Scanlan*, 838 F. Supp. 3d 150, 158 (D.N.H. 2026) ("Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source").

to rewrite the laws passed by Congress and signed by the President." *Nasrallah v. Barr*, 590 U.S. 573, 583 (2020).[9] This Court should decline the Government's invitation to do so here.

### B. The structure of the CRA and related voting statutes demonstrate that the CRA's investigatory grant is limited.

It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). As the district court concluded, the Government's attempt to harmonize Title III and related voting statutes was a "[t]ortured statutory construction" that Congress could not have intended. JA3.

Under the CRA, it is a criminal violation for anyone to "willfully steal[], destroy[], conceal[], mutilate[], or alter[] any record or paper

[9] As in related matters, the Government may argue that the SVRL is in part based on an aggregation of materials submitted by voters, but that is of no moment. The Government "has not requested the records or papers that [the Secretary ] obtained in creating the qualified voter file—the government has requested the [state-created] qualified voter file itself." *Benson*, 179 F.4th at 480-81.

required by [Title III] to be retained and preserved." 52 U.S.C. § 20702. That all makes sense when applied to specific applications or other physical materials voters submitted when registering to vote. On the other hand, expanding the definition to include the working files of election officials that they are legally obligated to update and alter on a regular basis would transform everyday administrative work into criminal conduct.

The contents of SVRL databases are in constant flux; indeed, the NVRA and HAVA affirmatively "*require*" state election officials to make "additions, subtraction[s] and revisions" to the SVRL, which under the Government's view of the statutory text would render required conduct liable to criminal prosecution. JA3; *accord Benson*, 179 F.4th at 479 (citing 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A)). Accordingly, "construing [Title III] in a manner that subjects the qualified voter file to Title III would place Title III on a collision course with the NVRA and HAVA." *Benson*, 179 F.4th at 480. As the district court observed, under the proper reading of § 20701, the SVRL simply is not a record covered by the CRA.

The Government's attempts to escape this quagmire only sink it further. It first suggests (at 44-45) that "alter" reaches only changes that

impair a record's integrity, not routine updates. But "alter" ordinarily means to "modify," *see Sierra Club v. Marsh*, 907 F.2d 210, 212 (1st Cir. 1990) (citation omitted), or "to change some of the elements . . . without substituting an entirely new thing," *United States v. Edwards*, 996 F.2d 1213 (4th Cir. 1993) (unpublished table decision) (citation omitted). The Government's narrower gloss means "alters" would add nothing to the "steals, destroys, conceals, [and] mutilates" that precede it. 52 U.S.C. § 20702.

Conversely, the Government's interpretation suffers from its own surplusage problem. What does it mean to alter an SVRL in a way that constitutes "minor tampering with or corruption of the document's integrity," U.S. Br. at 44 (quoting *United States v. Benson*, 187 F.4th 462, 473 (6th Cir. 2026) (Griffin, J., dissenting)), and why would that activity not be covered by the various other verbs included already in § 20702? And regardless, "there is still tension in a statutory construction that applies Title III's requirements to non-permanent records like voter registration lists," *Wis. Elections Comm'n*, 833 F. Supp. 3d at 955, in large part because Title III's requirements to "'retain' and 'preserve'" covered

records does not map on well to an "SVRL, which is continuously updated," *Koski*, 2026 WL 2032532, at *6.

The Government next invokes (at 45) § 20702's willfulness requirement, as though no official could "willfully" perform mandated maintenance. But willfulness requires only that the actor act "with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (citation omitted). On the Government's own reading, then, an official who updates the list knowing Title III forbids altering covered records would act willfully—leaving officials whipsawed between statutes that command the same act and punish it. *See Koski*, 2026 WL 2032532, at *6. The sensible reading—the one that avoids the whole dilemma—is that the SVRL is not a record covered by Title III at all.

### C. The historical context demonstrates that the Government's position is untenable.

In interpreting statutes, the historical context matters. *E.g.*, *Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979) ("[C]ourts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." (quoting

*United States v. Union Pac. R.R. Co.*, 91 U.S. 72, 79 (1875))). Yet the Government does not address the history of the CRA at all. In fact, what the Government tries to do here is decidedly ahistorical.

The concern that animated Congress in passing the CRA was state and local officials' discriminatory exclusion of Black citizens from voting. *E.g.*, *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126, 133-34 (3d Cir. 2024); H.R. Rep. No. 86-956 at 7 (1959), *reprinted in* 1960 U.S.C.C.A.N. 1939, 1944 (describing the purpose of Title III as bolstering the authority of the Attorney General to investigate and remedy discriminatory denial of the right to vote). Congress passed Title III to force Southern registrars to lawfully process voter registration forms from Black citizens, rather than destroying them to conceal disenfranchisement. *See, e.g.*, U.S. Comm'n on C.R., *Report of the U.S. Commission on Civil Rights 1959* at 93 (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"); H.R. Rep. No. 86-956 at 7 (1959), *reprinted* in 1960 U.S.C.C.A.N. 1939, 1945 (describing viewing of submitted registration materials as "an

essential step in the process of enforcing and protecting the right to vote"). It was crucial, therefore, to make sure that evidence relating to applicants' attempts to register would be available to investigators following an election. Congress thus enacted the record-retention provisions of Title III to prevent the destruction of materials would-be voters had submitted. Given that historical context, it is unsurprising that Congress limited § 20701 to "all records and papers which come into [the election official's] possession." 52 U.S.C. § 20701.

