No. 26-2684

**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

SECRETARY OF STATE FOR THE COMMONWEALTH OF PENNSYLVANIA,

*Defendants-Appellees*,

PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS, NICHOLAS MASTON, GREGORY PERRY, TODD THATCHER, JOEL DICKSON, TRISHA KENT, LIOR STERNFELD, JOHN THOMPSON, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, COMMON CAUSE, MIKE CROSSEY,

*Intervenors-Defendants-Appellees*,

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, STACEY TAYLOR,

*Intervenors-Appellees*.

On Appeal from the United States District Court
for the Western District of Pennsylvania

# BRIEF OF INTERVENORS-APPELLEES NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, PENNSYLVANIA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AND STACEY TAYLOR

(*See inside cover for listing of Counsel*)

ROBERT WEINER
LEAH FRAZIER
GILLIAN CASSELL-STIGA
CATHERINE MEZA
GRACE THOMAS
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

ANTON METLITSKY
ANDREW FRACKMAN
REEMA SHAH
O'MELVENY & MYERS LLP
1301 Ave. of the Americas, Ste. 1700
New York, NY 10019
Tel: (212) 326-2000

NOAH BOKAT-LINDELL
O'MELVENY & MYERS LLP
1625 Eye Street NW, 10th Floor
Washington, DC 20006
Tel: (202) 383-5300

*Counsel for Intervenors-Appellees National Association for the Advancement of Colored People, Pennsylvania State Conference of the National Association for the Advancement of Colored People, and Stacey Taylor*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the National Association for the Advancement of Colored People ("NAACP") states that it has no parent corporation and that no publicly held corporation holds 10% or more of its stock. The Pennsylvania State Conference of the National Association for the Advancement of Colored People states that its parent corporation is the NAACP and that no publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......................................................................................1

STATEMENT OF JURISDICTION.........................................................................2

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF RELATED CASES ........................................................................3

STATEMENT OF THE CASE...............................................................................3

A. Legal Background ...............................................................................3

B. DOJ's Voter Roll Policy ...........................................................................5

C. The Present Case ...................................................................................8

SUMMARY OF ARGUMENT ..............................................................................9

ARGUMENT ...........................................................................................12

I. THE DISTRICT COURT LACKED JURISDICTION TO ADJUDICATE DOJ'S REQUEST.............................................12

II. DOJ'S DEMAND IS SUBJECT TO TRADITIONAL JUDICIAL REVIEW ..........................................................13

III. DOJ FAILS TO SATISFY TITLE III'S "PURPOSE" REQUIREMENT ..............................................................14

A. The Purpose of a Title III Demand Must Be Consistent with the Purpose of Title III.......................................16

B. The Purpose of Title III is to Investigate and Remedy Discriminatory Voting Practices.............................................20

C. DOJ Fails to Articulate an Acceptable Purpose for Its Records Demand ..........................................................22

1. DOJ Cannot Use Title III to Compel Sensitive Voter Data for Its Admitted Purposes of Federal List Maintenance and Voter-Fraud Enforcement ..................22

2. Title III Does Not Authorize DOJ to Compel Sensitive Voter Data to Ascertain Compliance with the NVRA and HAVA. ..............................................27

3. DOJ's Proffered Purpose Does Not Justify Seeking the Sensitive Voter Data that Remains the Only Information in Dispute..............................................31

IV. DOJ DOES NOT STATE A BASIS FOR ITS DEMAND................35

A. Title III Requires that DOJ Provide a Factual Basis for Its Demand .................................................................35

B. DOJ Did Not State a Valid Factual Basis for its Request.........38

# TABLE OF CONTENTS

**Page**

V. DOJ'S INTERPRETATION OF TITLE III PRESENTS SIGNIFICANT FIRST AMENDMENT CONCERNS THAT MUST BE AVOIDED ............ 40

A. DOJ's Interpretation of Title III Presents Significant First Amendment Concerns ............ 40

B. Constitutional Avoidance Principles Demand that the Court Avoid DOJ's Interpretation ............ 49

VI. DOJ CANNOT DEMAND ELECTRONIC COPIES OF RECORDS UNDER TITLE III ............ 50

CONCLUSION ............ 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. Am. Airlines, Inc.*,
181 F.3d 363 (3d Cir. 1999)....20

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017).... 31, 34

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)....4

*Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*,
877 F.3d 136 (3d Cir. 2017)....36

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .... 35, 51

*Bond v. United States*,
572 U.S. 844 (2014)....16

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999).... passim

*Buele Morocho v. Warden Phila. FDC*,
189 F.4th 287 (3d Cir. 2026)....18

*Common Cause v. U.S. Dep't of Just.*,
2026 WL 3033772 (D.D.C. Oct. 9, 2026) .... passim

*Dep't of Comm. v. New York*,
588 U.S. 752 (2019)....24

*EEOC v. Kloster Cruise Ltd.*,
939 F.2d 920 (11th Cir. 1991) ....13

*E.E.O.C. v. Kronos Inc.*,
620 F.3d 287 (3d Cir. 2010)....28

*EEOC v. Univ. of Notre Dame Du Lac*,
715 F.2d 331 (7th Cir. 1983)....33

*EEOC v. Univ. of Pa.*,
850 F.2d 969 (3d Cir. 1988)....33

*F.D.I.C. v. Wentz*,
55 F.3d 905 (3d Cir. 1995).... passim

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
482 F.3d 247 (3d Cir. 2007).... 26, 29, 39

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....33

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Foster v. Love*,
522 U.S. 67 (1997) ....................4

*Fresenius Med. Care v. United States*,
526 F.2d 372 (8th Cir. 2008) ....................13

*FTC v. Turner*,
609 F.2d 743 (5th Cir. 1980) ....................13

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ....................18

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
105 F.4th 1324 (11th Cir. 2024) ....................50

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) .................... 41, 47

*Hewitt v. United States*,
606 U.S. 419 (2025) ....................16

*In re 2025 UPMC Subpoena*,
2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ....................27

*In re Children's Nat'l Hosp.*,
2026 WL 160792 (D. Md. Jan. 21, 2026) ....................27

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
2026 WL 33398 (D. Colo. Jan. 5, 2026) ....................26

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ....................42

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .................... passim

*Khouzam v. Att'y Gen. of U.S.*,
549 F.3d 235 (3d Cir. 2008) ....................49

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025), *aff'd sub nom.*, 2026 WL 1991571
(D.C. Cir. July 2, 2026) ....................4

*Major League Baseball v. Crist*,
331 F.3d 1177 (11th Cir. 2003) ....................44

*Malleus v. George*,
641 F.3d 560 (3d Cir. 2011) ....................14

*N.L.R.B. v. SW Gen., Inc.*,
580 U.S. 288 (2017) ....................19

*Nielsen v. Preap*,
586 U.S. 392 (2019) .................... 16, 37

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) .......... 22

*Parrish v. United States*,
605 U.S. 376 (2025) .......... 19

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026) .......... 30

*Pub. Int. Legal Found. v. Boockvar*,
431 F. Supp. 3d 553 (M.D. Penn. 2019) .......... 33, 51

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 34

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) .......... 34, 46

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026), *pet. for cert. docketed*, No. 26-98 (U.S. Jul. 22, 2026) .......... 34

*Reese Bros., Inc. v. United States*,
447 F.3d 229 (3d Cir. 2006) .......... 36

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) .......... 26

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) .......... 20, 22

*Stoffa v. Zaken*,
2025 WL 2159094 (3d Cir. July 30, 2025) .......... 36

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir.), *amended on denial of reh'g*, 110 F.4th 612 (3d Cir. 2024) .......... 32

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .......... 37

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*,
489 U.S. 749 (1989) .......... 14

*U.S. Int'l Trade Comm'n v. ASAT, Inc.*,
411 F.3d 245 (D.C. Cir. 2005) .......... 13

*United States v. Alabama*,
362 U.S. 602 (1960) .......... 21

*United States v. Albence*,
2026 WL 3407115 (D. Del. Nov. 10, 2026) .......... 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ....................................................................8

*United States v. California*,
2026 WL 3212945 (9th Cir. Oct. 26, 2026)..................................................5

*United States v. California*,
2026 WL 3268272 (9th Cir. Oct. 30, 2026)..................................................44

*United States v. Harris Methodist Fort Worth*,
970 F.2d 94 (5th Cir. 1992)..........................................................................33

*United States v. Jackson*,
964 F.3d 197 (3d Cir. 2020)..........................................................................36

*United States v. LaSalle Nat'l Bank*,
437 U.S. 298 (1978).......................................................................................17

*United States v. Lynd*,
301 F.2d 818 (5th Cir. 1962).........................................................................22

*United States v. Mississippi*,
380 U.S. 128 (1965).......................................................................................21

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950).......................................................................................17

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ............................................................ 24, 32

*United States v. Palomar-Santiago*,
593 U.S. 321 (2021).......................................................................................36

*United States v. Powell*,
379 U.S. 48 (1964)....................................................................................... 17, 24

*United States v. Rumely*,
345 U.S. 41 (1953)....................................................................................... passim

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ................................................ 24, 32, 43

*United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*,
5 F.4th 315 (3d Cir. 2021)..............................................................................20

*Voter Ref. Found. LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) .................................................................. 32, 34

*Wisconsin Cent. Ltd. v. United States*,
585 U.S. 274 (2018).......................................................................................36

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

### Constitutional Provisions

25 Pa. Stat. and Cons. Stat. Ann. § 1404 ....14
Pa. Const. art. I, § 1 ....14
U.S. Const. amend. XIV, § 1 ....4
U.S. Const. amend. XIV, § 5 ....4
U.S. Const. amend. XV ....4
U.S. Const. amend. XV, § 2 ....4
U.S. Const. art. I, § 4, cl. 1 .... 4, 30

