UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 26-2684

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

SECRETARY OF STATE FOR THE COMMONWEALTH OF PENNSYLVANIA,
*Defendant-Appellee,*

PENNSYLVANIA ALLIANCE FOR RETIRED AMERICANS; NICHOLAS MASTON; GREGORY PERRY; TODD THATCHER; JOEL DICKSON; TRISHA KENT; LIOR STERNFELD; JOHN THOMPSON; LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA; COMMON CAUSE; NATIONAL ASS'N FOR THE ADVANCEMENT OF COLORED PEOPLE; PENNSYLVANIA STATE CONFERENCE OF THE NAACP; STACEY TAYLOR,
*Intervenor-Appellees*.

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:25-cv-01484

---

# BRIEF OF *AMICI CURIAE* LOCAL ELECTION OFFICIALS AND LOCAL GOVERNMENTS IN SUPPORT OF APPELLEES AND IN SUPPORT OF AFFIRMANCE OF DISMISSAL

---

Alison L. Stohr
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
alison.stohr@publicrightsproject.org
(510) 738-6788
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF INTEREST .......................................................... 1

SUMMARY OF ARGUMENT........................................................... 3

ARGUMENT............................................................................... 4

I. COURTS MUST BE ABLE TO ASSESS ELECTION-RELATED RECORDS REQUESTS, INCLUDING DEMANDS UNDER THE CIVIL RIGHTS ACT .......................... 4

A. The district court properly exercised its authority to evaluate the DOJ's demand....................................................... 5

B. Without judicial review, local election offices and their attorneys could be overwhelmed by records demands............... 7

II. THE DOJ DID NOT PROVIDE A SUFFICIENT BASIS FOR ITS DEMAND......................................................................... 12

A. The efforts of state and local election officials in Pennsylvania meet the list maintenance requirements of the NVRA and HAVA. .......................................................... 13

B. In the experience of local election officials, EAVS data points are not evidence of unreasonable list management practices.......................................................................... 18

CONCLUSION......................................................................... 24

APPENDIX A – LIST OF *AMICI* ..................................................... 26

# TABLE OF AUTHORITIES

## CASES

*Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175 (3d Cir. 2017) 15

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) 14, 15

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) 6

*Pub. Int. Legal Found. v. Benson*, 136 F.4th 613 (6th Cir. 2025) 14, 17

*United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026) 7, 10

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) 4, 7

*United States v. California, --- F.4th ---*, No. 26-7070, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) 12

*United States v. California, --- F.Supp.3d ----*, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026) 12

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026) 23

*United States v. Henderson*, No. 26-cv-00166, 2026 WL 3181405 (D. Utah Oct. 23, 2026) 6

*United States v. Hobbs*, No. 3:25-cv-6078-KKE, 2026 WL 2833713 (W.D. Wash. Sept. 22, 2026) 23

*United States v. Powell*, 379 U.S. 48 (1964) 6

*United States v. Simon*, No. 25-cv-03761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) 4

*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) 6

## STATUTES

25 P.S. § 3050 19

25 P.S. § 3146.2b(c) 19

25 P.S. § 3150.12b(a) 19

25 Pa. C.S. § 1505(b) 19

25 Pa.C.S. § 1329 19

4 Pa. Code § 183 11

52 U.S.C. § 20501(b)(2) 1

52 U.S.C. § 20501(b)(4) 1

52 U.S.C. § 20507(a)(4) 15, 16

52 U.S.C. § 20507(c)(1) 17

52 U.S.C. § 20507(c)(2) 25

52 U.S.C. § 20507(d)(1) 18, 25

52 U.S.C. § 20703 14

52 U.S.C. § 20705 6

52 U.S.C. § 20922 21

52 U.S.C. § 21083(a)(4) 15, 16

**CONSTITUTIONAL PROVISIONS**

Pa. Const. art. I, § 5 1

Pa. Const. art. VI, § 3 1

**OTHER AUTHORITIES**

Ali Swenson & Gary Fields, T*he Justice Department Seeks Voter and Election Information from at Least 19 States*, AP Finds, AP News (Aug. 3, 2025) 3

Charles Minshaw et al., *Read the Annotated FBI Affidavit Used to Seize Fulton Ballots*, Atlanta Journal-Constitution 12

Electronic Registration Info. Ctr., *How ERIC Works* 18

Electronic Registration Info. Ctr., *Technology & Security Overview* 18

Jan Murphy, *County Election Offices in Pa. Challenged by Surge of Voting Record Requests*, Williamsport Sun-Gazette (Sept. 21, 2022) 8

Jane C. Timm, *Amateur Fraud Hunters Bury Election Officials in Public Records Requests*, NBC News (Feb. 12, 2022) 8

Jude Joffe-Block & Miles Parks, *DHS Acknowledges the Noncitizen Numbers It Touted on Voter Rolls Were Inflated*, NPR (Aug. 25, 2026) 10

Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (July 8, 2025) 21

Kate Brumback, *FBI Agents Execute Search Warrant at Elections Office near Atlanta*, PBS (Jan. 28, 2026) 12

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. 3

Kyle Yoder & April Tan, *Election Officials & the Misuse of Public Records Requests*, Ctr. for Election Innov. & Rsch. (June 2024) 9

Letter from Adrian Fontes, Ariz. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen. (Aug. 29, 2025) 24

Letter from Cathy Garrett, Wayne Cnty. Clerk, to Harmeet Dhillon, Assistant Att'y Gen. (Apr. 27, 2026) 13

Letter from Harmeet Dhillon, Assistant Att'y Gen., to Cathy Garrett, Wayne Cnty. Clerk (Apr. 14, 2026) 13