What is equally plain is what Congress did not authorize: federal fishing expeditions in the general files of state election officials. Nothing in the CRA authorizes the Government to go trawling for evidence in routine voting databases in hopes of finding something incriminating against an individual voter about whom it has no individualized suspicion of wrongdoing. There is no statutory basis for the Government to leap from rod-and-reel angling to dragnet harvesting.

The Government here offers no individualized allegations of electoral misconduct and instead avers generalized concerns about "illegal voting" and "fraud" somewhere by someone at some time. JA41. That is not enough. Congress did not grant sweeping power to seize a

state's unredacted electronic voter records when it enacted Title III in 1960; indeed, bulk databases populated with voters' sensitive personal information did not yet exist.

More generally, courts look warily at claims that Congress has implicitly authorized broad new investigatory powers, including the power to acquire records that may include sensitive personal information. *E.g.*, *In re Application of U.S. for an Ord. Directing a Provider of Elec. Commc'n Serv. to Disclose Recs. to Gov't*, 620 F.3d 304, 313-15 (3d Cir. 2010) (reviewing legislative history of the Communications Assistance for Law Enforcement Act of 1994, and concluding that Congress had imposed a standard higher than a subpoena for disclosure to DOJ of cell phone records, to prevent fishing expeditions), *abrogated on other grounds by United States v. Scarfo*, 41 F.4th 136, 168 (3d Cir. 2022); *United States v. Moalin*, 973 F.3d 977, 996 (9th Cir. 2020) (holding that "telephony metadata collection program exceeded the scope of Congress's authorization"). Likewise, in the constitutional context, courts keep "Founding-era understandings in mind when applying the Fourth Amendment to innovations in surveillance tools." *Carpenter v. United States*, 585 U.S. 296, 305 (2018).

Skepticism is particularly appropriate when the Government is asserting a new election-related power, as the Constitution commits the primary role of running elections to the states. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

When viewing the CRA through the appropriate historical lens, the scope of the statute comes clearly into focus. To address the harm caused by discrimination in voter registration, Congress provided an investigative tool that DOJ could use to scrutinize whether *election officials* were discharging their duties fairly. It created this tool against the backdrop of how the DOJ of the twentieth century conducted investigations. In that paradigm, "[s]earch warrants and document subpoenas typically seek the records of a particular individual or corporation under investigation." *ACLU v. Clapper*, 785 F.3d 787, 813 (2d Cir. 2015). Here, the Government is trying to use the CRA for something Congress never intended and never authorized: to conduct a dragnet against millions of Pennsylvanians. This would invert the statute: instead of protecting citizens from state and local bureaucrats, it would treat Pennsylvania's entire electorate as a pool of presumptive wrongdoers. Congress did not hide such an elephant in the record-

examination mousehole of Title III. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *cf.* Orin S. Kerr, *A Rule of Lenity for National Security Surveillance Law*, 100 Va. L. Rev. 1513, 1528 (2014) (criticizing application of Foreign Intelligence Surveillance Act as "a collect-it-all-and-query-with-suspicion model that bore no particular resemblance to the statute that purported to justify it"). The Government's attempt to balloon and distort its 1960-vintage Title III investigatory power to trawl for potential individual misconduct by some small subset of millions of voters should be rejected.

## II. DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS.

Even if Title III covered the SVRL—and it does not—DOJ failed to comply with Title III's requirement to set forth a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. That failure provides multiple additional bases to affirm.

### A. The Federal Rules of Civil Procedure apply.

DOJ claims that enforcing a Title III demand constitutes "a special statutory proceeding," such that the Federal Rules do not apply, and "[t]here is no room for judicial inquiry as to whether the basis and

purpose are factually accurate" or "sincer[e]." U.S. Br. at 23, 24, 25, 27. This is wrong, as over a dozen courts have now held.[10]

Begin with the text. Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The process that is "appropriate," where DOJ has filed a civil action, is defined by the Federal Rules of Civil Procedure.

Binding precedent so holds. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court held that proceedings to enforce a federal records statute—one whose jurisdictional provision is materially identical to the CRA, with the same "by appropriate process" language—are governed by the Federal Rules, *id.* at 52, 57-58 & n.18 (citing 26

[10] *See Benson*, 179 F.4th at 483 n.2; *Bellows*, 834 F. Supp. 3d at 122; *Fontes*, 832 F. Supp. 3d at 947 & n.1; *Amore*, 831 F. Supp. 3d at 155; *Oregon*, 828 F. Supp. 3d at 1102-03; *Weber*, 816 F. Supp. 3d at 1182; *Griswold*, 2026 WL 2235374, at *3; *Matthews*, 2026 WL 2212877, at *2; *Caldwell*, 2026 WL 2186515, at *5; *Adams*, 837 F. Supp. 3d at 885-86; *Oliver*, 2026 WL 2031479, at *7; *Warner*, 840 F. Supp. 3d at 449-50; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *6-7; *Scanlan*, 838 F. Supp. 3d at 153 n.2; *DeMarinis*, 2026 WL 1780586, at *3.

U.S.C. § 7604(a)). *Compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of . . . records" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper" (emphasis added)).

The *Powell* Court was clear: Because the jurisdictional provision of the records statute provided that requests would be judicially enforced "by appropriate process," and because no alternative process was specified, "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 57-58 & n.18. Where the federal government demands the production of documents in those circumstances, the demand may be contested as the Rules allow, on "any appropriate ground." *Id.* at 58.