### Statutes

52 U.S.C. § 10101 ....4
52 U.S.C. § 10101(e) ....19
52 U.S.C. § 20501 ....34
52 U.S.C. § 20501(b) ....5
52 U.S.C. § 20507(a)(3) ....30
52 U.S.C. § 20507(a)(4) .... 29, 30
52 U.S.C. § 20507(i) .... 27, 34
52 U.S.C. § 20510(a) .... 27, 31, 34
52 U.S.C. § 20701 .... 15, 32
52 U.S.C. § 20703 .... passim
52 U.S.C. § 20705 .... 2, 10, 12
52 U.S.C. § 21081 ....34
52 U.S.C. § 21082 ....34
52 U.S.C. § 21083 ....34
52 U.S.C. § 21083(a)(1)(A) ....30
52 U.S.C. § 21083(a)(2)(A)(i) .... 30, 35
52 U.S.C. § 21083(a)(2)(B) ....30
52 U.S.C. § 21083(a)(4) ....35
52 U.S.C. § 21083(a)(5)(A)(ii) ....29
52 U.S.C. § 21083(a)(5)(B)(i) ....48
52 U.S.C. § 21085 ....31
52 U.S.C. § 21111 .... 27, 31, 34
52 U.S.C. §§ 10301-10314 ....4

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

52 U.S.C. §§ 20701-20706 .......... 4

52 U.S.C. §§ 20901-21145 .......... 35

**Rules**

Fed. R. App. P. 28(i) .......... 8, 9, 13, 14

**Regulations**

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) .......... 5, 6

Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) .......... 7

**Other Authorities**

Mar. 26, 2026 Hr'g Tr., *United States v. Amore*, No. 25-cv-00639 (D.R.I.), https://www.brennancenter.org/media/15517/download/ri-hearing-transcript-2026-03-26.pdf .......... 23

*Addressing Risks from Chris Krebs and Government Censorship*, The White House (April 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship .......... 43

Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024), https://www.npr.org/2024/10/11/nx-s1-5147732/voter-fraud-explainer .......... 44

*Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __ (May 12, 2026) .......... passim

*Basis*, Black's Law Dictionary (4th rev. ed. 1968) .......... 37

*Basis*, Webster's New International Dictionary 2018 (2d ed. 1955) .......... 37

Br. of Amicus Curiae the United Black Agenda, *United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. Feb. 26, 2026) .......... 47

H.R. Rep. No. 86-956 (1959) .......... 22

H.R. Rep. No. 107-329 (2001) .......... 5

*Hearing on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 9 (1960) .......... 21, 22

Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters .......... 46

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026), https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion .......... 45

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota (Jan. 24, 2026), https://perma.cc/34U4-3SK3 ....................................25

Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026), https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html ....................................44

Miles Parks, *Republicans' Sweeping Election Overhaul Fails in the Senate*, NPR (June 4, 2026), https://www.npr.org/2026/06/04/nx-s1-5751145/save-act-senate-vote-trump ....................................7

Mot. to Expedite, *United States v. Simon*, No. 26-2679 (8th Cir. Aug. 21, 2026)....................................23

Office of Public Affairs, *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering*, U.S. Dep't of Just. (April 21, 2026), https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-poverty-law-center-wire-fraud-false-statements-and....................................48

*Purpose*, *Black's Law Dictionary* (4th Rev. ed. 1968)....................................36

*Purpose*, *Webster's New International Dictionary* 2018 (2d ed. 1955)....................................37

Tierney Sneed et al., *Inside the Justice Department's Pursuit of Trump's 2020 Election Fraud Fixations*, CNN (May 28, 2026), https://www.cnn.com/2026/05/28/politics/inside-justice-department-2020-election-fraud ....................................43

*Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Nov. 10, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information....................................6

U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* (2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf?inline=1 ....................................46

U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights* (1959)....................................21

## INTRODUCTION

The U.S. Department of Justice ("DOJ") seeks this Court's blessing to exploit the Civil Rights Act of 1960 ("CRA")—enacted to combat racial discrimination in voting—to seize control over elections and usurp the power the Constitution granted the states to manage voter-list maintenance. In furtherance of this unprecedented federal power grab, DOJ has commandeered the compulsory process provisions of Title III of the CRA to demand disclosure of the sensitive data of every Pennsylvania voter. And it has done so in service of long-debunked voter-fraud theories that have been used to target communities of color. DOJ does not even pretend that it has invoked compulsory process under Title III to enforce the CRA or to investigate racial discrimination in voting.

Instead, DOJ urges this Court to abdicate judicial review and grant limitless authority to DOJ to demand and amass sensitive voter information for any purpose. DOJ has no alternative but to discourage judicial scrutiny of its actions, because DOJ provided no factual basis for its demand and because DOJ's purported purpose—ascertaining compliance with the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA")—is pretextual. DOJ's true goal is to create a national voter database, enabling it to supplant the states' authority to determine voter eligibility and to bolster enforcement of immigration and criminal laws.

The Court should not grant the federal government unchecked power to use the CRA in any way it sees fit. Nor should the Court sanction such a sweeping invasion of voter privacy. Doing so would chill voters from registering to vote and participating in elections, especially given the federal government's high-profile efforts to investigate and prosecute voters and election officials and its sharing of information with agencies that have violently assaulted people of color on the mistaken assumption that they are illegal immigrants or violating a federal statute. These grave constitutional concerns require rejecting DOJ's reading of the CRA.

The district court correctly dismissed DOJ's unlawful Title III demands and denied its Motion to Compel production of Pennsylvania's unredacted voter roll. This Court should affirm its ruling.

## STATEMENT OF JURISDICTION

The district court lacked jurisdiction to hear this case because it was not "[t]he United States district court for the district in which [DOJ's] demand [was] made pursuant to [52 U.S.C. §] 20703 . . . , or in which a record or paper so demanded is located." 52 U.S.C. § 20705; *see infra* Part I. This Court has jurisdiction to determine whether the district court lacked jurisdiction, and to otherwise review the district court's judgment, under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Title III's jurisdiction-channeling provision barred DOJ from suing in the Western District of Pennsylvania.

2. Whether the district court rightly applied the Federal Rules of Civil Procedure to DOJ's complaint.

3. Whether DOJ's request failed to provide Pennsylvania with, or was not made pursuant to, a proper legal "purpose" consistent with Title III.

4. Whether DOJ failed to provide a factual "basis" for requesting Pennsylvania's full, unredacted voter rolls.

5. Whether constitutional avoidance principles preclude DOJ's interpretation of Title III allowing DOJ to demand sensitive, private voter information without any purpose or factual basis related to the CRA, chilling the exercise of the right to vote.

6. Whether Title III, whose text only requires state officials to make records available at his office, requires the Secretary to provide DOJ an electronic copy of Pennsylvania's voter roll.

## STATEMENT OF RELATED CASES

Intervenors-Appellees agree with Appellant's Statement of Related Cases.

## STATEMENT OF THE CASE

### A. Legal Background

The Constitution does not prescribe a role for the Executive Branch in administering federal elections. Instead, it "invests the States with responsibility for

the mechanics" of federal elections so long as "Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); U.S. Const. art. I, § 4, cl. 1.[1] States bear primary responsibility for maintaining registration lists, stemming from their sole power to prescribe voter qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (discussing Congress's lack of power to "regulate" qualifications). Where the Constitution contemplates federal involvement, it lies with Congress, not the Executive Branch. *See League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 72-74 (D.D.C. 2025), *aff'd sub nom.*, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

The Fourteenth and Fifteenth Amendments increased federal power to eliminate discrimination in voter qualifications and voting as needed, while underlining Congress's primary role in exercising that power. *See* U.S. Const. amend. XIV §§ 1, 5; *id.* amend. XV. Congress has passed "appropriate legislation" to fulfill this mandate, *id.* amend. XIV, § 5; *id.* amend. XV, § 2—including the Civil Rights Act of 1957, 52 U.S.C. § 10101, the Civil Rights Act of 1960, *id.* §§ 20701-20706, the Civil Rights Act of 1964, *id.* § 10101, and the Voting Rights Act of 1965 (VRA), *id.* §§ 10301-10314. In this constitutional context, Congress enacted information-retention and information-request provisions in Title III of the Civil

[1] Unless otherwise stated, all emphasis is added and citations, quotations, and alterations are omitted.

Rights Act of 1960, "to enable the Attorney General to determine whether [Civil Rights Act] suits or similar actions should be instituted" and to gather evidence to bring such cases. *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

Neither the CRA, nor the NVRA, nor HAVA authorizes the federal government to usurp states' responsibilities for maintaining voter lists, to pool sensitive voter data, or to dictate purges of individuals from state rolls. *See* H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001) (calling for the preservation of state-administered elections under HAVA); *see also Common Cause v. U.S. Dep't of Just.*, 2026 WL 3033772, at *25 (D.D.C. Oct. 9, 2026) ("Consistent with our constitutional structure, the NVRA and HAVA place *states* at the helm of maintaining their voter rolls."); *United States v. California*, 2026 WL 3212945, at *11 (9th Cir. Oct. 26, 2026) (Bennett, J., concurring) (referring to the NVRA as "clear policy . . . delegating responsibility for voter roll maintenance . . . to the states"). Indeed, Congress enacted those laws to facilitate ballot access. *See* 52 U.S.C. § 20501(b).

### B. DOJ's Voter Roll Policy

Two months into his current term, the President issued an Executive Order designed to exert unconstitutional federal control over elections. The order alleged a failure "to enforce basic and necessary election protections employed by modern, developed nations, as well as those still developing," and derided state policies such as "self-attestation for citizenship" and "mail-in voting." Exec. Order No. 14,248,

§ 1, 90 Fed. Reg. 14,005, 14,005 (Mar. 25, 2025). The order purported to impose new policies upon states and—claiming "[s]tates fail adequately to vet voters' citizenship," *id.*—it directed the Attorney General to "enter into information-sharing agreements" with state election officials "to provide the Department of Justice with detailed information on all suspected violations of *State* and Federal election laws discovered by State officials." *id.* § 5(a), 90 Fed. Reg. at 14,008.