Letter from Karen Sellers, Exec. Dir. of the Ky. State Bd. of Elections, to Michael Gates, Dep. Assistant Att'y Gen. (Aug. 29, 2025) 24

Letter from Michael Gates, Dep. Assistant Att'y Gen., to Jared

DeMarinis, State Adm'r of Elections (July 14, 2025) 23

Letter from Michael Gates, Dep. Assistant Att'y Gen., to Shirley Weber, Cal. Sec'y of State (July 10, 2025) 23

Letter from Michael Gates, Dep. Assistant Att'y Gen., to Susan Beals, Va. Comm'r of Elections (July 15, 2025) 23

Letter from Shirley Weber, Cal. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen. (Sept. 12, 2025) 23

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026) 10

Pa. Dep't of State, *Administration of Voter Registration in Pennsylvania: 2024 Annual Report to the Pennsylvania General Assembly* (June 30, 2025) 11

Paul Gronke et al., Elections & Voting Info. Ctr., *Today's Election Administration Landscape: Findings from the 2024 Elections & Voting Information Center* (Feb. 2025) 9

U.S. Election Assistance Comm'n, *2024 Archived Resources* 24

U.S. Election Assistance Comm'n, *2024 Election Administration and Voting Survey (EAVS) Guide to Using the Data Collection Templates* (Nov. 5, 2024) 23

U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests* (Mar. 2023) 9

U.S. Election Assistance Comm'n, *EAVS 2022-24 Crosswalk* 24

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025) 21, 25, 28

## STATEMENT OF INTEREST

*Amici* are local election officials and local governments representing fifty-one jurisdictions, including ten signatories in Pennsylvania and more who administer elections in one of the many other states that have received demands for sensitive voter data under the Civil Rights Act of 1960 ("CRA") from the U.S. Department of Justice ("DOJ") since 2025.[1] They sign this brief to support affirmance of the District Court's dismissal. Local election officials are responsible for administering local, state, and federal elections in their respective jurisdictions. *Amici* from Pennsylvania are sworn to defend their residents' rights to a free and equal election, Pa. Const. art. I, § 5; Pa. Const. art. VI, § 3, and all *amici* endeavor to fulfill the purposes of the National Voter Registration Act ("NVRA"), which include "ensur[ing] that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4), and "enhanc[ing] the participation of eligible citizens as voters," *id.* § 20501(b)(2).

Local election officials perform list maintenance activities that support the accuracy of the state voter registration lists and submit responses to the Election Administration and Voting Survey ("EAVS") about those activities. Because the

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is attached as Appendix A. Local election officials signing this brief do so in their individual capacities.

DOJ is investigating those activities and is citing those survey responses in support of its investigations in Pennsylvania and other states, *amici* write to provide context and accurate information about those processes using their combined decades of election administration experience across the country.

*Amici*'s interest in this case is also heightened due to the federal government's repeated attempts to insert itself into elections administration—an activity that is the responsibility of the states. The federal government has shown that it seeks to impose its own authority over voter rolls by attempting to coerce local and state election officials to remove certain voters it has deemed ineligible, without regard for the statutory limitations on list maintenance that were designed to protect eligible voters from removal. And it has attempted to use CRA demands in unprecedented ways to investigate other aspects of local election administration. *Amici* have a strong interest, given the potential downstream consequences, in ensuring the Court understands the facts of election administration, what constitutes proper list maintenance, and the purported basis of this lawsuit.

## SUMMARY OF ARGUMENT

In 2025, the DOJ began to send letters to local and state governments across the country demanding nonpublic copies of voter rolls with sensitive voter data.[2] The letters to states changed over time, but they generally asked questions about state compliance with federal voter list maintenance laws, suggested that certain data points from the EAVS 2024 Comprehensive Report indicated potential noncompliance with these laws, and demanded copies of the state voter registration lists ("SVRLs"), including sensitive unique identifiers for voters.[3] Eventually, the government began to cite the CRA to support its authority to demand the records. Most states refused, and the DOJ sued thirty states and Washington, D.C. as a result. Every district court—currently twenty-eight in total—that has evaluated motions to

---

[2] Ali Swenson & Gary Fields, *The Justice Department Seeks Voter and Election Information from at Least 19 States, AP Finds*, AP News (Aug. 3, 2025), https://perma.cc/X4YV-XRDS (documenting initial wave of letters to states demanding voter rolls and noting that several counties received similar requests from the DOJ).

[3] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Nov. 10, 2026), https://perma.cc/W4PX-9MAS (storing copies of the correspondence between states and the DOJ).

dismiss has dismissed the cases, and one circuit court has affirmed dismissal.[4]

The district court's decision here, which joined the chorus of dismissals by its sister courts, should be upheld. *Amici* write to illustrate two important points for the Court to consider regarding the impact of its decision on election administration. First, contrary to the DOJ's assertions that judicial review is limited, courts are not barred from evaluating records demands under the CRA. It is important that they do so; otherwise, state and local election officials in Pennsylvania and across the country would have no recourse for burdensome demands that request sensitive information like voter records. Second, investigations into list maintenance without a good reason are not a valid use of the Attorney General's record request authority under the CRA. Even if they were, the EAVS data cited by the DOJ as a basis for its investigations cannot be a proper basis for those demands.