The Federal Rules themselves are in accord. They "govern the procedure in *all* civil actions and proceedings in the United States district courts . . ." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include a

Title III claim. *See also* Fed. R. Civ. P. 81(a)(5) (expressly providing that the Rules "apply to proceedings to compel testimony or the production of documents"). Here, DOJ filed a federal civil action seeking to compel production of documents, and like every other civil action, the Federal Rules apply to its disposition.

The legislative history of Title III is also consistent. As Senator Hruska explained: "[§ 20705] is merely a restatement of court powers which now exist. . . . A formal court application, and any order which might flow from the court, would still remain unimpaired and without diminution." 106 Cong. Rec. S6959 (daily ed. Mar. 30, 1960). The CRA's "appropriate process" language was meant to confirm courts' unimpaired judicial oversight—not stymie it.

Applying the Rules here is consistent with the independent judicial function they are designed to serve. Whatever the context, it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements, and whether evidence sought through the judicial process is relevant and material to its investigation. *See, e.g.*, *Donaldson v.*

*United States*, 400 U.S. 517, 528 (1971) (citing Fed. R. Civ. P. 81(a)(3)). This independent judicial obligation is critically important today.

DOJ never supports its contrary assertion that this civil action is actually a "special statutory proceeding" that exists outside the Federal Rules, whereby courts may not "second-guess or probe the sufficiency or sincerity of the Attorney General's statement." U.S. Br. at 25, 27. It points to no statutory text that so provides—because none exists. Rather, DOJ's conception of this "special" process is based solely on the Fifth Circuit's 1962 opinion in *Lynd*, 306 F.2d at 225. *See* U.S. Br. 23-27. But that non-binding decision was issued before *Powell* and addressed wholly dissimilar circumstances.

*Lynd* was a response to the situation that prevailed in the Jim Crow states in the early 1960s, where counties refused to process the registrations of Black voters and thwarted every effort to enforce federal law. The Fifth Circuit described this recalcitrance: by the time *Lynd* was decided, the registrar defendants there had spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this

interminable proceeding would ever come to an end, and certainly never an order for production." *Lynd*, 306 F.2d at 227. "[T]he factual foundation for" the Title III requests was self-evident—massive racial disparities in registration that evidenced discriminatory refusal to register Black voters—and DOJ had in fact clearly stated the factual basis and purpose of its requests. *See id.* at 226-28 & n.6.[11] Against that backdrop, the Fifth Circuit emphasized that, after months of dilatory action, a new round of plenary "judicial review or ascertainment" of facts was unwarranted. *See id.* at 226-28.

Moreover, *Lynd* was decided before sensitive personal identifying information such as Social Security or driver's license numbers was part of a person's voter registration record, and before federal laws like the Privacy Act protected and constrained access to personal information. *Lynd* and contemporaneous cases required production of *public* records; as the court explained: "[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Id.* at 231. And even in that very different context, federal courts applying Title

---

[11] *See also infra* Section II.B.2-3.

III recognized there would be "exception[s]" to "[t]he right of free examination of official records" in the case of improper purpose. *In re Coleman*, 208 F. Supp. at 201.

*Lynd* is thus inapposite, and in any event, DOJ goes far beyond *Lynd* now. It instead argues that Title III prevents federal courts from *any* inquiry into whether a DOJ demand for millions of voters' personal identifying information is legally valid, even where DOJ has invoked the court's jurisdiction by filing a civil action. No wonder so many courts have rejected this claim: Title III's text, binding cases like *Powell*, the Rules, and basic notions of judicial independence are all to the contrary.

### B. DOJ failed to provide "a statement of the basis and the purpose" for its demand.

Whatever form of inquiry applies, Title III's requirements must be met; otherwise DOJ's demand is fatally flawed and unenforceable. The district correctly concluded that DOJ had failed to meet the statutory requirements here.

#### *1. The requirement to provide "the basis" and "the purpose" for a CRA demand.*

A Title III demand requires a written "statement of the basis and the purpose" for the records inquiry from the Attorney General. 52 U.S.C.

§ 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from being used to conduct baseless "fishing expedition[s]" and to ensure notice to election officials of the nature of the federal inquiry. *See* 106 Cong. Rec. H5326.

There are three notable aspects of the statutory text. First, § 20703 uses the words "*shall* contain," demonstrating that compliance "is mandatory, not a mere formality with which the federal government or this Court is free to dispense." *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026); *see also, e.g.*, *Benson*, 179 F.4th at 483; *United States v. Warner*, 840 F. Supp. 3d. 446, 453 (S.D. W. Va. 2026). Such mandatory commands are "impervious to judicial discretion." *E.g.*, *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) (citation omitted).

Second, the requisite statement containing "the basis and the purpose" must be made "in writing," meaning that the basis and the purpose "must be made express." *Galvin*, 830 F. Supp. 3d at 128. In this way, "[t]he statute . . . directs the Court to the Attorney General's written demand—rather than the United States' subsequent court filings." *Id.*

Third, the statute's language, providing that the demand "contain a statement of *the* basis <u>and</u> *the* purpose therefor," confirms that "basis"

and "purpose" are two independent, "conceptually distinct" requirements, both of which must be satisfied by the written demand. *Id.* at 127-28 (emphasis added); *see* 52 U.S.C. § 20703; *see also Benson*, 179 F.4th at 483; *United States v. Scanlan*, 838 F. Supp. 3d 150, 159-60 (D.N.H. 2026). Moreover, by twice using the definite article, the statute requires not just *a* conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165-66 (2021) (use of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