"In response to the President's order," DOJ began issuing Title III demands across the country "to compel states to turn over statewide voter lists" and "share those records" with the Department of Homeland Security, "seek[ing] to strike" purportedly ineligible voters "from [states'] voter registration list[s]." *Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __, at 1, 5-6 (May 12, 2026) ("OLC Memo");[2] *see also Common Cause*, 2026 WL 3033772, at *4, *20 (noting that DOJ adopted voter-list-request policy in response to an executive order, gave it a name, and received opinion on its proposal from OLC). So far, DOJ has requested unredacted sensitive voter-roll data from 48 states and has sued 30 of them along with the District of Columbia to compel disclosure. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Nov. 10, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-

[2] https://www.justice.gov/olc/media/1440346/dl.

justice-department-requests-voter-information. Through these efforts, DOJ seeks not just to build a federal list maintenance database, but also to "share" voters' sensitive information "with DHS for the purpose of identifying illegal aliens who are ineligible to vote" and conducting criminal prosecutions. OLC Memo 1.

Another executive order issued this year reinforced the federal government's desire to usurp states' authority to determine their voters' qualifications. The order required DHS to create federal lists of citizens whom the federal government deems eligible to vote; it threatened states with loss of federal funds for failure to cooperate; and it blustered about prosecuting individuals who send ballots to those the federal government deems ineligible. Exec. Order No. 14,399, §§ 2(a)-(b), 5, 91 Fed. Reg. 17125, 17125-27 (Mar. 31, 2026). It also ordered the U.S. Postal Service to issue a regulation providing, among other things, that "USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on [DHS's] State-specific list" of citizens. *Id.* § 3(b)(iii), 91 Fed. Reg. at 17126.[3]

To date, every court that has ruled on DOJ's enforcement actions against states has dismissed its claims. *See United States v. Benson*, 179 F.4th 470 (6th Cir.

---

[3] Consistent with the Constitution's directive that the Executive play no part in state elections, Congress rejected the Administration's proposed legislation adopting many of the same initiatives appearing in the executive order. Miles Parks, *Republicans' Sweeping Election Overhaul Fails in the Senate*, NPR (June 4, 2026), https://www.npr.org/2026/06/04/nx-s1-5751145/save-act-senate-vote-trump.

2026); *United States v. Albence*, 2026 WL 3407115, at *1, *2 n.1 (D. Del. Nov. 10, 2026) (dismissing and citing 27 other cases doing same). Notably, in a recent opinion, the U.S. District Court for the District of Columbia assessed DOJ's policy of demanding states' voter registration lists, comparing them against a citizenship-status database plagued with inaccuracies, and urging removal of purportedly ineligible voters. *See Common Cause*, 2026 WL 3033772, at *1. The Court concluded that the policy exceeded DOJ's statutory authority under the CRA, NVRA, and HAVA, and violated the Administrative Procedure Act, the Privacy Act, and the Paperwork Reduction Act. *Id.*

### C. The Present Case

The National Association for the Advancement of Colored People ("NAACP"), Pennsylvania State Conference of the National Association for the Advancement of Colored People, and Stacey Taylor (collectively, "NAACP Intervenors") adopt the background section, including the procedural history section, of the brief of Defendant-Appellee Secretary of State for the Commonwealth of Pennsylvania ("the Secretary"). *See* Fed. R. App. P. 28(i).[4]

Of note, DOJ's August 4 Letter identified "potential anomalies in Pennsylvania's . . . responses" to a government elections survey, Appellant's Br. 22,

[4] NAACP Intervenors intervened in the district court and moved to dismiss the case alongside the Secretary and other intervenors. JA26, 35; Docs. 17, 109.

and requested that Pennsylvania produce its state voter roll "[p]ursuant to Section 20507(i) of the NVRA," JA210-11. DOJ's August 14 Letter provided the "purpose" for its demand: "to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." JA222. On August 21, 2025, Secretary Schmidt offered to let DOJ inspect Pennsylvania's Full Voter Export as provided by the CRA and Section 20507(i) of the NVRA. JA225-26. DOJ did not respond to the Secretary's offer and instead filed the instant action on September 25, 2025. The only fields DOJ seeks that Secretary Schmidt has declined to provide are voters' partial social security numbers ("SSN4s") and drivers' license numbers. JA52 ¶ 43.

## SUMMARY OF ARGUMENT

DOJ's demand for Pennsylvania's unredacted voter roll fails to satisfy Title III's "purpose" and "basis" requirements. The Court should affirm.[5]

1. As a threshold matter, the district court lacked jurisdiction to hear DOJ's Title III claim. Title III channels jurisdiction to the district courts of the districts in which DOJ's requests were made or where the records sought are located—which

[5] Other appellees' briefs address the district court's holding that Pennsylvania's statewide voter list falls outside Title III's ambit, with which NAACP Intervenors do not disagree. NAACP Intervenors adopt the other appellees' arguments explaining why DOJ's request does not preempt state privacy laws and violates federal privacy laws. *See* Fed. R. App. P. 28(i). This brief will focus principally on DOJ's failure to satisfy Title III's "purpose" and "basis" requirements, which the district court found to be an alternative basis for dismissal. *See* JA3-4. The district court also dismissed DOJ's claims under the NVRA and HAVA, *see* JA4; DOJ did not appeal the dismissal of these claims, *see* Appellant's Br. 13.

in this case is the Middle, not the Western, District of Pennsylvania. *See* 52 U.S.C. § 20705.

2. Even if the court had jurisdiction, DOJ is simply wrong that courts cannot review its Title III requests. DOJ cannot claim unreviewable power under Title III to investigate *any* possible violation of *any* statute—a dangerous combination of asserted authorities.

3. On the merits, DOJ fails entirely to satisfy the statutory requirements that its Title III demand identify a "purpose" for its investigation consistent with that of the statute and state the *factual* "basis" to suspect Pennsylvania is violating federal law. 52 U.S.C. § 20703.

***First***, as to purpose: The text of Title III makes plain that DOJ may only issue demands for purposes consistent with the statute—*i.e.*, investigating and remedying voter discrimination. To hold otherwise—to allow *any* purpose to satisfy Title III—would neuter the purpose requirement. Here, by its own admission, DOJ seeks Pennsylvania's unredacted voter roll to identify, prosecute, and remove from state-voter lists purportedly undocumented and "ineligible" voters. OLC Memo 5 (admitting DOJ's true aims are "to identify illegal aliens who are ineligible to vote" and otherwise "remove those who are ineligible to vote from their rolls—whether due to illegal presence in this country or otherwise."); *see also* Appellant's Br. 52. Neither this purpose nor DOJ's asserted (but pretextual) purpose of ascertaining

NVRA and HAVA compliance has anything to do with investigating or remedying voter discrimination.

Even if purposes unrelated to voter discrimination *could* satisfy Title III, DOJ cannot invoke NVRA and HAVA compliance to compel sensitive voter information. The NVRA imposes *procedural* requirements on states; DOJ does not need the sort of sensitive voter data it demands here to assess compliance. Courts have never required states to hand over such data *en masse* to DOJ, even under Title III. And seeking such data to enforce the NVRA and HAVA is especially inappropriate, since doing so would circumvent the NVRA's own narrower public-disclosure provision.

***Second***, DOJ fails the statute's requirement to give the "basis" for its request. "Basis" means *factual* basis—*i.e.*, the reason DOJ believes there is a potential legal violation to which Pennsylvania's unredacted voter roll is relevant. DOJ provided none. And if, as DOJ asserts, stating the *legal* authority were enough, then the "basis" and "purpose" requirements would collapse into one and the word "basis" would be superfluous. But even if DOJ had supplied a basis to suspect Pennsylvania election officials violated federal election laws, it has provided no basis for demanding and retaining the driver's license or SSN4 of every voter in Pennsylvania pursuant to its investigation.

***Third***, allowing the government to wield Title III to compel *any* voter's sensitive data for *any* purpose without *any* factual basis to suspect a legal violation—

DOJ's desired interpretation—would undoubtedly chill voter participation. DOJ's interpretation of Title III raises significant First Amendment concerns. The Supreme Court has held many times that courts should avoid interpreting statutes in a manner that raises such constitutional questions. *See United States v. Rumely*, 345 U.S. 41, 47 (1953).

4. Finally, DOJ is not entitled to the remedy it seeks: an electronic copy of Pennsylvania's voter roll. Title III only guarantees DOJ the right to inspect and copy documents itself at the office of the documents' custodian; the statute does not require Pennsylvania to instead provide DOJ with an electronic copy of its voter list.

## ARGUMENT

### I. THE DISTRICT COURT LACKED JURISDICTION TO ADJUDICATE DOJ'S REQUEST.

The district court correctly dismissed for lack of subject-matter jurisdiction because DOJ "*sued in the wrong place*." JA4. As the NAACP Intervenors argued below, *see* Doc. 109, at 22-23; *see also* Doc. 132 (joining the Secretary's opposition to DOJ's motion to transfer), Title III channels jurisdiction solely to the district courts in the districts "in which a demand is made, . . . or in which a record or paper so demanded is located," 52 U.S.C. § 20705. The district court here did not fall into either of these categories and so did not have jurisdiction over this case. The NAACP Intervenors adopt the Secretary's arguments regarding the district court's

lack of jurisdiction, including his arguments regarding DOJ's claim (Br. 16-19) that Section 20705 is a venue statute. *See* Fed. R. App. P. 28(i).

## II. DOJ'S DEMAND IS SUBJECT TO TRADITIONAL JUDICIAL REVIEW.

The Court should reject DOJ's attempt (Br. 23-27) to immunize its demand for the sensitive data of every Pennsylvania voter from judicial review.