## ARGUMENT

### I. COURTS MUST BE ABLE TO ASSESS ELECTION-RELATED RECORDS REQUESTS, INCLUDING DEMANDS UNDER THE CIVIL RIGHTS ACT

[4] *United States v. Simon*, No. 25-cv-03761, 2026 WL 2389778, slip op. at *1 (D. Minn. Aug. 17, 2026) ("[F]ederal courts in Michigan, Oregon, California, Maryland, Colorado, Wisconsin, Maine, Arizona, Rhode Island, Massachusetts, New Mexico, Illinois, New Jersey, Kentucky, Virginia, New York, New Hampshire, Connecticut, Pennsylvania, West Virginia, the District of Columbia, and Nevada have dismissed Plaintiff's claims demanding production of unredacted statewide voter registration lists."); *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) (affirming dismissal).

Courts have a vital role to play in adjudicating novel records requests for some of our most sensitive voting data. Local election officials regularly receive records requests, but the volume and scope of those requests has increased in recent years. In the face of this increased volume, *amici* and other local election officials rely on courts to evaluate less-routine requests and identify the limits of production obligations. Courts serve as arbiters of the validity of novel elections-related records requests, thereby affirming limits on the obligations of local election officials. Without those limits, local election officials would be hard-pressed to find time to fulfill their day-to-day election administration responsibilities while also responding to every single onerous or frivolous records request. Additionally, requests for records by today's DOJ are increasingly tied to unprecedented attempts to intervene in state and local list maintenance responsibilities, which interfere with local election officials' ability to administer elections.

In this case, the District Court properly exercised its authority to decide whether the DOJ's CRA demand was valid. If, as the DOJ contends, "district courts lack the authority to second-guess the DOJ's asserted basis and purpose for its demand," DOJ Br. at 13, local election officials like *amici* would be subject to sweeping demands by the federal government or others, and could be left without recourse if those demands are overbroad, unduly burdensome, or unlawful.

### A. The district court properly exercised its authority to evaluate the DOJ's demand.

The statute governing demands under the CRA grants district courts the jurisdiction to compel records demanded by the Attorney General "by appropriate process." 52 U.S.C. § 20705. The DOJ argues that such process does not include "litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge" the purpose of a CRA request, and relies on *Kennedy v. Lynd* to do so. DOJ Br. at 25 (citing 306 F.2d 222, 226 (5th Cir. 1962) (holding that the CRA created a "special statutory proceeding" to consider CRA demands)). The DOJ is incorrect. Not only is *Lynd* out-of-circuit, it also quickly became outdated. Two years after *Lynd*, the Supreme Court analyzed a similar statute using the term "appropriate process" and found that because the statute did not "specify[] the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). "Nothing in the text of Title III [of the CRA] requires a special statutory proceeding or any abbreviated procedures," *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026), so *Powell* should control.

In parallel cases concerning voter roll demands in other states, courts considering the DOJ's assertion that they may not review the sufficiency of its stated basis and purpose for CRA demands have roundly rejected that assertion. *See United States v. Henderson*, No. 26-cv-00166, 2026 WL 3181405, at *5 n.55 (D. Utah Oct. 23, 2026) (collecting cases). And the only circuit court to have issued a decision in

these cases agrees that *Powell* and related decisions "carve[] out a role for the courts in reviewing civil investigative demands like the government's." *Benson*, 179 F.4th at 483 n.2. This Court should do the same.

### B. Without judicial review, local election offices and their attorneys could be overwhelmed by records demands.

Local election officials must have judicial review available to help them determine when a request is unlawful. *Amici* and other local election officials in Pennsylvania and around the country have seen the number of records requests expand exponentially in recent years and have had to increase time spent on record production as a result.[5] Minimal or no judicial review of demands under the CRA would translate to a drain on local election office resources, as they would be forced to respond to "fishing expeditions" like the DOJ's efforts to review state voter rolls. *United States v. Amore*, 831 F. Supp. 3d 149, 158 (D.R.I. 2026) (characterizing the parallel CRA demand for voter roll information in Rhode Island as a "fishing expedition"). Such expansive requests have caused cascading problems for voters when requestors keen on finding problems have misunderstood election records.

---

[5] *See, e.g.,* Jane C. Timm, *Amateur Fraud Hunters Bury Election Officials in Public Records Requests*, NBC News (Feb. 12, 2022), https://perma.cc/3UZT-NFWQ (one Pennsylvania election director reported spending a quarter of his time on records requests); Jan Murphy, *County Election Offices in Pa. Challenged by Surge of Voting Record Requests*, Williamsport Sun-Gazette (Sept. 21, 2022), https://perma.cc/KN37-V655 (multiple Pennsylvania counties reported significant challenges preparing for elections under the burden of increased records requests).

The recent surge of election record requests has consumed considerable time and resources for *amici*. Local election offices nationwide have had to devote days or weeks of staff time to accommodate requests or even had to hire additional staff.[6] National surveys of local election officials reflect that the increased volume of records requests is a trend nationwide.[7] Depending on the type of record requested, production can sometimes be a complicated process requiring multiple teams and diversion from other election administration work. For example, a request for records that do not already have a clear public inspection or production procedure in place could involve consulting legal counsel to determine whether a response would violate privacy laws, converting files from formats used in voting software to shareable documents, monitoring public inspection sessions, devoting time to

---

[6] Kyle Yoder & April Tan, *Election Officials & the Misuse of Public Records Requests*, Ctr. for Election Innov. & Rsch. (June 2024), https://perma.cc/SW8C-THLP.