The "basis" is the factual grounds for why the Attorney General believes there may be a violation of voters' rights, whereas the "purpose" explains how the requested records would help the Attorney General determine whether there is, in fact, a violation. Courts have consistently held that "the 'basis' contemplated by Title III is a factual, not legal basis." *Warner*, 840 F. Supp. 3d at 452; *see also, e.g.*, *United States v. Amore*, 831 F. Supp. 3d 149, 156 (D.R.I. 2026); *Galvin*, 830 F. Supp. 3d at 127 (noting dictionary definitions for "basis" include the "foundation" or "'chief supporting factor' 'for' the demand" (citation omitted)); *Oregon*,

828 F. Supp. 3d at 1103; *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026); *United States v. Hanzas*, No. 25-cv-903, 2026 WL 2754349, *5 (D. Vt. Sept. 17, 2026); *United States v. Aguilar*, No. 25-cv-728, 2026 WL 2364502, at *5 (D. Nev. Aug. 14, 2026); *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 838 F. Supp. 3d at 161 (noting this textual "reading also accords with the Attorney General's own historical practice under Title III").

*Lynd* illustrates how the statute is supposed to work. In *Lynd*, the stated basis was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." 306 F.2d at 229 n.6. The stated purpose was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred," *i.e.*, to investigate and establish a discriminatory "pattern or practice" in the jurisdiction's voting registration processes. *Id.*; *see also id.* at 228 n.4. DOJ sent a single writing containing these statements to satisfy the statute's requirements. *Id.*

Here, the United States's failure to provide *either* the basis *or* the sufficient purpose for its request for Pennsylvania's unredacted SVRL invalidates its CRA claim. This Court can affirm based on either of these fatal defects of statutory compliance.

*2. DOJ failed to state the basis for its CRA demand.*

DOJ did not provide notice of the basis for its request for the Pennsylvania SVRL. Trying to dodge that defect, the Government first suggests that stating the "*legal* basis" for the demand is sufficient, U.S. Br. at 28, but that is indefensible. Merely referring to Title III cannot be sufficient, because *every* Title III request is, by definition, legally based on Title III. If DOJ could tautologically cite Title III as "the basis" for its request under Title III, the statutory obligation to provide "a statement of the basis" for the request in writing, 52 U.S.C. § 20703, would be rendered "wholly superfluous," *e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Trying a slightly different tack, DOJ now argues that it complied with Title III "[b]y invoking the NVRA and HAVA," which it claims were the "legal basis" set forth in the August 14 demand letter. U.S. Br. at 28. DOJ never argued this point below, and for good reason: The August 14

letter says no such thing. To the contrary, the letter says "[t]he *purpose* of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." JA222. Even if merely stating a legal basis for the demand (*i.e.*, citing some statute other than Title III without any factual grounds to think a violation occurred) were sufficient to comply with Title III, DOJ did not do that here.

As for a factual basis, which is what Title III actually requires, DOJ's demand letter simply contained none. DOJ invoked the CRA and demanded the SVRL pursuant to the Title III in its August 14 Letter. JA221-223. And the August 14 Letter contains literally nothing that could be characterized as a factual basis for the demand. *Id.* Rather, the letter claims that various statutes including the CRA entitle DOJ to the SVRL, and then says, "[p]ursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Pennsylvania's complete and current [S]VRL." JA222. Again, it states "[t]he purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* It never sets forth a factual basis.

Even now, DOJ does not attempt to claim that the August 14 letter—the only place where it made a CRA demand—contained a factual basis for its CRA demand. The total omission of any factual basis for the demand is fatal, as numerous courts have concluded. *E.g.*, *Amore*, 831 F. Supp. 3d at 157; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Warner*, 840 F. Supp. 3d at 453; *see also, e.g.*, *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 838 F. Supp. 3d at 160-61.

To evade this conclusion here, DOJ for the first time on appeal relies on the August 4 letter, which nowhere mentions the CRA, claiming that the factual basis for its CRA demand may be found there. U.S. Br. at 29. More specifically, DOJ points to the August 4 letter's references to Pennsylvania's responses on the 2024 EAVS survey as supplying the requisite factual basis. U.S. Br. at 29-30, 34-35. This argument fails for several reasons.

*First*, it is waived. DOJ included no allegations in its Complaint that the EAVS responses discussed in the August 4 letter were its "basis" for the CRA demand, and it made no such arguments before the district court in its opposition to the motions to dismiss. Instead, DOJ argued below that the provision of a *legal* basis for the demand (*i.e.*, citing the

CRA) in the August 14 letter was enough, *see* JA179 ("The [August 14] letter cited Section 303 of the CRA as the basis for the request"). Having completely failed to identify, plead, or argue a factual basis before the district court, DOJ may not do so now for the first time on appeal. *E.g.*, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 706 F.3d 217, 226 (3d Cir. 2013).

*Second*, the August 4 letter itself is not a "demand in writing" for purposes of the CRA. 52 U.S.C. § 20703. As a matter of statutory text, a CRA demand must take the form of a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." *Id.* In other words, the CRA requires a single written demand that "must contain *both*" a statement of the basis along with the purpose. *Benson*, 179 F.4th at 483 (emphasis added). Here, neither letter does that. The August 4 letter, which discusses Pennsylvania's responses to the 2024 EAVS survey, does not mention the CRA at all. JA210-212. The August 14 letter, which does mention the CRA and which DOJ identified in its Complaint as propounding its written CRA demand, purports to state a "purpose" for the demand but includes no statement of any factual basis whatsoever. JA222; *see also* JA51 ¶ 39. The two letters cannot be fused

after the fact to manufacture a valid demand under the CRA. *See Benson*, 179 F.4th at 483 (noting none of the three letters sent to Michigan officials contained "both a statement of the basis along with the purpose"); *accord Oregon*, 828 F. Supp. 3d at 1104; *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374, at *4 (D. Colo. Aug. 3, 2026); *United States v. Oliver*, No. 25-cv-1193, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026).