DOJ's extreme theory that it is entitled to conduct a digital roundup of voter information free from any limitation or judicial review conflicts with the regular judicial practice of reviewing investigative actions. Even under the more lenient standards applicable to administrative subpoenas, courts may review requests to determine whether they (1) are issued "pursuant to a legitimate purpose," (2) seek evidence that is "relevant" to that purpose, and (3) are not "unreasonably broad or burdensome"—and, most crucially here, (4) whether "the administrative steps required by the statute have been followed." *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995); *accord, e.g.*, *FTC v. Turner*, 609 F.2d 743, 745 (5th Cir. 1980); *Fresenius Med. Care v. United States*, 526 F.2d 372, 375 (8th Cir. 2008); *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 922-23 (11th Cir. 1991); *see U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 253 (D.C. Cir. 2005) ("[A]lthough the investigative powers of regulatory agencies are broad, they are not unlimited, and are subject to judicial review 'to protect against mistaken or arbitrary orders.'"). Moreover, "[w]hen personal documents of individuals . . . are the subject of an administrative

subpoena," as they are here, "privacy concerns must be considered." *Wentz*, 55 F.3d at 908.

That voters disclose their driver's license numbers and Social Security numbers to *states* when submitting routine voter registration forms does not mean that voters have no privacy interest in their sensitive information. Information is "private" as long as "it is 'intended for or restricted to the use of a particular . . . group." *Malleus v. George*, 641 F.3d 560, 564 (3d Cir. 2011) (quoting *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 763-64 (1989)). Voters' sensitive information was "intended for . . . use" by Pennsylvania election officials to determine voter identity. *Id.* "'The right not to have intimate facts concerning one's life disclosed without one's consent' is 'a venerable [right] whose constitutional significance [this Court has] recognized in the past.'" *Id.* And voters provided this information under a state-law guarantee that it would not be disclosed. *See* Pa. Const. art. I, § 1; 25 Pa. Stat. and Cons. Stat. Ann. § 1404.

The NAACP Intervenors adopt the arguments of the Secretary and the Common Cause Intervenors on this issue. *See* Fed. R. App. P. 28(i).

## III. DOJ FAILS TO SATISFY TITLE III'S "PURPOSE" REQUIREMENT

DOJ has not shown that it made its request to Pennsylvania for a statutorily permissible legal purpose. To determine whether DOJ's request is valid, courts must determine whether "the administrative steps required by the statute have been

followed." *Wentz*, 55 F.3d at 908. Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for" federal office "are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ may then seek "inspection, reproduction, and copying" of "[a]ny record or paper required by section 20701 of this title to be retained and preserved." *Id.* § 20703. But the government must specify a legal "purpose" for its investigation and a factual "basis" for the requested records that is tied to a possible legal violation. *Id.*

Title III's plain language and longstanding principles of administrative law require the purpose of DOJ's Title III demands to align with Title III's own purpose: investigating and remedying voter discrimination. DOJ's request here does not. DOJ's own statements confirm that it demands voters' sensitive information to federalize list maintenance and exert additional control over state elections, including by preventing flagged individuals from casting votes and prosecuting purportedly undocumented or ineligible voters. DOJ's stated purpose of ascertaining compliance with the NVRA and HAVA also fails to align with Title III's voter discrimination-related aims.

### A. The Purpose of a Title III Demand Must Be Consistent with the Purpose of Title III.

The text of Section 20703 makes plain that the purpose of a Title III demand for records must match that of the statute. Section 20703 does not require that the government provide *a* purpose in the abstract, but "*the* purpose *therefor*." 52 U.S.C. § 20703. By requiring Section 20703 demands to contain a statement of "the purpose therefor," Congress specified both that DOJ cannot simply give *any* reason for seeking information and that the reason given must actually be the purpose "therefor"—the real reason for the request. *See Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("[G]rammar and usage establish that 'the' is 'a function word indicating that a following noun or noun equivalent is *definite* or has been previously *specified by context*.'").

That Title III does not expressly "limit[] the purposes for which the DOJ may request the records," Appellant's Br. 40, does not give DOJ carte blanche to wield the statute for any purpose it pleases. Demands under Section 20703 are "investigative in nature," *Lynd*, 306 F.2d at 228, and must be interpreted in light of the presumptions that traditionally govern information requests made during government investigations. "Part of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Bond v. United States*, 572 U.S. 844, 857 (2014); *see, e.g.*, *Hewitt v. United States*, 606 U.S. 419, 424, 431 (2025) (interpreting statute "against the backdrop of certain

unexpressed presumptions," including that vacated orders are "void *ab initio*"). One such "unexpressed presumption" is the bedrock principle that when the government initiates an investigative request for information, it must do so "pursuant to a legitimate purpose" through an inquiry "relevant to [that] purpose." *United States v. Powell*, 379 U.S. 48, 57-58 (1964). Accordingly, the "purpose" of a Section 20703 demand should mean what it does in other investigatory settings: a purpose tied to the statute authorizing the demand. *See United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 318 (1978) (government demands for production must be made "in good-faith pursuit of the congressionally authorized purposes of" the statute authorizing the demand).

Principles of administrative law dictate the same result. It is well settled that any administrative demand for production must have a "legitimate purpose" and be part of an inquiry "relevant to [that] purpose." *Powell*, 379 U.S. at 57-58 (explaining that it would be an "abuse" of the court's "process" "if [a] summons [was] issued for an improper purpose"); *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("[A] governmental investigation . . . may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."); *see also Wentz*, 55 F.3d at 908 (administrative subpoenas must be made "pursuant to a legitimate purpose" and be "relevant" to the agency's investigation). Title III demands are no different.

DOJ claims that it can seek records to enforce *any* federal law whatsoever—however unrelated that law is to Title III, its purpose, or indeed to voting at all—and that states cannot challenge DOJ's purpose. Appellant's Br. 38, 40. Such an interpretation would give DOJ near-limitless power to investigate anyone for any reason. It also would deprive the statutory "purpose" requirement of all practical significance; DOJ could cite *any* legal purpose. In mandating that the Attorney General include a statement of purpose with any demand for records, Congress did not intend that it be merely performative. *See Buele Morocho v. Warden Phila. FDC*, 189 F.4th 287, 295 (3d Cir. 2026) ("[Statutes must] be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."). That concern is only heightened by the breadth and sensitivity of the data DOJ seeks here. The Court must interpret Title III to avoid granting DOJ unconstrained authority to intrude on the privacy and voting rights of all citizens, unless such a rights-protective reading would be "plainly contrary to the intent of Congress," *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014)—which is clearly not the case. *See also Rumely*, 345 U.S. at 47 (construing statute authorizing investigation of "all lobbying activities" to reach only "representations made directly to Congress," not all efforts to "influence, encourage, promote or retard legislation," because Congress would have used more "explicit" language to authorize "so extensive an investigation").

That a section in Title VI of the CRA, but not Title III, expressly references racial discrimination does not change the analysis, *contra* Appellant's Br. 30-31, especially where there is no dispute that the CRA's purpose is to fortify anti-discrimination protections. *Infra* Part II.B. "The expressio unius canon applies only when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded.'" *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). The section in Title VI of the CRA on which DOJ relies provides substantive remedies to the victims of voter discrimination. 52 U.S.C. § 10101(e) (providing remedies to "any person [that] has been deprived on account of race or color of any [voting] right[s]"). It lies in an entirely different section of the statute and does not "have anything to do with" government records requests. *Parrish v. United States*, 605 U.S. 376, 389 (2025). It therefore provides no support for DOJ's argument that Congress intended to give DOJ free rein to compel sensitive voter data for any purpose it wants. *E.g.*, *id.* (holding that inclusion of authority to relate premature notices of appeal forward in two subsections of rule does not impliedly prohibit relation forward in neighboring subsection dealing with different context, especially in light of background rule allowing relation forward).

This logic applies even more strongly to the other statutes DOJ cites, including Title VII of the 1964 Civil Rights Act, the 1965 Voting Rights Act, and the 1968 Fair Housing Act. "[T]he presumption that 'disparate inclusion or exclusion' is

purposeful is weakened when, as here, the provisions were not joined together or considered simultaneously." *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 332 (3d Cir. 2021); *see also Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 373 (3d Cir. 1999) (expressio unius canon "is pretty weak when applied to acts of Congress enacted at widely separated times"). All the more so because each of these statutes postdates Title III; they cannot shed much light on a prior Congress's intent.

### B. The Purpose of Title III is to Investigate and Remedy Discriminatory Voting Practices.

DOJ cannot use Title III to seek records for a purpose unrelated to investigating discrimination. Title III's "purpose is to enable the Attorney General to determine whether [CRA] suits or similar actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. It is *not* to assess general compliance with the NVRA or HAVA, which were enacted long after the CRA—nor, for that matter, to enforce immigration laws.

Title III's history makes its purpose clear. Confronted with pervasive discrimination against Black voters in the South, Congress enacted the Civil Rights Act of 1957, which "authorized the Attorney General to seek injunctions against public and private interference with the right to vote." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). But local officials quickly adapted. They heightened registration and ballot-access restrictions against Black voters by imposing literacy

tests and other discriminatory election devices, vacated public offices to evade injunctions against proper party defendants, and enacted laws requiring the destruction of election records. *See United States v. Mississippi*, 380 U.S. 128, 132-33 (1965) (passage of Mississippi literacy tests in 1954); *United States v. Alabama*, 362 U.S. 602, 603-04 (1960) (per curiam); *Hearing on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 9 (1960) ("CRA Hrg.") (statement of Lawrence Walsh, Deputy Att'y Gen. of the U.S.) (referring to Alabama's destruction of records 30 days after denying applicant's registration).

At the same time, federal efforts to enforce civil rights laws and halt these discriminatory practices faltered because the 1957 Act provided no pre-litigation mechanism to compel production of voting records necessary to prove discrimination. U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights* 131 (1959). Recognizing this problem, the U.S. Commission on Civil Rights called on Congress to amend the 1957 Act to provide federal "access to registration records and [to] requir[e] their retention," citing the lack of such authority as the reason DOJ failed to secure an indictment against Louisiana's illegal purging of 6,100 Black voters. *Id.* DOJ echoed the Commission's concern. The Deputy Attorney General testified before Congress that "[i]n many cases, discrimination in registration can be proved only by comparing the records of [Black] applicants with those of white applicants," and that "the Government

lack[ed] any procedure by which to compel the production of these records *before suit is filed*." CRA Hrg. 9 (statement of Lawrence Walsh, Deputy Attorney General of the United States).