[7] *See* Paul Gronke et al., Elections & Voting Info. Ctr., *Today's Election Administration Landscape: Findings from the 2024 Elections & Voting Information Center* 20 (Feb. 2025), https://perma.cc/E9SQ-V498 ("[O]ver 60% of requests are unduly burdensome and impede the ability of [local election officials] to perform their duties."); U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests*, at 1 (Mar. 2023), https://perma.cc/6HT3-MJXD ("Since the 2020 election cycle, election officials have reported an increase in public records requests, requiring time and resources added to their official duties of administering elections. Flooding elections offices with public records requests may impact key service delivery during critical periods of an election cycle when staff time and resources are already stretched thin.").

physical reproduction like copying and printing, applying redactions to protect voter privacy, answering questions about what the records mean, and responding to incidents arising from misinformation about the records.[8]

The DOJ's nationwide efforts to obtain sensitive voter data from states through the CRA serve as an example of why courts should be available to limit CRA requests. In addition to demanding copies of state voter rolls with sensitive voter data, the DOJ's demand letters sought voluminous information from state election officials, including in Pennsylvania, with a tight deadline. JA194–96. While Pennsylvania and other states devoted significant time and effort to responding, the

[8] The voter intervenors in this case demonstrate where that misunderstanding can go terribly wrong. They describe their experience in 2024, when their eligibility to vote was challenged by Pennsylvania Fair Elections after that group conducted "flawed attempts to analyze and match data" from Pennsylvania voter rolls and external sources. Br. in Supp. of Joinder and Mot. to Dismiss of Maston et al., Dkt. 116 at 8–9. Some *amici* from Pennsylvania had to devote significant time and resources during a very busy period of election administration to evaluating and responding to those challenges, which were a confused attempt to do work that state and local election officials already do to maintain voter rolls. Notwithstanding that result, the federal government later gave a leader of this effort a role in its own voter roll investigations. Jude Joffe-Block & Miles Parks, *DHS Acknowledges the Noncitizen Numbers It Touted on Voter Rolls Were Inflated*, NPR (Aug. 25, 2026), https://perma.cc/S9ES-BKVB (reporting that Heather Honey, who ran Pennsylvania Fair Elections and is now an official at DHS, told Nevada election officials that her team had analyzed the state rolls and were certain that a group of 185 were not citizens); Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026), https://perma.cc/9JVJ-J4YD (reporting that Nevada investigated the 185 voters that Honey identified as noncitizens, and found that they were all, in fact, citizens).

DOJ appears to have sent the demand letters after minimal due diligence. Many of the DOJ's questions about Pennsylvania's process for list maintenance could be answered in the Pennsylvania Department of State's ("PA DOS") annual report to the state legislature on voter registration. *See* JA203 (citing to the report in Pennsylvania's response to the DOJ, and the detailed regulations governing the use of the statewide voter registration system, 4 Pa. Code § 183). For example, the DOJ asked Pennsylvania to "[d]escribe the process by which voters who have moved outside the Commonwealth and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A)." JA202. But this process was already described in detail in the publicly-available annual report.[9]

After watching the DOJ make demands of other election officials across the country, many local election officials fear that they will be the next to receive time-consuming and unlawful CRA requests. This fear is reasonable; in the course of the correspondence with PA DOS, the DOJ asked for names of all local election officials

---

[9] Pa. Dep't of State, *Administration of Voter Registration in Pennsylvania: 2024 Annual Report to the Pennsylvania General Assembly* (June 30, 2025), https://perma.cc/4UC3-2RBK. This pattern of demanding answers before doing any research seems to have persisted in all of the voter roll demands; in a hearing in the parallel case in Rhode Island, "the United States proposed that its unprecedented demands for unredacted voting rolls are the result of its 'trust but verify' approach to the states' list maintenance efforts." *Amore*, 831 F. Supp. 3d at 154.

responsible for list maintenance in the state. JA210. And the DOJ has recently attempted to wield CRA demand authority far beyond its historical use. In October 2025, after the Georgia State Election Board issued a subpoena to Fulton County demanding election records, the DOJ issued a CRA demand letter to the county for the same materials demanded by the subpoena.[10] Additionally, in April 2026, the DOJ issued a CRA demand letter to Wayne County, Michigan demanding "all ballots (including absentee and provisional), ballot receipts, and ballot envelopes" from the November 2024 federal election.[11]

In conclusion, local election officials have already been under strain to meet records requests from the public as misinformation about election administration has spread over the past few years, and the federal government's approach has increased those pressures on time and resources. Instances of the DOJ's recent invocation of

---

[10] After Fulton County fought that demand letter in court but before the court could rule on the matter, the FBI obtained a search warrant and seized those materials. Kate Brumback, *FBI Agents Execute Search Warrant at Elections Office near Atlanta*, PBS (Jan. 28, 2026), https://perma.cc/N2MA-667Y. The factual basis of the affidavit used to obtain the search warrant has been disputed. Charles Minshaw et al., *Read the Annotated FBI Affidavit Used to Seize Fulton Ballots*, Atlanta Journal-Constitution, https://perma.cc/E6Y3-58L3. Ten months later, the DOJ has not brought any charges, despite the unprecedented nature of the seizure.

[11] Letter from Harmeet Dhillon, Assistant Att'y Gen., to Cathy Garrett, Wayne Cnty. Clerk (Apr. 14, 2026), https://perma.cc/8N63-T7Q3. In that case, Wayne County responded that it was not the custodian of the records the DOJ sought. Letter from Cathy Garrett, Wayne Cnty. Clerk, to Harmeet Dhillon, Assistant Att'y Gen. (Apr. 27, 2026), https://perma.cc/YZH5-ZJWX.

the CRA to demand records in novel circumstances suggest that this approach will continue.[12] An opinion from this or any court that opens the door to unreviewable CRA demands could result in an unsustainable burden on local election officials. *Amici* and other local election officials should not be forced to drop day-to-day election administration duties to respond to unrestricted records requests from the DOJ.