*Third*, even if the August 4 letter could be considered as part of the relevant CRA demand, that would not salvage DOJ's position, because that letter still contains no statement of the basis for the demand. DOJ claims that the August 4 letter refers to "potential anomalies in Pennsylvania's responses to the 2024 EAVS report" and now asserts that "the EAVS responses suggest that Pennsylvania might have improperly removed or failed to remove voters from its SVRL following confirmation notices, in violation of the NVRA." U.S. Br. at 29, 34-35. But the August 4 letter does not describe or refer to any "anomalies" or make any mention of any potentially improper list-maintenance practices. *See* JA210-212. Rather, the letter asks six focused questions about the responses Pennsylvania reported on certain questions in the 2024 EAVS survey

that if anything indicate strong voter-list hygiene; for example, several of the questions concern Pennsylvania's comparatively *low* number of duplicate registrations. JA211. The August 4 Letter never explains how the survey responses DOJ inquired about are even *potentially* indicative of any improper practice under the NVRA or HAVA or otherwise inconsistent with the "reasonable effort" at list maintenance that those statutes require. *Cf. Pub. Int. Legal Found. v. Benson* (*PILF*), 136 F.4th 613, 624-27 (6th Cir. 2025) (describing statutorily required "reasonable effort" for purposes of NVRA and HAVA as "a serious attempt" which "need not be perfect, or even optimal"), *cert. denied*, 146 S. Ct. 1772 (2026).[12] The narrow questions it contains are not a basis for DOJ's sweeping SVRL demand.

[12] Moreover, as the 2024 EAVS Report itself acknowledges, such differences are to be expected between the states, and even within states. *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (2024 EAVS Report) at 2 (2025), https://perma.cc/9M99-STAY ("Broad legal and procedural authority [over elections] rests with the states . . . . As a result, wide variation exists in the policies and practices for conducting elections across and sometimes within states, and these policies and practices are constantly changing"). The mere fact of variation in states' responses to EAVS survey questions cannot indicate a failure to make reasonable list-maintenance efforts as required by the NVRA and HAVA.

Moreover, and as DOJ acknowledges (at 29), Pennsylvania quickly provided lengthy responses to DOJ's questions. *See* JA214-219. The detailed response with respect to the question of duplicate registration applications is especially telling: Pennsylvania officials (1) pointed out that the factual premise of the question was wrong because DOJ had confused duplication registrations with duplicate registration *applications*, (2) noted that DOJ had also cited the wrong figure from the EAVS data, and then (3) explained that Pennsylvania had enacted policies to discourage duplicate registrations, such as online registration and registration-lookup services. JA215-216.

DOJ appears to acknowledge that one function of the CRA's "basis" requirement is to provide "notice" to election officials, U.S. Br. at 28. But it never explains how DOJ's technical questions about Pennsylvania's 2024 EAVS survey submission in the August 4 letter could have provided even a hint of notice that there might be some federal concern over Pennsylvania's voter-removal practices under the NVRA or HAVA—let alone that such concern was the basis for DOJ's later CRA demand for the SVRL.

The CRA is not a game. The statute was designed to give DOJ significant power to investigate real violations of voting rights, while including key safeguards to prevent pure fishing expeditions. DOJ was required to provide a clear written demand setting forth "the basis and the purpose" for its request for millions of Pennsylvanians' sensitive data. That is what DOJ did in the early 1960s cases like *Lynd*. *E.g.*, 306 F.2d at 229 n.6 (demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made"); *accord Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (same demand) (cited at U.S. Br. at 24). But DOJ did not do that here.

### *3. DOJ failed to state a valid purpose for its CRA demand.*

The statutorily required "purpose" is an explanation of how the requested records would help determine if there is a legal violation. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6. Title III requires an "assessment of the sufficiency of . . . the purpose asserted," *United States v. Bellows*, 834 F. Supp. 3d 113, 124 (D. Me. 2026); otherwise, "[i]f *any* purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104.

Here, DOJ's August 14 letter invoking the CRA stated that "[t]he purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." JA222. At least eight courts have held that this purported purpose does not satisfy Title III, including the district court here. *See* JA3-5; *accord Bellows*, 834 F. Supp. 3d at 123-27; *Amore*, 831 F. Supp. 3d at 157-58; *Oregon*, 828 F. Supp. 3d at 1104-05; *Weber*, 816 F. Supp. 3d at 1183-84; *Griswold*, 2026 WL 2235374, at *4; *Matthews*, 2026 WL 2212877, at *5-6; *Warner*, 840 F. Supp. 3d at 455. The district court was correct: DOJ's stated purpose is invalid for multiple reasons.

*First*, DOJ's stated purpose is outside the scope of Title III. Title III was not designed "to investigate list maintenance procedures" but rather "violations of individuals' voting rights." *Oregon*, 828 F. Supp. 3d at 1105; *see also Amore*, 831 F. Supp. 3d at 157-58; *Weber*, 816 F. Supp. 3d at 1183; *Matthews*, 2026 WL 2212877, at *5. Congress enacted it to "help end voting discrimination." *Benson*, 179 F.4th at 474. Accordingly, the purpose of a Title III demand must involve "an investigation into potential violations of an individual's right to vote." *Warner*, 840 F. Supp. 3d at 455. To be sure, it is theoretically possible for list-maintenance

procedures to implicate individuals' right to vote—for example, in the case of their improper removal in violation of the NVRA, *see, e.g.*, 52 U.S.C. § 20507(d). But the generic statement in DOJ's August 14 letter does not indicate any such purpose.