Congress enacted the Civil Rights Act of 1960 to solve this problem. The CRA authorized the government to "inspect voting records" provided it had "reasonable grounds for belief that certain voters [were] being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962). Title III thus acted as a "necessary supplement" to the 1957 Act, helping to "implement federal enforcement" of prohibitions against discrimination in voting. H.R. Rep. No. 86-956 at 26 (1959); *see Katzenbach*, 383 U.S. at 313; *Pa. State Conf. of NAACP Branches v. Sec'y Commw. of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024) ("[T]he Civil Rights Act of 1960 . . . sought to protect minorities' access to the polls in States with a 'pattern or practice' of denying the right to vote on racial grounds.").

### C. DOJ Fails to Articulate an Acceptable Purpose for Its Records Demand.

#### 1. DOJ Cannot Use Title III to Compel Sensitive Voter Data for Its Admitted Purposes of Federal List Maintenance and Voter-Fraud Enforcement.

In its Title III demands, Complaint, and Opening Brief, DOJ has stuck to the same disingenuous party line: that the purpose of its Title III demand is to "ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." JA42, 50, 222; Appellant's Br. 36. But DOJ's own statements and legal

filings reveal a different purpose. A May 12, 2026 Memorandum Opinion from DOJ's Office of Legal Counsel ("OLC") explains that the true purpose of DOJ's Title III demands is and has been "to remove those who are ineligible to vote from [states'] rolls—whether due to illegal presence in this country or otherwise," and to "refer [those individuals] for prosecution." OLC Memo 5. If there were any doubt regarding this purpose, DOJ put it to rest in a parallel case in another circuit, where it confirmed an intention to "work with the Social Security Administration (SSA)" to use states' unredacted voter rolls to identify and target "fraudulent or noncitizen registrations." Mot. to Expedite 17-18, *United States v. Simon*, No. 26-2679 (8th Cir. Aug. 21, 2026). And in a court hearing on a similar Title III demand for Rhode Island's voter roll, DOJ represented that it "intend[s]" to "send [unredacted voter rolls] to Homeland Security . . . to see if any of these people are not citizens," and that DOJ "cannot promise what [] other agenc[ies] will or will not do" with voter data. Mar. 26, 2026 Hr'g Tr. 65:1-6, 66:2-14, *United States v. Amore*, No. 25-cv-00639 (D.R.I.).[6]

This purpose cannot justify DOJ's demand. Neither the NVRA nor HAVA authorizes or contemplates federalizing list maintenance, and neither authorizes immigration enforcement, voter-fraud enforcement, or criminal law enforcement.

---

[6] https://www.brennancenter.org/media/15517/download/ri-hearing-transcript-2026-03-26.pdf.

Nor do these activities pertain to Title III's purpose of investigating and remedying voter discrimination. *See Powell*, 379 U.S. at 58 (courts must not enforce production demands "issued for an improper purpose"). DOJ cannot weaponize a statute Congress enacted to facilitate the right to vote to instead disenfranchise voters it deems "ineligible."

Glossing over its proliferation of public admissions, DOJ reiterates its supposed rationale that it was really seeking to determine Pennsylvania's compliance with the NVRA and HAVA. Appellant's Br. 40-42. But courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019). The Court need not accept the government's pretextual justification here. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1184, 1186 (C.D. Cal. 2026) (holding DOJ put forward "pretextual investigative purpose" for requesting voter rolls, and that DOJ was engaged in "nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database"); *United States v. Oregon*, 828 F. Supp. 3d 1092, 1106 (D. Or. 2026) (noting that since *Weber*, DOJ "has continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists"). From the start, DOJ's true purpose has always been to create a federal system for voter eligibility verification and to use that voting data to advance its agenda of exerting unauthorized federal control over elections—just as the

President's executive orders demanded. *See Common Cause*, 2026 WL 3033772, at *4 (discussing origin of DOJ "Voter List Maintenance Policy"); *see supra* at 5-8.

The Administration has seized opportunities to coerce states to cede control of the list maintenance process. Case in point: then-Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz tying reduction in ICE activity to access to Minnesota's full, unredacted voter rolls. Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota 2 (Jan. 24, 2026), https://perma.cc/34U4-3SK3. In the former Attorney General's words, "allow[ing] the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law" was one of a few "common sense solutions" to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota." *Id.* at 3.

DOJ does not contest the substance of these statements, which government officials themselves made publicly. Instead, DOJ quibbles with certain other secondary sources cited by some parties and the district court and asserts that courts cannot examine the sincerity of its claimed purpose on a motion to dismiss. Appellant's Br. 36-38. But when the Secretary and Common Cause Intervenors raised these sources before the district court, JA139; Doc. 116, at 6-13, DOJ failed to object to their use below, arguing instead that the statements of basis and purpose in its demand letter cannot be questioned and that the Federal Rules of Civil

Procedure did not apply at all, JA181. DOJ has thus forfeited any evidentiary or Rule 12-based objection to the sources on which the district court relied. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007).

Regardless, the NAACP Intervenors here rely solely on executive orders, agency memoranda and documents, and in-court statements *from the government itself* to prove the same point. *See supra* at 5-7, 22-23, 25. And DOJ's true purpose and policy has been examined extensively. *See Common Cause*, 2026 WL 3033772, at *4-7. Such "matters of public record," the authenticity of which DOJ cannot dispute, are judicially noticeable and so may be considered at the motion-to-dismiss stage. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Against this discordant backdrop, DOJ's current claim that the purpose of its demand is "ascertain[ing] Pennsylvania's compliance with . . . the NVRA and HAVA," Appellant's Br. 36, is not credible.

Because neither conducting federal voter-list maintenance nor expanding federal control over elections has anything to do with Title III's lawful purpose, DOJ used ascertaining compliance with the NVRA and HAVA "as a smokescreen for its true objective[s]." *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *6-7 (D. Colo. Jan. 5, 2026). As the district court recognized, this deception is an "abuse of the Court's process" and yet another reason to deny DOJ's demand. *Id.* (denying DOJ's administrative subpoena because "the government's

proffered purpose for the Subpoena—investigating potential violations of the FDCA—is pretext[]" for "its true objective"); *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026) (denying DOJ administrative subpoena issued for pretextual purpose); *see* JA3-4 (dismissing in part on this basis); *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *1-2 (W.D. Pa. Dec. 24, 2025) (noting "no reported federal decision has ruled in the government's favor" to authorize DOJ administrative subpoenas that "carr[y] more than a whiff of ill-intent").

### 2. Title III Does Not Authorize DOJ to Compel Sensitive Voter Data to Ascertain Compliance with the NVRA and HAVA.

Even assuming DOJ's stated rationale were genuine and that the information sought were relevant to that rationale, "ascertaining compliance" with the NVRA and HAVA falls outside Title III's authority. Compliance with the NVRA's and HAVA's general list maintenance requirements is unrelated to Title III's purpose of investigating and remedying voter discrimination. DOJ cannot bridge this gap by rebranding the evaluation of compliance with the NVRA and HAVA as "protect[ing] voting rights." Appellant's Br. 34. Congress enacted Title III to help solve the particular problem of voting discrimination, not to hand DOJ roving audit power related to every statute touching elections—and certainly not audit authority related to the NVRA and HAVA, which have their own enforcement provisions that do not authorize DOJ to compel sensitive information. *See* 52 U.S.C. §§ 20507(i), 20510(a), 21111; *Rumely*, 345 U.S. at 47.

Moreover, even if Title III could be used for purposes beyond combating voter discrimination, DOJ's demand for sensitive personal information would still lack a proper purpose.

***First***, DOJ's stated purpose is improper because the information it seeks—*sensitive voter information* about *every registered voter in Pennsylvania*—is not "relevant" "to [that] purpose." *Wentz*, 55 F.3d at 208. Drivers' license and Social Security numbers, especially in a static voter roll, offer no insight into whether Pennsylvania is complying with the NVRA's and HAVA's procedural list maintenance requirements, so it is improper to require Pennsylvania to hand over that data in violation of state law. *See EEOC v. Kronos Inc.*, 620 F.3d 287, 301-02 (3d Cir. 2010).

Nowhere in its requests to Pennsylvania did DOJ explain why determining Pennsylvania's compliance with the NVRA and HAVA would require hoovering up the sensitive data of every Pennsylvania voter. In its opening brief, DOJ now claims it needs this information because it "allows the Department to assess whether Pennsylvania's list contains duplicate registrations, voters who have died or changed residence, and voters who were never eligible to register." Appellant's Br. 42. DOJ makes this argument for the first time on appeal. Before the district court, DOJ claimed that the voter roll is needed to determine whether Pennsylvania was complying with a procedural requirement in HAVA to ensure that applicants include

their driver's license number or SSN4s in their registration applications. *See* JA179-80.[7] The Court should not consider a new argument at this late stage. *See Fletcher-Harlee Corp.*, 482 F.3d at 253.