## II. THE DOJ DID NOT PROVIDE A SUFFICIENT BASIS FOR ITS DEMAND

*Amici* agree with the district court's conclusion that the DOJ did not supply a sufficient purpose for its request. JA3. But even if it had, the CRA requires both a "basis and purpose," JA3 (citing 52 U.S.C. § 20703), and the DOJ did not provide a

[12] The DOJ's attempts to involve itself in state and local list maintenance activities beyond records demands have also resulted in a burden on local election officials. Just weeks away from the 2026 general election, the DOJ presented California and Los Angeles County with a list of around 20,000 individuals that the DOJ claimed were "likely" noncitizens and demanded that L.A. County segregate mail ballots that it received from them. *United States v. California*, --- F.4th ---, No. 26-7070, 2026 WL 3212945, at *1–2 (9th Cir. Oct. 26, 2026). While the demand would require L.A. County to "create wholly new procedures while the election is already underway," the DOJ sued to attempt to enforce its own list maintenance preferences anyway. *United States v. California*, --- F.Supp.3d ----, 2026 WL 3252428, at *13 (C.D. Cal. Oct. 28, 2026). Courts found the DOJ's lists to be questionable, 2026 WL 3252428 (C.D. Cal.), and rejected its efforts to seek relief, 2026 WL 3212945, at *6 (9th Cir.). Following the election, the DOJ voluntarily dismissed the case, Notice of Voluntary Dismissal, *United States v. California*, No. 2:26-cv-12025, Dkt. 180 (C.D. Cal. 2026), but not before causing a significant disruption to L.A. County's election administration efforts.

sufficient basis. The DOJ's citations to certain EAVS responses as evidence of Pennsylvania's questionable list maintenance practices, DOJ Br. at 29, were misleading in two ways. First, local election officials in Pennsylvania meet and exceed the federal list maintenance standard, which is one that requires a reasonable process—not perfect data. And second, the DOJ's assertions regarding EAVS data illustrate nothing more than a lack of understanding of election administration on the DOJ's part. Neither the EAVS data the DOJ presents as a basis for its demand nor the evidence it seeks in the sensitive voter data have any bearing on whether states meet their reasonable-effort requirements under the NVRA and HAVA.

### A. The efforts of state and local election officials in Pennsylvania meet the list maintenance requirements of the NVRA and HAVA.

Nationwide, local election officials like *amici* participate in state list maintenance programs that the DOJ allegedly seeks to enforce, and they are familiar with the federal statutory requirements: state programs must consist of reasonable efforts to remove certain categories of ineligible voters. HAVA requires "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A). Section 8(a)(4) of the NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the registrant's death or change of address. *Id.* § 20507(a)(4).

Circuit courts evaluating these provisions have found that they require state list maintenance programs to do only what the statutes plainly say: make a "reasonable effort." 52 U.S.C. §§ 21083(a)(4), 20507(a)(4). The Sixth Circuit recently offered a construction that such reasonable effort is demonstrated by "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026) The Eleventh Circuit has similarly explained, "The failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a local election office's list maintenance] effort unreasonable." *Bellitto v. Snipes*, 935 F.3d 1192, 1207 (11th Cir. 2019) (discussing a county's process for identifying and removing deceased voters from rolls).

Circuit courts have also read list maintenance requirements to distinguish between mandatory and permissive removal programs, with death and change-of-address being the only circumstances requiring mandatory removal. Considering litigation over list maintenance associated with criminal convictions, this Court distinguished between mandatory and permissive programs: "[T]he mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away. Removal due to criminal conviction is not included on this list of mandatory purging, and we will not amend the statute by reading that requirement into its text when

Congress obviously chose not to do so." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182–83 (3d Cir. 2017). And another circuit court explained that "the statutory language is plain and unambiguous and requires the states to employ a general program of list maintenance that makes a reasonable effort to remove voters based *only* on account of death or change of address" and not on other ineligibility factors. *Snipes*, 935 F.3d at 1201 (emphasis added).

Local and state election officials in Pennsylvania operate list maintenance programs of these two mandatory programs—concerning voters who have died or moved away—that exceed statutory requirements. During their correspondence over voter rolls and list maintenance, PA DOS described those processes to the DOJ in great detail. JA203. As to voters who have moved, Pennsylvania starts with the NVRA's safe harbor process[13] and then exceeds it: counties send notices to voters who have filed a change-of-address form with the United States Postal Service and follow NVRA procedures for removing those voters if they do not respond to the

[13] The NVRA's safe harbor provision outlines an option for states to meet their change-of-residence list maintenance obligations by establishing a program under which election officials send confirmation notices to voters who appear to have moved based on the information contained in the National Change of Address ("NCOA") database maintained by the United States Postal Service. 52 U.S.C. § 20507(c)(1); *Snipes*, 935 F.3d at 1203 (defining the provision as a "safe harbor"). Under this statutory safe harbor process, election officials may then remove voters who filed a change-of-address form only if they (1) do not respond to that notice; and (2) have not voted for two consecutive general elections for federal office following the failure to respond to a confirmation notice. 52 U.S.C. § 20507(d)(1).

notice or confirm the move. Participation in Electronic Registration Information Center ("ERIC")[14] supplements that NVRA safe harbor procedure by identifying when voters registered in Pennsylvania have registered to vote in another state that participates in ERIC. JA203. To meet their obligations as to deceased registrants, election officials coordinate with the Pennsylvania Department of Health ("PA DOH"). JA201. PA DOH updates a death report twice a month, and PA DOS sends that report to county registration commissions through the state voter registration system. *Id*. Counties may supplement that report with reviews of obituaries and probate records. 25 Pa.C.S. § 1505(b).