*Second*, DOJ's stated purpose does not comport with the records it demands. Neither the August 14 letter nor the Complaint articulates how the unredacted SVRL, which is a static snapshot of Pennsylvania's voter file, is relevant to ascertaining Pennsylvania's compliance with the NVRA or HAVA. JA41-56, 220-223. In fact, it is not.

Both the NVRA and HAVA make clear that voter list maintenance is the responsibility of the states. The NVRA requires states to "conduct a general program that makes a reasonable effort" to remove ineligible voters from the official lists of eligible voters. 52 U.S.C. § 20507(a)(4). Perfect or error-free voter rolls are not the standard, nor are they feasible in practice. *See, e.g.*, 2024 EAVS Report at 150 (noting it is "inevitable that voter lists will contain some number of voter records for individuals who are no longer eligible to vote"); *see also, e.g.*, *PILF*, 136 F.4th at 624-26 (discussing "reasonable effort" requirement). Indeed, the NVRA explicitly *prohibits* removal of some potentially ineligible registrants

until steps are taken to provide notice and ensure they are not removed prematurely or unfairly. 52 U.S.C. § 20507(d); *see also* 2024 EAVS Report at 150 (noting that "registration removal can take up to two federal general election cycles to complete for some registration records"). The NVRA thus mandates that SVRLs include some voters who may no longer qualify to vote.

Meanwhile, HAVA, which requires the collection and use of personal identifying information and numerical identifiers in the SVRL, makes clear that it is *states*—not the federal government—that are principally tasked with "perform[ing] list maintenance." 52 U.S.C. § 21083(a)(2)(A). That statute expressly provides that "[t]he specific choices on the methods of complying with" such requirements "shall be left to the discretion of the State." *Id.* § 21085.

Accordingly, it is a state's *overall procedures* for voter list maintenance and how the state carries them out that establish its compliance with the NVRA and HAVA, *see* 52 U.S.C. § 20507(a)(4), (c)(1), § 21083(a)(2)(A), § 21085; *see also PILF*, 136 F.4th at 624-26; *Oregon*, 828 F. Supp. 3d at 1097; *Matthews*, 2026 WL 2212877, at *1; *Bellows*, 834 F. Supp. 3d at 120-21. A snapshot of the unredacted voter

file from one moment in time does not provide information relevant to determining whether the state is making a "reasonable effort" to remove ineligible voters or is otherwise in compliance with the NVRA or HAVA. And the sensitive personal identifiers like driver's license numbers and partial Social Security numbers contained in such unredacted files are especially unnecessary for such an inquiry. All the more so here, where Pennsylvania in fact provided extensive and detailed answers to the only questions DOJ raised about its voter list practices, which DOJ does not engage with at all. JA214-219.

DOJ does not offer even a rudimentary explanation of how it would use the SVRL for its stated purpose. It argues that the SVRL will allow it to assess "possible noncompliance" with the NVRA and HAVA, but never identifies what statutes might be violated or how the SVRL could be used to make that assessment. U.S. Br. at 28-29. It suggests that it wishes to "assess whether Pennsylvania's list contains duplicate registrations, voters who have died or changed residence, and voters who were never eligible to register," and that "[t]he United States can identify these voters using Social Security and driver's license numbers," *Id.* at 42, but even if efforts of the federal government to recreate the list-

maintenance procedures that are the ambit of states were proper for purposes of assessing NVRA or HAVA compliance (and they are not), the United States never says the public voter roll data that Pennsylvania already offered would be insufficient for identifying ineligible voters. DOJ also references "fraudulent votes," again with no attempt to describe what this means, or how it relates to Pennsylvania's SVRL. *Id.* at 34. DOJ's failure to articulate a valid purpose is independently fatal to its Title III claim.

*Third*, DOJ's stated purpose is also contradicted by judicially noticeable information and admissions confirming that it seeks to use voters' sensitive data for purposes other than those stated in the CRA demand, including to violate the NVRA and HAVA.

DOJ intends to use whatever voter data it can get its hands on to work with DHS to build a national voter list that can and will be used for immigration-related enforcement. *See, e.g.*, OLC Memo at 1, 5. The statements and documents in the public record suggest the Administration's underlying intentions, as the district court explained: "[T]o create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance

unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." JA3; *see also Oregon*, 828 F. Supp. 3d at 1106, 1108; *Weber*, 816 F. Supp. 3d at 1184; *Oliver*, 2026 WL 2031479, at *6 n.15. Yet creating a national voter list and conducting immigration enforcement are nowhere mentioned in DOJ's written CRA demand. JA210-223.

The concern that DOJ has not disclosed the true and complete purpose or purposes of its demands for state voter roll data as required by Title III is particularly acute in light of the MOU that the United States has asked states to sign in connection with its SVRL requests. *See* JA229-237. Far from supporting any purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes. For example, the MOU purports to allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," JA233, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the bar against systematic voter removals close to an election. *See generally* 52 U.S.C. § 20507. The MOU suggests that DOJ's purpose is not ascertaining compliance with the NVRA and HAVA, but

defying those statutes to unlawfully centralize control over state voter rolls in the hands of the federal executive.