In any event, this rationale also is not sufficiently "relevant" to any "legitimate" investigatory "purpose" under the NVRA and HAVA, *Wentz*, 55 F.3d at 908, because those statutes impose *procedural* requirements. A static snapshot of a Pennsylvania's voter roll says nothing about whether Pennsylvania is satisfying the NVRA's requirement to "conduct a general program" that "makes a *reasonable* effort to remove the names of ineligible voters" from the voter lists. 52 U.S.C. § 20507(a)(4). A snapshot also does not indicate if Pennsylvania, under HAVA, performs "list maintenance" "in accordance with the provisions of the [NVRA]" such that registered voters appear on state voter rolls and unregistered and ineligible

[7] Even this argument, which DOJ repeats glancingly on appeal (Br. 42), misreads the underlying statutes and fails to justify DOJ's request. DOJ did not mention below that applicants who lack both a driver's license and a Social Security number may still register; the state must simply "assign the applicant a number" for identification purposes, meaning states will always provide an identification number of some sort to every voter. 52 U.S.C. § 21083(a)(5)(A)(ii); *see* JA180; *but see* Appellant's Br. 7 (recognizing this provision). And Pennsylvania could still show DOJ that it has met this requirement without divulging voters' most private information by, for instance, telling DOJ the percentage of registrants who provided a Social Security number or driver's license, what percentage of registrants required a state-created identification number, and whether any registrants lack any identification number in the database at all. Or it could provide its voter list with each registrant's identification number redacted to indicate that such a number is present for each voter on the list.

voters are "removed" from state voter rolls, 52 U.S.C. § 21083(a)(2)(A)(i), (a)(2)(B). Nor is the voter roll a list of who was or was not permitted to vote in any particular election.

Indeed, because the NVRA only requires a "rational and sensible" effort to remove ineligible voters, even finding any arbitrarily significant number of ineligible voters inadvertently left on the rolls would not prove a violation. *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026); *see id.* at 628 (holding that plaintiff's "calculation of 27,000 deceased voters on the state's voter rolls" did not prove that Michigan violated NVRA's list-maintenance requirement). Thus, even crediting DOJ's claim, the sensitive data it requests is not "relevant" to its claimed investigative "purpose." *Wentz*, 55 F.3d at 908.

***Second***, DOJ cannot use Title III to intrude on the states' constitutional authority over their own elections. The Constitution grants states primary authority over elections, and grants Congress authority in that realm. U.S. Const., art. I, § 4, cl. 1. In exercising that authority in the NVRA and HAVA, Congress affirmed that *states* are in charge of maintaining voter rolls. 52 U.S.C. § 20507(a)(3)-(4) (NVRA provisions discussing how "each State" will remove voters from their rolls); *id.* § 21083(a)(1)(A) (HAVA provision that "each State" must implement and maintain a centralized voter registration list meeting certain requirements). Indeed, HAVA

leaves "[t]he specific choices on the methods of complying with the requirements of this subchapter . . . to the discretion of the State." *Id.* § 21085. DOJ can enforce some provisions of HAVA, *id.* §§ 20510(a), 21111, but it cannot "inspect Pennsylvania's unredacted" voter roll to conduct list maintenance itself, Appellant's Br. 58—let alone force states to remove certain voters from their rolls. *See Common Cause*, 2026 WL 3033772, at *25 ("Consistent with our constitutional structure, the NVRA and HAVA place *states* at the helm of maintaining their voter rolls."). Nor can DOJ use Title III to hijack states' constitutional authority over elections or voter registration procedures Congress delegated to the states.

**3. DOJ's Proffered Purpose Does Not Justify Seeking the Sensitive Voter Data that Remains the Only Information in Dispute.**

Even if DOJ could use the CRA to investigate suspected violations of the NVRA or HAVA, production of Pennsylvania voters' most sensitive personal information (*e.g.*, SSN4s or driver's license numbers) is not reasonably related to investigating such a violation or otherwise ensuring compliance with those statutes. The Secretary has offered to provide DOJ a copy of Pennsylvania's voter list without disclosure of private information that would chill Pennsylvanians' willingness to register and vote. *See* JA225-26; *infra* Part V. "As its text makes clear, NVRA was intended as a shield to protect the right to vote, not as a sword to pierce it." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017). DOJ cannot invoke the NVRA or HAVA to force states to divulge private voter data.

No federal court has ever held that determining compliance with list maintenance requirements justifies disclosure of the types of personal information DOJ now seeks. Even in *Lynd*, the 1962 Fifth Circuit case that required disclosure of information under the newly enacted Title III, the court swept away officials' logistical objections by making clear that it was "not discussing confidential, private papers and effects[, but] rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. And the courts that have since analyzed this question have unequivocally rejected DOJ's position. *See, e.g.*, *Oregon*, 828 F. Supp. 3d at 1107-08; *Weber*, 816 F. Supp. 3d at 1183.

DOJ has given no reason to chart a new path. Nothing in the text of Title III, especially when measured under the principles of conflict preemption, prohibits states from redacting sensitive voter information as required by state law, especially when such data are not needed for DOJ's proffered investigative purpose. *See* 52 U.S.C. §§ 20701, 20703; *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 158 (3d Cir.) (obstacle preemption applies only where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"), *amended on denial of reh'g*, 110 F.4th 612 (3d Cir. 2024); *see also Voter Ref. Found. LLC v. Torrez*, 160 F.4th 1068, 1082-83 & n.14 (10th Cir. 2025) (holding that, while NVRA's disclosure provision preempts certain state-law disclosure restrictions, "the NVRA does not prohibit" states from "redact[ing]

appropriate personal information"); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561 n.3 (M.D. Penn. 2019) ("[NVRA's] Disclosure Provision does not guarantee unfettered access to confidential sensitive information.").

This is unsurprising. This Court and others routinely order the redaction of private personal information from records produced when disclosure of that information is not necessary. *See EEOC v. Univ. of Pa.*, 850 F.2d 969, 982 (3d Cir. 1988) (vacating order to release nonredacted records and holding redactions of identifying information in records sought by Title VII investigation may be justified); *see also EEOC v. Univ. of Notre Dame Du Lac*, 715 F.2d 331, 337 (7th Cir. 1983) (ordering redactions of identifying information); *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 103-04 (5th Cir. 1992) (inviting target of government document request to "seek the assistance of the courts when necessary to protect" confidential information).

DOJ's proffered purpose—the desire to ascertain NVRA and HAVA compliance—is a particularly weak justification for seeking sensitive voter data, since those data are not available under the NVRA and HAVA themselves. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (courts must interpret statutes in light of "subsequent statutes" that "more specifically address the topic at hand"). Congress enacted the NVRA and HAVA to set minimum requirements for voting systems and voter registration lists. 52 U.S.C.

§§ 20501, 21081-21083. If any states are "noncompliant" with these requirements, they can be enforced "via attorney general suits," *Am. C.R. Union*, 872 F.3d at 185, for declaratory and injunctive relief, 52 U.S.C. §§ 20510(a), 21111. But while DOJ can bring civil actions to *enforce* the NVRA and HAVA, Congress did not include in either statute the pre-enforcement power to mandate disclosure of unredacted state voter rolls.

Rather, Congress included a more limited public-disclosure provision in the NVRA. *See* 52 U.S.C. § 20507(i). All courts have interpreted this provision *not* to prevent states from withholding the very sensitive voter data DOJ seeks here. *See, e.g.*, *Torrez*, 160 F.4th at 1083 n.14; *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021); *see also Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 679 (9th Cir. 2026) (holding that NVRA's disclosure provision does not mandate disclosure of state voter rolls at all), *pet. for cert. docketed*, No. 26-98 (U.S. Jul. 22, 2026). So even if determining compliance with the NVRA's and HAVA's procedural requirements necessitated identification of individual voters on states' voter lists, such review has occurred without disclosure of such sensitive personal data. *E.g.*, *Bellows*, 92 F.4th at 43, 56 (authorizing request for state's voter rolls under NVRA's disclosure provision while allowing state to redact voters' private data).

HAVA, meanwhile, does not even have a disclosure provision. *See* 52 U.S.C. §§ 20901-21145. As HAVA's list-maintenance requirements expressly incorporate and build on the NVRA's, Congress did not need to create a separate disclosure provision in HAVA. *See* 52 U.S.C. § 21083(a)(2)(A)(i), (a)(4). Nor does HAVA alter or enhance the NVRA's existing disclosure or list maintenance requirements. *See Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations.").

DOJ cannot use the NVRA and HAVA to justify its request, only to then conduct an end-run around the NVRA's subsequent, NVRA-tailored disclosure provision.

## IV. DOJ DOES NOT STATE A BASIS FOR ITS DEMAND.

DOJ separately fails to satisfy Title III's "basis" requirement. DOJ's demands to the Secretary provided no *basis* for an investigation into voter discrimination in Pennsylvania, or even an investigation into potential violations of the NVRA or HAVA. DOJ's failure to do so, by itself, precludes its claim. *See* 52 U.S.C. § 20703.

### A. Title III Requires that DOJ Provide a Factual Basis for Its Demand.

DOJ asserts that its "*purpose*" to "ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA," JA222, also supplies the "*basis*" for its request. Appellant's Br. 28. DOJ provides no affirmative argument for this position, merely "[a]ssuming that a legal basis is sufficient." *Id.* This drive-

by statement, with no accompanying legal authority, does not preserve DOJ's argument on appeal. *See Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017). Nor did DOJ raise such an argument below. Therefore, DOJ has "doubly forfeited" any claim that *basis* refers to a legal, as opposed to a factual, basis for DOJ's request. *Stoffa v. Zaken*, 2025 WL 2159094, at *3 (3d Cir. July 30, 2025).

Regardless, the basis and purpose requirements are distinct. Courts must "give effect, if possible, to every clause and word of a statute." *United States v. Jackson*, 964 F.3d 197, 203 (3d Cir. 2020). That is especially true where, as here, Congress connected *basis* with *purpose* using the word "and," whose "usual meaning . . . is conjunctive." *Reese Bros., Inc. v. United States*, 447 F.3d 229, 235-36 (3d Cir. 2006); *accord United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021). The terms "purpose" and "basis" must therefore be read separately, "consistent with their ordinary meaning" at the time of passage. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018).