Beyond their reasonable-effort list maintenance requirements due to death and change of address, counties also engage in other list maintenance practices. They send "five-year notices" to registrants who have not voted or otherwise had contact with the Elections Board within the past five years; registrants are marked inactive and set for cancellation if they do not respond. JA203. The state's participation in

---

[14] ERIC is a platform that compares voter registration, licensing, and identification data to generate list maintenance reports to support member states' list maintenance programs by identifying voters who may have moved or passed away, locating potential duplicate registrations, and flagging potential illegal voting activity. Electronic Registration Info. Ctr., *How ERIC Works*, https://perma.cc/XXX9-SK7P. ERIC keeps data secure by utilizing cryptographic hashes that convert sensitive information into a string of what appear to be random characters; this encryption ensures that sensitive voter data is protected within the participating states' own environments. Electronic Registration Info. Ctr., *Technology & Security Overview*, https://perma.cc/W8SS-64AL.

ERIC assists it in other list maintenance efforts, like reducing duplicate records. *Id.* And while its voter challenge processes have recently been subject to overuse by those who challenge large groups of voters they have never personally met,[15] the Pennsylvania Election Code provides multiple avenues for voters, candidates, and election workers to challenge voter eligibility based on personal knowledge. *See* 25 Pa.C.S. § 1329 (registration challenges); 25 P.S. § 3146.2b(c) (absentee ballot application challenges); *id.* § 3150.12b(a) (mail ballot challenges); *id.* § 3050 (Election Day challenges). In sum, Pennsylvania's list maintenance program is more than reasonable.

The DOJ posits that it cannot evaluate whether Pennsylvania is complying with the NVRA without access to sensitive voter information. DOJ Br. at 29–30. But the NVRA requires "serious attempt[s]" to follow list maintenance processes that are "rational and sensible," *Benson*, 136 F.4th at 625, not an unspecified threshold of a particular rate of error. By the statutory standards, the processes that Pennsylvania described *are* rational and sensible attempts. Even if the DOJ's purpose of list maintenance evaluation were sufficient for a CRA demand—and it is not—the records it seeks would not answer the question of whether state list maintenance programs meet the statutory reasonableness standards established by

---

[15] *See supra* note 8 (describing mass challenges to voters based on third-party analysis).

HAVA and the NVRA.

### B. In the experience of local election officials, EAVS data points are not evidence of unreasonable list management practices.

Individual EAVS data points without any context cannot serve as a proper basis for a CRA request. In its demand letters, and now in its briefing, the DOJ calls certain data points from the 2024 EAVS report "potential anomalies" that may serve as the "factual basis" of its CRA request. DOJ Br. at 29. But these data points are not a sufficient basis to suspect unreasonable list maintenance practices in Pennsylvania or other states targeted with these CRA demands.

The EAVS is a survey of state and local election officials conducted on a biennial basis by the U.S. Election Assistance Commission ("EAC"). HAVA created the EAC to "serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections." 52 U.S.C. § 20922. The EAC uses data from the EAVS to fulfill that mandate. EAVS data can be helpful in identifying general trends in voting, but its individual data points cannot be used effectively to draw conclusions about the sufficiency of specific states' list maintenance practices. The EAVS 2024 Comprehensive Report explains its purpose as "produc[ing] a general understanding of core aspects of the election process and the management challenges faced by election officials," helping the EAC determine how to better support election officials and voters, and informing lawmakers and the public about the impact of

voting laws, among other purposes.[16] The Congressional Research Service's overview of that report reminds readers that "some data may not be straightforwardly comparable across years, states, or localities."[17] In other words, while useful in many ways, selective EAVS data points alone do not provide a fulsome picture of list maintenance activities.

One reason for this difficulty in drawing comparisons across EAVS data is the simple fact that elections in the United States are administered under state law at the local level. Differences across states and local jurisdictions, and changes in election laws over time across all fifty states, are not perfectly captured in the standardized question and response categories of a nationwide survey. The survey might be written in ways that local election officials across different jurisdictions will interpret differently, and indeed is regularly updated to accommodate new voting practices and prevent confusion across jurisdictions. For example, the DOJ asked states about confirmation notices, asking why certain states sent them out at

---

[16] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report*, at i (June 2025), https://perma.cc/55CV-FA8J.

[17] *See* Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings*, at 2 (July 8, 2025), https://perma.cc/J85C-AHNV.

rates above or below the national average, and why some states had missing data.[18] But the EAVS instructions for confirmation notice questions told local election officials to omit data if they did not collect it, and several states followed that instruction.[19] Additionally, multiple states told the DOJ that conflicting instructions about the notices confused officials, which could account for variation in data across states.[20] Indeed, the EAC later clarified these questions about the rate of

---

[18] *See* Letter from Michael Gates, Dep. Assistant Att'y Gen., to Jared DeMarinis, State Adm'r of Elections, at 2 (July 14, 2025), https://perma.cc/5L3G-MFUM (inquiring about why the state sent confirmation notices at a rate "well above" the national average"); Letter from Michael Gates, Dep. Assistant Att'y Gen., to Susan Beals, Va. Comm'r of Elections, at 2 (July 15, 2025), https://perma.cc/XGP3-S58A (inquiring about why the state sent confirmation notices at a rate "well below the national average"); Letter from Michael Gates, Dep. Assistant Att'y Gen., to Shirley Weber, Cal. Sec'y of State, at 2 (July 10, 2025), https://perma.cc/WP5W-HVJ3 (inquiring about "missing" data).