The district court's assessment was not based simply on hearsay from news reports, as DOJ wrongly argues. U.S. Br. at 35-39. Numerous judicially-noticeable in-court admissions, court filings, and government documents and statements demonstrate DOJ's failure to set forth the actual purpose for its demand. *See, e.g.*, OLC Memo 1, 5; JA230, 233. This Court is not "required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted), or to "accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184, 1186; *accord* JA3-5; *Oregon*, 828 F. Supp. 3d at 1106-08; *Warner*, 840 F. Supp. 3d at 456 n.9. DOJ was required to state, in writing, "*the* purpose" for its demand. 52 U.S.C. § 20703; *see Niz-Chavez*, 593 U.S. at 165-66. The pleadings and public record show that it did not. The Court can affirm on that basis as well.

## III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT

Even if the United States had provided the basis and the purpose in support of its demand for records covered by Title III—which it did

not—any sensitive personal voter information would still be subject to redaction. Constitutional and privacy concerns prohibit disclosure of the sensitive information that the Government seeks.

If the Government could access the unredacted databases it seeks here, the end result would be that Pennsylvanians could no longer register to vote without disclosing uniquely sensitive information including their driver's license numbers and other personal identifiers to the federal government. Making such disclosures a prerequisite to voting creates an unnecessary, impermissible burden on their fundamental right to vote. *See Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that making disclosure of sensitive data "a condition of [the] right to vote . . . creates an intolerable burden on that right"); *cf. Ingerman v. Del. River Port Auth.*, 630 F. Supp. 2d 426, 444-45 (D.N.J. 2009) (Privacy Act prohibited defendants from requiring E-ZPass Senior Citizen Program registrants to provide SSN); *Stollenwerk v. Miller*, No. 04-cv-5510, 2006 WL 463393, at *1 (E.D. Pa. Feb. 24, 2006) ("Pennsylvania's requirement that an applicant disclose his Social Security number to purchase a handgun or receive a license to carry a handgun is invalid under the federal Privacy Act.").

Voters would be discouraged from registering and exercising their right to vote if the federal government could seize the sensitive information they submitted for registration without an opportunity to object. And the risk of jeopardizing voters' constitutional rights is now at its zenith, as the Government has admitted to sharing sensitive personal information from the SSA with outside "election integrity" groups and storing such data on unsecured, non-government servers that did not conform with agency security protocols. *See AFSCME* Notice at 5-6.[13]

In *Lynd*, the Fifth Circuit noted that "of great importance" to its reasoning was that it was "not discussing confidential, private papers and effects" but "rather dealing with public records which ought

[13] Other recent incidents have shown that today, in ways unimaginable when *Lynd* was decided, vast federal databases can be hacked or mishandled. *See, e.g.*, *In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 49 (D.C. Cir. 2019) ("In 2014, cyberattackers breached multiple U.S. Office of Personnel Management . . . databases and allegedly stole the sensitive personal information—including birth dates, Social Security numbers, addresses, and even fingerprint records—of a staggering number of past, present, and prospective government workers."); *Nemeth-Greenleaf v. U.S. OPM,* No. 25-cv-407, 2026 WL 2559476, at *3 (D.D.C. Aug. 28, 2026) (denying reconsideration of denial of motion to dismiss where "Plaintiffs alleged that Defendants shared their personal information with DOGE staffers who, at the relevant time, were not government employees, had not completed the necessary training, and had demonstrated a willingness to handle and share sensitive data in an insecure manner").

ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. But in this case, the Government seeks sensitive private information like Social Security numbers, not just public records. Federal laws enacted since *Lynd* acknowledge the sensitivity of such personal data in multiple ways. *See, e.g.*, 5 U.S.C. § 552(b)(6) (FOIA provision exempting private records from disclosure); *id.* § 552a(b) (establishing protections for personal information held by the federal government); 18 U.S.C. §§ 2721-2722 (restricting disclosure of personal information from state motor vehicle records); 44 U.S.C. § 3501 note, Pub. L. No. 107-347, § 208(a), 116 Stat. 2899, 2921 (2002) (purpose of E-Government Act of 2002 is to "ensure sufficient protections for the privacy of personal information.").

Courts' treatment of requests for state voter rolls under the NVRA is instructive here. The NVRA includes a records provision allowing for disclosure of records related to list maintenance. *See* 52 U.S.C. § 20507(i)(1). And, as courts have recognized in NVRA cases, "appropriate redaction" of voters' sensitive personal data is permitted and may even be affirmatively required to protect the fundamental right to vote as well as voter privacy. *See Pub. Int. Legal Found., Inc. v.*

*Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir. 2012); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Interpreting the NVRA to allow for such redactions thus helps prevent any conflict between the NVRA's disclosure provisions and voters' constitutional rights and thereby "avoid[s] a statutory interpretation that creates constitutional issues." *Burton v. Schamp*, 25 F.4th 198, 212 (3d Cir. 2022).

Title III should be interpreted consistently with the later-enacted NVRA to allow and even require redactions to protect privacy and the right to vote. It is no accident that the statutes use the same "all records" language. *Compare* 52 U.S.C. § 20507(i)(1) ("Each State shall maintain for at least 2 years and shall make available for public inspection . . . *all records* concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters") (emphasis added), *with id.* § 20701 ("Every officer of election shall retain and preserve, for a period of twenty-two months . . . *all records* and papers which come into his possession relating to any application, registration, payment of poll tax, or other act

requisite to voting in such election . . . .") (emphasis added). And both statutes are silent as to how sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703, *with id.* § 20507(i)(1).