The *purpose* of a records request is the legal rationale for or goal of the investigation—*e.g.*, determining whether a state is complying with the CRA. *See Purpose*, *Black's Law Dictionary* (4th rev. ed. 1968) (defining "purpose" as "[t]hat which one sets before him to accomplish; an end, intention, or aim, plan, project"); *Purpose*, *Webster's New International Dictionary* 2018 (2d ed. 1955) (defining

"purpose" as "the end or aim" sought); *supra* Part III(A)-(B). The *basis* is DOJ's grounds to believe there is a potential legal violation to which the records are relevant. *See Basis*, *Black's*, *supra* (defining "basis" as the "[f]undamental principle; groundwork; support; foundation"); *Basis*, *Webster's*, *supra*, at 227 (defining "basis" as "[t]hat which supports or sustains"). The function of these requirements is to enable the court to examine whether the stated purpose and basis of the request are consistent with the statute.

The statute's plain language makes this clear. In addition to connecting the two requirements by the conjunctive "and," Title III instructs that written demands contain "*the* basis and *the* purpose therefor." 52 U.S.C. § 20703. Congress's use of the definite article "establish[es] . . . that [the] following noun or noun equivalent"—here, "the" basis and "the" purpose—are "definite" concepts, not two different ways of saying the same thing. *See Nielsen*, 586 U.S. at 408. As such, Title III's text requires that DOJ assert both. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction" that no "word shall be [interpreted as] superfluous, void, or insignificant").

DOJ again attempts to rely (Br. 28-29) on *Lynd* to seek immunity from review of the basis for its request. As the Secretary's brief discusses, *Lynd* does not state the modern standard for review of government information requests under statutes worded like Title III. *See also supra* Part II. In any event, the cited statement in *Lynd*

was dicta. That case enforced Title III demands where the government's written requests specified that they were "based upon *information in the possession of the Attorney General* tending to show that *discriminations on the basis of race or color* have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 229 & n.6. In short, they provided exactly what DOJ was required—and has failed—to show here: a *factual* basis to investigate claims of racial discrimination. The court also itself held that "[t]he record establishes without contradiction that the" demands "adequately stated the basis and the purpose therefor," *id.* at 229—so the court's language about unreviewability was unnecessary to its ruling.

### B. DOJ Did Not State a Valid Factual Basis for its Request.

DOJ's letters to Pennsylvania seeking its voter roll contained *no basis whatsoever* for the request. DOJ's first letter to Pennsylvania discussed compliance with HAVA and asked questions about the Commonwealth's list-maintenance policies but did not seek its voter roll. JA194-96. DOJ's next letter cited the disclosure provision of the NVRA—which, as noted, does not require disclosure of voters' sensitive data—and requested the voter roll without any factual basis. *See* JA210. Its third letter merely stated DOJ's purported legal authorities for requesting records, stated that it sought "*all fields*" of Pennsylvania's voter list, and stated the supposed legal "purpose" for the request. JA221-23. At no time did DOJ state a

factual basis for its request. This alone was sufficient grounds to dismiss DOJ's complaint. *See* 52 U.S.C. § 20703.

DOJ now argues (Br. 29) that "potential anomalies in Pennsylvania's responses" to a governmental survey about its list-maintenance processes provided the requisite basis. But DOJ never raised this argument before the district court. Indeed, it made no response below to defendants' argument that it failed to provide an adequate factual basis for its request, except to claim that courts cannot review its stated basis. *See* JA178-81.[8] DOJ cannot attempt to conjure a factual basis for the first time on appeal. *See Fletcher-Harlee Corp.* 482 F.3d at 253.

Regardless, as already discussed, this supposed basis does not relate to a legitimate purpose for investigation under the statute, as Title III can only be used to investigate potential discrimination in voting. *See supra* Part III.A-B. And even if DOJ's rationale could be considered, Pennsylvania's survey responses did not provide a factual predicate for seeking individual voters' data. The "potential anomalies" DOJ notes (Br. 29) were a proper subject for written questions to Pennsylvania, which the Secretary amply answered. *See* JA215-18. As the Secretary's responses showed, DOJ's questions betrayed numerous misunderstandings about the survey data—for instance, treating survey questions

[8] DOJ never stated *any* basis for its request—a circumstance that even DOJ's star case, *Lynd*, suggested would make judicial review appropriate. *See* 306 F.2d at 226.

about the number of duplicate applications Pennsylvania *received* as though they were about how many duplicate *registrations* ended up on its voter rolls. JA215-17. Therefore, no basis existed for believing Pennsylvania could be violating the NVRA or HAVA. At no point, either in its back-and-forth with Pennsylvania or in its briefing below or in this Court, did DOJ explain how Pennsylvania's responses were inadequate, much less why any inadequacy would necessitate reviewing the Commonwealth's voter rolls rather than simply asking clarifying questions.

## V. DOJ'S INTERPRETATION OF TITLE III PRESENTS SIGNIFICANT FIRST AMENDMENT CONCERNS THAT MUST BE AVOIDED.

The Court should reject DOJ's interpretation of Title III for yet another reason: allowing DOJ to compel sensitive voter data for *any* purpose it asserts and without *any* factual basis to suspect a legal violation will chill voter participation and "raise[] doubts of constitutionality in view of the prohibition on the First Amendment." *Rumely*, 345 U.S. at 46 (courts should interpret statutes to "avoid[] a serious constitutional doubt").

### A. DOJ's Interpretation of Title III Presents Significant First Amendment Concerns.

Laws that compel the disclosure of private information violate the First Amendment when they "discourage[] participation" in the electoral process. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 200 (1999). For example, in *Buckley*, the Supreme Court held a Colorado law that compelled individuals

circulating ballot-initiative petitions to wear name badges violated the First Amendment because it "discourages participation in the petition circulation process." *Id.* Similarly, in *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993), the Fourth Circuit struck down a Virginia statute that compelled individuals registering to vote to publicly disclose their Social Security numbers because "the possibility of a profound invasion of privacy when exercising the fundamental right to vote" would deter voters, *id.* at 1354; *see id.* at 1352, 1354 (holding that by "condition[ing] the right to vote on . . . the public disclosure of a would-be voter's SSN," the Virginia statute "substantially burdened" the right to vote because it was "eminently reasonable" "not to provide [a] SSN" and thus not participate in the voting process).[9] As a general matter, if there is "a reasonable probability that the compelled disclosure of personal information will subject [individuals] to threats, harassment, or reprisals from either Government officials or private parties," then "those resisting

[9] The court in *Greidinger* noted in dicta that the statute might not burden the right to vote if Social Security numbers were disclosed to the Virginia state government. *See* 988 F.2d at 1354 n.10. But constitutionality depends on whether disclosure will discourage participation in elections, *Buckley*, 525 U.S. at 200, or otherwise significantly burden the right to vote, *Greidinger*, 988 F.2d at 1354. In *Greidinger*, the court had no reason to believe that Virginia would misuse voters' information. *See id.* at 1352-54. Here, by contrast, DOJ openly admits it seeks voters' data to federalize elections and investigate purported voter fraud. OLC Memo 5; Mot. to Expedite, *Simon*, *supra*, at 17-18. This prospect chills the right to vote in the same way the public disclosure of Social Security numbers did in *Greidinger*. *See infra* at 42-49.

disclosure can prevail under the First Amendment." *John Doe No. 1 v. Reed*, 561 U.S. 186, 200-01 (2010) (denying First Amendment challenge only because plaintiffs provided "scant evidence or argument" that disclosure would subject them to harm).

DOJ's interpretation of Title III presents the same First Amendment concerns as in *Buckley* and *Greidinger*. Functionally, if DOJ can issue a Title III demand without *any* factual basis and for *any* purpose, then it can use the statute to collect and investigate voters' sensitive data whenever, wherever, and for whatever purpose it pleases. The prospect of such unbounded and arbitrary disclosure would discourage participation in the voter registration process just as Colorado's name badge requirement "discourage[d] participation in the petition circulation process." *Buckley*, 525 U.S. at 200.

Like Colorado's requirement, an unbounded Title III demand would put voters at risk of "harassment." *Id.* at 198. An administration could share compelled voter data with state and local partners to facilitate targeted voter roll purges, signature-match challenges, or eligibility investigations. Unscrupulous officials could themselves dox voters or allow others to do so. Even if the government did not abuse its authority, the threat would persist. DOJ's interpretation of Title III thus "stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote, canceling

their registration, or skip casting a ballot because they are worried about how their information will be used." *Weber*, 816 F. Supp. 3d at 1176 (warning of the electoral chilling effect of DOJ's voter roll demands in California).

This chilling effect is not speculative. Pennsylvania voters have every reason to fear that DOJ will weaponize their sensitive data against them, particularly those in vulnerable minority communities already targeted in other ways. DOJ itself telegraphed this intent when it asked OLC whether it could use voters' sensitive information "for the purpose of investigating *voter fraud*," OLC Memo 6, a familiar refrain the Administration deploys when targeting political adversaries and racial or ethnic minorities, *see, e.g.*, *Addressing Risks from Chris Krebs and Government Censorship*, The White House (Apr. 9, 2025)[10] (instructing the Attorney General to investigate former head of the Cybersecurity and Infrastructure Security Agency for "inappropriately . . . dismissing" purported reports of "widespread election malfeasance and serious vulnerabilities with voting machines"); Tierney Sneed et al., *Inside the Justice Department's Pursuit of Trump's 2020 Election Fraud Fixations*, CNN (May 28, 2026)[11] (FBI agents sought interviews with Milwaukee election officials to find evidence of voter fraud).

---

[10] https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship.

[11] https://www.cnn.com/2026/05/28/politics/inside-justice-department-2020-election-fraud.

The premise of that justification is demonstrably false: voter fraud in American elections is vanishingly rare. *See, e.g.*, *United States v. California*, 2026 WL 3268272, at *7 (9th Cir. Oct. 30, 2026) (crediting district court findings "that the risks that noncitizens are voting are, at best, uncertain, and also tempered by California's established voter-eligibility procedures"); Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024).[12] Yet the Administration has persistently and falsely claimed otherwise, and threatened to prosecute purported perpetrators. *See, e.g*., Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026)[13] (describing President Trump's "often repeated—and equally often debunked—claims of widespread election fraud").