[19] Letter from Shirley Weber, Cal. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen., at 5–6 (Sept. 12, 2025), https://perma.cc/VCL5-ZFA3 ("Letter from California") (noting that the instructions for the confirmation notice questions make it clear that if jurisdictions do not track an item, they may indicate on the EAVS that data is not available) (citing U.S. Election Assistance Comm'n, *2024 Election Administration and Voting Survey (EAVS) Guide to Using the Data Collection Templates* (Nov. 5, 2024), https://perma.cc/MW5B-WSSY).

[20] *See, e.g.*, Letter from Adrian Fontes, Ariz. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen., at 2 (Aug. 29, 2025), https://perma.cc/5AUR-SN85 (describing how different counties understood the question about confirmation notices differently and how that confusion impacted the data); Letter from Karen Sellers, Exec. Dir. of the Ky. State Bd. of Elections, to Michael Gates, Dep. Assistant Att'y Gen., at 2 (Aug. 29, 2025), https://perma.cc/RG58-SGTZ (identifying conflicting definitions of "confirmation notices" in the EAVS instructions).

confirmation notices sent to registered voters in the following EAVS survey.[21]

Additionally, deviations from the average in EAVS data can be explained by a difference in the timing of the nationwide survey and the timing of state election administration. For example, the DOJ asked states about low rates of removals from voter rolls, but the NVRA *requires* a waiting period of two federal elections after it appears that a registered voter may have moved before their registration may be cancelled—a delay of at least four years. 52 U.S.C. § 20507(d)(1). Additionally, the NVRA prohibits systematic removal of registrants during the ninety-day period before an election, which can add months to the prohibition on removal, or longer if a jurisdiction has a special election scheduled between primaries and general elections. *Id.* § 20507(c)(2). Clearly, data gaps caused by obvious and well-known timing issues[22] do not amount to evidence of unreasonable list maintenance practices

---

[21] U.S. Election Assistance Comm'n, *EAVS 2022-24 Crosswalk*, at row 139, https://perma.cc/33V5-NWGD. As the "Crosswalk" spreadsheet is described on the EAC's "2024 Archived Resources" page, it "documents changes that have been made to the EAVS questions between 2022 and 2024." U.S. Election Assistance Comm'n, *2024 Archived Resources*, https://perma.cc/A4X8-EH3J.

[22] The DOJ should be aware of this potential for delay, because the 2024 EAVS report that the DOJ used to identify its EAVS "anomalies" flags this issue specifically. *See EAVS 2024 Comprehensive Report*, *supra* note 16, at 131 ("[D]ata on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include registrants who are no longer eligible to vote in that state but who have not been removed from the voter lists because the removal process laid out by the NVRA can take up to two election cycles to be completed.").

that would provide a sufficient basis for a CRA demand.

Beyond the EAVS data points themselves having limited value for drawing conclusions about the reasonableness of list maintenance practices, the DOJ's approach to identifying purported "anomalies" was flawed, seeming to assume the worst and ignore the explanations states provided. For example, in its brief, the DOJ suggests to this Court that Pennsylvania counties recording "either 0 or 1 transactions to remove duplicate registrants" is cause for concern, DOJ Br. at 29, but omits that PA DOS explained this data point when the DOJ asked about it in their correspondence leading up to this litigation. Specifically, PA DOS pointed out that strong efforts to prevent duplicate registrations at the point of registration can decrease removals for duplicate registrations. JA216. It explained that since it began participating in ERIC in 2020, the number of potential duplicate registrations decreased by more than 80%; so subsequent EAVS reports, including in 2024, will include fewer duplicate registration removals. JA216–17. In its brief, the DOJ also notes that the most common reason to send a confirmation notice in Pennsylvania was "Other," DOJ Br. at 29, as if that is suspicious, but the DOJ knows why this is the case: as PA DOS noted in the EAVS report itself, the highest number of transactions categorized as "other" represented pending applications. JA217.

The DOJ's overall national strategy of CRA demands also suggests that it did not conduct individualized research or take steps to find out more about state list

maintenance practices before suing. The DOJ has issued demands to most states, citing some EAVS data points that fell outside of the national average for a particular element of election administration. But naturally, every state will have some EAVS data points that are higher or lower than average, whether because of differences in state law, because the EAVS data collection period did not synchronize with the state's most relevant time period to identify useful data, or for some other reason. If an EAVS data point that is higher or lower than the average is considered an "anomaly" worth investigating, then every state will have some such "anomalies."

Finally, in the case of Pennsylvania and many other states that have been sued, the states *did* answer the DOJ's questions about list maintenance as related to specific EAVS data points. *See* JA215–18. The DOJ sued thirty states nonetheless, apparently finding none of the responses sufficient. When the DOJ now cites EAVS data as a "basis" for its demands, it is unclear why the context provided by the states' narrative responses was insufficient. Stranger still, the DOJ did not cite EAVS data—or any purported basis—at all when demanding some states' nonpublic voter rolls, *see, e.g.*, *United States v. Galvin*, 830 F. Supp. 3d 122, 129 (D. Mass. 2026) ("Here, the Attorney General offered no basis—none"), but the DOJ has maintained in at least one oral argument in the voter roll cases that the cases were all "factually indistinguishable," *United States v. Hobbs*, No. 3:25-cv-6078-KKE, 2026 WL 2833713, at *1 n.3 (W.D. Wash. Sept. 22, 2026). If cases where the DOJ cites EAVS

data are factually indistinguishable to the DOJ from cases where it is not, then it is not clear whether DOJ believes that its EAVS citations hold any meaning.