Resisting this straightforward approach, the Government argues that the NVRA's disclosure provisions are available to all, whereas the CRA applies only to the federal government. U.S. Br. at 46-47. But invasions of privacy by the federal government are no less chilling than those wrought by private actors—indeed, many would find federal intrusions to be a *bigger* problem. *See, e.g.*, Barry Friedman & Danielle Keats Citron, *Indiscriminate Data Surveillance*, 110 Va. L. Rev. 1351, 1356 (2024); William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1845 (2016). Moreover, the limited case law considering records requests under the CRA from around the time of the statute's passage expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230; *accord In re Coleman*, 208 F. Supp. at 200. In other words, even in the CRA context, courts can and must protect sensitive voter information from disclosure where privacy and constitutional concerns

arise. *See, e.g.*, *Bellows*, 92 F.4th at 56; *accord Project Vote/Voting for Am., Inc.*, 682 F.3d at 339.[14]

And in addition to these constitutional constraints, DOJ's efforts also run afoul of the federal Privacy Act, which requires it to publish a System of Records Notice (SORN) detailing the use and storage of the SVRLs before collecting them, 5 U.S.C. § 552a(e)(4), and which bans the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," such as the right to vote, *id.* § 552a(e)(7); *see Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69, 75-76 (1990).

[14] Pennsylvania voters have a strong interest in the privacy of their personal identifying information, including driver's license numbers and SSN4s, as the existence of numerous state law protections for such information shows. *See, e.g.*, 25 Pa. Cons. Stat. § 1404 (statutory restrictions on SVRL data dissemination); 4 Pa. Code § 183.14(c)(3) (regulation pursuant to that statute prohibiting disclosure of SVRL fields revealing driver's license numbers and SSN4s); 74 Pa. Stat. § 201 (broad restrictions on disclosure and dissemination of SSNs); 65 Pa. Stat. § 67.708(b)(6)(i)(A) (exempting from public records law documents "containing all or part of a person's Social Security number [or] driver's license number"); 73 Pa. Stat. §§ 2301-2330 (Breach of Personal Information Notification Act). These state laws are relevant not because they somehow supersede federal law, but because they help define the strong privacy interest of Pennsylvania voters.

The Government's response is that it may bypass these constraints by relying on years-old, outdated SORNs. U.S. Br. at 50-52. The breathtaking reasoning behind that response echoes the Government's "trawling expedition" understanding of what Congress authorized in 1960: in the Government's view, *every registered voter in Pennsylvania is a subject of a federal criminal investigation into voter fraud* and somehow simultaneously a *victim* of the fraud being investigated. *See* U.S. Br. at 52 ("Persons who appear in [an SVRL] are '[s]ubjects of investigations,' 68 Fed. Reg. at 47,611," and also "potential 'victims' of NVRA and HAVA noncompliance, 68 Fed. Reg. at 47,611."). That the Government needs to characterize each of the nine million registered voters in the Commonwealth as both a subject and a victim in a criminal investigation to get around the requirement to publish a new SORN is telling. Under the Government's interpretation, it can compile and maintain a nationwide voter database that has never been authorized by Congress as part of its "routine" enforcement of the CRA, NVRA, and HAVA. *See* U.S. Br. at 51. This would make a mockery of the Privacy Act.

Even if the Government had properly pleaded some entitlement to Pennsylvania's SVRL under Title III, voters' sensitive personal

information would still need protection. Because DOJ demands only an unredacted SVRL containing sensitive personal identifying information that cannot be disclosed without violating the Constitution and the Privacy Act, its demand is defective, and the Court can affirm on that basis as well.

## CONCLUSION

The decision below should be affirmed.

Dated: November 20, 2026

Respectfully submitted,

/s/ Ari J. Savitzky

Ari J. Savitzky (NY 5060181)
Theresa J. Lee (NY 5022769)
Sophia Lin Lakin (NY 5182076)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

Witold J. Walczak (PA 62976)
Kate I. Steiker-Ginzberg (PA 332236)
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Tel: (215) 592-1513
vwalczak@aclupa.org
ksteiker-ginzberg@aclupa.org

Mary M. McKenzie (PA 47434)
Benjamin Geffen (PA 310134)
Olivia Mania (PA 336161)
Martin J. Black (PA 54319)
PUBLIC INTEREST LAW
CENTER
1617 JFK Blvd., Suite 1650
Philadelphia, PA 19103
Tel: (267) 546-1313
mmckenzie@pubintlaw.org

*Counsel for Intervenor-Defendants - Appellees Nicholas Maston, Gregory Perry, Todd Thatcher, Joel Dickson, Trisha Kent, Lior Sternfeld, John Thompson, League of Women Voters of Pennsylvania, and Common Cause*

bgeffen@pubintlaw.org
omania@pubintlaw.org

## COMBINED CERTIFICATIONS

The undersigned is a member of the bar of this Court.

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this document contains 12,909 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced 14-point serif font, Century Schoolbook, using Microsoft Word

The text of this electronic brief is identical to the text in paper copies that will be filed with the Court.

Pursuant to 3d Cir. L.A.R. 31.1(c), virus detection program, Malwarebytes version 5.7.3 (x64), has been run on this electronic brief and no virus was detected.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Ari J. Savitzky*
Ari J. Savitzky

## CERTIFICATE OF SERVICE

I herby certify that on November 20, 2026, I caused a true and correct copy of the foregoing Motion to be served on all parties via the Court's CM/ECF system.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Ari J. Savitzky*
Ari J. Savitzky