Continuing "voter fraud" investigations of non-crimes necessarily target voters who cast *lawful* ballots. This is yet another reason why DOJ's interpretation presents constitutional concerns. *See Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) ("investigations premised solely upon legal activity are the very type of 'fishing' expeditions" the Supreme Court has found unconstitutional). DOJ unreasonably suggests (Br. 42) that mere clerical errors in the form of duplicate

[12] https://www.npr.org/2024/10/11/nx-s1-5147732/voter-fraud-explainer.

[13] https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html.

registrations create both sufficient factual basis to establish a failure to reasonably maintain voter rolls and probable cause for fraud investigations. Such investigations chill political and expressive rights. Voters may reasonably fear that DOJ will use Title III to cross-reference their sensitive voter data with other federal databases and race to prosecute, all in furtherance of DOJ's proclaimed purpose of "investigating voter fraud." OLC Memo 5-6. That fear is especially potent given that minority communities historically may favor the Democratic Party, and voter-registration and primary-voting records would reveal individual voters' preferences. Against this backdrop of threats and overblown accusations, voters have good reason to fear that granting federal agencies unfettered access to sensitive voter data could enable the Administration to target them as perceived political opponents and direct investigations against them. That prospect chills the exercise of the franchise.

Just as chilling is DOJ's promise to use voters' sensitive information to "identify illegal aliens" and "refer [them] for prosecution," *id.* at 5, a threat that affects more than just the undocumented. The Administration's supposedly revamped tool for identifying noncitizens—the Systematic Alien Verification for Entitlements ("SAVE") program—consistently misidentifies U.S. citizens as noncitizens. *See* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and

Texas Tribune (Feb. 13, 2026);[14] *see also* Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025).[15] These flaws are built into the system itself, which was never intended for widescale immigration enforcement. Indeed, as a 2018 report by the U.S. Commission on Civil Rights noted, "SAVE is not a comprehensive list of U.S. Citizens," "[i]t is not updated to include all naturalized citizens, and it does not include derivative citizens born to U.S. parents outside the country." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 148 (2018);[16] *see also N.C. State Bd. of Elections*, 996 F.3d at 261 (describing a North Carolina report finding that "SAVE information had a high rate of inaccuracy").

An unbounded Title III would thus force eligible voters to weigh the risk that registering to vote—and thereby disclosing sensitive information to the federal government, not just to state election authorities under a guarantee of confidentiality—will trigger immigration enforcement, which DOJ has now openly

[14] https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion.

[15] https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters.

[16] https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf?inline=1.

admitted is a purpose for which it is using voter data.[17] OLC Memo 5. It would also force eligible voters to weigh the risk of investigation for other possible violations of law, or the investigation of their closest relations and associations. Indeed, derived citizens, naturalized citizens, and relatives of recent immigrants may not register to vote for fear that DOJ will share their home address and other personal information with DHS for use in immigration raids targeting their relatives and close associates. In other words, voters would face the same poisoned choice the Fourth Circuit condemned in *Greidinger*: register to vote and risk "misuse" of your sensitive information or abandon the right to vote entirely. 988 F.2d at 1352–55. Forcing voters to make that choice would "discourage[] participation" in the electoral process and violate the First Amendment. *Buckley*, 525 U.S. at 200.

DOJ's attempt to use Title III to seize Pennsylvania voters' sensitive information has already provoked alarm among leaders of local and national civil rights organizations, who warn that the prospect of government misuse of their members' information alone is enough to chill civic participation. *See, e.g.*, JA60-62, JA65-66. That chilling effect is especially potent for NAACP members and voters of color in Pennsylvania. *See* JA60-62; Br. of Amicus Curiae the United Black

[17] This is a particularly potent risk for recently naturalized citizens and derived citizens, who will not appear as citizens in the SAVE program that DHS and DOJ use to determine whether to initiate an immigration enforcement action. *See supra* at 45-46.

Agenda at 18-22, *United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. Feb. 26, 2026), ECF No. 78. These communities have long been the target of government officials hostile to their mission and advocacy efforts. JA61. In light of that history, NAACP's members have concrete and legitimate reason to fear that DOJ would wield an unconstrained Title III as a tool for retaliation—especially toward members who may hold political views and engage in civic activities the current Administration disfavors. *See, e.g.*, Office of Public Affairs, *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering*, U.S. Dep't of Just. (Apr. 21, 2026);[18] *see also supra* at 42-44. Some, no doubt, would vote anyway. But others, understandably, would stay home.

That the NVRA and HAVA already require voters to disclose sensitive information to states is not reason to disregard the chilling effect described above. Congress's decision, in enacting HAVA, to authorize *states* to receive sensitive voter data as part of the voter registration process, *see* 52 U.S.C. § 21083(a)(5)(B)(i), says nothing about whether Title III—an entirely different statute—authorizes the *federal government* to compel sensitive information for any purpose it pleases. Nor is there

[18] https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-poverty-law-center-wire-fraud-false-statements-and ("'The SPLC is manufacturing racism to justify its existence,' said Acting Attorney General Todd Blanche.").

any reason to treat the two disclosures the same way. HAVA only requires partial Social Security numbers on state voter registration forms so that state election officials can "verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B)(i). There is no evidence Pennsylvania shares that information with law enforcement, and thus no threat that providing it will "discourage[] participation" in the electoral process. *Buckley*, 525 U.S. at 200. DOJ, by contrast, has acknowledged openly that it seeks Pennsylvania voters' sensitive voter data "to remove those who are ineligible to vote from [Pennsylvania's voter] roll[]" and "refer [those individuals] for prosecution." OLC Memo 5; *accord* Mot. to Expedite, *Simon*, *supra*, at 17-18. And it has argued continuously in courts around the country that DOJ can compel voters' sensitive data for any purpose it wants, without limitation. *E.g.*, Appellant's Br. 40-41. Allowing DOJ to compel sensitive voter information so that it may investigate voters' immigration and voting status poses a far greater burden on First Amendment rights than authorizing state election officials to collect that information as part of their states' confidential and routine voter registration processes.

### B. Constitutional Avoidance Principles Demand that the Court Avoid DOJ's Interpretation.

Because DOJ's interpretation of Title III would present serious questions as to its constitutionality in circumstances like this one, the Court must avoid it. *See Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 246 (3d Cir. 2008) ("[W]e must avoid

construing a statute in a manner that 'would raise serious constitutional problems,' if an alternative interpretation that would avoid such problems is 'fairly possible.'"). Here, that means rejecting DOJ's interpretation of Title III and dismissing DOJ's complaint. *See Rumely*, 345 U.S. at 46 (construing statute authorizing investigation of "all lobbying activities" to reach only "representations made directly to the Congress" to avoid "doubts of constitutionality in view of . . . the First Amendment").

## VI. DOJ CANNOT DEMAND ELECTRONIC COPIES OF RECORDS UNDER TITLE III

This Court also can affirm the district court's decision because DOJ has not established a right to the electronic copy it seeks, when Title III provides for a more limited alternative. Title III mandates only that records "be made available for inspection, reproduction, and copying at the principal office of such custodian" of the records. 52 U.S.C. § 20703. The statutory text thus only guarantees DOJ in-person inspection and copying in Harrisburg, Pennsylvania. Yet DOJ insists that the Secretary must provide the state voter list electronically. JA53 ¶¶ 48-50; JA55-56. He need not. Making records available for inspection, reproduction, and copying under Title III does not require that states "turn [unredacted] records over in electronic format." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1332-33, 1335 (11th Cir. 2024) (rejecting electronic disclosure requirement under analogous NVRA disclosure provision); *Boockvar*, 431 F. Supp.

3d at 561 n.3 (similar); *see also Bellitto*, 935 F.3d at 1202 ("Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations.").

## CONCLUSION

DOJ has exploited Title III of the Civil Rights Act of 1960 in an unprecedented, nationwide effort to impose, rather than eliminate, barriers to voting. Title III does not authorize DOJ to make sweeping records requests for millions of Americans' sensitive personal data for a pretextual purpose, with no factual basis for the demands, in a manner that will chill political speech and activity. For the foregoing reasons, the Court should affirm.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Noah B. Bokat-Lindell*

ROBERT WEINER
LEAH FRAZIER
GILLIAN CASSELL-STIGA
CATHERINE MEZA
GRACE THOMAS
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

ANTON METLITSKY
ANDREW FRACKMAN
REEMA SHAH
O'MELVENY & MYERS LLP
1301 Ave. of the Americas, Ste. 1700
New York, NY 10019
Tel: (212) 326-2000

NOAH BOKAT-LINDELL
O'MELVENY & MYERS LLP
1625 Eye Street NW, 10th Floor
Washington, DC 20006
Tel: (202) 383-5300

*Counsel for Intervenors-Appellees National Association for the Advancement of Colored People, Pennsylvania State Conference of the NAACP, and Stacey Taylor*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,949 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

2. In accordance with Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of this Brief of Appellees-Intervenors as electronically filed is identical to the text of the brief to be submitted in paper copies.

3. In accordance with Third Circuit Local Appellate Rule 31.1(c), I further certify that the electronic submission was subjected to a virus scan using Windows Defender, version 1.343.445.0, and that no virus was detected.

Dated: November 20, 2026 *<u>/s/ Noah B. Bokat-Lindell</u>*
Noah B. Bokat-Lindell

# CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of November, 2026, the foregoing brief was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system. Paper copies of the foregoing will be filed with the Clerk in accordance with the Local Rules.

Dated: November 20, 2026

*/s/ Noah B. Bokat-Lindell*
Noah B. Bokat-Lindell

**CERTIFICATE OF BAR MEMBERSHIP**

I hereby certify that I am a member in good standing of the bar of the Court of Appeals for the Third Circuit.

Dated: November 20, 2026

/s/ *Noah B. Bokat-Lindell*
Noah B. Bokat-Lindell