EAVS data is not useless. Election administrators and state policymakers can and do review the data to identify general trends and areas for improvement, and local election officials regularly work with the EAC to improve the quality of the collected data.[23] However, it is not useful as the sole basis for an investigation into sensitive voter information. The way that the DOJ has identified data points and interpreted variances across states as "anomalies" without seeming to review information provided by the states does not establish a valid basis for an investigation into list maintenance, even if such an investigation were for a purpose authorized by the CRA.

## CONCLUSION

The district court came to the correct conclusion that it had jurisdiction to determine whether the DOJ's demand was issued pursuant to a proper purpose, and that the DOJ's purported purpose of list maintenance enforcement cannot support a

[23] "From late 2021 to early 2022, the EAC convened a working group of state and local election officials to gather their insights on terms that needed updates, voter registration data collection practices, and potential revisions to survey questions [regarding voter registration practices]." *EAVS 2024 Comprehensive Report*, *supra* note 16, at 130.

demand under the CRA. For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Alison L. Stohr*
Alison L. Stohr
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788
alison.stohr@publicrightsproject.org

*Counsel for Amici Curiae*

## Appendix A – List of *Amici*

### Pennsylvania Local Election Officials and Local Governments

Allegheny County, Pennsylvania

Bucks County, Pennsylvania

Lisa Deeley
*City Commissioner and Vice Chair, City of Philadelphia, Pennsylvania*

Justin Douglas
*Commissioner and Chair, Dauphin County, Pennsylvania*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Neil Makhija
*Commissioner and Chair of the Board of Elections, Montgomery County, Pennsylvania*

James Sabatino
*Chair, Luzerne County Council, County of Luzerne, Pennsylvania*

Omar Sabir
*City Commissioner and Chair, City of Philadelphia, Pennsylvania*

David Voye
*Elections Division Manager, Allegheny County, Pennsylvania*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

### Local Governments Nationwide

City of Ann Arbor, Michigan

City of Boston, Massachusetts

Los Angeles County, California

King County, Washington

Milwaukee County, Wisconsin

City of Minneapolis, Minnesota

City of New Haven, Connecticut

Pima County, Arizona

City of Rochester, New York

San Diego County, California

City of San Diego, California

City of San Jose, California

Sonoma County, California

**Local Election Officials Nationwide**

Sandra Balz
*Administrative Clerk, Marathon County, Wisconsin*

Lisa Brown
*Oakland County Clerk/Register of Deeds, County of Oakland, Michigan*

Bill Burgess
*County Clerk, Marion County, Oregon*

Barb Byrum
*Ingham County Clerk, Ingham County, Michigan*

Juan Pablo Cervantes
*County Clerk, Recorder, & Registrar of Voters, County of Humboldt, California*

Mary R Clark
*Clerk, Delta Charter Township, Michigan*

Katharine Clark
*Santa Fe County Clerk, County of Santa Fe, New Mexico*

Rich Coglianese
*Board of Elections Member, Union County, Ohio*

Ellen Craig-Bragg
*City Clerk, Romulus, Michigan*

Jilline Dobratz
*City Clerk, City of West Bend, Wisconsin*

Eileen Giesbrecht Clerk
*Southfield Township, Michigan*

Jacob P Gonzales
*Chief Deputy Clerk, San Miguel County, Colorado*

Mary Hall
*Auditor, Thurston County, Washington*

Anjela Hamm
*Town Clerk, Town of Farmington, Wisconsin*

Victoria Houser
*City Clerk, Battle Creek, Michigan*

Nicole Hunt
*Clerk, Town of Pine Grove, Wisconsin*

Kristina Irwin
*Clerk/Treasurer, Village of Endeavor, Wisconsin*

Celestine Jeffreys
*Former Clerk, Green Bay, Wisconsin*

Lisa Lawitzke
*Clerk, Bellevue Township, Michigan*

Nicholas Lima
*Registrar / Director of Elections, City of Cranston, Rhode Island*

Dean C. Logan
*Registrar-Recorder/County Clerk, County of Los Angeles, California*

Daniel Loomis
*County Clerk, County of Douglas, Oregon*

Robin Major
*Elections Administrator, County of Monmouth, New Jersey*

John Myers
*Town Clerk, Town of Buxton, Maine*

Diane Nelson
*Clerk, Brule, Wisconsin*

Jake Quinn
*Board of Elections Member, Buncombe County, North Carolina*

Derrin E. Robinson
*County Clerk, County of Harney, Oregon*

Heather Suffron
*Clerk/Treasurer, Town of Manitowish Waters, Wisconsin*

Chris Walker
*County Clerk, Jackson County, Oregon*

Kenneth Warner
*Elections Commissioner, Cayuga County, New York*

Julie Wise
*Director, King County Elections, King County, Washington*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 3d Cir. L.A.R. 26.1.1, *Amici Curiae* disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of their stock.

Dated: November 20, 2026

*/s/ Alison L. Stohr*
Alison L Stohr

# CERTIFICATES

I, Alison Stohr, certify that:

1. I am a member of this Court in good standing;
2. Malware detection was run on this file and no virus was detected;
3. The text of this brief is identical to the text in paper copies that will be filed with the Court; and
4. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,248 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).
5. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

*/s/ Alison L. Stohr*
Alison L. Stohr
Public Rights Project

Dated: November 20, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Alison L. Stohr*
Alison L. Stohr
Public Rights Project

Dated: November 20, 2026